## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | |
|---|---|
| ORACLE AMERICA, INC.,<br>　　　　Plaintiff, ) | |
| v. ) | No. 18-1880C |
| THE UNITED STATES, )<br>　　　　Defendant, ) | Senior Judge Eric G. Bruggink |
| and ) | |
| AMAZON WEB SERVICES, INC., )<br>　　　　Defendant-Intervenor. ) | |

## OBJECTION TO ORACLE AMERICA, INC. IN-HOUSE COUNSEL'S APPLICATION FOR ACCESS TO INFORMATION UNDER PROTECTIVE ORDER

Pursuant to paragraph 5 of the Protective Order in this action and Appendix C to the Rules of the United States Court of Federal Claims ("RCFC"), Amazon Web Services, Inc. ("AWS") hereby objects to the application for admission to the Protective Order filed by Oracle America, Inc.'s ("Oracle") in-house counsel Peggy Bruggman. *See* ECF 29. Oracle is already represented by five experienced outside counsel—the same five counsel that represented it in the immediately preceding Government Accountability Office ("GAO") protest[1]—but now requests that its in-house counsel also be provided access to the Government's procurement files and, potentially, competitor proposals in an ongoing procurement. Such a request is both unusual and unnecessary. It is also made more troubling by published reports indicating that Oracle has engaged in a broad public campaign against AWS and this procurement.[2] Under these

---

[1]　　AWS understands that Ms. Bruggman was not admitted to the GAO Protective Order.

[2]　　*See* Exhibit 1 (Naomi Nix, Ben Brody and Bill Allison, *Oracle Is Leading Anti-Amazon Lobby on Pentagon Cloud Bid*, Bloomberg (Apr. 13, 2018), https://www.bloomberg.com/news/articles/2018-04-13/oracle-is-said-to-lead-anti-amazon-lobby-on-pentagon-cloud-bid).

circumstances, the risk of disclosure significantly outweighs any purported need for Oracle's

in-house counsel to be admitted to the Protective Order.  Oracle's application should be denied.

### ARGUMENT

In reviewing an objection to an application for access to protected information, this Court

considers (1) "the nature and sensitivity of the information at issue;" (2) "the party's need for

access to the information in order to effectively represent its position;" (3) "the overall number

of applications received;" and (4) "any other concerns that may affect the risk of inadvertent

disclosure."  RCFC App'x C, ¶ 18(c).  Here, each of these factors weighs against admission of

Oracle's in-house counsel to the Protective Order.

*__First__*, there is no dispute that the information at issue in this case is highly sensitive.

Oracle's Complaint emphasized at the outset the importance of the Joint Enterprise Defense

Infrastructure ("JEDI") procurement—which seeks a *ten-year*, *ten-billion-dollar* contract to

provide cloud services across the DoD enterprise.  ECF 1 at 1.  And Oracle itself filed its

Complaint under seal and with an accompanying motion for protective order.  In that motion,

which the Court granted, Oracle explained that "[t]he proceedings in this matter *will involve*

material covered by a GAO Protective Order, sensitive agency source selection information, and

proprietary offeror proposal information."  ECF 5 at 2.

Indeed, the sensitivities here cannot be emphasized enough, given the early stage of the

procurement.  Unlike in a typical post-award bid protest, the procurement here is *ongoing*:

offerors have submitted initial proposals; DoD will evaluate those initial proposals and form a

competitive range; and then DoD will conduct discussions with offerors, allowing them an

opportunity to revise their proposals.  Any release of agency source selection sensitive

information or proprietary offeror proposal information could materially impact the ongoing competition.

Given these heightened sensitivities, access to protected information should be limited to only those persons specifically necessary to conduct this litigation.

**_Second_**, Oracle does not need its in-house counsel to access protected information in order to "effectively represent its position."  RCFC App'x C, ¶ 18(c).  Oracle already has five outside counsel admitted under the Protective Order in this action.  *See* ECF 14-18.  Those same outside counsel represented Oracle in the immediately preceding GAO protest, which involved the same record and issues as those here.  Thus, arguably no counsel—whether in-house or outside—would be better positioned to effectively represent Oracle in this protest than those already admitted to the Protective Order.

Nor does Ms. Bruggman's application identify specific qualifications necessary for Oracle's prosecution of this protest.  To the contrary, Ms. Bruggman has affirmatively disclaimed involvement in most "procurement-related matters," which are the focus of the current action.

Finally, to the extent Oracle would prefer that in-house counsel have access to protected information to supervise and/or provide general guidance in this litigation, that too is unnecessary.  Experienced outside counsel are intimately familiar with the constraints of protective orders issued by GAO and this Court, and are more than capable of operating under those constraints and communicating sufficient non-protected information to enable their clients to make informed decisions.  *See, e.g.*, *McDonnell Douglas Corp.*, B-259694.2, B-259694.3, June 16, 1995, 95-2 CPD ¶ 51 ("[I]n-house counsel stated generally that he would manage MDC's outside counsel and otherwise 'contribute' in an unspecified manner during the protest.

This alone did not indicate that the in-house counsel's access to protected material was necessary for MDC to pursue its protest, given the admission of MDC's outside counsel to the protective order."). Here, such communications should be even easier than in most protests, as the public version of Oracle's 97-page Complaint contains almost no redactions, enabling anyone at Oracle—including its in-house counsel—to discuss that unredacted information with outside counsel. Thus, again, there is no need for in-house counsel to be admitted to the Protective Order at this juncture.[3]

**_Third_**, as discussed above, Oracle already has five outside counsel admitted to the Protective Order. That is more than sufficient to effectively represent its position, especially where those five counsel are already familiar with the record before GAO, which will undoubtedly be similar to the Administrative Record here.

**_Fourth_**, the "risk of inadvertent disclosure" significantly outweighs the (non-existent) need for Oracle's in-house counsel to access protected information in this protest. RCFC App'x C, ¶ 18(c); _see also, e.g._, _Fairholme Funds, Inc. v. United States_, 118 Fed. Cl. 795, 798 (2014) (denying expert access to protected information after explaining that "[b]inding precedent instructs that the court 'must balance the seriousness of potential injury [that] discovery poses against the need for information in the preparation of a plaintiff's case'" (quoting _Levine v. United States_, 226 Ct. Cl. 701, 701 (1981)); _Ross-Hime Designs, Inc. v. United States_, 109 Fed.

---

[3] Should a specific need arise later in this litigation for any party to consult with in-house counsel regarding information designated as protected, the party may, of course, seek the release of that specific information, pursuant to the terms of the Protective Order. _E.g._, ECF 9, ¶ 14 ("Waiving Protection of Information"); _id._, ¶ 17 ("Seeking Relief from the Protective Order"). Until such a specific need arises, however, and in light of the heightened sensitivities discussed above, there is no need to preemptively provide in-house counsel access to _all_ current and future protected information related to any issue and any party, as Oracle's application requests.

Cl. 725, 743 (2013) (denying corporate officer of competitor access to protective order after finding that potential harm of disclosure outweighed party's need for such disclosure).

As discussed above, there is no need for Oracle's in-house counsel to access the highly sensitive agency source selection and offeror proposal information at issue in this protest. By contrast, there is a tangible risk of inadvertent disclosure should such access be granted. For example, although Ms. Bruggman states that she does not consider herself to be involved in competitive decision making, she admits that at times she provides advice in connection with Oracle's contemplated acquisition of other companies, and that she "assist[s] and advise[s] internal clients with respect to pre-litigation disputes with customers, distributors, or partners." ECF 29 at 3; *cf. Atl. Research Corp.*, B-247650, June 26, 1992, 92-1 CPD ¶ 543 (denying in-house counsel access to protected material where he was involved with business matters such as mergers and acquisitions and had provided advice with respect to commercial contracts).

While AWS trusts that Ms. Bruggman would not intentionally violate her ethical obligations if admitted to the Protective Order, it may be difficult if not impossible for her to sufficiently "compartmentalize" protected information when fulfilling her stated employment obligations. *McDonnell Douglas Corp.*, B-259694.2, B-259694.3, June 16, 1995, 95-2 CPD ¶ 51 ("We determined that if the in-house counsel were given access to HMSC's proprietary information and the agency's source selection sensitive information, he would need to be continuously aware of, and to mentally compartmentalize, the potentially relevant information that would be nondisclosable to his MDC colleagues whenever asked for advice."); *see also, e.g.*, *Hitkansut LLC v. United States*, 111 Fed. Cl. 228, 239 (2013) ("Even accepting that [applicant] would make a conscious and sustained effort to comply with the terms of the protective order, the fallibility of the human brain is paramount. It is simply impossible for a human being to

segregate, or 'unlearn,' certain pieces of knowledge.  Furthermore, Hitkansut has not made a sufficient showing of need in connection with its request for access by [applicant].").  The inability of humans to compartmentalize is of particular importance here because Ms. Bruggman's responsibilities include the review of Oracle's "product design, marketing or financial documents."  ECF 29 at 3.  As evidenced by the fact that both parties have submitted proposals related to this procurement, AWS and Oracle have many products that are in direct competition.  Because it is impossible to entirely compartmentalize information in one's mind, if Ms. Bruggman were given access to AWS's proprietary information, she would use AWS information—even if unintentionally—in the performance of her Oracle responsibilities.  This would unfairly impact AWS's competitive position—to the benefit of Oracle.

Moreover, AWS understands from public reporting and third-party reports that certain technology companies are working together to spread misinformation to the media and on Capitol Hill, with Oracle reported to have been leading those efforts.  *See, e.g.*, Exhibit 1; Exhibit 2 (Kevin Baron, Frank Konkel, Patrick Tucker, *Someone Is Waging a Secret War to Undermine the Pentagon's Huge Cloud Contract*, Defense One (Aug. 20, 2018), https://www.defenseone.com/technology/2018/08/someone-waging-secret-war-undermine-pentagons-huge-cloud-contract/150685/); Exhibit 3 (Robert J. Terry, *Secret dossier, Greek philosophy, Vanity Fair: The JEDI cloud procurement has gotten weird*, Washington Business Journal (Aug. 21, 2018), https://www.bizjournals.com/washington/news/2018/08/21/secret-dossier-greek-philosophy-vanity-fair-the.html).  Thus, again, even though Ms. Bruggman may not consider herself involved in traditional forms of competitive decision making, there is the distinct possibility that she may be consulted regarding Oracle's reported public campaign against AWS and/or that she may find herself engaged in conversations directly related or adjacent to this procurement or the highly

6

proprietary business information at issue, and it would be "simply impossible for [her] to segregate, or 'unlearn,'" protected information from these proceedings. *Hitkansut LLC*, 111 Fed. Cl. at 239 (denying access to protective order).

Accordingly, the "risk of inadvertent disclosure" also counsels against allowing Oracle's in-house counsel access to protected information.

## CONCLUSION

As discussed above, each of the factors identified in RCFC App'x C, ¶ 18(c) weighs against admission of Oracle's in-house counsel to the Protective Order. The protected information in this case is highly sensitive; Oracle has no specific need for its in-house counsel to access protected information; Oracle is already represented by capable outside counsel who are intimately familiar with the GAO record; and the "risk of inadvertent disclosure" significantly outweighs the (non-existent) need for Oracle's in-house counsel to access protected information. For each and all of these reasons, AWS respectfully requests that the Court deny Oracle's application.

December 27, 2018

Of Counsel:

Olivia L. Lynch
Robert J. Sneckenberg
OLynch@crowell.com
RSneckenberg@crowell.com

Respectfully submitted,

s/ Daniel R. Forman
Daniel R. Forman
    (Counsel of Record)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Tel: (202) 624-2504
Fax: (202) 628-5116
DForman@crowell.com

*Attorneys for Amazon Web Services, Inc.*

# Exhibit 1

https://www.bloomberg.com/news/articles/2018-04-13/oracle-is-said-to-lead-anti-amazon-lobby-on-pentagon-cloud-bid

Deals

# Oracle Is Leading Anti-Amazon Lobby on Pentagon Cloud Bid

By Naomi Nix, Ben Brody, and Bill Allison
April 13, 2018, 2:24 PM EDT

▶ Microsoft, IBM, Dell, HPE are said to be involved in effort

▶ Initiative aims to ensure contract goes to multiple firms

Oracle Corp. is leading a campaign in Washington to prevent Amazon.com Inc. from winning a lucrative Defense Department computing contract that'll be awarded in coming months, according to three people familiar with the matter.

The Oracle-led effort relies on a loose coalition of technology companies also seeking a slice of the Pentagon work, including Microsoft Corp. and International Business Machines Corp., said the people, who described the matter on condition of anonymity. Dell Technologies Inc. and Hewlett Packard Enterprise Co. are also participating, said one of the people.

Their goal is to make sure that the award process is opened up to more than one company and unseat Amazon as the front-runner for the multibillion-dollar deal. As part of the campaign, the people said, Oracle is holding regular calls with tech allies, courting trade and mainstream media and lobbying lawmakers, defense officials and the White House.

The tech companies are jockeying for a piece of the Pentagon's cloud business, which will provide a rich revenue stream and give the winner an edge in government cloud computing. Oracle has long-term contracts with many departments that use its flagship database to store information on their own systems. As the agencies look to switch to cloud computing and eye market-leader Amazon, Oracle's traditional revenue sources could be under threat. Oracle has tried to protect its database business by offering cloud services of its own, but has come late to that market.

The Pentagon has said it intends to move the department's technology needs -- 3.4 million users and 4 million devices -- to the cloud, indicating the massive size of the award. Pentagon officials, including Defense Secretary Jim Mattis, have repeatedly said no decision about the winner-take-all contract has been pre-made and that bids will be considered on their merits, with an award to a company or a team of companies expected in September. But Amazon's dominant market share in the cloud-contracting business is seen by many analysts as giving it a significant advantage in the competition.

Oracle's Catz Is Said to Talk Amazon Contract Row With Trump

"Of course Oracle is interested in competing for the DoD cloud contract and we are equally interested in the mission success of the DoD," said Oracle's Senior Vice President Ken Glueck in a statement. The best approach "is to have an open competition, allowing DoD to choose from many competing, innovative, modern, secure cloud architectures," Glueck said.

IBM said in a statement it has been advocating for a multi-cloud approach for months, without commenting on whether it's involved in an Oracle-led coalition.

## 'Fair and Open'

Pentagon acquisition chief Ellen Lord said the competition is fair and open and that the department continues to have multiple cloud contracts.

"No decisions have been made and we are working with a variety of companies," Lord said. "I see no focus toward one company whatsoever."

Amazon, Microsoft and HPE declined to comment. Dell said it competes with Oracle on hardware products but collaborates to make sure their products can be used together, and declined to comment about whether it's working with an Oracle group.

## Trump Broadsides

The battle over the Pentagon work is unfolding behind closed doors as Amazon faces withering broadsides from President Donald Trump. Trump has assailed the company and its founder Jeff Bezos in a series of tweets and public statements that escalated in late March, criticizing its delivery contract with the U.S. Postal Service and its tax practices. The attacks have raised speculation that Trump's true concern is Bezos's ownership of The Washington Post, which aggressively and critically covers him and his administration. Thursday night, Trump ordered the creation of a task force to review USPS's business practices.

While Trump has used his Twitter account to press for lower costs for weapons systems such as Lockheed Martin Corp.'s F-35 and Boeing Co.'s new Air Force One planes, any attempt to intervene in a contract competition pitting rival companies would be unprecedented.

It also would provide losing bidders with grounds to challenge an award through the Government Accountability Office and the courts, which would be likely to unearth emails, phone records or memos from bureaucrats documenting the interference.

## Washington Influence

While Oracle's $187 billion market value is less than a third of Amazon's, it punches way above its weight in Washington, where it has a team of seasoned policy officials and personal relationships that go all the way to the top.

Trump personally ordered the Justice Department to hire Oracle's Ezra Cohen-Watnick to advise Attorney General Jeff Sessions on national security matters, according to people familiar with the matter. Cohen-Watnick went to Oracle in August after leaving the National Security Council, where he had been caught up in a controversy over the release of intelligence material to a member of Congress, according to people familiar with the matter.

Glueck has led Oracle's government affairs shop in Washington for more than 20 years while the company sparred with other companies in the capital, including funding investigations 💻 into Microsoft during its antitrust trial and more recently supporting 💻 anti-sex trafficking legislation that was initially opposed by tech trade groups representing Alphabet Inc.'s Google, among other internet platforms.

Last year, the company brought on Vice President Mike Pence's former chief of staff and longtime aide Josh Pitcock to be its vice president of government affairs. Former Hill staffers Joel

Hinzman and Jason Mahler have been with Oracle since 2003 and 2010, respectively.

## Trump Supporters

Oracle's Co-Chief Executive Officer Safra Catz was an early supporter of Trump, and days after he won the election, Catz visited the president-elect at Trump Tower in New York and subsequently served on the executive committee of his transition team. Trump's inner circle also had shown interest in Catz and spoken with her about the positions of U.S. Trade Representative and the Director of National Intelligence, according to people familiar with the matter.

Catz also joined the American Technology Council, a White House effort headed by onetime Microsoft finance chief Chris Liddell to seek the private sector's input on modernizing the federal government's technology among other issues.

## White House Dinner

On April 4, during a private dinner at the White House, where Catz was a guest of venture capitalist Peter Thiel, a longtime Trump supporter, she criticized the bidding process for the cloud contract, complaining that it seemed tilted in Amazon's favor, according to people familiar with the matter.

Trump listened and assured her the contract competition would be fair, but made no indication he'd interfere in the bidding, the people said. Catz didn't emphasize that her company is competing with Amazon for the award, the people added.

While it's best-known for being the world's largest online retailer, Amazon also operates Amazon Web Services, the market's top cloud-computing business. AWS has already won a similar contract with the Central Intelligence Agency, showing it can manage sensitive government information. That has contributed to making Amazon the leading contender to win the Pentagon cloud deal that may be as long as 10 years.

While Mattis told lawmakers at a hearing on Thursday that "it is a fair and open competition for anyone who wants to come in," he also praised the CIA's cloud project run by Amazon.

"We've examined what CIA achieved in terms of availability of data" and "also security of their data, and it's very impressive," Mattis said at the hearing.

## Lobbying Windfall

The battle for a piece of the contract could be a windfall for K Street. Amazon spent $12.8 million on lobbyists in 2017, according to federal disclosures filed with Congress, but faces well-funded challengers. Oracle said it spent nearly $9 million. Microsoft spent $8.6 million, IBM spent $5.3 million, HP Enterprise $5 million and Dell $4 million, disclosures show.

The anti-Amazon group has already claimed some significant victories, including Congress's directive to the Pentagon in the $1.3 trillion spending bill passed in March to explain why it's planning a single source award for the cloud contract, those people said. While the people attributed the provision to lobbying by Oracle and other companies, another person involved in the process said the language reflects lawmakers' own concerns about the competition.

Another win was the Pentagon's decision last month to pare 🖥 back a nearly $1 billion dollar cloud contract awarded to REAN Cloud LLC., a cloud migration company most of whose clients work with AWS, after Oracle formally protested the bid.

## Other Opponents

In the meantime, other Amazon opponents have emerged, including a conservative columnist and activist named Seton Motley.

Motley said he launched an advertising campaign in the New York Post goading Trump not to let the Pentagon give the cloud contract solely to Amazon. The campaign, which has a companion website, shows photos of Bezos laughing and chatting with Mattis with a fictional letter from Bezos telling Trump that the contract "will really help my many efforts to oppose your Administration's policies." Motley said he's paying for the ads himself and has had no contacts with Amazon's competitors.

Amazon is seeking allies of its own in the federal procurement sector. Earlier this year, Amazon hosted an event with several technology companies to propose starting a new coalition aimed at helping the government find commercial solutions for its technology needs, according to two people familiar with the event.

Amazon hasn't made any announcement about the effort and didn't respond to requests for comment about the initiative.

*– With assistance by Anthony Capaccio, Nico Grant, Jennifer Jacobs, and Daniel Flatley*

# Exhibit 2



# Someone Is Waging a Secret War to Undermine the Pentagon's Huge Cloud Contract

By Kevin Baron, Frank Konkel, and Patrick Tucker

August 20, 2018

As some of the biggest U.S. technology companies have <u>lined up to bid</u> on the $10 billion contract to create a massive Pentagon cloud computing network, the behind-the-scenes war to win it has turned ugly.

In the past several months, a private investigative firm has been shopping around to Washington reporters a 100-plus-page dossier raising the specter of corruption on the part of senior Defense Department and private company officials in the competition for the <u>JEDI cloud contract</u>. But at least some of the dossier's conclusions do not stand up to close scrutiny.

The dossier insinuates that a top aide to Defense Secretary Jim Mattis worked with Mattis and others to steer the contracting process to favor Amazon Web Services, or AWS — and enrich the aide. The aim of the dossier seems clear: to prevent the deal from going solely to AWS, the odds-on favorite in part because it operates the <u>CIA's classified commercial cloud</u>. Far less clear, however, is who backed its creation and distribution.

It's an unusually hardball form of backroom maneuvering in the world of lucrative but rigidly controlled defense contracting. The firm that prepared the dossier, <u>RosettiStarr</u>, shopped it to various Washington reporters earlier this year. *Defense One* was given a copy in May. At the time, RossettiStar President and CEO Rich Rosetti declined to reveal who funded the firm's efforts.

Former defense officials told *Defense One* they received inquiries about the allegations from the *Wall Street Journal*, the *Washington Post,* Reuters, and the *Intercept*. For months, the accusations went unaired by news outlets, including *Defense One* and *Nextgov*, sister publications in Atlantic Media's Government Executive Media Group.

But in the past few weeks, some of the information in the dossier has surfaced in various publications. Now that the dossier's targets have been publicly accused, they are speaking out. In exclusive interviews with *Defense One* and *Nextgov*, they vehemently deny any wrongdoing and seek to turn the spotlight on their mysterious accusers.

**A Contract and an Alleged Conspiracy**

It's hard to overstate the significance of the Pentagon's cloud contract. Known as JEDI, for Joint Enterprise Defense Infrastructure, it will help reshape American warfare by absorbing, processing, and analyzing intelligence, sensor, and troop data, and by facilitating communications through the Defense Department's worldwide network. The winner of the contract, should they meet stringent security and performance standards, will emerge as a front-runner for more huge cloud jobs across the government.

In June, some of the same information included in the RosettiStarr dossier appeared in a report by <u>Capitol Forum</u>, a private company that says it provides <u>"investigative news & analysis on how policy affects market competition"</u> to its paying subscribers. And in the last two weeks, similar information appeared in articles in <u>Reuters</u>, <u>*Vanity Fair*</u>, and the <u>*Daily Caller*</u>.

All of the reports highlight Sally Donnelly, whose consulting firm worked  for Amazon Web Services before she served as senior advisor to the secretary of defense, essentially Mattis' right hand, during his first year on the job. They raise questions about whether she received payments from AWS for steering the Defense Department to custom-tailor the JEDI requirements.

Donnelly, Pentagon officials, and AWS representatives deny all of it.

"From the beginning, the enterprise cloud initiative has been open, transparent and fair," said Pentagon press secretary Dana White in an email while traveling in South America with Mattis. "As with any other acquisition, a team of department experts developed the requirements and solicitation, and members of that team were screened for conflicts of interest and advised on compliance with applicable procurement and ethics laws. Neither Secretary Mattis, Ms. Donnelly, nor anyone else in the secretary's front office participated in drafting the requirements or the solicitation. Any assertion or suggestion to the contrary is false."

Donnelly declined repeated requests to comment on the record for this story, but her attorney, Michael Levy, said in a statement, "While at the Department of Defense, Ms. Donnelly had no role in acquisition or procurement. She played no role, and exercised no influence, in connection with any government contract, including – as the Department of Defense has confirmed repeatedly – the JEDI contract. To suggest otherwise not only reflects an absence of even the most rudimentary understanding of the government contracting process but also insults the dedicated career men and women at the Department of Defense who have spent countless hours developing and refining this and hundreds of other contracts with the sole purpose of protecting the safety and security of the United States.

"Ms. Donnelly was rightfully proud to serve our nation alongside the remarkable men and women of our Department of Defense," Levy continued. "In our country, everyone has a right to disagree with the approaches they may have taken, but attacking their integrity and honor is just wrong."

Donnelly's low public profile belies her longtime status as a top trusted advisor to senior military officials. She served on the staff of Joint Chiefs Chairman Adm. Mike Mullen until his 2014 retirement, traveling with him and reporters around the world and into war zones and capitals. Then she ran U.S. Central Command's office at the Pentagon, while Mattis was CENTCOM commander. After Mullen's departure, Donnelly left the Defense Department and formed a consulting firm, SBD Advisors, where she helped active and retired military commanders with media outreach and shaping their post-military careers. She hired Mullen and other former Pentagon officials.

By the start of 2017, the firm was also consulting with several military commands and companies, including Amazon Web Services. SBD helped defense industry clients navigate the Pentagon bureaucracy and hone their marketing messages to government buyers, according to company spokesman Price Floyd, who was the assistant defense secretary for public affairs when Donnelly was on Mullen's staff. When Mattis asked Donnelly to re-enter government to serve at his side, she divested her entire stake in SBD, according to government filings obtained by *Defense One* and *Nextgov*.

The RosettiStarr dossier insinuates that Donnelly kept a stake in her company so she could profit off a potential AWS win, and that she helped arrange a underline(meeting last year) between Mattis and Amazon CEO Jeff Bezos.

The dossier says one of Donnelly's financial disclosure forms appears to show that she had sold only part of her stake in SBD Advisors before re-entering DOD, because it reports a "partial" sale and a single payment of only $390,000. In fact, she later filed forms disclosing two pre-planned payments received after she re-entered government, bringing the total sale of her stake to $1.56 million. On the second page of Donnelly's publicly-available disclosure form, she lists the value of SBD as between $1 and $5 million and indicates that she has sold it completely. A note affixed to the front page by a U.S. Office of Government Ethics inspector certifies that the entirety of the $1 to $5 million asset was sold.

The ethics office signed off on Donnelly's financial disclosure form in August 2017, and on her final disclosure form, too, which she filed near the time she left the Defense Department in February. On it, a government officer states that "on the

basis of information contained in the report, I conclude that the filer is in compliance with applicable laws and regulations." The form notes the two payments she received for the sale of SBD while at the Pentagon. Donnelly signed the final form on May 3.

Floyd, the spokesman for SBD, now rebranded ITC Global Advisors, dismissed the allegations and subsequent reporting claims that Donnelly or her firm had any influence on how the request for proposal was written or that she stood to profit further off SBD.

"The idea that she would have anything to do untoward with the drafting of an RFP is just – is just ludicrous. Plus, it's not how it works!" he said in an interview. "That's just crap."

The three payments Donnelly received were pre-arranged  installments of the full amount she was owed, not reward for working on the cloud contract, Floyd said. "The price of her ownership stake in SBD was set at the point of sale, not at the point of payment."

Donnelly "had nothing to do with our work," said Floyd, who also served as the State Department's top public affairs official and later worked for defense giant BAE Systems. "We didn't contact Sally and say, 'Who should we meet with?' Nothing like that happened."

"Sally did not work on the JEDI contract for Amazon when she was in government. Period. It just didn't happen."

Arnold Punaro, former staff director of the Senate Armed Service Committee and retired 2-star Marine Corps general, said the whole process looks to be above board. "I've watched this one with interest from afar. I know the department extremely well. I've worked with the [Senate] Armed Services Committee for the past 15 years," Punaro said. "I'm very confident that the DOD and the people responsible for the RFP have adhered to the letter and the spirit of the law, dotted every 'i,' crossed every 't' because of the intense scrutiny given to such a large and high-profile contract. These things have to go through intense review."

Since Donnelly left government in January, her old firm has gone through a series of changes that the dossier and recent reporting suggest that she and her associates could still be working to favor and profit from an AWS win of the cloud contract. Earlier this year, SBD was acquired and renamed ITC Global Advisors by ITC Secure, itself owned by C5 Capital, which primarily funds smaller companies. C5 and AWS have a few investments in common: both have stakes in a Bahrain-based cloud accelerator that invests in small businesses with a proven product, and in PeaceTech Lab, an initiative with the U.S. Institute of Peace. Neither is particularly remarkable or unusual. But they made it into the dossier.

"C5 Capital is extremely concerned to hear from a number of media sources of the distribution of erroneous and defamatory information. Neither C5 nor its subsidiaries or portfolio companies have had any involvement in the bidding for the JEDI contract," the company's spokesperson said in a statement to *Defense One* and *Nextgov*.

C5's spokesperson went on to say the company bought ITC Secure to "provide cyber consulting services to ITC Secure's existing US enterprise clients by a world class team of US experts and national security leaders led by Admiral Mike Mullen, the former Chairman of the Joint Chiefs of Staff."

The spokesperson said C5 and its portfolio companies work with all the major cloud providers, "including Microsoft, Google, IBM and AWS." The company says it has nothing to hide regarding AWS. "C5 is proud of the work that our start-up accelerator is doing with AWS and our partners at the US Institute for Peace's Peacetech Lab in Washington to grow start-ups that prevent conflict and as a result help to save the lives of US and UK war fighters."

The dossier and some subsequent media reports name several SBD associates who later took positions in government, including at the Pentagon. It implies that Donnelly strategically embedded them in key Pentagon and congressional positions. But thousands of defense officials go in and out of the revolving door of government jobs, especially as the administration changes political party.

As for Mattis' meeting with Amazon's Bezos, the Pentagon notes that it was part of a broader <u>West Coast swing</u> aimed at <u>reaching out to key leaders in the tech community</u> regarding how DOD could better use commercial technologies. That effort was <u>launched by Mattis' predecessor, former Defense Secretary Ash Carter</u>. On the trip, Mattis also visited Naval Base Kitsap, Washington, and the office of the Pentagon's Silicon Valley outreach program, the Defense Innovation Unit-Experimental, or DIUx, in addition to visiting the headquarters of Google and Amazon.

## Heavyweight Battle

So who is really trying to take down AWS's chances at the $10 billion contract? RosettiStarr won't say. Company representatives reached last week declined to comment for this story.

Capitol Forum, which first published some details that also appear in the dossier, would not reveal their initial source for them. A company spokesperson said in a statement they did their own reporting. "Our June 8 story on SBD Advisors and the JEDI contract is based on financial disclosure documents obtained through a records request to the Office of the Secretary of Defense, as well as original interviews with representatives of ITC Global Advisors (formerly SBD Advisors) and C5 Capital." They laid out their initial findings under the headline "Secretive, Influential Consulting Firm's Close Ties to Amazon Web Services and DoD Raise Additional Questions Around JEDI Contract," and included denials of wrongdoing by the Pentagon's White and ITC's Floyd.

On Friday, *Daily Caller* writer Andrew Kerr said, "I am not going to discuss what my sourcing is. Every fact in my article is laid out clearly and attributed. If you have that dossier, I'd love to see it."

The author of the *Vanity Fair* report has not responded to a request for comment on the source used in the article.

Amazon Web Services is pointing the finger at its competitors for the JEDI contract.

"These types of misleading articles are fueled by old guard technology companies who have resorted to these types of unseemly tactics because they're struggling to compete effectively in open competitions in the private and public sectors," an AWS spokesperson told *Nextgov* and *Defense One* in a statement.

In April, <u>Bloomberg reported</u> that one technology company, Oracle, was leading an effort to "unseat Amazon as the front-runner for the multibillion-dollar deal," with participation from other contenders for the contract, including IBM and Microsoft.

Oracle did not respond to requests for comment from *Nextgov* and *Defense One* about whether it provided funding for the dossier or RosettiStarr or was leading an effort to undermine AWS's bid. IBM told *Nextgov* and *Defense One* it was "not involved" in the dossier. A Microsoft spokesperson declined to comment, stating the company "does not comment on active RFP processes."

What's clear is that there's a <u>broad battle</u> among tech industry heavyweights to position themselves for JEDI. It pits traditional tech and defense contractors that have served the military and government for decades against Amazon and Google, relative newcomers to the defense space that threaten to disrupt the multibillion-dollar defense technology market. Industry groups representing some of those tech firms and others <u>lobbied</u> the Pentagon to award the JEDI contract to multiple cloud providers, which would have meant significant revenue streams for all winners. But the Pentagon ultimately decided a single cloud provider would best suit its needs.

The JEDI contract calls for a cloud platform at the "tactical edge," and will put a commercial company in charge of hosting and distributing mission-critical workloads and classified military secrets to warfighters around the globe. Mattis, when asked in April by the Senate Armed Services Committee about the alleged "rush" to award JEDI, said it was needed for "lethality." The Pentagon later defended its single-award approach to Congress in a May report, claiming multiple clouds would reduce "the ability to access and analyze critical data," while the "lack of a common environment for computing and data storage" would minimize the effectiveness of new technologies like AI and machine learning for warfighters.

The Pentagon opened bidding for the contract on July 26. Industry bids are due by Sept. 17. DOD had planned to award the contract in late 2018 and roll out initial operating capabilities by mid-2019, but delays seem likely. On Aug. 7, Oracle filed a pre-award bid protest against the Pentagon that may not be resolved until November. High-profile, lucrative defense contracts are often protested after the award, so the Pentagon almost certainly faces another legal battle once it awards JEDI.

Delays in the JEDI acquisition may give an assist to AWS' closest competitors. According to the JEDI RFP, the winning company must meet the government's rigorous standards to host classified data within 180 days of the contract award, and meet standards to host Top Secret/Sensitive Compartmented Information within 270 days. Currently, AWS is the only cloud service provider that meets those standards, but officials from Microsoft and IBM say they're close.

By Kevin Baron, Frank Konkel, and Patrick Tucker // Kevin Baron is the founding executive editor of *Defense One*. Baron has lived in Washington for 20 years, covering international affairs, the military, the Pentagon, Congress, and politics for *Foreign Policy*, *National Journal*, *Stars and Stripes*, and the *Boston Globe*, where he ran investigative projects for five years at the Washington bureau. He is a frequent on-air contributor and previously was national security/military analyst at NBC News & MSNBC. Baron cut his muckraking teeth at the Center for Public Integrity and he is twice a Polk Award winner and former vice president of the Pentagon Press Association. He earned his M.A. in media and public affairs from George Washington University, his B.A. in international studies from the University of Richmond, and studied in Paris. Raised in Florida, Baron now lives in Northern Virginia. // Frank Konkel is Nextgov's executive editor. He writes about the intersection of government and technology. Frank began covering tech in 2013 upon moving to the Washington, D.C. area after getting his start in journalism working at local and state issues at daily newspapers in his home state of Michigan. Frank was born and raised on a dairy farm and graduated from Michigan State University. // Patrick Tucker is technology editor for Defense One. He's also the author of The Naked Future: What Happens in a World That Anticipates Your Every Move? (Current, 2014). Previously, Tucker was deputy editor for *The Futurist* for nine years. Tucker has written about emerging technology in *Slate*, *The Sun*, *MIT Technology Review*, *Wilson Quarterly*, *The American Legion Magazine*, *BBC News Magazine*, *Utne Reader*, and elsewhere.

August 20, 2018

https://www.defenseone.com/technology/2018/08/someone-waging-secret-war-undermine-pentagons-huge-cloud-contract/150685/

# Exhibit 3

From the Washington Business Journal:

https://www.bizjournals.com/washington/news/2018/08/21/secret-dossier-greek-philosophy-vanity-fair-the.html

# Secret dossier, Greek philosophy, Vanity Fair: The JEDI cloud procurement has gotten weird

Aug 21, 2018, 2:55pm EDT

The sniping began as soon as the Pentagon revealed that its Joint Enterprise Defense Infrastructure procurement — a high-profile 10-year, $10 billion commercial cloud computing program to transform the Department of Defense's IT posture in support of the warfighter — would be structured as a single award rather than multiple contracts to multiple companies.



JOSHUA ROBERTS

The Pentagon will entrust a commercial company to use cloud tech to support a wide range of DOD business and mission operations — moving massive amounts of data to the cloud and making it available for data-driven decision making.

Some claimed the procurement was specially tailored for Amazon Web Services, the cloud computing arm of internet behemoth Amazon.com Inc. (NASDAQ: AMZN) and the dominant commercial cloud player. The Pentagon was ignoring industry best practices by insisting on a single award "and all the reasons that they're citing for the need to do that fly in the face of technical reality," one executive with a prominent government contractor told me.

That complaint seems tame compared with what's emerged in recent days.

Defense One and Nextgov, sister publications in Atlantic Media's Government Executive Media Group, reported Monday on the existence of a secret dossier, shopped to the media by a D.C. private investigation firm in recent months, purporting to prove corruption between the Department of Defense and a consulting firm with ties to the Pentagon.

It's nothing less than a "secret war" to "undermine" the procurement, the media outlets reported, with pieces of the dossier making their way into other outlets, including Vanity Fair. The glossy magazine, more accustomed to wading into New York and Hollywood gossip, described the JEDI jostling as "a new scandal quietly unfolding in Washington" that could be a sign of how Jeff Bezos and his Silicon Valley ilk are perpetuating the swamp that President Donald Trump promised to drain.

Spurred by the dossier, according to Defense One and Nextgov, various reports have zeroed in on one Sally Donnelly, whose consulting firm did work for Amazon Web Services before she served as senior adviser to

Defense Secretary Jim Mattis. Those reports raise questions about whether Donnelly received payments from AWS for helping steer the JEDI procurement.

Donnelly, DOD and AWS officials all vigorously deny those reports, saying the procurement has been transparent and will go to the most worthy vendor or team of vendors. RosettiStarr, the firm identified by Defense One and Nextgov as having prepared the dossier, declines to reveal who's behind its efforts to connect those alleged dots.

But the swirl of conjecture speaks to the high stakes involved in what heretofore has been a story confined to those of us consumed by IDIQs and cloud tech stacks — that is to say, a niche audience. What's made this particular procurement go mainstream?

The presence of Amazon certainly is a factor — it's what prompted us to explore the emergence of AWS's public sector business in Greater Washington government contracting in a recent cover story, after all. As the Vanity Fair story illustrates, it also touches on the storyline of a sprawling and deep-pocketed tech industry spreading its tentacles into many facets of our lives, sometimes to our detriment.

Finally, there's the disruptive upstart taking on the government tech and defense establishment, an irresistible media narrative. One member of the establishment, Oracle Corp. (NASDAQ: ORCL), filed a pre-award protest two weeks ago with the Government Accountability Office taking issue with the Department of Defense's decision to structure the contract as a single award.

In its protest, Arnold & Porter lawyers retained by Oracle accuse DOD officials of talking out of both sides of their mouths — routinely warning of the rapid pace of technological change yet insisting on awarding a single, decadelong contract sure to stifle future innovation. With disruptive technology, the only constant is change, the protest notes, helpfully including a footnote citing Heraclitus of Ephesus as the source of that wisdom.

A decision from the GAO is due by Nov. 14, casting a cloud over the Pentagon's Sept. 17 due date for JEDI bids. But as Heraclitus also said: Opposition brings concord. Out of discord comes the fairest harmony.



**Rob Terry**
@FedBizWBJ

Oracle's 40-page protest of the Pentagon's JEDI contract includes a footnote crediting Heraclitus of Ephesus with a passage saying "the only constant is change" when it comes to disruptive tech. Now that's some legal attention to detail.

9   12:36 PM - Aug 8, 2018

See Rob Terry's other Tweets

**Robert J. Terry**
Senior Staff Reporter
*Washington Business Journal*

