## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| ORACLE AMERICA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| AMAZON WEB SERVICES, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**REDACTED VERSION
01/03/2019**

Case No. 18-1880C
Senior Judge Eric G. Bruggink

---

**PLAINTIFF'S REPLY TO DEFENDANT-INTERVENOR'S OBJECTION TO THE
APPLICATION FOR ACCESS TO INFORMATION UNDER PROTECTIVE ORDER
OF ORACLE AMERICA, INC. IN-HOUSE COUNSEL**

Plaintiff Oracle America, Inc. ("Oracle"), by its undersigned counsel and pursuant to Court's December 28, 2018 Scheduling Order, timely replies to the objection by Defendant Intervenor Amazon Web Services, Inc. ("AWS") to the application for access to information under protective order of Oracle's in-house counsel, Peggy Bruggman. Defendant The United States has not objected to Ms. Bruggman's application for access.

AWS claims that Oracle's request to have its experienced in-house litigation counsel admitted under the protective order is an extraordinary and unusual request in a bid protest. (AWS Resp. at 1, ECF 30 (declaring the request "unusual and unnecessary").) Not so. Indeed, the Court's Bid Protest Appendix and standard forms contemplate such access and even provide an application for access by outside *or inside counsel*. *See* Appendix of Forms, Rules Court of Federal Claims ("RCFC") at Form 9; *see also* RCFC, App. C at § VI.18(a).

To be sure, the information subject to the protective order is "highly sensitive". (AWS Resp. at 2, ECF 30.) Moreover, the harm that could occur from the release (even inadvertent) of source selection information or proprietary information in this ongoing competition, is real and material. But AWS has not and cannot show that Ms. Bruggman's application creates an unacceptable risk of such disclosure under the governing test.

AWS bases its objection to Ms. Bruggman's application on her role as in-house counsel, claiming that (1) Oracle's preference for her "to supervise and/or provide general guidance in this litigation [to experienced outside counsel] … is unnecessary," and (2) given her position, the risk of inadvertent disclosure is too significant to permit access. (*Id*. at 3-7.) AWS' arguments miss the mark.

First, AWS improperly belittles the desire to involve in-house counsel and the value in-house counsel deliver in litigation matters. *See generally e.g.*, *Doyle v. United States*, 15 Cl. Ct. 150, 151 (1988) (recognizing that the U.S. Court of Appeals for the Federal Circuit and the Court of Claims have both identified the "right of a party to select the counsel of its choice" as a "matter of significant importance") (citations omitted). Considering Ms. Bruggman's nearly fifteen years of litigation experience with Oracle, Ms. Bruggman is well positioned to give Oracle increased confidence in the approach taken in this litigation. That Oracle relied solely on outside counsel before the Government Accountability Office ("GAO") does not alter Oracle's right to seek the admission of additional counsel before this Court.

Second, the Federal Circuit has held expressly that "status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access," *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (1984), because, "[l]ike retained counsel …, in-house counsel are officers of the court, are bound by the

same Code of Professional Responsibility, and are subject to the same sanctions." *Id.* at 1469. In other words, the availability and severity of sanctions for release of protected information by an attorney – both from the court and the bar – generally serve as a sufficient deterrent to allow counsel, who based on professional standards must safeguard privileged and confidential information, to access information subject to a court's protective order.  Accordingly, "[w]hether an unacceptable opportunity for inadvertent disclosure exist, … must be determined … by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained." *Id.* at 1468.

Notably, the Federal Circuit in *U.S. Steel* devised a test for making this individualized factual inquiry regarding whether a particular counsel's access under a protective order may create an unacceptable risk of inadvertent disclosure, observing that the determinative factor is whether the involved-counsel performs "competition decisionmaking." *Id.*, n.3.   In her application, Ms. Bruggman certifies to this Court that she is "not involved in competition decision making as discussed in *U.S. Steel Corp. v. United State*s…." (*Compare* Bruggman Application ¶ 4, ¶ 8.e. (Addendum), ECF 29.)   AWS bases its suggestion to the contrary on misquotes or misunderstandings of Ms. Bruggman's responsibilities as litigation-counsel at Oracle and inapposite case law.

For example, AWS improperly attempts to equate Ms. Bruggman's litigation-based role at Oracle with the general counsel denied access in the protest of *Atlantic Research Corporation*, B-247650, June 26, 1992, 92-1 CPD ¶ 543.  GAO's decision in *Atlantic Research*, however, stands for the unremarkable proposition that competitive decisionmaking may be disqualifying even if not directly relate to government procurements.  In that protest, the general counsel stated that he did not participate in competitive decisionmaking for government procurements, but

"acknowledged that he [was] involved in competitive decisionmaking with respect to other business matters such as mergers and acquisitions," and with respect to commercial contracts. 92-1 CPD ¶ 543, at *3.[1]   Unlike the *Atlantic Research* general counsel, Ms. Bruggman's application makes clear that she does not participate in competitive decision-making at all – whether for Oracle's government or commercial business: "My responsibilities are restricted to litigation and dispute-related matters, including commercial litigation as well as patent and copyright litigation."  (Bruggman Application ¶ 4, ¶¶ 8a –e (Appendix).)  In this regard, Ms. Bruggman's application confirms that any advice she provides is litigation- or litigation-risk focused.  (*See id.*)

Specifically, with regard to "prelitigation disputes with customers, distributors, or partners," Ms. Bruggman explains that her "responsibilities include factual investigation of the underlying claims, assessment of responsibility and risk, recommendations as to resolution, documentation of settlements and management of any litigation that results."  (*Id.* at ¶ 8a (Addendum).)  In addition, Ms. Bruggman avers that any legal advice she has provided in the past in connection with acquisitions has involved "some litigation/dispute/risk related aspect of the potential acquisition," – i.e., whether any risk exists with the target's active or potential litigation or how certain acquisition-related representations (e.g., intellectual propriety infringement or indemnity) may create litigation risk.  (*Id.*)

Similarly, although AWS seeks to create confusion about the scope of Ms. Bruggman's responsibilities, the addendum to Ms. Bruggman's application confirms that she has "no role in

---

[1]  AWS' citation to *McDonnell Douglas Corp.*, B-259694.2, B-259694.3, June 16, 1995, 95-2 CPD ¶ 51, is also misplaced.   The in-house counsel seeking admission in that protest acknowledged that he had advised the company's competitive strategists on the very procurement at issue, including provisions in the solicitation which sought the offerors' creative approaches and strategies for streamlining the acquisition.  95-2 CPD ¶ 51, *4.

preparing product design, marketing, or financial documents;" rather, to the extent she would ever even review such documents it would be for a *litigation purpose*, i.e., "in the context of managing ongoing disputes or litigation."  (Bruggman Application Addendum ¶ 8.a., ECF 29.)  Accordingly, no support exist for AWS' insinuations, contrary to Ms. Bruggman's certification, that Ms. Bruggman engages in competitive decisionmaking.

Each of the other cases cited by AWS to oppose Ms. Bruggman's application likewise lack relevance.  Neither *Ross-Hime Designs, Inc. v. United States*, 109 Fed. Cl. 725 (2013), *Hitkansut LLC v. United States*, 111 Fed. Cl. 228 (2013), nor *Fairholme Funds, Inc. v. United States*, 118 Fed. Cl. 795 (2014), involved an application of counsel subject to the sanctions of the bar and the court.  Rather, in *Ross-Hime*, a case involving alleged patent infringement, the plaintiff requested access under the protective order for "*an officer of a competitive corporation*," who was named inventor on both patents alleged to have been infringed by the Government.  109 Fed. Cl. at 741-42 (emphasis added).  Similarly, in *Hitkansut*, another patent infringement case, the plaintiff requested access to the alleged patent infringer's information *by its principal*, which the government opposed on the ground that the principal operated as a competitive decisionmaker for the plaintiff and consultant to other companies that competed with alleged infringer.  111 Fed. Cl. at 238.  Finally, the application denied in *Fairholme* involved a *proposed expert that had a personal interest* in the litigation involving the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), both as an owner of common and preferred Fannie Mae stock and as the former Chief Financial Officer and Vice Chairman of the Board of Fannie Mae.  118 Fed. Cl. at 797, 799.  The court noted that the proposed expert had resigned his former position under controversy, and since resigning and the conclusion of other litigation, he had worked to restore his reputation,

including writing a book about the "demise of Fannie Mae," and engaging in public interviews and statements about "the charges against him, Fannie Mae's past and future, and the mortgage industry overall."  *Id*. at 797, 799.  None of the factual circumstances that raised concerns of the risk of inadvertent disclosure in *Ross-Hime*, *Hitkansut*, or *Fairholme* exist here.

If AWS had specific questions or concerns about Ms. Bruggman's litigation work at Oracle, AWS' outside counsel could have raised the questions or concerns with Oracle's outside counsel prior to Oracle submitting the application.  Indeed, Oracle outside counsel provided Defendant and Defendant-Intervenor counsel with a draft of the application and invited questions and concerns.  To address the concerns of Defendant The United States about the highly-sensitive information involved and the ongoing nature of the procurement, Ms. Bruggman agreed to revise her application to restrict her access to covered information only from an Arnold & Porter office, and to discuss protected material only from a private, non-Oracle location – enhanced protections requested by Defendant in lieu of an objection to Ms. Bruggman's admission to the protective order.  Despite the pre-submission invitations, AWS did not ask any questions or seek enhanced restrictions.  Instead, AWS stated its intent to object (without providing the basis) and now suggests some ill-intent on the part of Ms. Bruggman by relying on press articles suggesting "that certain technology companies are working together [purportedly] to spread misinformation to the media and on Capitol Hill."  (AWS Resp. at 6, ECF 30.)

AWS' attempt to undermine Ms. Bruggman as a risk of press leaks is without basis.  The fact that Congress, competitors, government watchdogs, industry associations, and others may have questioned the propriety of this massive Department of Defense ("DoD") procurement and the unseemly relationships between DoD officials and AWS has no bearing on Ms. Bruggman's request.  To the extent that the press is a concern, the Court can direct admitted counsel not to

speak or provide information to the press during the pendency of this action.  Such an order is of no concern for Ms. Bruggman or Oracle outside counsel.  At bottom, the articles lack relevance to whether Ms. Bruggman, an in-house litigation counsel who satisfies the Federal Circuit's test for admission under the protective order, somehow presents an unacceptable disclosure risk.

Moreover, AWS' attempt to cast the many articles about the Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement as some sort of competitor conspiracy smacks of insincerity.  AWS spends millions of dollars lobbying each year, undoubtedly has numerous public relations firms on its payroll, and even shares a common-owner with *the Washington Post* – AWS is no victim of the press or its competitors.[2]  In this regard, the press is not covering this procurement merely because Congress, competitors, non-profit government watchdogs, and trade associations all have raised red flags.  The press is covering this procurement because Freedom Of Information Act ("FOIA") requests submitted by investigative reporters have uncovered improper contacts between high level DoD officials and AWS.[3]  The press is covering the procurement because numerous non-profit government watchdogs have raised concerns about the ethics of participants.[4]  The press is covering this procurement because members of Congress

---

[2] Tonya Riley, "Amazon's Bid on a $10 billion Pentagon Contract is Riddled with Conflicts of Interest," Mother Jones (December 29, 2018), https://www.motherjones.com/politics/2018/12/amazons-bid-on-a-10-billion-pentagon-contract-is-riddled-with-conflicts-of-interest/   (reporting that AWS' "federal lobbying expenditures doubled from nearly $5 million in 2014 to more than $11 million in 2016 and topped $13 million last year").

[3] *See e.g.*, "JEDI:  Emails Between AWS and DoD Officials Reveal Questionable Judgment, Ethics Experts Say," Capital Forum Vol. 6 dated August 17, 2018, https://library.thecapitolforum.com/docs/2d6kne2jwe1n?u=241f9mqy8nht.

[4] Andrew Kerr, "Government Ethics Watchdogs Fear Amazon's Web of Influence May Have Tainted Pentagon's $10 Billion JEDI Cloud Deal," The Daily Caller (August 8, 2018), https://dailycaller.com/2018/08/08/sally-donnelly-defense-department-jedi-cloud-amazon/;   Pete Sweeney, "Amazon Pentagon ties may receive greater scrutiny," Reuters (Aug. 16, 2018), https://www.reuters.com/article/uk-usa-pentagon-breakingviews/breakingviews-amazon-pentagon-ties-may-receive-greater-scrutiny-idUSKBN1L10AS ("Both Donnelly and DeMartino

have requested an Inspector General review of "significant connections between DoD personnel charge with developing the JEDI requirements and the specific contractor," AWS.[5] The press is covering this procurement because DoD put a lifetime "Amazonian" in charge of the JEDI Cloud effort and that "Amazonian" then proceeded to advocate for positions favoring AWS and trashing its competitors.[6] The press is covering this procurement because AWS offered to buy a company from the DoD JEDI Cloud "lead PM" during the procurement.[7] The press is covering this procurement because AWS rehired that same JEDI Cloud lead PM during the ongoing procurement despite that he had access to vast quantities of highly sensitive information (both DoD and competitor), faced none of the controls offered by this protective order, and operates to this very day as an AWS General Manager and *competitive decisionmaker.*[8]

Accordingly, the Court should grant the application for access of Ms. Bruggman, experienced in-house counsel and member of the bar, who has certified that she does not participate in competitive decisionmaking and has agreed to the enhanced constraints relating to the protected material access that Defendant The United States requested.  Indeed, Ms. Bruggman will agree to additional reasonable protections as required – a position previously presented to AWS but declined in favor of its objection.

---

declared income from Amazon on ethics disclosures, and were working for Mattis when he visited Bezos in August 2017.")

[5]  Adam Mazmanian, "House appropriators seek IG probe of JEDI," FCW (Oct. 23, 2018),  https://fcw.com/articles/2018/10/23/jedi-cole-womack-letter.aspx.

[6] Aaron Gregg, "'Once an Amazonian, always an Amazonia'; Former Pentagon official's business ties draw scrutiny," Washington Post (Dec.18, 2018), https://www.washingtonpost.com/business/2018/12/18/once-an-amazonian-always-an-amazonian-former-pentagon-officials-business-ties-draw-scrutiny/?utm_term=.3f99148ff53e

[7]  *See id.*

[8]  David Harris, "Oracle Slams AWS 'Conflicts of Interest' in JEDI Cloud Lawsuit," CRN (Dec. 11, 2018), https://www.crn.com/news/cloud/oracle-slams-aws-conflicts-of-interest-in-jedi-cloud-lawsuit.

Dated:   January 2, 2019

Of Counsel:

Kara L. Daniels
Dana E. Koffman
Amanda J. Sherwood
Nathaniel Castellano
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Respectfully Submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Craig A. Holman
Craig A. Holman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone:  (202) 942-5722
Fax:  (202) 942-5999

Attorney of Record for Oracle America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of January 2019, I caused a true and correct copy of the foregoing Reply to the Objection by Defendant-Intervenor to the Application for Access to Information under Protective Order of Oracle America, Inc. In-House Counsel to be served by electronic delivery on:

William P. Rayel
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0302
Facsimile: (202) 307-0972
E-mail:   William.Rayel@usdoj.gov

*Counsel for Defendant*


Daniel R. Forman
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2504
Facsimile:  (202) 628-5116
E-mail:  dforman@crowell.com

*Counsel for Defendant-Intervenor*


/s/  Craig A. Holman