**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | |
|---|---|
| ORACLE AMERICA, INC., ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18-1880C |
| ) | |
| THE UNITED STATES, ) | Senior Judge Eric G. Bruggink |
| Defendant, ) | |
| ) | ▉ |
| and ) | |
| ) | |
| AMAZON WEB SERVICES, INC., ) | |
| Defendant-Intervenor. ) | |

**AMAZON WEB SERVICES, INC.'S RESPONSE TO ORACLE AMERICA, INC.'S
MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE
RECORD AND FOR LEAVE TO CONDUCT LIMITED DISCOVERY**

January 11, 2019

Of Counsel:

Olivia L. Lynch
Robert J. Sneckenberg
OLynch@crowell.com
RSneckenberg@crowell.com

Respectfully submitted,

s/ Daniel R. Forman
Daniel R. Forman
    (Counsel of Record)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Tel: (202) 624-2504
Fax: (202) 628-5116
DForman@crowell.com

*Attorneys for Amazon Web Services, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

QUESTION PRESENTED .......................................................................................................5

STATEMENT OF THE CASE .................................................................................................6

I.      Leadership Across DoD—with Significant Public Input—Designed the JEDI Cloud Procurement to Meet the Needs of the Warfighter............................................................6

II.     The Agency Decisions at Issue in This Protest.............................................................10

       A.     The Under Secretary of Defense and Responsible Contracting Officer Approved the Decision to Make a Single Award .................................................10

       B.     The Deputy Director of the Defense Digital Service Specifically Justified Each of the Solicitation's Gate Criteria .............................................................11

       C.     The Contracting Officer Determined that the JEDI Cloud Procurement Has Not Been Negatively Impacted by Any Conflicts of Interest..............................11

III.    Oracle's GAO Protest and Meritless Bias Allegations...................................................13

       A.     Oracle Wildly Overstates Deap Ubhi's Limited Involvement in the JEDI Cloud Procurement ..............................................................................................15

       B.     Oracle Wildly Overstates Anthony DeMartino's Limited Involvement in the JEDI Cloud Procurement....................................................................................17

IV.    GAO's Decision Denying Oracle's Protest and Oracle's Recycled Allegations in This Court ...........................................................................................................................18

ARGUMENT............................................................................................................................19

I.      Standards of Review for Bid Protest Supplementation and Discovery ...........................20

II.     None of Oracle's Broad Document Requests Are Necessary for Effective Judicial Review of the Thoroughly Documented Agency Decisions at Issue in This Protest........22

       A.     Offerors' Later-Submitted Proposals Are Irrelevant to the Threshold Propriety of the Solicitation..............................................................................................25

       B.     Oracle's Requests to Investigate Its Meritless Bias Allegations Are Irrelevant to this Court's Review of the Contracting Officer's Assessment.........................27

III.    Exhibit A to Oracle's Motion Is Not Necessary for Effective Judicial Review ..............29

IV.      Oracle's Meritless Conflict Allegations Do Not Warrant Third Party Discovery and Depositions from Individuals Who Were Not Decision-Makers in This Procurement ..... 30

     A.      Oracle's Inapposite Case Law Does Not Support Its Requested Discovery ......... 30

     B.      Oracle Has Not Carried Its Burden to Overcome the Presumption of Good Faith and Fair Dealing ......................................................................................... 32

         1.      Oracle Has Neither Identified Any Conduct That Is Hard to Explain Absent Bad Faith Nor Provided Anything More than Innuendo or Suspicion as to Potential Motivations for Bad Faith ................................. 33

         2.      Oracle's Requested Discovery Would Not Lead to Evidence Sufficient to Overcome the Presumption of Good Faith .......................... 35

V.      Oracle's Requested Discovery Would Unduly Interfere with the Agency's Lawful Discretion ...................................................................................................................... 37

CONCLUSION ................................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*AgustaWestland N. Am., Inc. v. United States,*
    880 F.3d 1326 (Fed. Cir. 2018) ......................................................................... 21

*Am-Pro Protective Agency, Inc. v. United States,*
    281 F.3d 1234 (Fed. Cir. 2002) .................................................................... 32, 35

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009) ................................................................... *passim*

*Beta Analytics Int'l, Inc. v. United States,*
    61 Fed. Cl. 223 (2004) ................................................................................ 22, 32

*CRAssociates, Inc. v. United States,*
    95 Fed. Cl. 357 (2010) ...................................................................................... 38

*DataMill, Inc. v. United States,*
    91 Fed. Cl. 722 (2010) ................................................................................ *passim*

*Diversified Maint. Sys., Inc. v. United States,*
    93 Fed. Cl. 794 (2010) ................................................................................ 30, 31

*E. W., Inc. v. United States,*
    100 Fed. Cl. 53 (2011) ................................................................................ 23, 25

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
    238 F.3d 1324 (Fed. Cir. 2001) ........................................................................ 38

*Jacobs Tech. Inc. v. United States,*
    100 Fed. Cl. 198 (2011) ....................................................................... 21, 37, 38

*Madison Servs., Inc. v. United States,*
    92 Fed. Cl. 120 (2010) ....................................................................... 22, 27, 30

*Oracle Am., Inc.,*
    B-416657 *et al.*, Nov. 14, 2018, 2018 CPD ¶ 391 .................................. 18, 19, 32

*Orion Int'l Techs. v. United States,*
    60 Fed. Cl. 338 (2004) ................................................................................ 30, 31

*Palantir USG, Inc. v. United States,*
    129 Fed. Cl. 218 (2016) ..................................................................... 30, 31, 33, 35

*Starry Assocs., Inc. v. United States,*
    125 Fed. Cl. 613 (2015) .............................................................................. *passim*

*Tauri Grp., LLC v. United States*,
  99 Fed. Cl. 475 (2011) .................................................................................. 23, 26

*Terry v. United States*,
  96 Fed. Cl. 156 (2010) .................................................................................. *passim*

**Statutes and Regulations**                                              **Page(s)**

10 U.S.C. § 2304a ................................................................................................ 10

28 U.S.C. § 1491 ................................................................................................. 20

FAR 16.504 ......................................................................................................... 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | | |
|---|---|---|
| ORACLE AMERICA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-1880C |
| | ) | |
| THE UNITED STATES, | ) | Senior Judge Eric G. Bruggink |
| Defendant, | ) | |
| | ) | ███████████████ |
| and | ) | |
| | ) | |
| AMAZON WEB SERVICES, INC., | ) | |
| Defendant-Intervenor. | ) | |

**AMAZON WEB SERVICES, INC.'S RESPONSE TO ORACLE AMERICA, INC.'S MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD AND FOR LEAVE TO CONDUCT LIMITED DISCOVERY**

Pursuant to the Rules of the United States Court of Federal Claims ("RCFC") and the December 13, 2018 Scheduling Order in this case, Amazon Web Services, Inc. ("AWS") hereby opposes Oracle America, Inc.'s ("Oracle") motion to supplement the administrative record and conduct discovery.

## INTRODUCTION

Oracle's Complaint is its second bite at the apple challenging the ground rules of the Department of Defense's ("DoD") Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement. Having already tried its hand at the Government Accountability Office ("GAO") and lost, Oracle now asks this Court to interfere in the extensively planned and critically important JEDI Cloud procurement. Notwithstanding that the procurement was reviewed and approved by numerous offices and decision-makers across DoD—each of whom thoroughly documented their relevant analyses—Oracle asks this Court to find that three specific

████████████████████████████████████

procurement decisions were somehow arbitrary and capricious: (1) the decision to make a single award; (2) the decision to include certain of the Solicitation's threshold Factor 1 Gate Criteria; and (3) the Contracting Officer's determination that the procurement was not tainted by any conflicts of interest.

For each of these decisions, the administrative record *already* includes the contemporaneous, documented determinations from the responsible Agency decision-makers. For example, regarding DoD's decision to make a single award, the record *already* contains both the Contracting Officer's formal Rationale and the Under Secretary of Defense for Acquisition and Sustainment's official Determination and Findings authorizing that decision. Regarding DoD's decision to include the Factor 1 Gate Criteria in the Solicitation, the record *already* includes the Defense Digital Service ("DDS") Deputy Director's formal Justification for each of those criteria. And regarding the Contracting Officer's decision that the procurement was not tainted by any alleged conflicts of interest, the record *already* includes the Contracting Officer's formal Assessment regarding the lack of any conflicts. Additionally, the administrative record *already* includes all of the materials considered and/or relied on by those decision-makers in reaching their decisions. Finally, in its GAO protest, Oracle had the opportunity to cross-examine both the Contracting Officer and the DDS Deputy Director regarding these issues, and the administrative record *already* includes that testimony, which further explains the bases for and rationality of each of the decisions at issue.

Critically, Oracle does not dispute that the administrative record already contains these voluminous materials—including the official, contemporaneously documented Agency decisions at issue. Nor does Oracle allege that any of the Agency decision-makers—the Contracting

Officer, the DDS Deputy Director, and the Under Secretary of Defense—were biased in any way. Thus, Oracle offers no basis to question the veracity of their official determinations.

However, Oracle now moves to supplement the administrative record and for broad discovery so that Oracle may *investigate* its own meritless allegations that two former government officials who were not the decision-makers at issue supposedly acted in a biased manner during the procurement. First, Oracle asks that this Court order the Government to produce eight broad categories of Agency materials—including many which may not even exist and forensic and metadata information regarding virtually every single document in the entire JEDI Cloud procurement.[1] Next, Oracle requests to supplement the Agency's administrative record with a personal blog post and tweet—neither of which were reviewed or considered by the Agency decision-makers at issue—by one of the former government officials that Oracle alleges may have been biased.[2] Finally, Oracle requests that it be allowed to serve third party discovery on and conduct depositions of the two former government officials that it alleges may have been biased.

For the following reasons, Oracle is not entitled to any of its requested materials.

*First*, the focus of this Court's deferential arbitrary and capricious review is the existing administrative record—*i.e.*, the official Agency determinations at issue and the specific materials

---

[1]     Oracle couches its eight requests as supposedly necessary to "complete" the record. Oracle Motion at 21. But Oracle is not seeking "to fill gaps" in the Agency's documentation of the materials considered by the decision-makers at issue; rather, Oracle is attempting "to investigate" its various assertions that two former government officials who were not decision-makers were supposedly "biased and that the bias affected" the procurement. *Cf. Starry Assocs., Inc. v. United States*, 125 Fed. Cl. 613, 622 (2015). Thus, Oracle's entire motion must be viewed through the lens of supplementation and/or discovery, not "completion."

[2]     Oracle also requested that Exhibit B to its motion be added to the record. Because the Government already included that document in the record, the request is moot.

considered by the Agency decision-makers in reaching those decisions. Absent allegations of bias *on the part of the specific Agency decision-makers*—which there are no such allegations here—there is no basis to expand the record beyond the official determinations at issue. Here, because the existing administrative record already includes the official determinations at issue (and more), the administrative record is already complete and no further materials are "necessary for effective judicial review."

*Second*, the personal blog post and tweet attached to Oracle's motion are irrelevant to this protest, as they were not considered by the Agency decision-makers at issue, do nothing to call into question the veracity of the official determinations, and are not necessary for this Court to review the rationality of those official determinations.

*Third*, Oracle's requested third-party discovery and depositions are particularly unwarranted. As a threshold matter, the responsible Contracting Officer contemporaneously investigated the two former government officials at issue, and she executed a formal Assessment that neither "negatively impact[ed] the integrity of the JEDI Cloud acquisition." That formal Assessment is the subject of this Court's review, not whatever hypothetical materials Oracle's broad investigation may or may not uncover. Additionally, while this Court's traditional test for bias discovery is irrelevant here—because Oracle has not alleged any bias on the part of the Agency decision-makers whose decisions are under review—Oracle nevertheless also fails under both prongs of that test: (1) Oracle has neither identified any conduct that is hard to explain absent bad faith nor provided anything more than innuendo or suspicion as to potential motivations for bad faith; and (2) Oracle's requested discovery would not lead to evidence sufficient to overcome the presumption of good faith. Accordingly, for each of these reasons, Oracle's requested discovery is neither necessary nor warranted.

*Finally*, Oracle's requested discovery would unduly interfere with the Agency's lawful discretion in conducting this ongoing procurement. The record already contains the relevant Agency decision-makers' official Determination, Justification, and Assessment decisions and complete analyses. While Oracle disputes the conclusions and sufficiency of those analyses, Oracle has not challenged the integrity and good faith of the actual Agency decision-makers. Thus, even if this Court were to agree with Oracle that a particular document or category of documents should have been considered, the proper remedy is to remand the matter to the Agency for the appropriate Agency decision-maker to conduct a supplemental investigation and execute a new determination. The Court need not—and, indeed, may not—conduct its own sweeping *de novo* investigation at Oracle's behest and then impose an outcome on the Agency. Granting Oracle's extremely broad discovery requests would lead to this very outcome and would require this Court to examine and evaluate newly produced materials in the first instance, which is the antithesis of the Tucker Act's deferential arbitrary and capricious review.

Accordingly, for each and all of these reasons, AWS respectfully requests that this Court deny Oracle's motion in its entirety.

## QUESTION PRESENTED

Whether Oracle should be permitted to conduct a broad, *de novo* investigation into the supposed bias of two former government officials where those individuals were not responsible for the procurement decisions at issue in this protest; the responsible Agency decision-makers contemporaneously documented and explained their official determinations; and Oracle has not alleged that the decision-makers were biased in any way in rendering and/or documenting their official determinations, which are already included and fully explained in the existing administrative record.

## STATEMENT OF THE CASE

The following sections briefly summarize the evolution of the JEDI Cloud procurement and key steps and decision-makers involved, as well as the development of the extensive record through Oracle's GAO protest. Oracle's Complaint and motion gloss over, strip of context, or completely ignore the extensive facts that contradict its paper-thin narrative. But, when viewed in full, the record not only contains the complete determinations and analyses of the relevant Agency decision-makers, it also establishes that the former government officials Oracle now seeks to investigate were *not* responsible for the decisions challenged in Oracle's Complaint.

## I. Leadership Across DoD—with Significant Public Input—Designed the JEDI Cloud Procurement to Meet the Needs of the Warfighter

In September 2017, the Deputy Secretary of Defense ("DSD") directed DoD to undertake a new initiative to accelerate adoption of cloud computing technologies through the acquisition of a modern enterprise cloud services solution that can support all classification levels. AR Tab 90 at 5947-5948.[3] As a result, the DDS "participated in multiple types of market research activities in support of the JEDI Cloud acquisition," including one-on-one meetings with vendors,[4] cloud focus sessions with DoD stakeholders (*e.g.*, USMC, Navy, USAF, etc.) and thought leaders (*e.g.*, MITRE, Gartner, etc.), and meetings with the Intelligence Community.[5]

---

[3]     Citations to "AR Tab" refer to the administrative record filed with this Court on January 10, 2019.

[4]     DDS conducted vendor meetings from October 12, 2017 to January 26, 2018. These meetings followed a consistent format, with meetings lasting anywhere from 60 to 90 minutes and including up to four DDS participants who used a standard set of questions. *See* AR Tab 20 at 367, 388-389 (Question Template for Vendor Meetings).

[5]     DDS was not the only group within DoD holding such meetings. The DoD Chief Information Officer ("CIO") and (then) Under Secretary of Defense for Acquisition, Technology and Logistics "also hosted 'cloud focus sessions' with each of the Military Services, larger DoD Components, and industry thought leaders." AR Tab 20 at 368.

*See* AR Tab 20 at 367, 390. On October 30, 2017, DoD released a public request for information ("RFI"), which would result in sixty-four separate responses from entities including but not limited to cloud service providers and integrators and resellers.[6] AR Tab 20 at 368, 391-396 (RFI); *see* AR Tabs 41, 44.

Separately, in November and December 2017 the Joint Staff, in consultation with DDS, developed the warfighting requirements for the JEDI Cloud. *See* AR Tab 75 at 5235. Joint Requirements Oversight Council Memorandum ("JROCM") 135-17, signed on December 22, 2017 by the Vice Chairman of the Joint Chiefs of Staff based on the recommendation of the Joint Requirements Oversight Council ("JROC"), established the following as the "cloud characteristics and elements of particular importance to warfighting missions": (1) Cloud Resiliency Linkage to Mission Criticality; (2) Cyber Defenses; (3) Cyber Defenders; and (4) Role-Based Training. AR Tab 17 at 321-324;[7] *see also id.* at 329-330. These requirements reflect the collective needs of the DoD[8] and, once JROCM 135-17 identified the warfighting requirements, "a team of experts from across the Department, who understand the technology, as well as understanding the war fighting need, spent time taking those requirements from the Joint

---

[6] On March 27, 2017, the Cloud Computing Program Office ("CCPO") released a Market Research Report that summarizes DDS's market research activities and key findings based on the RFI responses received. *See* Compl. ¶ 87; AR Tab 20 at 369-86. The Market Research Report "and *not* the individual [RFI] responses or any notes from the interested vendor meetings, were provided to decision makers." AR Tab 70 at 4986 (emphasis added).

[7] The JROCM 135-17 is identified as a key foundational document for the JEDI Cloud acquisition by such acquisition documents as the JEDI Cloud Acquisition Strategy. *See, e.g.,* AR Tab 25 at 472.

[8] *See, e.g.,* AR Tab 70 at 4986 (JROC "represents all of the Military Services in defining joint needs."); AR Tab 109 at 6505 ("Throughout the JROC process, the entire user community, including COCOMS, had opportunities for inputs and feedback leading up to the ultimate signing of the JROCM 135-17...").

Staff's list, and translating those into … the [Request for Proposal ("RFP")]." AR Tab 78 at

5408-5409 (DDS Deputy Director Testimony at 13:16-22, 12:1).

In an effort to encourage industry participation and ensure offerors had equal access to

JEDI Cloud information, DoD also hosted an industry day and published multiple draft

solicitation documents, prompting significant vendor response.[9] For example:

- Over 900 individuals attended the March 7, 2018 Industry Day;

- 46 vendors submitted over 1,000 comments on the initial March 7, 2018 draft RFP;

- 14 vendors submitted over 400 comments on the second April 16, 2018 draft RFP; and

- 7 vendors submitted over 100 comments on a draft pricing worksheet and pricing scenarios released in late May 2018.

Moreover, as DoD would later report to Congress, "[t]he military Service CIOs and COCOMs

reviewed the second draft of the solicitation package and provided comments, with particular

focus on user requirements and security, to ensure the JEDI Cloud effort would be responsive to

their requirements." AR Tab 109 at 6506-6506.

Finally, as part of the drafting of the Solicitation, in April 2018, "the JEDI Cloud Draft

RFP package, including related documents like the [Business Case Analysis], [Acquisition

Strategy], and Single Source D&F, went through a multi-day OSD peer review process" led by

the Director of Defense Procurement and Acquisition Policy ("DPAP"). AR Tab 75 at 5238; *see

also* AR Tabs 107, 113. "An OSD Peer Review is standard DoD practice for any acquisition

over $1 billion." AR Tab 75 at 5238.

---

[9]     *See also* AR Tab 75 at 5231 (noting that in addition to releasing two draft RFPs, DoD also released multiple deliberative process documents that it was not otherwise required to publish, such as the JROCM 135-17).

Only after completing all of the above steps did the Under Secretary of Defense authorize the JEDI Cloud Program Manager to release the JEDI Cloud RFP, which was done on July 26, 2018. *See* AR Tab 19 at 363; AR Tabs 1-15.[10] The following graphic summarizes these key steps and the numerous activities across DoD and high-level decision-makers involved in the procurement:



AR Tab 70 at 5022.[11]

---

[10]     DoD subsequently met with offerors and amended the Solicitation four times.

[11]     As of August 27, 2018, DoD had identified *seventy-two individuals* that were personally and substantially involved in drafting the JEDI Cloud requirement and drafting the RFP package (as well as supporting the acquisition package (*e.g.*, the Determination and Findings, Business Case Analysis, Acquisition Strategy, and Acquisition Plan)). AR Tab 64. This list includes the DSD, the Under Secretary of Defense for Acquisition and Sustainment, the DoD CIO, and the DoD Chief Management Officer ("CMO") as well as senior officials from the CCPO, Cost Assessment and Program Evaluation ("CAPE"), DDS, Defense Information Systems Agency ("DISA"), DPAP, the Joint Staff, National Security Agency ("NSA"), United States Cyber Command ("CYBERCOM"), and Washington Headquarters Services/Acquisition Directorate ("WHS/AD"), among others. *Id.*

## II.    The Agency Decisions at Issue in This Protest

With the foregoing context in place, the following sections address the limited Agency decisions at issue in this protest. Specifically, Oracle's Complaint challenges three issues; on each, the administrative record already contains the relevant decision-maker(s)' reasoned analysis and conclusion.

### A.    The Under Secretary of Defense and Responsible Contracting Officer Approved the Decision to Make a Single Award

Oracle's lead allegation is that the Agency's determination to make a single JEDI Cloud award violates law or regulation. Compl. ¶¶ 196-252 (Counts I-II). The record contains two contemporaneous Agency determinations comprehensively addressing this very issue.

First, on July 19, 2018, the Under Secretary of Defense executed a "Determination and Findings for Authority to Award a Task Order Contract to a Single Source." AR Tab 16. This Determination justifies a single-award Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract pursuant to the provisions of 10 U.S.C. § 2304a(d)(3) based on the Under Secretary's determination that "[t]he JEDI Cloud ID/IQ contract will provide only for FFP task orders for services for which prices are established in the contract for the specific tasks to be performed." AR Tab 16 at 319. The Determination identifies various factual findings to support the Under Secretary's official determination. *Id.* at 319-320.

Second, on July 17, 2018, the responsible Contracting Officer issued a detailed, 13-page Rationale explaining that a single-award approach is entirely consistent with and appropriate under both 10 U.S.C. § 2304a and Federal Acquisition Regulation ("FAR") 16.504(c) for each of the following reasons:

1. *Favorable Terms Exception*: Based on the Contracting Officer's knowledge of the market, more favorable terms and conditions, including pricing, will be provided if a single award is made.

2. *Administrative Cost Exception*: The expected cost of administration of multiple contracts outweighs the expected benefits of making multiple awards.

3. *Best Interest Exception*: Multiple awards would not be in the best interests of the Government.

AR Tab 24 at 457-464.  The DDS Deputy Director also signed the Contracting Officer's Rationale, attesting to the technical findings underlying the Contracting Officer's conclusion that multiple awards would not be in the Government's best interests.  *Id.* at 464.

### B. The Deputy Director of the Defense Digital Service Specifically Justified Each of the Solicitation's Gate Criteria

Oracle's second allegation is that three of the Solicitation's seven Gate Criteria, which offerors must pass in order to be accepted into the competitive range, supposedly exceed DoD's minimum needs and thus unduly restrict competition.  Compl. ¶¶ 253-328 (Counts III-V).

This issue is directly addressed by the DDS Deputy Director, who, on July 23, 2018, executed an official "Justification" for requiring an Offeror to receive an "Acceptable" rating for each of the Solicitation's Gate Criteria.   AR Tab 42.  The DDS Deputy Director's 9-page Justification explains in detail why "all Sub-factors under Factor 1 Gate Criteria are necessary and reflect the minimum requirements for JEDI Cloud."   AR Tab 42 at 952.  Additionally, on September 3, 2018, in connection with Solicitation amendments 1 and 2, the DDS Deputy Director executed a further "Justification" addressing, in part, Sub-Factor 1.2, High Availability and Failover.  AR Tab 43 at 955-56.

### C. The Contracting Officer Determined that the JEDI Cloud Procurement Has Not Been Negatively Impacted by Any Conflicts of Interest

The third allegation in Oracle's complaint is that the Contracting Officer failed to meaningfully investigate supposed conflicts of interest on the part of current and former government officials.  Compl. ¶¶ 329-92 (Counts VI-VII).  On this issue, the record already

includes the Contracting Officer's July 23, 2018 Assessment that the JEDI Cloud procurement was not negatively impacted by any conflicts of interest. AR Tab 33.

The Assessment shows that the Contracting Officer was keenly aware of her responsibility for considering a wide range of potential conduct that could arguably impact the integrity of the procurement. *See generally id.* After identifying a number of potentially relevant statutes and regulations, the Contracting Officer identified five instances in which individuals with potential financial conflicts of interest or impartiality restrictions were provided access—no matter how early and/or infrequently—to procurement sensitive information. *See id.* at 683 (citing FAR 3.104-7, 5 C.F.R. 2635.502, 18 U.S.C. § 208, and 41 U.S.C. §§ 2102-2104). Two of those instances concerned former government officials Deap Ubhi and Anthony DeMartino, neither of whose involvement with the JEDI Cloud procurement (to the extent that they were involved) the Contracting Officer found to negatively impact the integrity of the acquisition.

With respect to Mr. Ubhi, the Contracting Officer specifically noted his prior employment by AWS, his involvement in early JEDI Cloud market research activities, and the fact that Mr. Ubhi voluntarily recused himself from any participation in the JEDI Cloud procurement upon AWS's expression of interest in a start-up that he owned. *Id.* at 686. The Contracting Officer concluded that Mr. Ubhi's involvement was limited to "market research activities" that occurred over less than a seven-week time frame that ended with his recusal from JEDI Cloud procurement on October 31, 2017, and therefore he could not have "negatively impact[ed] the integrity of the JEDI Cloud acquisition." *Id.* at 686-687.[12]

---

[12] The Contracting Officer's analysis did not extend to whether AWS received unequal access to competitively sensitive information because "as of July 23, 2018 … AWS ha[d] not (Continued...)

With respect to Mr. DeMartino, the Contracting Officer recognized that he had previously provided consulting services to AWS and further noted his role as the "Chief of Staff/Deputy Chief of Staff for the Deputy Secretary and Secretary, respectively," and that he had consulted with DoD Standards of Conduct Office ("SOCO"). *Id.* at 685. The Contracting Officer concluded that the JEDI Cloud acquisition was not tainted by Mr. DeMartino's involvement given that his "involvement was ministerial and perfunctory in nature and he provided no input into the JEDI Cloud acquisition documents and did not participate personally and substantially in the procurement." *Id.*

## III.    Oracle's GAO Protest and Meritless Bias Allegations

Prior to the deadline for proposal submission, Oracle filed a pre-award protest with the GAO challenging DoD's determination to make a single award and certain Gate Criteria as supposedly unduly restrictive. Over the course of that protest, Oracle supplemented its initial filing first with allegations of bias on the part of Mr. Ubhi based on the fact that DoD identified him as having participated personally and substantially in market research for the JEDI Cloud procurement and later with allegations of bias on the part of Mr. DeMartino apparently upon discovering that he was mentioned in the Contracting Officer's Assessment.

In response to Oracle's allegations and at the direction of GAO, DoD produced over 4,000 pages of documents to Oracle, including but not limited to:

- Two statements from the Contracting Officer;

- Key JEDI Cloud acquisition documents that DoD had not already made public;

submitted a proposal yet." AR Tab 70 at 5021 (Contracting Officer statement noting that "[i]f AWS submits a proposal, [she] will investigate whether or not Mr. Ubhi was in anyway involved with AWS proposal process"). To the extent Oracle's Complaint challenges any such investigation that has not yet been completed, its allegations are premature.

- Potential competitors' responses to the October 30, 2018 RFI;

- A list of the seventy-two individuals that were personally and substantially involved in the JEDI Cloud procurement, their office and position, their role on the JEDI Cloud procurement, and the approximate timeframe each individual worked on the JEDI Cloud procurement;

- The Contracting Officer's official Assessment that no conflicts of interest "negatively impact[ed]" the procurement;

- The Conflict of Interest and Non-Disclosure Agreement that Mr. Ubhi executed;

- Documents regarding Mr. Ubhi's voluntary recusal on October 31, 2017 from all JEDI Cloud activities;

- Over 1,000 pages of emails, calendar invitations, and related materials pertaining to Mr. Ubhi and/or Mr. DeMartino (AR Tab 34 at 688-717; AR Tab 47 at 2783-2900, 3183-4302; AR Tab 51 at 4312-4437); and

- Over 200 pages of Slack messages[13] involving and/or pertaining to Mr. Ubhi (AR Tab 47 at 2901-3182).

Additionally, on October 11, 2018, GAO held a hearing to address issues including the purportedly restrictive RFP Gate Criteria and the Contracting Officer's investigation of potential conflicts of interest and appearances of impropriety. AR Tab 74; Compl. ¶ 190. Counsel for Oracle had the opportunity to cross-examine both:[14]

1. The Contracting Officer about the Rationale for use of a single-award (AR Tab 78 at 5707-5724) and Assessment that the JEDI Cloud procurement had not been tainted (*id.* at 5646-5676); and

2. The DDS Deputy Director regarding the justification for Gate Criteria 1.1 Elastic Usage (AR Tab 78 at 5474-5485), Gate Criteria 1.2 High Availability and Failover (*id.* at 5485-5502), and Gate Criteria 1.6, Commercial Cloud Offering Marketplace (*id.* at 5502-5506). The DDS Deputy Director was also questioned about the

---

[13] As explained by the Contracting Officer, "electronic conversations about JEDI Cloud are hosted in Slack, which is an electronic messaging tool that allows users to communicate with each other in the tool." AR Tab 75 at 5230.

[14] The GAO hearing lasted the entire day and resulted in a transcript of over 350 pages. *See* AR Tab 78.

Contracting Officer's investigation into both Mr. Ubhi and Mr. DeMartino.  *Id.* at 5537-5541.

As Oracle gained access to more documents and information, it stitched together a self-serving narrative from snippets of e-mails and informal Slack messages to create the impression that the purported bias of Mr. Ubhi and Mr. DeMartino impacted the single-award determination and/or resulted in adoption of the purportedly unduly restrictive Gate Criteria.  However, as is briefly addressed below, Oracle's Complaint and Motion are replete with mischaracterizations and over-exaggerations of the roles that these two individuals played in the JEDI Cloud procurement.

### A.  Oracle Wildly Overstates Deap Ubhi's Limited Involvement in the JEDI Cloud Procurement

Oracle alleges that Mr. Ubhi drove "the JEDI Cloud single award acquisition structure and other solicitation requirements aimed at limiting the competition."  Oracle Motion at 1; *id.* at 9 ("As the 'lead PM' for the acquisition, Ubhi drove the determination that DoD would award the vast JEDI Cloud effort to a single contractor."); *id.* at 11 ("Ubhi participated in developing the acquisition strategy and in defining the JEDI Cloud requirements").  Oracle goes so far as to state that "[t]he significance of Ubhi's role in the development of the JEDI Cloud acquisition is difficult to overstate."  *Id.* at 9.

Not so.  When DDS began investigating enterprise cloud solutions, Mr. Ubhi joined the DDS team to work on market research, which he did for at most seven weeks until he voluntarily recused himself from further participation on the JEDI Cloud procurement on October 31, 2017.  *See* AR Tab 64; AR Tab 70 at 4987.

What the record actually shows about Mr. Ubhi's involvement is as follows:

- Mr. Ubhi recused himself well before the JROCM defined the warfighter's requirements on December 22, 2017, and work on the requirements documents, such

15

as the Statement of Objectives ("SOO") and the RFP, began in January 2018. *See* AR Tab 78 at 5408 (DDS Deputy Director Testimony at 13:9-10 (noting that General Silva signed the JROCM after "a process that lasted about 45 days")); *id.* at 5405 (DDS Deputy Director Testimony at 10:13-15 (explaining that "any requirement documents, such as the SOO or the RFP" were not started "before January of 2018")); *see also* AR Tab 75 at 5235.

- Mr. Ubhi recused himself well before work began on the acquisition strategy. AR Tab 78 at 5407 (DDS Deputy Director Testimony at 12:4-6 (explaining that "we started the acquisition strategy, I want to say in January, but it could have been in late December.")).

- Although DDS started having conversations in October 2017 about the format of the Business Case Analysis, when Mr. Ubhi recused himself, another DDS employee became responsible for this document. AR Tab 78 at 5406 (DDS Deputy Director Testimony at 11:19-21 (testifying that "we really started writing the business case, as it existed in its final form, around the November-December time frame")); *id.* at 5442-5443 (DDS Deputy Director Testimony at 47:22-48:14 (explaining that Mr. Ubhi "was involved in early conversations about the format of the business case should be, and what the outline might look like. I think it's, again, probably worth highlighting, that there were a variety of different folks across the Department who were involved in those conversations, who come at this from a variety of different perspectives … in November, we restructured the business case, again, entirely, once we had filled in some of the details.")); *id.* at 5615-5616 (Contracting Officer Testimony at 220:17-221:1 (explaining that: "Ubhi's involvement with the business case extended to drafting a table of contents of things that may be included in the -- that may be fleshed out subsequently as the business case was built. However, when Deap Ubhi recused himself, October 31st of 2017, and another person took over.")).[15]

- Oracle's repeated characterizations of Mr. Ubhi as "the lead for the acquisition" or a product manager for the "JEDI Cloud acquisition" are not "fair" characterizations. *Id.* at 5531 (DDS Deputy Director Testimony at 136:7-16 ("At the time, Deap was a product manager, who was . . . one of the leads of work we were doing at the behest of the Cloud Executive Steering Group. The initial product he was asked to take the lead on was the market research report … I think characterizing him as the lead for the acquisition is not fair. It's not true.")); *id.* at 5532 (DDS Deputy Director Testimony at 137:2-6 (responding to the question that what Mr. Ubhi was managing "would be the JEDI Cloud acquisition, correct?" with the answer "No, that's the distinction I was trying to make. I would say the product here was the market research report.")); *see also id.* at 5579 (Contracting Officer Testimony at 184:7-10 (identifying Lt. Col. Kaight Meyers as the program manager for JEDI Cloud)).

---

[15] Ultimately, the DoD CMO approved the Business Case Analysis, dated April 11, 2018, submitted by the CCPO Program Manager. AR Tab 21 at 398.

Thus, Oracle's characterizations of Mr. Ubhi's role and "significance" in driving key decisions and drafting the Gate Criteria for this procurement are grossly inaccurate.

**B.      Oracle Wildly Overstates Anthony DeMartino's Limited Involvement in the JEDI Cloud Procurement**

Oracle argues that Anthony DeMartino, a former government official who previously served as both the Chief of Staff for the DSD and the Deputy Chief of Staff to the Secretary of Defense, also had a hand in crafting "the JEDI Cloud single award acquisition structure and other solicitation requirements aimed at limiting the competition."  Oracle Motion at 1; *see also* Compl. ¶ 37 ("DeMartino … participated personally and substantially in the acquisition by, among other things, advocating procurement positions, including single source; participating substantively in JEDI Cloud meetings and briefings; and editing official communications and other procurement-related documents.").

However, the record shows instead that Mr. DeMartino's role was exactly as the Contracting Officer repeatedly described it:[16] "ministerial and administrative in nature, limited to

---

[16]      In a statement before GAO, the Contracting Officer explained that "[t]he facts that I documented about Mr. DeMartino … are based on my personal knowledge; conversations with [Agency Counsel], [the DDS Deputy Director], and other individuals who assisted in drafting the SOO; the safeguarding protocols and practices I established in coordination with the legal team; and the security controls afforded by Google Drive and Slack."  AR Tab 75 at 5239; *see also id.* at 5229 (discussing the "variety of safeguarding protocols and practices to maintain acquisition integrity" put in place by the "JEDI Cloud legal and contract teams" in light of "the number, dispersion, and seniority of the people involved and the high visibility of the acquisition," and the fact that "DoD senior leadership, Congress, the media, private industry, and other agencies have all requested information about the pending JEDI cloud acquisition").  The Contracting Officer further explained that her personal knowledge regarding the development of the JEDI Cloud Solicitation and related documents is based on the fact that "[t]he JEDI Cloud team held countless meetings and working sessions to develop [these documents]" and either the Contracting Officer or "one of [her] contract specialists, attended almost every meeting and [the Contracting Officer] was briefed on the ones that [she] missed."  AR Tab 75 at 5234; *see also id.* at 5239 (noting that she had "almost daily interaction with the majority of the individuals personally and substantially involved in the JEDI Cloud acquisition").

scheduling and attending meetings." AR Tab 75 at 5232; *see also* AR Tab 33 at 685.  For

example:

- The Contracting Officer drafted and finalized the RFI and "can personally attest to the fact that [she] never received, verbally or in writing, any feedback about the content of the RFI from Mr. DeMartino … Mr. DeMartino was not asked to provide and did not provide feedback about the RFI."  AR Tab 75 at 5235-5236.  "Mr. DeMartino was never granted access to the Google Drive, as previously noted, or otherwise provided access to the RFI responses."  *Id.* at 5236.

- The Contracting Officer can "personally attest to the fact that [Mr. DeMartino] did not have any involvement in drafting or reviewing the JEDI Cloud Solicitation, AS, Business Case Analysis…, single award determination, or other pre-decisional sensitive documents."  *Id.* at 5232.  "Neither [the Contracting Officer] nor the DDS personnel working on JEDI Cloud ever received any inputs from Mr. DeMartino about any acquisition documents, including, but not limited to, the [Business Case Analysis], [Acquisition Strategy], and/or single award determination."  *Id.* at 5237.

- Mr. DeMartino did not participate in the multi-day OSD Peer Review "in any capacity."  *Id.* at 5238.

- "[T]the only edits that [the Contracting Officer is] aware of that [Mr. DeMartino] has ever been asked for was in relation to an op-ed article worked on by the -- on behalf of the Deputy Secretary of Defense, Mr. Shanahan."  AR Tab 78 at 5588 (Contracting Officer Testimony at 193:13-16).

Oracle's assertions otherwise directly contradict the Contracting Officer's unequivocal testimony

and other record evidence.

## IV.    GAO's Decision Denying Oracle's Protest and Oracle's Recycled Allegations in This Court

After reviewing the entire record, including the Agency decision-makers'

contemporaneous Determination, Justification, and Assessment decisions and the Contracting

Officer and DDS Deputy Director's hearing testimony, GAO denied Oracle's protest.  *Oracle*

*Am., Inc.*, B-416657 *et al.*, Nov. 14, 2018, 2018 CPD ¶ 391.  First, GAO held that the

Contracting Officer's Rationale and the Under Secretary of Defense's Determination were

entirely consistent with statutory and regulatory requirements and reasonably supported the

determination to make a single award. *Id.* Second, GAO held that the Agency—and in particular the DDS Deputy Director's Justification—"presented multiple bases—including, but not limited to, . . . concerns regarding national security—that reasonably support all of the challenged requirements." *Id.* Finally, GAO held that "*even if* we were to conclude that either [Mr. DeMartino] or [Mr. Ubhi] meaningfully participated in the agency's determinations regarding the RFP requirements, *it would be improper for our Office to recommend that the agency proceed with the JEDI Cloud procurement in a manner that is inconsistent with meeting its actual needs.*" *Id.* (emphasis added).[17]

After losing at GAO, Oracle filed its Complaint in this Court on December 6, 2018. Oracle's Complaint challenges the same three issues before GAO: (1) the Contracting Officer's and Under Secretary of Defense's decisions to make a single award; (2) the DDS Deputy Director's Justification for the Gate Criteria; and (3) the sufficiency of the Contracting Officer's investigation and Assessment that the procurement was not "negatively impact[ed] by any alleged conflicts of interest. *See generally* Compl.

## ARGUMENT

After filing its Complaint, Oracle informally requested that the Government include in the administrative record twenty-four separate categories of materials that Oracle contended were relevant to its protest. *See* Oracle Motion, Ex. C at 5-6. The Government responded, appropriately, that it would include in the administrative record those materials actually

---

[17] Separately, GAO held that to the extent Oracle alleged that the Contracting Officer failed to investigate or consider the fact that Mr. Ubhi ultimately returned to AWS after departing from DDS, any such allegation was premature given that the Agency had not yet evaluated proposals or had an opportunity to consider that issue.

considered by the relevant Agency decision-makers, plus the voluminous additional information already produced in response to Oracle's GAO protest. *See id.*

Still not satisfied, Oracle filed the instant motion and requests that this Court (1) order the Government to produce eight broad categories of materials; (2) admit as supplements to the administrative record exhibits attached to Oracle's motion; and (3) permit Oracle to obtain third party discovery and depositions from two former government officials who were not responsible for any of the Agency decisions at issue in Oracle's protest. For the reasons that follow, Oracle's motion is flawed in its entirety and should be denied. Most importantly, because Oracle's Complaint challenges three contemporaneously documented decisions made by high-ranking DoD officials—and because Oracle has not challenged the motivations or veracity of any of those actual decision-makers—Oracle's requested supplementation and discovery are entirely irrelevant to this Court's arbitrary and capricious review.

## I.      Standards of Review for Bid Protest Supplementation and Discovery

This Court reviews agency procurement decisions under the Administrative Procedure Act's ("APA") deferential arbitrary and capricious standard. *See* 28 U.S.C. § 1491(b)(4). In applying that standard, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). This serves "to guard against courts using new evidence to 'convert the 'arbitrary and capricious' standard into effectively de novo review.'" *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)); *see also id.* at 1384 (emphasizing that "[t]he Supreme Court has warned against undue

judicial interference with the lawful discretion given to agencies" (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004)).

Accordingly, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence *precludes effective judicial review.*'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735) (emphasis added). Stated differently, supplementation is *not* appropriate unless it is specifically necessary to resolve the "ultimate question" in the case. *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (holding that "[t]he Court of Federal Claims was . . . required to explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether the [agency's procurement decision] was arbitrary and capricious").

Additionally, where responsible agency officials are charged by statute or regulation with conducting a given analysis—*e.g.*, regarding alleged conflicts of interest in a procurement—and such an analysis is challenged, the Court may evaluate the rationality of that analysis, including "whether the agency's failure to conduct further . . . analysis or . . . investigation was arbitrary and capricious"; but the deferential framework of APA review precludes the Court from itself weighing extra-record evidence to determine whether, in the first instance, the Court may have come to a different conclusion than the agency. *See, e.g.*, *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 208 (2011) (despite holding that contracting officer's failure to further investigate issue was irrational, denying request to supplement administrative record with materials to be investigated because "the agency—not the Court or [protester]—is charged with conducting the . . . analysis and . . . investigation (if warranted)"). Likewise, where an agency's "explanation has been furnished within an administrative record that appears complete, . . . the party proffering extra-record material 'must indicate some personal animus or bias on the part of agency officials,

reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual.  Absent this threshold showing, a plaintiff's bare allegations . . . are insufficient to place the issue or the proffered extra-record evidence before the court.'" *Terry v. United States*, 96 Fed. Cl. 156, 165 (2010) (quoting *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010)).

Finally, a protester requesting to investigate alleged bias by current or former Government officials faces an even higher bar.  Because Government officials are presumed to act in good faith, a protester seeking such discovery "must: (1) make a threshold showing of either a motivation for the government employee to have acted in bad faith or of conduct that is hard to explain absent bad faith; and (2) persuade the court that discovery could lead to evidence that would provide the level of proof sufficient to overcome the presumption of regularity and good faith."  *DataMill, Inc. v. United States*, 91 Fed. Cl. 722, 730-31 (2010) (citing *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004)).

With these standards thus clarified, the following sections explain why Oracle is not entitled to any of the supplementation or discovery it requests.

## II.      None of Oracle's Broad Document Requests Are Necessary for Effective Judicial Review of the Thoroughly Documented Agency Decisions at Issue in This Protest

Oracle's motion first requests that this Court order the Government to produce eight broad categories of Government records and/or forensic information that, although not considered by the relevant Agency decision-makers, Oracle contends are relevant to its allegations in this protest.  Oracle Motion at 23-27.  One request seeks offerors' proposals and evaluations in response to the Solicitation.  *Id.* at 25.  The remaining seven seek to investigate the

activities of three former government officials. *Id.* at 23-27.[18]  However, none of Oracle's requests are necessary for effective judicial review.

As a threshold matter, the administrative record is already complete as to the Agency decisions challenged in Oracle's Complaint.  As discussed above, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom*, 564 F.3d at 1379 (quoting *Camp*, 411 U.S. at 142).  In turn, the "administrative record already in existence" "'depends on what the agency did in reaching its decision'" and, thus, should "include the information *relied upon* by the *relevant agency decision makers* and their advisers in reaching the decisions being challenged, and the *contemporaneously articulated reasons* for these decisions." *E. W., Inc. v. United States*, 100 Fed. Cl. 53, 56 (2011) (quoting *Tauri Grp., LLC v. United States*, 99 Fed. Cl. 475, 480-81 (2011) (emphasis added)); *see also id.* at 56 (explaining that supplementation is not appropriate unless "a court is not presented with 'the full administrative record that was before the [*agency decision maker*] *at the time he made his decision*'" (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420-21 (1971)) (italics added; other alterations in original).

Here, the administrative record already includes the official Determination, Justification, and Assessment decisions challenged in Oracle's Complaint.  First, the administrative record already includes both (1) the Contracting Officer's July 17, 2018 Rationale and (2) the Under Secretary of Defense's July 19, 2018 Determination and Findings justifying the determination to make a single JEDI Cloud award.  *See* AR Tabs 16, 24; *see also supra* Statement of the Case

---

[18]  Oracle's Complaint alleges that the Contracting Officer supposedly failed to consider alleged bias on the part of Mr. Ubhi and Mr. DeMartino.  Yet, Oracle's motion seeks extensive discovery regarding a third former government official, Sally Donnelly.  Given that Ms. Donnelly is not at issue in Oracle's Complaint, Oracle's requests for documents regarding her are categorically irrelevant.

("SOC") § II.A.  Second, the administrative record already includes the DDS Deputy Director's July 23, 2018 Justification specifically explaining the necessity of each of the specific Gate Criteria.  *See* AR Tab 42; *see also supra* SOC § II.B.  Third, the administrative record already includes the Contracting Officer's July 23, 2018 Assessment that the procurement was not tainted by any conflicts of interest.  *See* AR Tab 33; *see also supra* SOC § II.C.[19]

Oracle's Complaint challenges the rationality of the decision-makers' conclusions in these documents, and/or the sufficiency of the decision-makers' investigations.  However, Oracle does ***not*** allege that any of the three decision-makers were themselves biased, or that their reasoned determinations did not reflect their actual analyses and conclusions with respect to the decisions at issue.  Accordingly, the administrative record is already complete as to the ultimate questions in this protest, and Oracle's requests to broadly investigate further Agency documents and information are irrelevant to this Court's limited APA review.

Additionally, even assuming *arguendo* that the record were not already complete, Oracle's requested documents are also not necessary because none were before the decision-makers when they made their determinations or relevant to those determinations, as discussed in the following sections.

---

[19]     During its GAO protest, Oracle had the opportunity to cross-examine both the Contracting Officer and the DDS Deputy Director on each of these issues; that testimony is also included in the administrative record, and further explains and justifies each of the decisions at issue in this protest.  *See* AR Tab 78; *see also supra* SOC § III.  The only relevant Agency decision-maker who has not specifically testified regarding their official analysis is Under Secretary of Defense Ellen Lord.  While her further testimony and explanation is not relevant here and thus would not be necessary for effective judicial review, it is notable that despite its exceedingly broad requests, Oracle has *not* requested any discovery from or deposition of the Under Secretary.  Instead, Oracle wastes the Court's and the parties' time requesting miscellaneous documents about individuals who were not the relevant decision-makers in this procurement.

### A. Offerors' Later-Submitted Proposals Are Irrelevant to the Threshold Propriety of the Solicitation

While Oracle's bias allegations and requests are the primary focus of its motion, Oracle also includes a single request for "[t]he proposals submitted in response to the Final RFP and the Agency's associated evaluation." Oracle Motion at 25. The *entirety* of Oracle's argument is that these documents "evidence the impact of the unduly restrictive criteria challenged by Oracle," and thus should be added to the administrative record. *Id.* But even if Oracle were correct that the Agency's evaluations would "evidence the impact" of the Gate Criteria on offerors' proposals, the full proposals and evaluations are still not relevant to Oracle's actual allegations and likely will never be.

*First*, as noted above, the administrative record should "include the information *relied upon* by the relevant agency decision makers", *i.e.*, "'the full administrative record that was before the [agency decision maker] *at the time he made his decision*.'" *E. W., Inc.*, 100 Fed. Cl. at 56 (quoting *Overton Park*, 401 U.S. at 420-21) (emphasis added). The relevant decisions in this instance are the decision to make a single award and/or the decision to include the threshold Gate Criteria in the Solicitation. *See* Compl. ¶¶ 196-328. Inherently, those decisions were made well before offerors submitted their proposals *in response to* the Solicitation, which already included those requirements. Thus, offerors' later-submitted proposals, and the Agency's even later evaluations, were neither "relied upon" by the Agency decision-makers nor before the decision-makers "at the time" they made their decisions and, therefore, may not be added to the already complete administrative record.

*Second*, Oracle's request is premature. The Agency has not yet completed its evaluations of offerors' proposals. Thus, there are no evaluations to review and Oracle instead is effectively asking this Court to conduct its own *de novo* review to determine, in the first instance, whether

and to what extent offerors' proposals comply with the Solicitation's various technical requirements. Once again, however, that is not APA review. *Axiom*, 564 F.3d at 1380.

**Third**, even if the Agency were to complete its evaluations and then to form a competitive range during the pendency of this protest, offerors' proposals would still not be relevant to Oracle's current allegations. Rather, they would only become relevant if an offeror such as Oracle were excluded from the competition and then filed (or amended) a complaint to specifically challenge that exclusion.[20] And even then, only the excluded offeror's proposal and evaluation would be relevant to that hypothetical protest. The Court would review the excluded offeror's proposal and the Agency's corresponding evaluation and assess whether that evaluation comported with the terms of the Solicitation and applicable law and regulation; there would be no need for the Court to review any other offeror's proposal. *See, e.g.*, *Tauri Grp.*, 99 Fed. Cl. at 481 ("Of course, in a bid protest, the administrative record need not consist of every single document related in any way to the procurement in question, but may be reasonably limited to materials relevant to the specific decisions being challenged."). Thus, Oracle is not only premature but once again grossly overreaching in requesting each and every offeror's complete proposal and evaluation.

In sum, Oracle is not entitled to offerors' proposals and evaluations in this pre-award protest. Accordingly, Oracle's request for those materials should be denied.

---

[20] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████ then its arguments challenging the Gate Criteria as overly restrictive would fail for lack of prejudice and would be required to be dismissed (which, again, would mean that no proposals or evaluations are relevant or necessary for effective judicial review).

### B. Oracle's Requests to Investigate Its Meritless Bias Allegations Are Irrelevant to this Court's Review of the Contracting Officer's Assessment

Where, as here, a protester challenges a decision that the relevant Agency decision-maker specifically addressed—*i.e.*, the Contracting Officer's reasoned Assessment that the procurement was not "negatively impact[ed]" by any alleged conflicts of interest—a protester faces an even higher bar than the traditional "necessary for effective judicial review" test to bring extra-record evidence before the Court. For example, as Judge Sweeney explained in *Terry*, where an agency's "explanation has been furnished within an administrative record that appears complete, . . . the party proffering extra-record material 'must indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual. Absent this threshold showing, a plaintiff's bare allegations . . . are insufficient to place the issue or the proffered extra-record evidence before the court.'" 96 Fed. Cl. at 165 (quoting *Madison*, 92 Fed. Cl. at 130).

Here, Oracle cannot meet that burden. The Contracting Officer's Assessment—and her further testimony before GAO—already contains her complete analysis and conclusion, and none of Oracle's broad categories of requested documents even plausibly call into question the veracity of her analysis, let alone demonstrate "personal animus or bias" *by the Contracting Officer* such that her Assessment would be in any way "pretextual." *Id.* For example:

- Five of Oracle's requests seek information about communications, documents, or meetings—some of which occurred as far as ten months before DoD issued the Solicitation—that may or may not even show any involvement of Mr. Ubhi or Mr. DeMartino in this procurement. *See* Oracle Motion at 23-27 (Requests 1, 2, 3, 5, and 8).[21] None relate in any way to whether the Contracting Officer's reasoned Assessment was in any way "pretextual."

---

[21] Request 1: "All documents related to the role of DeMartino, Ubhi, or Donnelly in the preparation of the September 13, 2017 Memorandum."

(Continued...)

- One of Oracle's requests is for offerors' proposals and evaluations. *See id.* at 25 (Request 4). As discussed in the preceding section, those materials are not relevant.

- One of Oracle's requests seeks documents from the SOCO, which was not responsible for and did not make the decisions challenged in Oracle's protest. *See id.* at 27 (Request 7).[22] Moreover, to the extent the Contracting Officer considered any materials from that office, the administrative record already includes "all documents that [she] considered" in determining that neither Mr. Ubhi nor Mr. DeMartino "negatively impact[ed]" the integrity of the procurement. AR Tab 75 at 5236.

- Finally, Oracle requests every single document on the entire JEDI Cloud Google Drive,[23] as well as "*metadata showing the author, name of document, version, date, etc.*" for all such documents. *See id.* at 26 (request 6) (emphasis added). This request is perhaps unprecedented in a bid protest, and it is not entirely clear how Oracle would even review or present such voluminous forensic information to this Court. However, the Court need not ever reach that issue, as the request is not possibly relevant to assessing the rationality of the Contracting Officer's documented Assessment. Absent any evidence, let alone any allegation, that the Contracting Officer's Assessment was in any way made in bad faith or pretextual, it is irrelevant whether any given documents were on the Google Drive, or what their voluminous metadata may or may not show.[24]

---

Request 2: "All documents related to the role of DeMartino, Ubhi, or Donnelly in the Secretary of Defense's visit to AWS during the summer of 2017."

Request 3: "All documents related to the CESG meetings and any other DoD meetings that Donnelly, Ubhi, and DeMartino attended related to the JEDI Cloud."

Request 5: "Documents in Defendant's possession related to (i) communications between AWS and Ubhi, DeMartino or Donnelly while Ubhi, DeMartino, and Donnelly were employed or specially employed by DoD, (ii) communications involving Ubhi, DeMartino, or Donnelly about the JEDI Cloud, and (iii) communications involving Ubhi, DeMartino, or Donnelly about AWS."

Request 8: "All documents related to the JEDI Cloud which DeMartino, Donnelly, or Ubhi created or accessed."

[22] Request 7: "All non-privileged SOCO documents or communications regarding the JEDI Cloud or its participants."

[23] The JEDI Cloud Google Drive is the electronic repository for all JEDI Cloud documents—both official and unofficial.

[24] Although still not relevant, the Contracting Officer stated unequivocally that Mr. Ubhi's access to the Google Drive was "immediately" revoked following his voluntary recusal in October 2017, and Mr. DeMartino was "never" given access to the Google Drive. AR Tab 78 at 5580 (Contracting Officer Testimony at 185:21-22); AR Tab 75 at 5232, 5236-37.

For each of these reasons, none of Oracle's broad requests relate to "personal animus or bias" on the part of the Contracting Officer. Accordingly, they provide no basis to second-guess her contemporaneously documented and further explained Assessment that the procurement was not impacted by any alleged conflicts of interest. Accordingly, each of Oracle's requests should be denied.

## III. Exhibit A to Oracle's Motion Is Not Necessary for Effective Judicial Review

Oracle next asks this Court to add to the Agency's administrative record a personal blog post and tweet authored by Mr. Ubhi. *See* Oracle Motion, Ex. A. In the blog post, Mr. Ubhi expresses disagreement with certain of the policies and/or positions espoused by the President, but concludes by reaffirming his commitment "to serve faithfully, to perform my duties at my highest capacity, so that our men and women in uniform can be more effective soldiers." *Id.* at 1-4. The tweet, meanwhile, is eleven words commending a public commitment by the CEO of his then-former employer to fighting a particular social policy with which Mr. Ubhi disagreed. *Id.* at 5.

Oracle attempts to spin these documents as establishing that Mr. Ubhi was supposedly biased and incapable of performing his official Government duties in an impartial manner. *E.g.*, Oracle Motion at 8-9. The documents on their face refute that characterization. If anything, they simply show that Mr. Ubhi is interested in particular social policies and that he takes seriously his commitment to "serve faithfully" and "perform . . . at [his] highest capacity," with his ultimate priority being "our men and women in uniform" and their warfighting needs. Oracle Motion, Ex. A at 4.

Regardless of what these documents do or do not show about Mr. Ubhi, they are irrelevant to the issues in this protest. They do nothing to call into question the impartiality or

veracity of the Contracting Officer, the DDS Deputy Director, or the Under Secretary of Defense. Accordingly, they are not necessary for effective judicial review. *See, e.g.*, *Axiom*, 564 F.3d at 1380; *Terry*, 96 Fed. Cl. at 165; *Madison*, 92 Fed. Cl. at 130.

## IV. Oracle's Meritless Conflict Allegations Do Not Warrant Third Party Discovery and Depositions from Individuals Who Were Not Decision-Makers in This Procurement

Not content with the voluminous production already, or even with its broad requests of the Agency, Oracle requests permission to depose and obtain discovery from two third parties: Mr. Ubhi and Mr. DeMartino. *See* Oracle Motion at 30-39; Oracle Motion, Exs. E, F (Oracle Notices of Deposition and Requests for Production of Documents). As discussed below, neither Oracle's cited case law nor its proposed legal standard for discovery supports its broad requests.

### A. Oracle's Inapposite Case Law Does Not Support Its Requested Discovery

Oracle argues that its discovery requests are supported by various decisions where this Court previously allowed limited discovery into credible allegations of bad faith by *agency decision-makers* or *offerors*. *See id.* at 6 (citing *Starry Assocs., Inc. v. United States*, 125 Fed. Cl. 613 (2015); *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794 (2010); *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338 (2004)). Oracle is wrong.

As a threshold matter, none of Oracle's cited decisions involved a situation where, as here, the protest challenged thoroughly documented agency determinations and there were no allegation of bias or wrongdoing of any kind on the part of the actual Agency decision-makers. For that reason alone, the administrative record need not and may not be supplemented.

Moreover, in *Starry*, the protester alleged that the agency's decision to cancel a solicitation was a "pretext" to avoid having to comply with a GAO decision that would have resulted in the protester receiving the work. 125 Fed. Cl. at 617. This Court allowed

supplementation and discovery into "credible allegations of bias" by the specific agency employee who "*was clearly the decision maker* with regard to the cancellation of the solicitation and failure to follow GAO's direction." *Id.* at 622-23 (emphasis added). Here, by contrast, neither Mr. Ubhi nor Mr. DeMartino was the decision-maker for any of the Agency decisions challenged in Oracle's protest. Nor has Oracle alleged bias on the part of any of the actual decision-makers. Nor has Oracle provided this Court any legitimate basis to question the veracity of the decision-makers' official Rationale, Determination, and Justification analyses, or the Contracting Officer's and DDS Deputy Director's further explanatory testimony at GAO.

In *Palantir*, Judge Horn carefully scrutinized each of the protester's specific requests for supplementation and found, *inter alia*, that the agency itself had documented instances in which agency personnel "lost some of their objectivity with respect to how they presented information on Palantir." 129 Fed. Cl. at 239-40. Judge Horn permitted very limited supplementation and discovery related to the specific instances of bias recognized by the agency and the specific personnel involved. *Id.* Here, by contrast, the Agency has not identified any individuals as having "lost . . . their objectivity." Quite the opposite, the Contracting Officer contemporaneously documented her no conflicts Assessment and has since vehemently defended Oracle's scattershot allegations.

Finally, in *Diversified* and *Orion*, the questions concerned potential fraud on the part of offerors. For example, the awardee in *Diversified* had knowingly relied on a "backdated" lease. 93 Fed. Cl. at 796. In *Orion*, the protester alleged that the awardee's proposal had "fraudulently" misrepresented information regarding a particular key personnel. 60 Fed. Cl. at 344-46. Judges Williams and Wolski, respectively, allowed limited discovery on those narrow, "dispositive" issues. *Diversified*, 93 Fed. Cl. at 796. Here, by contrast, there is no allegation or admission of

any fraud by any offeror or Agency decision-maker. Nor are Oracle's allegations of bias supported by hard facts or in any way "dispositive."[25]

Accordingly, this case is unlike any of those on which Oracle relies; and none supports its requested discovery. For this reason as well, Oracle's request should be denied.

### B. Oracle Has Not Carried Its Burden to Overcome the Presumption of Good Faith and Fair Dealing

Government officials are presumed to operate in good faith. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Thus, in cases where a protester alleges that an agency *decision-maker* is biased and discovery is needed to assess whether or how that bias impacted their decision, this Court has held that the protester must *both* (1) make a threshold showing of "'motivation for the Government employees in question to have acted in bad faith or conduct that is hard to explain absent bad faith,'" *and* (2) demonstrate that "'discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity.'" *Starry*, 125 Fed. Cl. at 622 (quoting *Beta Analytics*, 61 Fed. Cl. at 226). Moreover, while the burden of proof at the motion to supplement stage may not be as high as for a final decision on the merits, the protester must nonetheless provide more than "innuendo or suspicion" to demonstrate bad faith and justify discovery. *Beta Analytics*, 61 Fed. Cl. at 226 (denying discovery); *accord DataMill*, 91 Fed. Cl. at 731; *see also, e.g.*, *Terry*, 96 Fed. Cl. at 164 (requiring "a 'strong showing of bad faith or improper behavior' such that without discovery the administrative record cannot be trusted" (citation omitted)).

---

[25] To the contrary, and as GAO already held, *even if* Oracle's requested discovery were to theoretically show that Mr. Ubhi and/or Mr. DeMartino were biased *and* that one or both played substantial roles in the procurement—both of which hypotheticals are contradicted by the record—"it would be improper . . . to recommend that the agency proceed with the JEDI Cloud procurement in a manner that is inconsistent with meeting its actual needs." *Oracle Am., Inc.*, B-416657 *et al.*, Nov. 14, 2018, 2018 CPD ¶ 391.

Here, Oracle relies on this two-part standard in arguing that it is entitled to investigate its allegations of bias by Mr. Ubhi and/or Mr. DeMartino. *See* Oracle Motion at 5-6, 38. Oracle is again incorrect, as this standard is irrelevant where, as here, there are no allegations of bias on the part of the Agency decision-maker whose decision is at issue. Nevertheless, even if Oracle's preferred standard were applicable, Oracle's motion fails both prongs.

### 1. Oracle Has Neither Identified Any Conduct That Is Hard to Explain Absent Bad Faith Nor Provided Anything More than Innuendo or Suspicion as to Potential Motivations for Bad Faith

Where this Court has previously allowed discovery of alleged bias, it has typically been because the existing administrative record already contained overwhelming evidence of, at a minimum, questionable conduct. For example, prior to this Court's decision to grant discovery in *Starry*, the record already established that "a previously-recused agency official stepped in to cancel a solicitation after the agency was unsuccessful in multiple efforts to award the contract to his former employer," *and*

> the same allegedly self-recused official was consulted regarding the make up of the [Technical Evaluation Panel], was kept informed of the process by the TEP panelists that he recommended, advised one potential TEP member that he had a bias issue while ignoring the same issue presented by his own recommendee, made known his preference for one offeror, and allegedly attempted to bias a performance rating for the protestor.

125 Fed. Cl. at 623. Similarly, in *Palantir*, Judge Horn's decision to allow discovery was heavily influenced by existing record evidence of "the modification or destruction" of prior agency documents and an agency investigative report expressly finding that agency staff had "lost some of their objectivity." 129 Fed. Cl. at 239-40.

By contrast, Judges have not found a sufficient predicate for discovery where, as here, the protester's allegations were conclusory and/or contradicted by the existing record. *See, e.g.*, SOC § III, *supra*. For example, in *DataMill*, the protester alleged that a competitor's employee

"was a 'key and pivotal person'" who, together with two agency program office employees, "conspired to influence the [procurement] decision" by, *e.g.*, supplying "patently false" information" for the agency's decision-making process. 91 Fed. Cl. at 731. Judge Sweeney, however, rejected the protester's "bald[] assert[ions] that '[a]ll three were critical to the decision made and provided substantial information," and instead explained that the protester "fail[ed] to elaborate as to how these individuals"—who were not the ultimate decision-makers—"allegedly exerted their influence." *Id.*; *see also, e.g.*, *Terry*, 96 Fed. Cl. at 164-65 (denying requested discovery where protester alleged that agency official other than Contracting Officer was biased but Contracting Officer had specifically explained that official "was not involved in the procurement process").

Here, having already obtained a more than fulsome record through its GAO protest, Oracle cherry picks isolated statements and informal Slack messages to weave a narrative of supposed bias. However, pull at the thread even the slightest bit and Oracle's story unravels.

For example, with respect to Mr. Ubhi, Oracle unconvincingly asserts that his personal political musings supposedly demonstrated clear bias, even though Mr. Ubhi expressly reiterated his commitment "to serve faithfully, to perform my duties at my highest capacity, so that our men and women in uniform can be more effective soldiers." Oracle Motion, Ex. A at 4. Similarly, Oracle harps on the Contracting Officer's description of Mr. Ubhi's advocacy in a single meeting as "robust" as if that supposedly evidences bad faith; yet, Oracle ignores the evidence—in the very same transcript discussion—that there were multiple "robust opinions" for both sides of the issue, and Mr. Ubhi's opinion was simply "one of the robust opinions" for his

side. *See id.* at 10 (citing Draft AR Tab 77 (Contracting Officer Testimony at 347:7-14)).[26] Finally, Oracle attempts to use Mr. Ubhi's voluntary recusal as evidence of supposed bias, when in reality it demonstrates precisely the opposite: Mr. Ubhi acted specifically to avoid any potential conflict by voluntarily recusing himself from any JEDI activities before he eventually returned to AWS.

With respect to Mr. DeMartino, Oracle's entire argument is predicated on its unfounded allegations that he supposedly participated personally and substantially in the JEDI Cloud procurement. But that is thoroughly refuted by the record, including the Contracting Officer's Assessment and GAO testimony. *See, e.g.*, SOC §§ II-III, *supra*.

Ultimately, unlike in *Starry*, Oracle has not identified any questionable conduct that could only be explained by bad faith. And unlike in *Palantir*, the Agency has not conceded any instances of bias or impartiality. Rather, just as in *DataMill*, Oracle overstates the supposed involvement of the individuals at issue and relies on "bald[] assert[ions]" of alleged wrongdoing, and nothing more than innuendo and suspicion. Accordingly, Oracle has not carried its burden.

### 2. Oracle's Requested Discovery Would Not Lead to Evidence Sufficient to Overcome the Presumption of Good Faith

Oracle's motion also fails because Oracle cannot establish that its requested discovery would lead to evidence sufficient to overcome the longstanding presumption that Government officials act in good faith. *See, e.g.*, *Am-Pro*, 281 F.3d at 1239. For example, Oracle baldly asserts that, "[a]s the 'lead PM' for the acquisition, Ubhi drove the determination that DoD

---

[26] This was also a widely-attended, "early meeting" specifically designed to "ask[] specific questions . . . to get points of view, technical points of view." AR Tab 78 at 5629-5630 (Contracting Officer Testimony at 234:1-2, 234:19-21, 235:5-8). Thus, far from supporting Oracle's insinuation of bias, the record reflects that Mr. Ubhi was simply participating in open and honest dialogue, which is precisely what a Government official in his role at that time should have been doing.

would award the vast JEDI Cloud effort to a single contractor," Oracle Motion at 9,[27] and that Mr. Ubhi had a role in making other "critical procurement decisions," *id*. at 3. Similarly, Oracle contends that Mr. DeMartino supposedly "lobbied on behalf of" and "directed efforts" in order to favor AWS. *See* Oracle Motion at 32. But all of Oracle's allegations are directly contradicted by the record.

For example, as discussed in detail above, Mr. Ubhi was one of many DDS employees supporting initial market research efforts in September and October 2017, and then voluntarily recused himself and had no further involvement whatsoever with the JEDI Cloud procurement. His access was immediately revoked, and he had no role in preparing any of the Solicitation's requirements or in preparing or approving any of the formal Agency determinations at issue in this protest, all of which were executed long after he left the Government.

Similarly, contrary to Oracle's attempts to recharacterize Mr. DeMartino's "ministerial and administrative" functions as supposedly substantive, the Contracting Officer repeatedly and consistently explained that Mr. DeMartino "was never granted access to the Google Drive," AR Tab 75 at 5237, and "did not have any involvement in drafting or reviewing the JEDI Cloud Solicitation, AS, Business Case Analysis (BCA), single award determination, or other pre-decisional sensitive documents." AR Tab 75 at 5232; *see also* AR Tab 33 at 685.[28]

---

[27]     Tellingly, Oracle's characterizations of Mr. Ubhi's supposed "lead" role comes not from the administrative record but instead from puffery by Mr. Ubhi himself in criticizing the President's policies. *See* Oracle Motion at 9.

[28]     *See also, e.g.*, AR Tab 75 at 5235 ("[DeMartino] did not review or provide input into the JROCM that established the warfighting requirements for the JEDI Cloud. He did not attend any of the meetings with the Joint Staff about the JEDI Cloud JROCM."); *id.* at 5237 ("Neither I nor the DDS personnel working on JEDI Cloud ever received any inputs from Mr. DeMartino about any acquisition documents . . . .").

Given the exceedingly limited roles played by Mr. Ubhi and Mr. DeMartino, and the fact that they were not decision-makers for any aspect of the JEDI Cloud procurement, let alone for the Agency decisions challenged in Oracle's protest, even if discovery were granted it would not lead to evidence sufficient to overcome the presumption of good faith. *See, e.g., Terry*, 96 Fed. Cl. at 164-65 (denying motion because, despite alleging bias on part of other agency official, protester did not allege bias by Contracting Officer and thus could not overcome presumption that Contracting Officer "conducted … procurement with regularity and in good faith"). For this reason as well, Oracle has not carried its burden, and its request for discovery should be denied.

## V. Oracle's Requested Discovery Would Unduly Interfere with the Agency's Lawful Discretion

In *Axiom*, after finding that the Court erred in allowing supplementation and inserting itself into the agency's contracting process, the Federal Circuit emphasized that "[t]he Supreme Court has warned against undue judicial interference with the lawful discretion given to agencies." 564 F.3d at 1384 (citing *Norton*, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.")). Here, although Oracle does not request precisely the same outcome as in *Axiom*, the effect would be the same: undue judicial interference.

For example, in *Jacobs*, the protester filed a motion to compel supplementation and discovery so that it could investigate whether an ongoing procurement was tainted by an organizational conflict of interest ("OCI") and/or potential Procurement Integrity Act ("PIA") violation. 100 Fed. Cl. at 207-08. The Court, however, explained that the motion was "inappropriate" because "*the agency—not the Court or [protester]—is charged with conducting the OCI analysis and . . . PIA investigation (if warranted).*" *Id.* at 208 (emphasis added). Thus, even though the Court ultimately concluded that it was arbitrary and capricious for the agency

not to further investigate certain of the allegations raised by the protester, *id.* at 210, the Court still denied the motion for supplementation and discovery. *See id.* at 222 (instead enjoining agency from proceeding without the agency itself first considering the information); *see also CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 384 (2010) ("[I]f the record before the court precludes a determination as to whether 'the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure,' *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001), and the claimed error, alone or in combination, appears prejudicial, *the court must remand the matter to the agency to allow it to supply, in the first instance, the missing explanation*." (emphasis added)).

Here, as in *Jacobs*, Oracle does not truly seek discovery to contest the rationality of the Agency's documented decisions, which are already in the administrative record. Instead, Oracle seeks discovery to enable it, and this Court, to conduct a *de novo* review of the entire procurement—but that is fundamentally inconsistent with the Tucker Act's deferential arbitrary and capricious bid protest review.

Indeed, perhaps the only circumstance in which discovery may be the appropriate course of action rather than remand is where remand would be to the very same Government officials already demonstrated to be biased. In such circumstances, there could be concern that the biased individuals would be "less than candid" in investigating and reporting on their own activities. *See, e.g.*, *Starry*, 125 Fed. Cl. at 621, 624. Here, that is not a concern. As discussed throughout this brief, there are no allegations that any of the agency decision-makers in this case were biased. Rather, Oracle's bias allegations pertain only to two *former* government officials who the record establishes played virtually no role in this procurement and exerted no influence on

the ultimate Solicitation.  Thus, even if this Court were to determine that the Contracting Officer,

DDS Deputy Director, or Under Secretary of Defense could have conducted a more thorough

investigation or analysis of any of the issues challenged in Oracle's Complaint, the proper

remedy would be to remand for further review, not to open the door to Oracle's broad discovery.

## CONCLUSION

For each and all of the foregoing reasons, AWS respectfully requests that the Court deny

Oracle's motion in its entirety.

January 11, 2019

Of Counsel:

Olivia L. Lynch
Robert J. Sneckenberg
OLynch@crowell.com
RSneckenberg@crowell.com

Respectfully submitted,

s/ Daniel R. Forman
Daniel R. Forman
      (Counsel of Record)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Tel: (202) 624-2504
Fax: (202) 628-5116
DForman@crowell.com

*Attorneys for Amazon Web Services, Inc.*