# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>AMAZON WEB SERVICES, INC.,<br><br>    Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REDACTED VERSION**
**01/23/2019**

Case No. 18-1880C
Senior Judge Eric G. Bruggink

▮▮▮▮▮▮▮▮▮▮▮▮▮

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD AND FOR LEAVE TO CONDUCT LIMITED DISCOVERY

*Of Counsel:*

Kara L. Daniels
Dana E. Koffman
Amanda J. Sherwood
Nathaniel E. Castellano
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Craig A. Holman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone:  (202) 942-5722
Fax:  (202) 942-5999
Email:  craig.holman@arnoldporter.com

*Attorney of Record for Oracle America, Inc.*

**TABLE OF CONTENTS**

                                                                                    **Page**

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND.................................................................................8

III. ARGUMENT........................................................................................................10

   A.  The Agency Records That Oracle Seeks Address Fundamental Protest Issues
       And Advance Meaningful Judicial Review (Oracle Mem. IV.A.B, DoD Opp.
       at I, II, AWS Opp. at I, II)..........................................................................10

       1.  The Court Requires the Full Factual Record of the Participation of the
           Conflicted Individuals To Review Meaningfully Oracle's Allegations
           and the CO's No-Impact Determination.....................................................10

       2.  Each Objection to Oracle's Request For Agency Documents Fails...........15

   B.  Oracle Has Established The Need For DoD Record Supplementation of
       Exhibit A (Oracle Mem. at IV.B., AWS Opp. at III)............................................20

   C.  The Conflicts of Interest And Appearances Of Impropriety Raised By The
       Participation Of Ubhi And DeMartino Warrant Limited Discovery (Oracle
       Mem. at IV.B; DoD Opp. at II.C, D; AWS Opp. at IV, V). ...................................22

       1.  The Ubhi Misconduct, and the Absence of Basic Information from the
           Record, Warrant the Limited Ubhi/AWS Discovery Sought....................23

       2.  The DeMartino Misconduct, and the Absence of Basic Information
           from the Record, Warrant the Limited Discovery Sought.........................28

       3.  The GAO Decision Does Not Negate the Need for Discovery. ................31

       4.  The Agency's Declarations Support the Need for Supplementation and
           Discovery. ................................................................................................33

IV.  CONCLUSION....................................................................................................34

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Asarco, Inc. v. EPA,*
   616 F.2d 1153 (9th Cir. 1980) .......................................................................15

*AshBritt, Inc. v. United States,*
   87 Fed. Cl. 344 (2009) ..................................................................................22

*Axiom Res. Mgmt., Inc. v. United States,*
   564 F.3d 1374 .................................................................................................4

*Dairyland Power Co-op. v. United States,*
   77 Fed. Cl. 330 (2007) ..................................................................................17

*Diversified Maint. Sys., Inc. v. United States,*
   93 Fed. Cl. 794 (2010) ..........................................................................4, 15, 22

*Impresa Construzioni Geom. Domenico Gaurifi v. United States,*
   238 F.3d 1324 (Fed. Cir. 2001).....................................................................11

*Inforeliance Corp. v. United States,*
   118 Fed. Cl. 744 (2014) ..................................................................................4

*Joint Venture of Comint Sys. Corp. v. United States,*
   100 Fed. Cl. 159 (2011) ...........................................................................10, 11

*K & R Eng'g Co., Inc. v. United States,*
   616 F.2d 469 (Ct. Cl. 1980) ............................................................................3

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
   91 Fed. Cl. 347, 357 (2010) ...........................................................................20

*L-3 Services, Inc.,*
   B-400134.11, Sept. 3, 2009, 2009 CPD ¶ 171 ...............................................32

*Lockheed Martin Corp. v. United States,*
   124 Fed. Cl. 709 (2016) ..................................................................................19

*MG Altus Apache Co. v. United States,*
   102 Fed. Cl. 744 (2012) ..................................................................................15

*Molina-Crespo v. U.S. Merit Sys. Protection Bd.,*
   547 F.3d 651 (6th Cir. 2008) ..........................................................................26

*Mori Assocs., Inc. v. United States,*
   98 Fed. Cl. 572 (2011) ..................................................................................12

*NetStar-1 Gov. Consulting, Inc. v. United States*,
    101 Fed. Cl. 511 (2011) ................................................................................33

*Oracle Am., Inc.*,
    B-416657, *et seq.*, Nov. 14, 2018, 2018 CPD ¶ 391 ..........................................32, 33

*Palantir USG Inc. v. United States*,
    129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).........................22, 29

*Starry Assocs., Inc. v. United States*,
    125 Fed. Cl. 613 (2015) ...........................................................................4, 22

*In re Subpoena Duces Tecum*,
    145 F.3d 1422 (1998)..................................................................................17

*Tauri Group, LLC v. United States*,
    99 Fed. Cl. 475 (2011) ...............................................................................14

*Tech Systems, Inc. v. United States*,
    97 Fed. Cl. 262 (2011) ...............................................................................21

*Terry v. United States*,
    96 Fed. Cl. 156 (2010) ...............................................................................13

*TRW Envtl. Safety Sys., Inc. v. United States*,
    18 Cl. Ct. 33 (1989) ....................................................................................4

*United States v. Mississippi Valley Generating Co.*,
    364 U.S. 520 (1961)................................................................................3, 32

**STATUTES**

18 U.S.C. § 208...............................................................................................25

**REGULATIONS**

5 C.F.R. § 734.302 ...........................................................................................26

5 C.F.R. § 2635 ........................................................................................*passim*

48 C.F.R. § 1.102-2(c)(1)......................................................................................3

48 C.F.R. § 3.101-1.....................................................................................1, 3, 11

48 C.F.R. § 3.104 .............................................................................................24

**OTHER AUTHORITIES**

Exec. Order No. 13770, 82 Fed. Reg. 9333 (Jan. 28, 2017)............................................7

## I.   INTRODUCTION

Tacitly recognizing that the JEDI procurement misses the mark, the Department of Defense ("DoD" or "the Agency") declares Federal Acquisition Regulation ("FAR") 3.101's mandates, including that "Government business shall be conducted in a manner above reproach" and that agencies must "avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships," as mere "aspirational goals." (*Compare* 48 C.F.R. § 3.101-1 *with* DoD Opp. at 21.)  But excluding conflicted government personnel from procurements and rebuking companies that make monetary overtures (corporate purchase, job offers, etc.) to officials during procurements are not aspirations for agencies to meet when convenient – they are bedrock principles of the federal procurement system, grounded in Title 18 of the United States Code, Title 5 of the Code of Federal Regulations, and FAR Parts 1 and 3. These statutes and regulations are all that stand between competition and corruption.

DoD has not conducted this significant ten-billion dollar acquisition in a manner above reproach or strictly avoided conflicts of interest.  To the contrary, <u>DoD did not even screen</u> the participants for conflicts as its most basic procurement policies require.  No conflict-of-interest questionnaires exist for Deap Ubhi or Anthony DeMartino, minimum requirements in even a modest DoD procurement.  Unsurprisingly, given the absence of meaningful screening efforts, DoD allowed these individuals to participate in the procurement despite patent conflicts of interest.  As a result, scores of press articles exist questioning this procurement due to the Amazon Web Services, Inc. ("AWS")-DoD personnel connections; Congress has requested an Inspector General investigation and passed legislation rebuking the single-award approach challenged by Oracle America, Inc. ("Oracle"); non-profit government watchdogs have questioned the insider involvement of personnel with AWS ties; numerous trade associations have criticized the structuring of the procurement; and three of the four competitors have

publicly questioned the procurement structure and transparent favoritism.  (Compl. at ¶¶ 1-4.) Still, DoD and AWS would have this Court believe that the widespread concerns about this substantial acquisition lack merit, while advocating that the Court avoid obtaining even the most basic facts.

DoD and AWS demand that the Court apply presumptions of regularity and bad faith merits standards to Oracle's allegations of prohibited conflicts of interest by government personnel and conflicts created by AWS' decision to solicit, purchase a business from, and hire the JEDI lead product manager during the procurement.[1]  Neither presumptions of regularity nor bad faith standards, however, have any place in assessing allegations that DoD failed to screen for and address statutory and regulatory conflicts – much less in determining whether record supplementation and discovery is warranted.  Instead, the statutes and regulations involved set an objective standard, which presumes that no man (honest or not) may faithfully serve two masters:

> The obvious purpose of the statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare.  The moral principle upon which the statute is based has its foundation in the Biblical admonition that no man may serve two masters, Matt. 6:24, a maxim which is especially pertinent if one of the masters happens to be economic self-interest.  Consonant with this salutary moral purpose, Congress has drafted a statute which speaks in very comprehensive terms....
>
> It is also significant, we think, that the statute does not specify as elements of the crime that there be actual corruption or that there be any actual loss suffered by the Government as a result of the defendant's conflict of interest. This omission indicates that the statute establishes an objective standard of conduct, and that whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, regardless of whether there is positive corruption. The statute is thus directed not only at dishonor, but also at conduct that tempts

---

[1] To be certain, Oracle also has robust evidence demonstrating Ubhi's bias, including (but not limited to) public statements by Ubhi such as "Once an Amazonian, Always an Amazonian", repeated attacks on AWS competitors, inappropriate attacks on government officials supporting multi-cloud approaches, and more.  (Compl. at ¶¶ 53-69, 337-66; Ex. A to Oracle Mem.)

dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. . . .

The statute is directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption. The seriousness of this evil quite naturally led Congress to adopt a statute whose breadth would be sufficient to cope with the evil.

*United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 548-49, 562 (1961) (noting that any contract formed where such a conflict exists is "nonenforceable" notwithstanding the absence of any actual corrupt actions);[2] *K & R Eng'g Co., Inc. v. United States*, 616 F.2d 469, 475 (Ct. Cl. 1980) (finding contract unenforceable based on government employee's conflict and noting, "it is the potential for injuring the public interest created by a conflict of interest that requires invalidation of the tainted contract.").

Both the FAR and Office of Government Ethics ("OGE") regulations incorporate this principle, by making clear that the mere appearance of impropriety is the measure by which courts must evaluate such government-contractor conflicts. 48 C.F.R. § 3.101-1 ("The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."); *id.* at § 1.102-2(c)(1) ("An essential consideration in every aspect of the [procurement] System is maintaining the public trust."); 5 C.F.R. § 2635.502 (requiring recusal based on personal and business relationships and noting that: "An employee's reputation for honesty and integrity is not a relevant consideration for purposes of any determination required by this section.").[3] So critical are these regulations to the integrity of the procurement process that this Court has found that the presence of a violation requires redress

---

[2] All emphasis of quoted material in this submission is added unless otherwise noted.
[3] 5 C.F.R. § 2635.101 ("Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain.").

3

(prejudice or not): "That is to say, where there occurs within the federal procurement process a violation of a conflict of interest statute, which exists for the purpose of protecting the very integrity of that process, <u>any contract arising from such tainted process must be disaffirmed</u>." *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 69 (1989) (sustaining bid protest). Thus, the arguments of DoD and AWS lack merit. No presumption of regularity exists where colorable allegations of such conflicts exist, bias standards of proof do not apply, and Oracle need not prove the involved personnel were final decisionmakers.

Oracle also need <u>not</u> prove the merits of its protest in order to obtain record completion/supplementation or discovery. *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 748 (2014) ("A plaintiff seeking supplementation or discovery need not, however, meet the same burden of proof that it ultimately must carry on the merits."). Instead, Oracle must only establish that the supplementation is "necessary in order not 'to frustrate effective judicial review.'" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (*quoting Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)). This Court has approved supplementation where, as here, the complaint alleges that the agency decisionmaker failed to consider relevant information, *Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794, 801 (2010) ("It is well established that the [AR] may be supplemented when the agency allegedly failed to consider information relevant to its final decision."), or where the information sought for supplementation would by its very nature "not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations." *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744 (2014) (authorizing depositions) (citation omitted); *see also Starry Assocs., Inc. v. United States*, 125 Fed. Cl. 613 (2015) (same).

Here, Oracle amply meets its burden. The Agency hand-selected Ubhi to serve as the

██████████████████████████████████████

JEDI Cloud "lead PM", despite Ubhi's historic employment by, public statements of affiliation with, and ongoing connections to AWS. Ubhi previously worked at AWS before joining the Defense Digital Service ("DDS") in the summer of 2016, and he returned to AWS in a leadership position in November 2017, where he remains today. While acting as a DoD's leader of the JEDI procurement, Ubhi and AWS discussed AWS buying one of Ubhi's businesses and Ubhi rejoining AWS in a leadership position. Ubhi also made public statements affirming his allegiance to AWS during the period. Ubhi's conduct gives rise to two separate conflict issues: (i) have DoD and Ubhi created an appearance of impropriety or biased the procurement given that Ubhi participated in prohibited business dealings and employment discussions with AWS while serving as the procurement's lead PM; and (ii) has AWS created a further conflict of interest by engaging in employment discussions and re-hiring Ubhi during the procurement given Ubhi's extensive access to confidential DoD and JEDI competitor information.

The Contracting Officer's ("CO") assessment of these patent Ubhi conflicts spans less than one page. (AR Tab 33 at 686-87.) The CO did not interview or ask any questions of Ubhi, failed to identify when or how the Ubhi-AWS business negotiations began, did not identify the documents Ubhi accessed, downplayed and mischaracterized Ubhi's acquisition role, and entirely ignored Ubhi's AWS re-employment. (*See, e.g.*, AR Tab 78 at 5603:1-6, 5609:18-19, 5642:6-7, 5645:13-22-5646:1-4, 7-11, 5656:7-5657:18.)

Despite that the Administrative Record ("AR") lacks even the most basic information regarding the Ubhi-AWS business contacts (beyond that they occurred), DoD and AWS argue that the Court should not permit record supplementation or discovery. DoD and AWS instead demand that the Court presume Ubhi "promptly recused himself" (DoD Opp. at 12; AWS Opp. at 15), even though Ubhi's October 31, 2017 recusal note indicates otherwise: "Particularly,

Tablehero, a company I founded, may soon engage in <u>further partnership discussions</u> with Amazon...." (*See* AR Tab 45 at 2777.) The incomplete AR lacks material information – e.g., who contacted Ubhi, when the communications started, how they started, what AWS offered Ubhi, etc. – information critical for the Court to review Ubhi's conduct against the statutory and regulatory standards and the CO's no-impact decision. (AR Tab 33 at 686; AR Tab 78 at 5656:21-5657:4; *id.* at 5645:18-251:2.)

Similarly absent from the CO's investigation and the incomplete AR are any facts about AWS' re-employment discussions with Ubhi. DoD (contradicting its claim of an adequate record) proffers a declaration to explain the omission: "In my July 23 determination, I did not consider whether AWS had an organizational conflict of interest based upon AWS' employment of Mr. Ubhi or any other individual ... I am currently considering whether AWS' employment of Mr. Ubhi (and potentially others) creates an OCI that cannot be avoided or mitigated." (DOJ Opp. Appx., Brooks Decl. at 1-2.) To be certain, this AWS-conflict requires investigation especially given DoD's recent admission that Ubhi downloaded the entire Google drive to his laptop from DoD's servers. (DOJ Opp. Appx., Kasper Decl. at 6.) But the relevance of AWS' employment of Ubhi is not merely an AWS conflict of interest. To the contrary, the AWS-Ubhi employment discussions required <u>Ubhi's immediate recusal</u> from the JEDI procurement. 5 C.F.R. § 2635.602 ("[A]n employee who is seeking employment or who has an arrangement concerning prospective employment must comply with the applicable recusal requirements of §§ 2635.604 and 2635.606...."). Yet, like the business communications, the CO has no idea when the Ubhi-AWS employment communications commenced.

Ubhi gave notice regarding his departure on November 13, 2017. (AR Tab 46 at 2782.) Ubhi, however, only recused himself on October 31, 2017, thirteen days earlier. (AR Tab 45.)

DoD would have the Court presume that the first employment overture and all negotiations between Ubhi to return to AWS occurred _after_ his recusal on October 31, 2017 and before his resignation thirteen days later on November 13, 2017.   But again, such unnecessary guesswork invites errors and impedes meaningful review.

With respect to DeMartino (a high level political employee appointee and former AWS consultant), the record establishes that the DoD Standards of Conduct Office ("SOCO") warned DeMartino against participation in any matter involving AWS.   (AR Tab 51 at 4345.) DeMartino _knowingly ignored_ the specific direction and involved himself in the JEDI procurement.   And when SOCO learned that DeMartino had violated SOCO's direction (following press contacts regarding his involvement), SOCO directed DeMartino's immediate recusal from JEDI matters.  (AR Tab 75 at 5233 (¶ 13).)  If DeMartino's involvement had been appropriate as DoD claims, SOCO would not have required DeMartino's immediate recusal.

Numerous Title 18 and 5 C.F.R. provisions prevented DeMartino's participation. Moreover, for appointees (like DeMartino), the President's ethics pledge extends the regulatory prohibition to two years. Exec. Order No. 13770, 82 Fed. Reg. 9333 (Jan. 28, 2017).  Pursuant to regulations and the ethics pledge, DeMartino should not have participated in matters involving AWS until at least January 2019.   Again, the less-than-one page CO review of the issue lacks critical information. (AR Tab 33 at 685.)  The CO did not interview DeMartino.  (AR Tab 78 at 5686:11-14; _id._ at 5695:2-9.)  The CO did not review DeMartino's emails or other documents to test her understanding of his role in the acquisition.  (_Id._)  The CO did not participate in the JEDI meetings DeMartino called.  (_Id._)  Yet, without even these most basic steps, the CO asserted that this senior political appointee participated in JEDI merely as a note-taker.  (AR Tab 33 at 685.) The few DeMartino documents in the record, largely collected due to Ubhi-related productions,

demonstrate that DeMartino was no note-taker. (Oracle Mem. at 16-19.) In fact, even now DoD changes tack and describes DeMartino as a liaison for the Secretary and Deputy Secretary of Defense. (DoD Opp. at 3.) Regardless, as with Ubhi, the issue is serious and this Court ought not to have to guess about basic facts regarding DeMartino's participation in the procurement. Record completion/supplementation and limited discovery is thus appropriate.

## II.    FACTUAL BACKGROUND

Oracle restates the factual background contained in its Complaint and Motion. Given the limited time and space within which to reply to DoD and AWS, Oracle has not responded to all of their factual allegations. The Oppositions, however, contain numerous incorrect, misleading assertions. For instance, DoD asserts: "In August, 2017, the Defense Innovation Board, along with former Secretary of Defense, James Mattis, visited technology companies in Seattle, Washington and Palo Alto, California." (DoD Opp. at 6.) In fact, Secretary Mattis and his core team visited AWS only and after meeting with AWS, returned to Washington.[4]  Shortly thereafter, the Deputy Secretary of Defense tasked DDS to lead the JEDI procurement.

DoD also claims that "the single award strategy was not made until well after [Ubhi's] recusal," citing a DoD February 2018 press release that the Cloud Executive Steering Group ("CESG") purportedly was "still assessing relevant data in an effort to determine final acquisition strategies." (DoD Opp. at 8 (AR Tab 97 at 5985).) But, the CESG meeting minutes, withheld from GAO, show both that (1) the CESG committed to a single award approach during Ubhi's tenure at DDS, and (2) the CESG withheld that decision from the public to delay scrutiny. (See

---

[4] AR Tab 33 at 686 ("The Secretary of Defense was scheduled to meet with both Amazon, Inc. and Microsoft Corporation. During this trip, the Secretary of Defense met with Amazon, Inc., but did not meet with Microsoft Corporation..."); Pete Sweeney, *Amazon Pentagon ties may receive greater scrutiny*, Reuters (Aug. 16, 2018), https://www.reuters.com/article/uk-usa-pentagon-breakingviews/breakingviews-amazon-pentagon-ties-may-receive-greater-scrutiny-id USKBN1L10AS ("Both Donnelly and DeMartino declared income from Amazon on ethics disclosures, and were working for Mattis when he visited Bezos in August 2017.").

AR Tab 86 at 5928.)  Specifically, the September 14 CESG minutes state that the CESG planned to "[a]void specifying that there is a single vendor", because doing so "will create perception issues with vendors already in use." (*Id.*)  The minutes of the October 5, 2017 CESG meeting, again during Ubhi's tenure, state: "Single cloud solution necessary for this enterprise initiative to be successful and allow DoD to achieve its mission objectives with cloud adoption." (AR Tab 88 at 5934.)  The October 27, 2017 update on the DoD Enterprise Cloud advised the Deputy Secretary of Defense that "the CESG acquisition strategy is focusing on a single award." (AR Tab 51 at 4325.)  Then, on November 6, 2017, just days after Ubhi's recusal, DoD issued a written public statement (which DoD now mischaracterizes as a "leaked draft") confirming DoD's chosen "Acquisition Strategy" of a "Single-award Indefinite Delivery/Indefinite Quantity (ID/IQ) contract using full and open competitive procedures." (AR Tab 92 at 5957.)  All of this occurred while Ubhi worked at DoD and the record confirms Ubhi as the architect of the single source strategy.  *See infra* at III.C.

AWS' assertions depart even further from the facts.  For instance, AWS states that the Agency made the decision to pursue a single award in July 2018, and declares the Under Secretary of Defense's D&F "contemporaneous" with the decision. (AWS Opp. at 10.)  Yet, as noted above, the AR establishes that DoD adopted the single award approach much earlier, while both Ubhi and DeMartino were involved. (*See also* AR Tab 47c at 3114 (Woods asking Ubhi to explain the single award approach).)  Similarly misstating the relevant timing, AWS states that "Ubhi voluntarily recused himself from any participation in the JEDI Cloud procurement upon AWS' expression of interest in a start-up that he owned" (AWS Opp. at 12), whereas the record shows that SOCO required Ubhi's recusal when SOCO learned of the communications described by Ubhi as "<u>further</u> partnership discussions." (AR Tab 45 at 2777-78.)

In addition, AWS suggests that Ubhi had no involvement in requirements for the JEDI Cloud, stating that Ubhi recused himself "well before the JROCM [the Joint Requirements Oversight Council] defined the warfighter's requirements on December 22, 2017, and work on the requirements documents ... began in January 2018." (AWS Opp. at 15-16.) But the record contradicts AWS' assertion.  For instance, JROC accepted the "cloud brief", defining DoD's cloud needs ("capabilities and characteristics"), <u>that DDS developed in the fall of 2017</u>. (AR Tab 17 at 321; AR Tab 51 at 4369.)  Moreover, the record establishes that Ubhi had a heavy hand in crafting the specifications.  (*See, e.g.*, AR Tab 47a at 2941 (addressing technical requirements); *see also infra* at III.C.)

## III.   ARGUMENT

### A.   The Agency Records That Oracle Seeks Address Fundamental Protest Issues And Advance Meaningful Judicial Review (Oracle Mem. IV.A.B, DoD Opp. at I, II, AWS Opp. at I, II).

By its Motion, Oracle established that the record lacks critical information which the DoD had available to it when DoD made the procurement decisions challenged in this protest. Oracle, consequently, asked the Court to require production of the "whole record" necessary for judicial review.  In opposition, DoD and AWS ask the Court to hold that DoD need only produce such portions of the procurement record as DoD elects.  The facts and law support Oracle.

#### 1.   The Court Requires the Full Factual Record of the Participation of the Conflicted Individuals To Review Meaningfully Oracle's Allegations and the CO's No-Impact Determination.

"A complete administrative record is the predicate to meaningful and effective judicial review of agency action." *Joint Venture of Comint Sys. Corp. v. United States,* 100 Fed. Cl. 159, 168 (2011) (noting that a court "certainly cannot engage in effective judicial review in the absence of a complete agency record").  Oracle's record completion request is not a "fishing

expedition." (DoD Opp. at 1, 20, 35, 36.)  The specific requests primarily seek basic documents regarding the actions of Ubhi, DeMartino and Donnelly – fundamental factual evidence that the Court must consider to rule on the alleged prohibited conflicts of interest.  *Impresa Construzioni Geom. Domenico Gaurifi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001).  Notably, FAR 3.101-1 provides: "While many Federal laws and regulations place restrictions on the actions of Government personnel, <u>their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions</u>."  *Id.*  Given the FAR's admonition, DoD should have no reluctance providing the Court DoD's complete record of the actions of Ubhi, DeMartino, and Donnelly and their connections to AWS.

The CO based the purported no-impact determination of the Ubhi, DeMartino, and Donnelly conflicts on what DoD describes as their alleged "limited involvement" or "limited roles" in the procurement.  (DoD Opp. at 19.)  Nevertheless, DoD and AWS seek to limit the Court's review of their JEDI Cloud activities, prohibiting the Court from testing the CO's findings regarding the participation by Ubhi, DeMartino, and Donnelly in the procurement.  But, as Judge Sweeney noted in *Joint Venture of Comint Sys. v. United States*:

> The purpose of bid protests is to "protect the integrity of the procurement process"…, by providing a mechanism for review of agency action.  The court's review function is undermined when an agency assembles a record that consists solely of materials that insulate portions of its decision from scrutiny or that it deems relevant to specific allegations raised by a protester.

100 Fed. Cl. 159, 168 (2011).  Accordingly, and consistent with the bid protest standard of review, Oracle has requested the following categories of Agency documents to fill factual gaps in the AR related to the participation of Ubhi, DeMartino, and Donnelly:

- Documents evidencing the role of DeMartino, Ubhi, or Donnelly in the preparation of the September 13, 2017 Memorandum;

- Documents related to the role of DeMartino, Ubhi, or Donnelly in the Secretary of

11

Defense's visit to AWS during the summer of 2017;

- Documents related to the CESG meetings and any other DoD meetings that Donnelly, Ubhi, and DeMartino attended related to the JEDI Cloud;

- Documents in Defendant's possession related to (i) communications between AWS and Ubhi, DeMartino or Donnelly while DoD employed Ubhi, DeMartino, and Donnelly, (ii) communications involving Ubhi, DeMartino, or Donnelly about the JEDI Cloud, and (iii) communications involving Ubhi, DeMartino, or Donnelly about AWS;

- The JEDI Cloud Google Drive or at a minimum the index of documents on the drive and metadata showing the author, name of document, version, date, etc.;

- All non-privileged SOCO [Standard of Conduct Office] documents or communications regarding the JEDI Cloud or its participants; and

- All documents related to the JEDI Cloud which DeMartino, Donnelly, or Ubhi created or accessed.

(Oracle Mem. at 23-27.) These narrow requests do not involve "'new' or 'extra-record' evidence," as DoD claims, but rather seek the Agency's record of the conflicted individuals' JEDI actions. *Compare* DoD Opp. at 15-17 *with Comint Sys. v. United States,* 100 Fed. Cl. 159, 167 (2011) (observing that documents "generated by the [agency] during the procurement process or considered by it as part of its overall decisionmaking" are not "'new' or 'extra-record'" evidence); *see also Mori Assocs., Inc. v. United States,* 98 Fed. Cl. 572, 575 (2011) (granting motion to complete record with records not considered by the CO and noting that "a court must look to see if an agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983)).

That the CO did not collect or review this basic information, documenting the activities of the conflicted individuals and their communications with and about AWS, does not shield

such documents from review by the Court.[5] (DoD Opp. at 15-19; AWS Opp. at 24.) DoD and AWS seek to constrain the Court to accept the CO's findings that the participation of the conflicted individuals in the procurement was minimal based on an incomplete record.

For instance, DoD claims that the CO "was personally aware of Mr. DeMartino's involvement with the procurement." (DoD Opp. at 29 (citing AR Tab 78 at 5664).) The CO, however, acknowledged that she did not interview DeMartino. The CO did not review his emails or other documentation to test her understanding of his role in the acquisition. (*Id.* at 5686:291:11-14; *id.* at 5695:2-9 ("I didn't investigate ... all of the emails and everything that he sent.... I wasn't aware of this ... article from anyone at Amazon.... I largely relied on conversations that I had with the DSS legal counsel who provided advice in concert with SOCO."); AR Tab 75 at 5239 (¶ 33 ("there are relatively few documents that I considered in my investigation").) The CO did not review the Slack messages prior to making her determination. (AR Tab 78 at 5600:16-17 (CO testifying that hearing was first time she had seen Slack key); *id.* at 5603:6 (stating that hearing was first time she has seen particular message); *see also id.* at 5609:18-19 ("I can't attest to every single Slack between DDS employees in here").) The CO did not participate in many of DeMartino's meetings. (AR Tab 78 at 5686:11-14; *id.* at 5695:2-9.) Instead, the CO relied on her incomplete personal experience.

The CO did not recognize the conflict of interest presented by DeMartino's involvement

---

[5] AWS' Opposition strays even further, rewriting the applicable standard of review to hold that absent some allegation of bad faith on the part of the CO, the Court's review is limited to the four corners of the CO's determination. (AWS Opp. at 3-4, 22-24.) AWS' misreads Judge Sweeney's decision in *Terry v. United States*, 96 Fed. Cl. 156 (2010). Judge Sweeney neither deviated from the Supreme Court case law regarding the APA standards of review nor the Federal Circuit case law holding that "supplementation is justified when 'required for meaningful judicial review.'" *Terry*, 96 Fed. Cl. at 163 (quoting *Impresa*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)). Rather, Judge Sweeney specifically applied those standards, and held that, based on the record before her, the information that plaintiff sought to supplement the record would not advance meaningful judicial review.

in the JEDI procurement at all. Despite her solicitation oversight role, the CO did not screen DeMartino. The CO does not even remember when, or exactly how, the issue of DeMartino's conflict of interest came to her attention. Prior to the GAO process, the CO had not seen the April 2017 ethics warning that SOCO issued to DeMartino, directing him to seek prior approval before participating in matters involving AWS. (*Id.* at 5667:16-22; *id.* at 5668:1-5; *id.* at 5668:12-5669:13.) The natural limits of any one person's experience is why procurement regulations require a reasonable investigation into potential conflicts, rather than only the contracting officer's personal interactions (limited here) with the conflicted person.

Even the incomplete record the Agency produced at GAO and reproduced to the Court demonstrate that the CO did not understand DeMartino's significant activities in regard to the procurement. This senior political appointee did not merely act as a note taker, as the CO found. (AR Tab 33 at 685.) Indeed, DeMartino had an active hand in crafting the procurement from at least August 2017 through April 2018. DeMartino extensively revised the Secretary of Defense's JEDI Cloud Briefing. (*E.g.*, AR Tab 51 at 4368.) He participated in Cloud discussions related to the Acquisition Strategy, Security Strategy, and Business Case. (AR Tab 51 at 4351.) DeMartino attended meetings relating to the JEDI Cloud. (AR Tab 47a at 2926.) DeMartino facilitated JEDI communications with other agencies. (AR Tab 51 at 4328 (CIA); *id.* at 4329-30 (DIA); *id.* at 4412 (Senate Armed Services).) All of this Oracle learned from the partial production of documents obtained at GAO but not considered by the CO.

"Judicial review using the APA standard requires the Court to scrutinize whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Tauri Group, LLC v. United States*, 99 Fed. Cl. 475, 481 (2011) (citation omitted). This standard of "review 'entails identifying judgements made by the relevant

officials and <u>verifying that the relevant information was considered</u>, the relevant factors were employed, and a satisfactory explanation was articulated.'" *Id.* (citation omitted).  Accordingly, in order to perform the required standard of review effectively, the Court will complete or supplement the record "when the agency allegedly failed to consider information relevant to its final decision," as alleged here.  *Diversified Maint. Syst., Inc. v. United States*, 93 Fed. Cl. 794, 801 (2010) (permitting supplementation by deposition where agency allegedly failed to consider information regarding awardee material misrepresentations) (citing *Kent County, Dela. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992)); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also MG Altus Apache Co. v. United States*, 102 Fed. Cl. 744, 750 (2012) (permitting supplementation with documents regarding salient events and actions).

## 2.   Each Objection to Oracle's Request For Agency Documents Fails.

Whether the Court determines that the records sought complete the record or supplement the record, each of the document categories requested by Oracle advance meaningful judicial review under the APA standard and are not overly broad.[6]

**Requests 1-3, 5-6, 8**:  As noted, based on the CO's focus on the purported level of participation of each conflicted individual, the majority of the requests seek the Agency's record of the conflicted individuals participation in the procurement, including their role in the preparation of the September 13, 2017 Memorandum,[7] the visit to AWS in the summer of 2017,[8]

---

[6] DoD complains that Oracle's requests from these Agency records would delay the procurement. (DoD Opp. at 35-39.)  Not true.  Oracle and the government agreed to a set calendar for this case, a calendar which only DoD has delayed.  The remand advocated by DoD, not the document production requested by Oracle, will delay the procurement. Oracle seeks only those documents within DoD's possession that relate specifically to the JEDI procurement and three former government employees.

[7] Regarding Request 1 seeking "[a]ll documents related to the role of DeMartino, Ubhi, or Donnelly in the preparation of the September 13, 2017 Memorandum," the Agency complains "[i]t is unclear what Oracle hopes to learn from these requests."  (DoD Opp. at 36.)  "What Oracle hopes to learn" is apparent from the face of Oracle's request: "the role of DeMartino, Ubhi, or Donnelly," in the acquisition.

meetings they attended related to the JEDI Cloud, communications they had about the procurement or AWS, and JEDI Cloud related documents they drafted or accessed. Likewise, given that the CO made determinations about the alleged conflicts of Ubhi, DeMartino, and Donnelly in connection with AWS, Oracle also seeks the communications between AWS and the conflicted individuals – information that is relevant for the Court to assess the rationality of the CO's determinations about their covered relationships.[9]  An agency cannot make a reasoned determination about the participation of a conflicted individual without adequately researching that individual's activities.  The Court should have access to the record of their JEDI activities and communications.

Notably, the incomplete AR includes ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████.

The "research" section of the AR also includes information from █████████████████

---

[8] Regarding Request 2, DoD complains that "Oracle identifies no reason why it would be improper for the Secretary of Defense to visit Amazon or any other technology company." (DoD Opp. at 36.)  Oracle's allegations center on the relationship and impact of AWS-connected individuals on the procurement.  The record already indicates that Donnelly and DeMartino were prohibited from participating in specific matters including AWS, yet arranged the Mattis trip. (AR Tab 33 at 686; AR Tab 51 at 4345.)
[9] Regarding Oracle's request for communications involving the three conflicted individuals, the Agency contends "all but the most irrelevant information should already be in the administrative record." (DoD Opp. at 37.)  But DoD should not be able to self-select which communications are "relevant" to conflict inquiry.  Moreover, DoD has produced hardly any DeMartino communications and no Donnelly communications.  DoD also has not produced communications prior to September 13, 2017.

███████████████████████████████████████████████████████████

████████████████████████████████████ Absent from the record is

any indication of who collected the information about the ████████, when, and why, etc.

The date on the documents appears to be when DoD collected them for production to the Court

and not when the Agency first reviewed the information.  (*Id.* (each reflecting a "12/20/2018"

print date).)  The full record about the activities of Ubhi, DeMartino, and Donnelly as well as

their communications with AWS will help to shed light on these and other record documents.

**Request 3, 6**:  DoD objects to Oracle's request for record completion/supplementation

with respect to CESG and other meeting minutes based on the "deliberative process" privilege,

contending that informal meeting notes and communications are not ordinarily part of the AR.

(DoD Opp. at 16, 18.)  DoD also counters that Oracle should "target[] particular meetings of

interest," and labels Oracle's request "a broad, inappropriate fishing expedition into the mental

processes of DoD personnel."  (*Id.* at 36.)  Neither objection has merit.  First, Oracle has targeted

its requests to those JEDI Cloud meetings and communications involving the three conflicted

individuals at issue in order to obtain an accurate record of their participation in the procurement

and their contacts with AWS.  Second, DoD's reliance on the deliberative process privileged is

misplaced.  That "privilege is not absolute," *Dairyland Power Co-op. v. United States*, 77 Fed.

Cl. 330, 337 (2007), but rather was "fashioned in cases where the governmental decisionmaking

is collateral to the plaintiff's suit."  *In re Subpoena Duces Tecum*, 145 F.3d 1422, 1424 (D.C. Cir.

1998).  For that reason, the government cannot use the privilege as a shield where the

participation of certain government officials in the procurement is a central issue in the case.  *Id.*

("If Congress creates a cause of action that deliberately exposes government decisionmaking to

the light, the privilege's raison d'etre evaporates").  In such circumstances, the need for the

███████████████████████████████████████████████████████████

evidence outweighs the purported interest in confidentiality.  DoD does not dispute the relevance of documents evidencing the participation of Ubhi, DeMartino, and Donnelly in such meetings. In fact, DoD claims DeMartino is the note-taker.  Nor does DoD proffer other evidence as a substitute.  Undoubtedly, the public interest in a government procurement conducted with integrity and in a manner that maintains the public trust is a serious issue.  To the extent DoD has a legitimate interest in the confidentiality of the minutes or communications requested, the protective order can safeguard the interest.

Request 4: Oracle requests the initial proposals and any evaluation thereof against the gate criteria, noting that such documents fall within the definition of "core documents" under Appendix C of the Rules of the Court of Federal Claims and relate to Oracle's complaint allegations that the Gate Criteria unduly restrict competition and were designed so that at most two of the six largest IaaS providers could compete.  (Oracle Mem. at 25, 28, 36; Compl. at ¶¶ 4, 18.)  DoD argues that the requested documents lack relevance if DoD is correct on the merits. (DoD Opp. at 36-37.)  This circular, and qualified, merits-based response fails.  The number of offerors capable of meeting the criteria relates directly to whether the criteria restrict competition.  AWS' rebuttal likewise fails.  The fact that DoD has not completed the proposal evaluations lacks relevance – the proposals will evidence whether offerors were able to propose, for example, the requisite number of FedRAMP approved data centers.  (AWS Opp. at 25-26.)

Request 7: Based on the CO's post-hoc statements submitted to GAO about communications between DeMartino and SOCO in 2018 and an alleged determination by SOCO about his involvement in the procurement, Oracle also requests that DoD complete the AR and produce the "non-privileged SOCO documents or communications regarding the JEDI Cloud or its participants." (Compare AR Tab 75 at 5233 (¶¶ 13-14) with Oracle Mem. at 27.)  Even under

the flawed standard advocated by DoD and AWS, there can be no dispute that such documents belong in AR.[10]

**Requests 6, 8**: Lastly, Oracle's request for the JEDI Cloud Google Drive or an index of its contents, and the JEDI documents that Ubhi, DeMartino, and Donnelly accessed plainly relate to Oracle's conflict-of-interest allegations and the Court's review of the CO's investigation. These records not only address the participation of the conflicted individuals in the procurement, but also establish the timing of various acquisition-related activities.   DoD's objection and declaration about the difficulty in recreating the Google Drive is an admission that DoD did not investigate and does not know key details regarding Ubhi's participation.   The CO admits she made her no-impact determination without any knowledge of what Ubhi created, accessed, or impacted, and DoD's opposition is that it is simply too much trouble to ascertain that information now. (AR Tab 78 at 5603:1-6, 5609:18-19, 5642:6-7; AR Tab 75 at 5239 (¶ 33); DOJ Opp. at 38-39.)

Both DoD and AWS seek to use post-hoc testimony from the DDS Deputy Director and CO regarding when, what, and who created various JEDI related documents, despite that their memories are flawed and their personal knowledge limited. (*See, e.g.*, AR Tab 78 at 5536:15-22 (DDS Deputy Director noting that he "may have misspoken" when stating that the Google drive did not contain cost data at time of Ubhi's involvement); *id.* at 5537:12-15 (admitting that he did not review the Google Drive to verify the timeline of when documents were created).)[11]

---

[10] The Agency also argues that Oracle's request for SOCO "communications with people other than DeMartino or Ubhi … overbroad and unlikely to lead to any evidence demonstrating bad faith." (DoD Opp. at 37.) Yet, bad faith is not the standard here; the issue is the sufficiency of Agency investigation into conflicts, which these documents would illuminate.   The record already reflects two other potential conflicts of interest related to JEDI.

[11] Further, without the documentation showing the documents created and accessed by the conflicted individuals, the Court cannot "critically and skeptically" assess the post-hoc statements by DDS Deputy Director and CO. *Lockheed Martin Corp. v. United States*, 124 Fed.

DoD should not benefit from the fact that DoD failed to document contemporaneously the information accessed and created by the conflicted individuals. Regardless, DoD should produce the Google Drive; the fact that DoD cannot affirm precisely what documents Ubhi created and downloaded is no reason for DoD to withhold the information.

In view of the foregoing showing that each of the categories of documents Oracle seeks will advance meaningful judicial review, the Court should grant Oracle's motion and require DoD to produce the requested documents.

### B. Oracle Has Established The Need For DoD Record Supplementation of Exhibit A (Oracle Mem. at IV.B., AWS Opp. at III).

The Court should also grant Oracle's request to supplement the record with the contemporaneous public statements by Ubhi set forth in Exhibit A to the Motion, as the Ubhi documents contradict the CO's investigation findings regarding Ubhi's role and evidence Ubhi's bias for AWS. Specifically, in a personal blog that Ubhi posted in mid-October 2017 (during JEDI), Ubhi describes himself as "leading the effort [for DoD] to accelerate adoption of the Cloud" and as an "Amazonian." (Ex. A, Ubhi Twitter & Blog Post at 5.) AWS argues these documents are "irrelevant to the issues in this protest" because they "do nothing to call into question the impartiality or veracity of the Contracting Officer, the DDS Deputy Director, or the Under Secretary of Defense." (AWS Opp. at 29-30.) AWS' argument fails.

First, the blog post relates to these proceedings because, a party may rely on extra-record evidence to support its claim that discovery regarding improper conduct is necessary, as Oracle has done in its motion seeking limited discovery from Ubhi. *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 357 (2010). Second, the Court should add the Ubhi statements

---

Cl. 709, 722-23 (2016) ("materials generated in proceedings at GAO must be submitted to, and are part of the record in this court, but any 'post-hoc rationalizations' in those materials are critically and skeptically evaluated.").

in Exhibit A to the AR because the statements contradict the CO's findings that Ubhi had a limited market research role (AR Tab 33 at 679) and evidence a patent appearance of impropriety given that DoD had a self-described "Amazonian" leading the JEDI Cloud effort.

Finally, AWS' repeated suggestion that any conflict by Ubhi does not matter because Ubhi did not make the ultimate decision is wrong. In *Tech Systems, Inc. v. United States*, an incumbent brought a post-award protest alleging that the award decision was biased because "the facility manager of the training center, a USGC officer who formerly served as the Contracting Officer's Technical Representative ("COTR") for plaintiff's contract, was biased against plaintiff and favored the awardee." 97 Fed. Cl. 262, 263 (2011). "The government oppose[d] supplementation, arguing that the facility manger 'played *no role whatsoever*' in the source selection decision." *Id.* at 266 (emphasis in original). To support its objection to supplementation, the government even submitted declarations from the agency evaluators that "denied having any discussions or interactions with the former COTR during the evaluation process relating to the procurement, and claimed he had no influence on their decision." *Id.* at 266. Judge Wolski, nevertheless, granted plaintiff's motion to supplement, explaining that the government's arguments relating to the former COTR's involvement "are all matters best left to the merits determination." *Id.* at 266. As Judge Wolski explained, no requirement exists that allegations of misconduct must be directed only at final decisionmakers:

> Under these circumstances, in which a plaintiff alleges bad faith and bias on the part of an official who had at least some involvement in the procurement, and seeks to supplement the record with evidence of bias and bad faith allegedly coming from that official's own mouth, effective judicial review would be frustrated in the Court were not to allow the record to be supplemented.

*Id.* at 266. Indeed, as noted above, the Supreme Court also has rejected the standard claimed by AWS.

**C.   The Conflicts of Interest And Appearances Of Impropriety Raised By The Participation Of Ubhi And DeMartino Warrant Limited Discovery (Oracle Mem. at IV.B; DoD Opp. at II.C, D; AWS Opp. at IV, V).**

Consistent with existing precedent, Oracle's Motion established that the Court should permit limited document and deposition discovery of Ubhi and DeMartino to ensure that the Court has the basic facts necessary to assess this matter. DoD and AWS demand that the Court presume that Ubhi and DeMartino (both of whom DoD SOCO recused from this procurement after material involvement) have done nothing worthy of concern. The facts and law say otherwise. Regardless, the law permits discovery in such circumstances like these where relevant information by its very nature would not be found in the record, e.g., communications between a government official and a competitor to purchase a business or for future employment. *Palantir USG Inc. v. United States*, 129 Fed. Cl. 218, 237 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Starry Assocs.*, 125 Fed. Cl. at 624; *Diversified Maint. Sys.*, 93 Fed. Cl. at 801. To that end, "[a]llowing a protest to be decided upon an [administrative record] which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review." *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366 (2009) (supplementing record and providing injunctive relief).

The record lacks the most basic information regarding the Ubhi-AWS business dealings notwithstanding that the dealings plainly took place during the JEDI procurement – when did AWS begin offering to buy Ubhi's business, who made the contact, what was offered, when did AWS and Ubhi begin discussing re-employment, what happened to the Google Drive materials Ubhi downloaded to his laptop, was Ubhi lying when he publicly proclaimed (without DoD rebuke) that he was leading the JEDI effort or is the CO wrong, etc. Ubhi had no incentive to document such information <u>and</u> DoD has made no effort to obtain it.

The same is true of DeMartino.  Contrary to SOCO's April 2017 direction that DeMartino should seek prior approval before engaging in matters involving AWS, DeMartino participated in the procurement for months before raising his participation with SOCO in April 2018 (following press inquiries).  No record indication exists that DoD limited DeMartino's role to "note taking" – not an email to DeMartino circumscribing his JEDI participation, not a single directive to the JEDI team cautioning their interactions with DeMartino, nothing.  Still further, the CO in drawing the note-taker conclusion did not interview DeMartino and did not collect his JEDI documents.  And, as to DeMartino's improper JEDI communications with AWS during the procurement, all DoD offers in defense is that DoD can find no DeMartino response.  Of course, DoD has not looked and DeMartino presumably knew enough to avoid widespread communications on DoD's system.  Obtaining information regarding DeMartino's role is necessary to a fair review of this matter.

**1.    The Ubhi Misconduct, and the Absence of Basic Information from the Record, Warrant the Limited Ubhi/AWS Discovery Sought.**

DoD and AWS suggest that Oracle cannot meet its burden to demonstrate hard facts that Ubhi had AWS-related conflicts during his JEDI work.  The DoD and AWS arguments fail.

As related to the limited deposition and document discovery Oracle seeks from Ubhi, the hard facts related to the Ubhi conflicts and improprieties abound:

- In direct contradiction of the CO's investigative findings that Ubhi's involvement was "limited to market research activities" (AR Tab 33 at 686-87), internal DoD documents establish that Ubhi served as the "lead PM" on the JEDI effort.  (AR Tab 47a at 2811; AR Tab 78 at 5431:4-9.)  Ubhi publicly declared that he was leading the JEDI procurement: "currently leading the effort to accelerate adoption of the cloud for the Department of Defense."  (Ex. A to Oracle Mem., Ubhi Twitter & Blog Posts at 2.)  Ubhi drafted the JEDI Problem Statement, contributed to the Business Case – the self-described "foundation" for the procurement, helped develop the requirements (metrics), and prepared or supported other acquisition strategy documents, among other things.  (*See* AR Tab 47b at 2992 (confirming Ubhi's involvement in preparing and revising Problem Statement); *id.* at 3006 (same); AR Tab 78 at 5442:21-5443:6 (involvement in business

23

case); *id.* at 5572:4-11 (same); AR Tab 21 at 399 (document describes itself as "serv[ing] as a foundation" for the JEDI procurement).)  Ubhi had unlimited access to the procurement "google drive," which housed all of the JEDI procurement sensitive information. (*See, e.g.*, AR Tab 78 at 5532:17-18, 5533:8-16; AR Tab 47a at 2910.) Ubhi personally met with numerous user agencies regarding their particular cloud needs. (*See, e.g.*, AR Tab 47c at 3168-69.)  In one exchange, ██████████████████████████████████████████████████████████████████████ (AR Tab 47c at 3169.) Ubhi developed and acted as lead advocate for the single source approach. (*See, e.g.*, AR Tab 47c at 3114; AR Tab 47c at 3181 (regarding meeting with CESG "Deap has a specific way he wants to tackle this [one versus multiple providers] and will be attending in person for this purpose.").)[12]

- Contrary to DoD's assertion that the CO conducted a purported "contemporaneous investigation," the DDS Deputy Director testified that the CO first asked questions related to Ubhi and his recusal "around May or June [2018]," and clarified "[i]t may have been July" 2018. (*Compare* DoD Opp. at 25-26 *with* AR Tab 78 at 5538:9-5539:4.) This is consistent with the investigation memo dated July 23, 2018 (when procurement challenges appeared imminent), eight months after Ubhi had left DDS. (AR Tab 33 at 687.)  The CO did not interview Ubhi, pull the documents he accessed, review his documents, etc.

- Contrary to DoD's intimation (relying on a Slack message exchange during the procurement) and despite that this is a ten billion dollar procurement, no one properly screened Ubhi for conflicts of interest prior to involving him in the procurement.  No conflict-of-interest identification and disclosure form exists despite that such documents are a "minimum requirement" of a DoD procurement.[13]

---

[12]  Oracle's Complaint outlines Ubhi's extensive role based on the record documents provided at paragraphs 53-69, 337-366. DoD and AWS claim that Oracle overstates or misstates the Slack messages Ubhi wrote and circulated among DDS officials. Oracle welcomes close review of the Slack messages shared among DoD participants.  The messages are riddled with improper statements that have no place in any procurement (much less one of this size) and would unquestionably undermine the public's faith in the procurement and the people running it.  (*See, e.g.*, AR Tab 47c at 3167 (Ubhi about a government official "She's f---ing White Hidden Figures" (dashes added)); *id.* at 3172 (Ubhi: "She's schooling us on the tactical edge," "f---ing taking us to school, in a yellow f---ing bus," Woods: "the short one, right?," Van Name: "hahaha" (dashes added)).)
[13]  Evidencing the problems with its record, DoD cites a short Slack exchange for the proposition that DoD vetted Ubhi. (DoD Opp. at 30.)  The exchange makes no mention of the business negotiations between Ubhi and AWS, the last date Ubhi received a payment from AWS, whether Ubhi holds stock in AWS – all questions that DoD (by law) should have asked Ubhi before involving Ubhi in JEDI. *See* 5 C.F.R. § 2635 Subparts D, E. With citation to FAR 3.104, and 5 C.F.R. § 2635, DoD procurement guidance provides that: "To confirm statutory and regulatory compliance, ensure all persons receiving source selection information sign a Non-Disclosure Agreement and a Conflict of Interest statement.  Ensure Conflict of Interest Statements (from both Government members/advisors and nongovernment team advisors) are appropriately reviewed and actual or potential conflicts of interest are resolved prior to granting access to any

24

- The CO's half-page investigation concludes that Ubhi had no prohibited past-employment conflict merely because more than one year had elapsed from Ubhi's departure employment with AWS. The law required DoD to ascertain whether Ubhi received any separation or subsequent bonus payments from AWS, held any AWS stock, had any discussions about returning to AWS after his DoD stint ended, etc. *See, e.g.*, 5 C.F.R. §§ 2635.501-503. For instance, under applicable regulations, the one-year prohibition does not even start to run until any bonus is paid. Moreover, an "extraordinary severance or other payment" yields a two-year ban. Stock ownership would have prevented Ubhi's participation entirely. Yet, no one asked this self-declared "Amazonian" any of these questions prior to making him lead PM and the CO did not ask any of these basic questions as part of the purported investigation.

- Although DoD contracting procedures required that Ubhi enter a non-disclosure agreement and DoD purportedly had non-disclosure agreements with involved JEDI personnel, Ubhi did <u>not</u> sign his non-disclosure agreement. (AR Tab 53 at 4440.)[14]

- Despite that ███████████████████████████████████████████████████████████████████████████████████████████ did not interview Ubhi or ask any questions about the communications. Still today, DoD does not know ███████████████████████████████████████████████████████████████████ (AR Tab 78 at 5656:21-5657:4.) Ubhi's email to DoD makes clear that he did not immediately recuse himself; instead it references "<u>further</u> partnership discussions." (AR Tab 45 at 2777-78.)

- AWS (<u>during the JEDI procurement</u>) also held employment discussions with Ubhi to rejoin AWS as its General Manager. The CO's conflict-of-interest investigation (despite that DoD knew AWS had rehired Ubhi) does not mention the rehiring at all, let alone investigate the underlying facts.[15]

---

source selection information." DoD Source Selection Procedures at 11 (Apr. 1, 2016, effective May 1, 2016), available at https://www.dau.mil/guidebooks/Shared%20Documents/Source%20 Selection%20Guide.pdf. DoD procedures describe the "Nondisclosure and conflict of interest statements" as <u>minimum requirements</u> of the "permanent contract file." *Id.* at 36.

[14] During the GAO hearing, the CO claimed to have a signed non-disclosure agreement from Ubhi. (AR Tab 78 at 5745:20-22 (Q: "Has Mr. Ubhi signed any NDA, to your knowledge on this procurement?" A: "Yes.").) On request from GAO for the document, the Agency produced an <u>unsigned</u> non-disclosure agreement. (AR Tab 53 at 4440.)

[15] Federal law prohibits a federal employee from participating personally and substantially in a particular matter that the employee knows will have a direct and predictable effect on the financial interests of any person or organization with which the <u>employee is negotiating or has an arrangement concerning prospective employment</u>. 18 U.S.C. § 208; 5 C.F.R. § 2635.606 (requiring recusal while seeking employment); 5 C.F.R. § 2635.604 (requiring recusal where an arrangement for employment exists).

- Ubhi previously worked at AWS before joining DDS in the summer of 2016.  While working for DoD, Ubhi repeatedly tweeted his praise for Amazon and declared with respect to himself, "Once and Amazonian always an Amazonian," evidencing a continuing bias for AWS. (Ex. A to Oracle Mem., Ubhi Twitter & Blog Posts at 5.)

- During JEDI (and while purportedly running it), Ubhi identified his government position and role on the JEDI procurement and then referred to President Trump as a dog-whistling racist and likened President Trump to fictional villain Lord Voldemort (of Harry Potter) and the JEDI Cloud to the fictional Elder Wand that only particular people (presumably AWS and Bezos to Ubhi) can handle without grave risks. (*Id.* at 2-3.)[16]

- As part of the JEDI procurement, Ubhi repeatedly attacked AWS cloud competitors and multi-cloud supporters. (Complaint at 86; Oracle Mem. at 10-11.)[17]

- Ubhi downloaded the <u>entire</u> DoD JEDI Google Drive from DoD's database at some point prior to recusing himself from the procurement.  The record contains no indication or investigation of what happened to these documents.  The CO did not investigate what documents Ubhi created, accessed, downloaded, or took with him on departure. (AR Tab 78 at 5603:1-6, 5609:18-19, 5642:6-7; AR Tab 75 at 5239 (¶ 33).)  In fact, the CO's investigation claims that DoD shut down Ubhi's Google Drive access immediately – despite that DoD now acknowledges Ubhi had downloaded the entire Google Drive to his laptop. (*Compare* AR Tab 33 at 686 ("His access to any JEDI cloud materials was immediately revoked") *with* DOJ Opp. Appx., Kasper Decl. ¶ 11 ("I know that <u>Mr. Ubhi synced Google Team Drives to his laptop</u> while working for DDS").)

- Ubhi edited his public LinkedIn profile to indicate that he left DDS in August 2017 (prior to the JEDI procurement formally commencing) rather than late November 2017 when he actually left. (*Compare* AR Tab 77 at 5254 (suggesting that Ubhi left DDS in August 2017) *with* AR Tab 33 at 686 (indicating that Ubhi left DDS on November 27, 2017).)

- Ubhi crafted and championed the single-cloud approach favored by AWS, and no other competitor. (*See, e.g.*, AR Tab 47c at 3114 ("<u>I really need to better understand from you [Ubhi] why only one provider makes sense.</u>"); AR Tab 78 at 5742:7-14 (CO admitting on

---

[16] DoD and AWS seek to treat these statements evidencing Ubhi's intent as irrelevant.  The statements both evidence Ubhi's desire to influence who may control the JEDI Cloud and indicate <u>yet</u> other procurement violations by Ubhi.  Although the Hatch Act permits federal employees to engage in political activities on social media, it specifically <u>prohibits</u> federal employees from referring to their official titles, positions, and roles when engaged in political activity.   https://osc.gov/Pages/The-Hatch-Act-Frequently-Asked-Questions-on-Federal-Employees-and-the-Use-of-Social-Media-and-Email.aspx; 5 C.F.R. § 734.302 (prohibiting federal employees from using his or her official title when participating in a political activity).  Congress passed the Hatch Act to address a legitimate government interest in preventing the appearance of partisan influence in the expenditure of federal funds.  *Molina-Crespo v. U.S. Merit Sys. Protection Bd.*, 547 F.3d 651, 659 (6th Cir. 2008).
[17] DoD's attempts to explain the inappropriate statements contained in the JEDI record are misguided.  If explanation is to be had for these statements, it should be obtained through a deposition of Ubhi rather than DoD recrafting.

cross examination that Ubhi advocated "robustly" for the single award approach, countering the multi-cloud approach of numerous other DoD personnel).)

Given these hard facts, the reasons for the limited discovery from Ubhi are many. For instance, DoD asserts that no evidence exists that AWS approached Ubhi to purchase his company prior to the October 31, 2017 Ubhi email, despite Ubhi's clear assertion that he "may soon engage in further partnership discussions" with AWS.  (*See* AR Tab 45 at 2777.) Regardless, the CO has testified that she neither knows when AWS began making offers of financial payment to Ubhi nor investigated the matter.  (AR Tab 78 at 5656:2-5657:18; *see also id.* at 5546:6-11.)  DoD asks this Court to presume that Ubhi immediately recused himself on the first overture from AWS despite that Ubhi's own recusal note indicates otherwise.  Procurement law prohibits the participation of a government official in matters where personal financial interests are implicated.  Indeed, the United States routinely pursues government officials and contractors that violate these prohibitions.  *See, e.g.*, United States Office of Government Ethics Annual Prosecution Survey (2018) at https://www.oge.gov/web/oge.nsf/Legal%20Advisories/ A7C768271A74BD07852582CD004A2B0C/$FILE/LA-18-09%202017%20Conflict%20of%20 Interest%20Prosecution%20Survey.pdf?open.  DoD demands the Court presume nothing is amiss despite evidence to the contrary.  Obtaining the documents surrounding the AWS financial overtures to Ubhi and deposing Ubhi as to such information will allow for proper resolution of the allegations.  DoD has had ample time to seek such information on its own.

Similarly and despite that the law prohibits federal procurement officials from engaging in employment discussions with competitors (5 C.F.R. § 2635.604) or from participating in procurements where an arrangement for future employment exists (5 C.F.R. § 2635.606), the CO did not mention that Ubhi had returned to AWS, much less investigate when the employment discussions began or even whether Ubhi had returned all of the extensive JEDI information

downloaded to his laptop.  But again, neither DoD nor AWS want this Court to have the <u>actual</u>

<u>information</u>, preferring instead to demand presumptions of the improbable.  The Court should

reject invitation not to seek the facts but instead presume that the first overture for Ubhi to return

to AWS occurred <u>after</u> his recusal on October 31, 2017 and before Ubhi provided notice of

departure on November 13, 2017 – an improbable circumstance given that it typically takes more

than two weeks to interview for and negotiate an executive position.

Facing patent conflicts of interest both DoD and AWS assert that Ubhi did not make the

final decisions at issue.  But the DoD Conflict of Interest Deskbook itself (like the U.S. Supreme

Court and this Court) makes clear that:  "The fact that an employee does not make the final

decision <u>is not relevant</u>." (DoD Ethic's Counselor's Deskbook at Conflicts of Interest p.5 (2018),

http://ogc.osd.mil/defense_ethics/ethics_counselors/resources/deskbook_index.html.)  Moreover,

as discussed above, the record is full of documents (unconsidered by the CO's purported

investigation) indicating how Ubhi shaped this procurement.   In any event, the impact of the

Ubhi conflicts is a merits issue, not a discovery issue.

> **2.      The DeMartino Misconduct, and the Absence of Basic Information
> from the Record, Warrant the Limited Discovery Sought.**

Realizing that no defense exists for DeMartino's participation in the JEDI procurement in

direct violation of written DoD SOCO direction, DoD starts by setting a false standard:  "Oracle

has presented no evidence whatsoever suggesting that Mr. DeMartino was attempting to steer the

JEDI contract to Amazon."  (DoD Opp. at 27.)  Oracle does not have to prove the motives for

DeMartino's procurement law violations – manifest though they are.   Regardless, like Ubhi,

DeMartino's participation favored one contractor only and contradicts the CO's characterization

of his role as "ministerial and perfunctory."  (AR Tab 33 at 685.)  If DoD limited this high level

appointee's involvement to note-taking as the CO contends, one would expect a memorandum

indicating his limitations, circulated to the members of the JEDI team so they understood his constraints. No such document exists.

As related to the limited deposition and document discovery Oracle seeks from DeMartino, the hard facts of his impropriety again are clear:

- DoD claims <u>without a single record citation</u> that "the record indicates that DeMartino sought in good faith to follow [SOCO's] advice." (DoD Opp. at 28.) But, SOCO gave DeMartino simple directions in April 2017 (prior to JEDI) – contact SOCO <u>before</u> participating in any matter involving AWS: "<u>In particular, Amazon, Palantir, and Bloomberg do business with DoD, and therefore, you should be vigilant and consult with our office before participating in any matters involving these entities</u>...." (AR Tab 51 at 4345.) DeMartino worked on JEDI from August 2017 until at least April 2018 before contacting SOCO to ask about his involvement in JEDI and only then contacted SOCO because of press inquiries about his AWS connections. (*Id.* at 4361.)

- The record does not include a single document showing DoD screened DeMartino for conflicts of interest before allowing his participation in the JEDI procurement – again a violation of basic DoD procedures. (*Cf.* AR Tab 51.)

- DoD did not ask DeMartino to sign a non-disclosure agreement despite that DoD admits that he had extensive access to sensitive information and a relationship with AWS. (*Cf.* AR Tab 53 at 4440.)

- Investigative reporters (apparently via FOIA) have uncovered communications between DeMartino and AWS during JEDI, regarding the JEDI Cloud competition. (AR Tab 51 at 4429.)

- When DeMartino contacted SOCO in April 2018 – after many months of JEDI involvement, SOCO directed his immediate recusal from JEDI. (AR Tab 75 at 5233 (¶ 13).) This action would not have been necessary were his participation proper as DoD contends.

- DeMartino participated personally and substantially in the procurement taking a number of significant actions. <u>For instance</u>, DeMartino directed JEDI Cloud press strategies. (AR Tab 51 at 4346.) DeMartino directed involvement of other participants. (AR Tab 51 at 4352 ("Jay, wanted you to know that we are moving out on the cloud initiative. Now that you are on the team we should discuss how CMO will be involved going forward. <u>DSD and I were discussing responsibility for this over the longer term</u>..."); *id.* at 4354-55 ("Closed out discussion of savings and significance savings could have for the Department (CAPE – <u>check in with me on this point</u>)").) DeMartino reviewed procurement documents. (*Id.* at 4357 (directing DDS to hold industry day release for DeMartino comments); *id.* at 4366-67 (<u>extensive DeMartino comments and revisions on procurement document</u>).) Numerous other examples exist. DeMartino was not merely a

note-taker.

- When investigating the matter, the CO did not interview DeMartino or collect and review his documents. (AR Tab 78 at 5686:11-14, 5695:2-9.) The CO also has acknowledged that she did not participate in many of the meetings DeMartino conducted. (*Id.* at 5634:17-22; *see also* AR Tab 47a at 2926 (referencing meeting JEDI CO did not attend).) The CO is not copied on many of the DeMartino emails regarding JEDI. DoD has not produced the meeting minutes from the meetings DeMartino attended. Still, DoD claims the CO is "personally aware of Mr. DeMartino's involvement." (DoD Opp. at 29.)

DoD does not counter these hard facts with evidence demonstrating DeMartino followed SOCO's direction to get advance approval before involving himself in the JEDI procurement. DoD does not provide citation to a JEDI team notice advising that DeMartino had a limited role. The DeMartino documents at Tab 51 (limited as they are given DoD's failure to collect the necessary documents) evidence that DeMartino did not merely note-take – DeMartino participated in the procurement for the Office of the Deputy Secretary of Defense. Oracle seeks discovery of information regarding DeMartino's involvement that DoD did not see fit to collect, and DeMartino may not have recorded in any event.

Contrary to DoD's suggestion, the DeMartino-AWS communications provide a further significant example for why discovery is appropriate. On January 25, 2018 (during JEDI), Jennifer Chronis (AWS) sent DeMartino an email titled "Pentagon takes another step toward commercial cloud" with the text "Article on SETA Award". (AR Tab 51 at 4429.) DoD claims "there is no evidence Mr. DeMartino responded." (DoD Opp. at 29.) Given that the CO admits that she made no effort to review or collect DeMartino's emails this is unsurprising. What is unexplained is why AWS' JEDI point of contact was writing DeMartino about DoD's commercial cloud if DeMartino was not to communicate with AWS regarding particular matters involving DoD. Moreover, the email on its face is not a cold call email; it does not start, for instance, "Good afternoon Mr. DeMartino." The email is sent by someone plainly in routine

communication with DeMartino:  "Article on SETA Award."

Still further, if Chronis (AWS) and DeMartino were not in active communication regarding this JEDI matter and DeMartino was adhering to SOCO's direction, DeMartino almost certainly would have responded "please don't contact me regarding this live procurement."  But as DoD notes, the record does not contain any DeMartino response.  The Court is faced with gaps in its record that only discovery can fill.

### 3.    The GAO Decision Does Not Negate the Need for Discovery.

AWS suggests that the Court should pass on discovery because GAO did not sustain Oracle's conflict arguments.   GAO rulings do not bind this Court for a variety of reasons, including different statutory rules, differences in standards of review, and GAO's more narrow record composition requirements.  Even so, AWS misreads GAO's conflict-of-interest findings.

To be certain, the GAO did not sustain Oracle's conflict of interest allegations but AWS' suggestion that GAO somehow approved of DoD's handling of these conflict issues is false. Oracle has two types of conflict of interest allegations: (i) whether DoD's failure to screen and involvement of government personnel with prohibited conflicts of interest has undermined the procurement; and (ii) whether the AWS business dealings and hiring of a government procurement lead, create a conflict of interest requiring AWS' exclusion.  As to whether DoD acted improperly by involving Ubhi and DeMartino despite conflicts (conflict issue i), GAO effectively made a no-prejudice finding, not a finding that DoD had properly screened or involved Ubhi and DeMartino:

> Accordingly, even if we were to conclude that either the Chief of Staff or the Digital Service Expert meaningfully participated in the agency's determinations regarding the RFP requirements, it would be improper for our Office to recommend that the agency proceed with the JEDI Cloud procurement in a manner that is inconsistent with meeting its actual needs.

*Oracle Am., Inc.*, B-416657, *et seq.*, Nov. 14, 2018, 2018 CPD ¶ 391.   But, as noted in the

introduction, this is an incorrect test under applicable law.  If Ubhi and DeMartino meaningfully

participated in the matter, the law compelled action – not to protect DoD, to protect the public's

trust and the integrity of the procurement system.  That the DoD personnel involved do not care

about the conflict, does not matter:

> In any event, the knowledge of Wenzell's superiors and their approval of his
> activities do not suffice to exempt Wenzell from the coverage of the statute.
> Neither Section 434 nor any other statute empowered his superiors to exempt him
> from the statute, and we are convinced that it would be contrary to the purpose of
> the statute for this Court to bestow such a power upon those whom Congress has
> not seen fit to so authorize. Congress undoubtedly had a very specific reason for
> not conferring such a power upon high-level administrators. It recognized that an
> agent's superiors may not appreciate the nature of the agent's conflict, or that the
> superiors might, in fact, share the agent's conflict of interest. . . .
>
> Were we to decree the enforcement of such a contract, we would be affirmatively
> sanctioning the type of infected bargain which the statute outlaws and we would
> be depriving the public of the protection which Congress has conferred.

*Mississippi Valley*, 364 U.S. at 561.  To be certain, no JEDI contract yet exists to disaffirm, but

this passage makes clear that GAO could not pass over this issue.[18]

As to the second conflict of interest, namely whether DoD should exclude AWS (which

entered business negotiations and rehired Ubhi knowing that Ubhi was leading the JEDI effort),

GAO declared the argument premature but twice affirmed that Oracle would receive a

presumption of prejudice against AWS when the matter ripened:

---

[18] GAO's finding also contradicts its own precedent. In *L-3 Services, Inc.*, B-400134.11, Sept. 3,
2009, 2009 CPD ¶ 171, the protester alleged that SI International ("SI"), a subcontractor to the
awardee, had a biased ground rules organizational conflict of interest. *Id.*  GAO agreed with the
protester, finding that the agency "failed to appreciate the way in which performance [of SI's
previous work] shaped the statement of work" because the agency had discounted the fact that
"some of the information research by the Uni-Comm team, which included [SI's] employee, was
later part of the source information used to develop the requirement." *Id.*  GAO noted that the SI
employee could have intentionally or unintentionally supported "draft specifications for Uni-
Comm that would favor the employee's corporation."   *Id.*   In sustaining the protest, GAO
confirmed that "the relevant concern is not simply whether a firm drafted specifications that were
adopted into the solicitation, but, rather, whether a firm was in a position to affect the
competition, intentionally or not, in favor of itself." *Id.* (citing 48 C.F.R. §§ 9.505-1, -2).

> As noted above, we have recognized that, in post-award protests involving the
> award to a contractor that has hired a former government employee who possesses
> competitively useful non-public information, our Office will presume prejudice
> "without the need for an inquiry as to whether that information was actually
> utilized by the awardee." We also note that the FAR provides that a contracting
> officer should identify and evaluate potential conflicts as early in the acquisition
> process as possible in order to avoid, neutralize, or mitigate significant conflicts
> before contract award. FAR §9.504(a).
>
> On the record here, we decline to consider Oracle's assertion that the contracting
> officer's consideration of conflicts-before proposals were submitted-was flawed
> for failing to consider the actions of AWS and the Digital Service Expert after he
> left government service. In the event the agency's subsequent actions provide a
> basis for protest, Oracle may raise this matter consistent with our Bid Protest
> Regulations.

*Oracle Am., Inc.*, B-416657, *et seq.*, Nov. 14, 2018, 2018 CPD ¶ 391 (internal citation

omitted).[19] The only reason GAO cited for not considering the plain conflict arising from AWS

rehiring Ubhi, namely that AWS had not submitted a proposal at the time of the CO July 2018

memorandum, has now long since passed.

The GAO decision has no relevance to this discovery motion.

### 4. The Agency's Declarations Support the Need for Supplementation and Discovery.

Contradicting its opposition to supplementation, DoD proffers two declarations to explain

the record. First, DoD proffers a CO declaration seeking to explain the failure to mention (much

less investigate) AWS' rehiring of Ubhi: "In my July 23 determination, I did not consider

whether AWS had an organizational conflict of interest (OCI) based upon AWS's employment of

Mr. Ubhi or any other individual…. I believe it would have been premature to consider this issue

before AWS actually submitted a proposal." (DoD Opp. Appx. at 2, CO Decl. ¶ 6.) The

declaration is a tacit admission that the record lacks sufficient explanation to stand on its own.

---

[19] This Court too presumes prejudice in such circumstances. *NetStar-1 Gov. Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 529 (2011) ("A long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless the evidence shows compelling evidence to the contrary.").

The declaration also ignores that the CO had to investigate the Ubhi-AWS employment discussions because government employee conflict-of-interest laws required Ubhi to recuse himself prior to seeking employment.

Second, DoD proffers the Declaration of Jordan Kasper to explain why DoD cannot even provide an index of the Google Drive to establish the documents Ubhi created and accessed while leading the JEDI procurement. At GAO, the CO acknowledged never interviewing Ubhi or assessing what documents he created and accessed, much less what he did with the documents on recusal. The inability to identify the documents Ubhi created and accessed (even now) undermines any argument that an adequate investigation occurred. Also troubling, the Kasper Declaration reveals that Ubhi "synced Google Team Drives to his laptop while working for DDS." (DoD Opp. Appx. at 6, Kasper Decl. ¶ 11.) Neither the CO's final determination nor Mr. Kasper's declaration identify any ability to track what Ubhi did with such documents or even whether DoD took actions to recover such documents at the time of his purported recusal.

## IV.    CONCLUSION

For the reasons stated herein, Oracle respectfully requests that this Court grant Plaintiff's Motion to Complete and Supplement the Administrative Record and for Leave to Conduct Limited Discovery.

Dated:  January 16, 2019

*Of Counsel:*

Kara L. Daniels
Dana E. Koffman
Amanda J. Sherwood
Nathaniel E. Castellano
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Respectfully Submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Craig A. Holman
Craig A. Holman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5722
Fax: (202) 942-5999
*Attorney of Record for Oracle America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January 2019, I caused a true and correct copy of

the foregoing Reply to be served by electronic delivery on:

William P. Rayel
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0302
Facsimile: (202) 307-0972
E-mail:  William.Rayel@usdoj.gov

*Counsel for Defendant*

Daniel R. Forman
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2504
Facsimile:  (202) 628-5116
E-mail:  dforman@crowell.com

*Counsel for Defendant-Intervenor*

/s/  Craig A. Holman