**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

|  |  |
|---|---|
| ORACLE AMERICA, INC., )<br><br>    Plaintiff, )<br><br>    v. )<br><br>THE UNITED STATES, )<br><br>    Defendant, )<br><br>    and )<br><br>AMAZON WEB SERVICES, INC., )<br><br>    Defendant-Intervenor. ) | Case No. 18-1880C<br>Senior Judge Eric G. Bruggink |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

*Of Counsel:*

Kara L. Daniels
Dana E. Koffman
Amanda J. Sherwood
Nathaniel E. Castellano
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Craig A. Holman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5722
Fax: (202) 942-5999
Email: craig.holman@arnoldporter.com

*Attorney of Record for Oracle America, Inc.*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................1

II.   QUESTIONS PRESENTED...............................................................9

III.  STATEMENT OF FACTS ................................................................10

    A.    From Early On, DoD Sought A Single Award. ...........................10

    B.    DoD Structured The Challenged Gate Criteria To Restrict Competition. ............11

    C.    The Improper Competitive Range Decision .........................................12

    D.    DoD Neither Screened Personnel Adequately Nor Resolved Conflicts. ...............13

        1.    Deap Ubhi ................................................................................14

            a.    Ubhi's JEDI Influence and Information Access.............................15

            b.    AWS Knew of Ubhi's JEDI Role as AWS Courted Ubhi.............18

        2.    █████████████ ...............................................................18

        3.    Anthony DeMartino .................................................................21

IV.   JURISDICTION AND STANDARD OF REVIEW ........................22

V.    THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF ORACLE....................22

    A.    The Single Award D&F Violates 10 U.S.C. § 2304a(d)(3) And FAR 16.504(c)(1)(ii)(D) (Count I). ..............................22

        1.    Congress Largely Prohibits Large, Single Award IDIQ Contracts............23

        2.    Pursuant to the JEDI Technology Refresh Provision, the Cloud Services and Pricing Available on the Contract Will Constantly Adjust. ................24

    B.    The CO's Single Award Approach Contradicts Law And Reason (Count II). ......25

        1.    The CO Did Not Meaningfully Consider the Benefits of Competition.....26

        2.    The CO's Purported Justifications Fail Against the Record. ....................29

            a.    The CO Errantly Found that a Single Award Approach Will Result in More Favorable Contract Terms and Conditions. ..........29

████████████████████████████████████████

           b.      The CO's One-Sided Determination that the Expected Costs of Multiple Awards is Prohibitive Lacks Record Support. ................30

           c.      The CO's Best Interests Determination Ignores Record Evidence and Congressional Statements to the Contrary. ............31

C.      DoD's Restrictive Subfactor 1.1 Violates CICA (Count III). .................33

D.      DoD's Competitive Range Determination Lacks A Rational Basis And Is Unequal (Count IV). .........................................................................37

E.      Subfactor 1.2 And 1.6 Also Exceed DoD's Authority Or Legitimate Needs And Unduly Restrict Competition (Counts V-VI)..........................................................40

           1.      Subfactor 1.2 Violates 10 U.S.C. § 2319 and Exceeds DoD's Needs........40

           2.      DoD Lacks Authority to Solicit an Online Marketplace (Subfactor 1.6) ..43

F.      The CO Irrationally Determined That Conflicts of Interest Have Not Impacted JEDI And Performed An Incomplete Investigation................................................45

           1.      The CO Irrationally Determined That Ubhi's and AWS' Misconduct Did Not Impact JEDI (Count VII). ..................................................................45

           2.      The CO Irrationally Determined That ████████ and AWS' Misconduct Did Not Impact JEDI (Count VIII)...........................................................55

           3.      The CO Irrationally Determined That DeMartino's Misconduct Did Not Impact JEDI (Count IX)...........................................................................58

G.      The CO's Determination That AWS Does Not Have An Unmitigated OCI From Its Hiring Of Multiple JEDI Officials Lacks A Rational Basis. ...........................61

VI.      ORACLE MEETS THE PERMANENT INJUNCTIVE RELIEF REQUIREMENTS ....64

VII.     CONCLUSION................................................................................................65

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Am. Safety Council, Inc. v. United States,*
   122 Fed. Cl. 426 (2015) ................................................................................33

*CW Gov't Travel, Inc. v. United States,*
   61 Fed. Cl. 559 (2004) ................................................................................64

*Dep't of Navy- Recon.,*
   B-286194.7, May 29, 2002, 2002 CPD ¶ 76..........................................62

*Distributed Sols., Inc. v. United States,*
   539 F.3d 1340 (Fed. Cir. 2008)................................................................22

*Electra-Med Corp. v. United States,*
   140 Fed. Cl. 94 (2018) ...........................................................................5, 44

*Express One Int'l, Inc. v. United States Postal Serv.,*
   814 F. Supp. 93 (D.D.C. 1992) ............................................................45, 46

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
   238 F.3d 1324 (Fed. Cir. 2001)................................................................22

*Int'l Res. Grp.,*
   B-409346.2 *et al.*, Dec. 11, 2014, 2014 CPD ¶ 369 ............................62

*Jacobs Tech. Inc. v. United States,*
   100 Fed. Cl. 198 (2011) .............................................................................61

*K & R Eng'g Co., Inc. v. United States,*
   616 F.2d 469 (Ct. Cl. 1980) ......................................................................47

*Kingdomware Techs., Inc. v. United States,*
   136 S. Ct. 1969 (2016)................................................................................2

*L-3 Commc'ns EOTech Inc. v. United States,*
   83 Fed. Cl. 643 (2008) ..........................................................................38, 39

*Long Island Savings Bank, FSB v. United States,*
   503 F.3d. 1234 (Fed. Cir. 2007)................................................................50

*McCarthy/Hunt, JV,*
   B-402229.2, Feb. 16, 2010, 2010 CPD ¶ 68 ..........................................64

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
   375 F.3d 1182 (D.C. Cir. 2004)................................................................54

*Nat'l Gov't Servs., Inc. v. United States*,
  __ F.3d __, 2019 WL 1941163 (Fed. Cir. May 2, 2019) ...................................35, 37

*NetStar-1 Gov't Consulting, Inc. v. United States*,
  101 Fed. Cl. 511 (2011) ................................................................ *passim*

*Palantir USG, Inc. v. United States*,
  904 F.3d 980 (Fed. Cir. 2018)..............................................................26

*Palantir USG, Inc. v. United States*
  129 Fed. Cl. 218, 291 (2016) ...............................................................65

*Precision Asset Mgmt. Corp. v. United States*,
  135 Fed. Cl. 342 (2017) ......................................................................22

*Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*,
  614 F.3d 375 (7th Cir. 2010) ...............................................................50

*Quinn v. Gulf & W. Corp.*,
  644 F.2d 89 (2d Cir. 1981)....................................................................7

*Redland Genstar, Inc. v. United States*,
  39 Fed. Cl. 220 (1997) .......................................................................43

*SMS Data Products Grp., Inc. v. United States*,
  853 F.2d 1547 (Fed Cir. 1988).......................................................26, 34

*TRW Envtl. Safety Sys., Inc. v. United States*,
  18 Cl. Ct. 33 (1989) .....................................................................45, 47

*United States v. Miss. Valley Generating Co.*,
  364 U.S. 520 (1961)......................................................................6, 47

*Univ. Research Co., LLC v. United States*,
  65 Fed. Cl. 500 (2005) .......................................................................65

*USA Jet Airlines, Inc., Active Aero Grp., Inc.*,
  B-404666, Apr. 1, 2011, 2011 CPD ¶ 91 ..........................................33, 35

*W.G. Yates & Sons Constr. Co., Inc. v. Caldera*,
  192 F.3d 987 (Fed. Cir. 1999)....................................................4, 37, 42

*Weeks Marine v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009)....................................................23, 44

*WinStar Comm'ncs, Inc. v. United States*,
  41 Fed. Cl. 748 (1998) ................................................................ *passim*

iv

STATUTES

10 U.S.C. § 2304(c)(1) ........................................................................34, 41

10 U.S.C. § 2304(c)(2) ..............................................................................34

10 U.S.C. § 2304a(d) ...........................................................2, 3, 23, 26

10 U.S.C. § 2305 ............................................................................ *passim*

10 U.S.C. § 2319 ............................................................................ *passim*

18 U.S.C. § 208 ............................................................................. *passim*

28 U.S.C. § 1491(b)(4) ..............................................................................22

41 U.S.C. § 111 ........................................................................................49

41 U.S.C. § 2101 ......................................................................................49

41 U.S.C. § 2103 ...............................................................................46, 48

Department of Defense and Labor, Health and Human Services, and Education
    Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L.
    No. 115-245, § 8137, 132 Stat. 2981, 50-51 (2018) .......................4, 28, 31

National Defense Authorization Act, Pub. L. No. 115-91, § 846(k)(3), 131 Stat.
    1483 (2017) ...........................................................................................44

REGULATIONS

5 C.F.R. § 2635 .......................................................................46, 47, 57, 58

48 C.F.R. § 1.102-2(c)(1) ..........................................................................46

48 C.F.R. Subpart 3.1 ...............................................................................46

48 C.F.R. § 3.101-1 .............................................................................6, 46

48 C.F.R. § 3.104-1 ....................................................................7, 8, 47, 60

48 C.F.R. § 3.104-2 ...................................................................................58

48 C.F.R. § 3.104-3(c)(2) ..........................................................................46

48 C.F.R. § 3.104-7(b) ..............................................................................55

48 C.F.R. § 3.104-8(b) .......................................................................46, 48

48 C.F.R. § 6.301 ...................................................................................................................33

48 C.F.R. § 6.302-1 ...........................................................................................................34, 41

48 C.F.R. § 6.302-2 ...........................................................................................................34, 41

48 C.F.R. § 7.503(a) ...............................................................................................................44

48 C.F.R. § 11.002(a) .............................................................................................................33

48 C.F.R. § 15.403-3(c) ..........................................................................................................25

48 C.F.R. § 16.504(c)(1) ..........................................................................................2, 3, 23, 26

48 C.F.R. § 203.171-3 .............................................................................................................56

48 C.F.R. § 216.504(c)(1)(ii)(D) ............................................................................................23

48 C.F.R. § 252.203-7000 ...................................................................................................9, 56

## OTHER AUTHORITIES

73 Fed. Reg. 54008, 54009 (Sept. 17, 2008) ...................................................................23, 24

75 Fed. Reg. 13416, 13420 (Mar. 19, 2010) ..........................................................................26

80 Fed. Reg. 38293-01, 38997 (July 2, 2015) ........................................................................23

82 Fed. Reg. 9333 (Jan. 28, 2017) ..........................................................................................58

S. Rep. No. 110-77 (2007) ...........................................................................................23, 24, 25

Plaintiff Oracle America, Inc. ("Oracle") seeks declaratory and injunctive relief to remedy defects related to Department of Defense ("DoD") Solicitation No. HQ0034-18-R-0077 (the "RFP"), known as the Joint Enterprise Defense Infrastructure Cloud procurement ("JEDI"). The JEDI RFP solicits a single awardee to provide infrastructure as a service ("IaaS") and platform as a service ("PaaS") cloud services across the entire DoD enterprise, under a ten-year, ten billion dollar, single award, indefinite delivery, indefinite quantity ("IDIQ") contract. (AR Tab 35.)

## I.    INTRODUCTION

Structured by the newly created Defense Digital Service ("DDS") to "hack the bureaucracy,"[1] the JEDI team has done just that, leaving numerous violations of federal laws and broken rules in its wake. DoD does not operate like a Silicon Valley startup for good reason; DoD does not answer to a handful of owners, it answers to the U.S. citizenry. The citizenry, in turn, has elected legislators, who pass laws to ensure that DoD's actions serve the citizens' interests. If DoD finds those laws cumbersome, its recourse lies with the public or Congress—not in avoidance, nullification, or hacking. If competitors subvert those laws, whether due to corrupt motives, hegemonic desire, or ignorance, they do so at their peril.

This case presents several targeted questions critical to JEDI and the procurement system, such as: can a lead procurement official accept a hidden, ████████ package of stock and bonuses from a competitor and then continue to act on material acquisition matters without consequence for the procurement or the involved contractor? Can violations by at least three involved officials of FAR Subpart 3.1, Office of Government Ethics ("OGE") regulations, and

---

[1] *See New DDS Director* (Apr. 23, 2019), https://dds.mil/new-dds-director-announced/ ("Under the leadership of Chris Lynch, DDS has hacked the bureaucracy…"); AR Tab 242 at 60099 ("we need a two person team just doing bureaucracy hacking"). The wisdom of DoD using a team of "private sector" talent on "term-limited 'tours of duty'" to lead a $10 billion contract is questionable. The failure to adequately screen such personnel for inevitable conflicts is inexcusable.

████████████████████████████████████████████

potentially Title 18 all due to dealings with the same competitor possibly have no impact on a procurement?  Can an agency circumvent a statutory prohibition on single award IDIQ contracts over $112 million by claiming it solicited firm fixed prices ("FFP") for all technology services solicited despite near constant refresh requirements?  Can an agency use outsized qualifying criteria (some measured months before proposal submission) to limit the competitive field without following specified procedures?  The U.S. Code answers each of these questions in the negative, and compels judgment for Oracle.  *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1979 (2016) ("we do not defer to [the procuring] agency when the statute is unambiguous").[2]

First, DoD has violated 10 U.S.C. § 2304a(d)(3) by soliciting this $10 billion IDIQ contract, with near constant technology refresh requirements, as a single award.   In 2008, Congress, prohibited use of such contracts absent a head-of-agency determination that one of four narrow exceptions existed.  As relevant here, section 2304a(d)(3) permits the award of an IDIQ contract valued over $112 million to a single source if "the contract provides only for firm, fixed price task orders or delivery orders for … services for which prices are established in the contract for the specific tasks to be performed."  10 U.S.C. § 2304a(d)(3); 48 C.F.R. § 16.504(c)(1)(ii)(D). The challenged determination and finding ("D&F"), asserts that the awardee's proposed cloud catalog incorporated into the contract will cover all services delivered across the potential ten years of performance and include a "single, fixed unit price for delivery of that particular cloud service." (AR Tab 16 at 319.)  The RFP, the stated purpose of JEDI, and the record contradict the D&F.

DoD designed JEDI to keep pace with the evolving commercial cloud arena by having the awardee regularly add new commercial cloud services onto the JEDI contract.   Documents withheld from the U.S. Government Accountability Office ("GAO") confirm DoD's recognition

---

[2] All emphasis to quoted material has been added unless otherwise noted.

that: "Iaas/PaaS offerings are not static and will be updated overtime [sic] both in terms of available services and applicable pricing." (AR Tab 130 at 8721.) In fact, DoD crafted a special technology refresh clause, which requires that the awardee continually add new services to the contract, at later determined prices. (AR Tab 35 at 740-41.) Gartner estimates that major cloud providers release 40 to 50 new cloud services each month.[3] A Blomberg technology writer summarized the question raised: "How can the Pentagon request firm fixed prices on services that don't yet exist?"[4]

Second, the Contracting Officer ("CO") violated separate statutory and regulatory directives (applicable to all IDIQ contract competitions, regardless of size) to favor a multiple award IDIQ acquisition strategy to the "maximum extent practicable." *See* 10 U.S.C. § 2304a(d)(4); 48 C.F.R. § 16.504(c)(1)(i). Here, accepting the CO's one-sided "maximum extent practicable" analysis requires a suspension of disbelief. Earlier this week, the United States House of Representatives Appropriations Committee expressed continuing concern for the JEDI single award approach "given the rapid pace of innovation in the industry and that this approach may lock the [DoD] into a single provider for potentially as long as ten years," and noting:

> [T]he Central Intelligence Agency (CIA) … is now pursuing a multi-vendor, multi-cloud approach in its new Commercial Cloud Enterprise procurement, a follow-on to its single vendor Commercial Cloud Services contract awarded in 2013. Specifically mentioned in the CIA market survey materials is a statement that, "[t]he Government is pursuing a multiple cloud strategy to increase access to cloud innovation and reduce the disadvantages associated with using a single cloud service provider.'" …. Further, the Committee believes that the [DoD] is deviating from established OMB [Cloud Smart] policy and industry best practices, and may be failing to implement a strategy that lowers costs and fully supports data innovation for the warfighter.[5]

---

[3] Chris Pemberton, *Hidden Cloud Opportunities for Technology Service Providers*, Gartner (June 20, 2018), https://www.gartner.com/smarterwithgartner/7-hidden-cloud-growth-opportunities-for-technology-service-providers/.
[4] Chris Cornillie, *Five Takeaways from GAO's JEDI Decision Denying Oracle*, Bloomberg (Nov. 30, 2018), https://about.bgov.com/blog/five-takeaways-jedi-decision-oracle/.
[5] DoD Appropriations Bill, 2020, https://appropriations.house.gov/sites/democrats.appropriations.house.gov/files/FY2020%20Defense%20Report%20Draft.pdf.

The last Congress also rejected DoD's assertion that a JEDI single award serves U.S. interests.[6]

Further, the CO's analysis remains a one-sided (negatives only) concoction. FAR 16.504(c) "plainly requires consideration of the benefits of multiple awards." *WinStar Comm'ncs, Inc. v. United States*, 41 Fed. Cl. 748, 758 (1998) (overturning single award determination). OMB has observed that multiple award IDIQ technology contracting both reduces costs (by 16% for one agency, $1.6 billion here) and improves quality. (AR Tab 77 at 5309-12.) DoD Guidelines, likewise, identify seven competition benefits, none of which the CO considered. (*Id.* at 5361-62.)

Third, unsatisfied with eliminating task order competition, DoD devised qualifying gates to restrict the number of viable proposals without following the process Congress mandated. The Competition In Contracting Act ("CICA"), including 10 U.S.C. § 2304(c), (f), and FAR subpart 6.3 set forth requirements an agency must satisfy to limit the number of sources. The U.S. Code also restricts the use of qualification requirements. 10 U.S.C. § 2319; *W.G. Yates & Sons Constr. Co., Inc. v. Caldera*, 192 F.3d 987, 994 (Fed. Cir. 1999) (qualification requirement invalid). Significantly, internal DDS communications reveal an even more problematic scheme: "Let me put the metrics [we select] in this context. The agreed upon measures drive what acquisition strategy will be approved. So if multiple cloud providers can meet the metrics, then we don't get to one. The metrics solve the problem." (AR Tab 47c at 3123.) The gates had the planned effect: even massive cloud providers such as Google,[7] IBM, and Oracle could not pass the qualifying

---

[6] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 8137, 132 Stat. 2981, 50-51 (2018); *see* Adam Mazmanian, *Under new management, Congress renews JEDI objections*, Mazmanian Federal Computer Week (May 20, 2019), https://fcw.com/articles/2019/05/20/jedi-cloud-house-approps.aspx (noting continued Congressional objection to the single award JEDI approach by Congressional appropriators).

[7] Google noted: "Had the JEDI contract been open to multiple vendors, we would have submitted a compelling solution for portions of it...." Aaron Gregg, *Google bows out of Pentagon's $10 billion cloud-computing race*, Washington Post (Oct. 9, 2018), https://www.washingtonpost.com/business/2018/10/09/googlebows-out-out-pentagons-billion-cloud-computing-race/?utm_term=.a52ce34abd46.

metrics, thwarting meaningful base contract competition.[8]

Subfactor 1.1 requires each offeror to show that the DoD-provided, <u>massive</u> elastic usage metrics (network, compute, and storage) are less than 50% of the offeror's Commercial Cloud Offering usage during the months of January-February 2018, i.e., <u>nine months before proposal submission and sixteen months before the anticipated award</u>.  (AR Tab 35 at 791.)  DoD concedes that the elastic usage needs will not arise until after contract award.  (AR Tab 78 at 5476:5-9.)  The measurement period selected does not serve a minimum, legitimate need.  *Cf.* 10 U.S.C. § 2305(a).

Subfactor 1.2 mandates that each offeror have, <u>by proposal submission</u>, three existing, physical data centers separated by at least 150 miles, each supporting <u>FedRAMP Moderate Authorized offerings</u>.  DoD admits that JEDI does <u>not</u> require FedRAMP authorization.  (AR Tab 78 at 5495:5-14.)  The offeror need not even propose the data centers and offerings used to clear the qualifying gate.  (AR Tab 40 at 853 (Q233).)  Moreover, DoD's demand that offerors meet the requirement by proposal submission exceeds DoD's needs and violates FedRAMP policy.[9]

Subfactor 1.6 requires each offeror to demonstrate an online marketplace of third-party platform and software offerings.  DoD lacks authority to procure such a marketplace.  Congress only recently gave the General Services Administration ("GSA") permission to test such an approach and required inclusion of multiple contractors.  And, this Court has declared a similar Department of Veterans Affairs vendor overseen marketplace a violation of CICA.  *Electra-Med Corp. v. United States*, 140 Fed. Cl. 94, 104 (2018).

Fourth, to the extent that the Court does not strike Subfactor 1.1 as unlawful, Oracle's

---

[8] Gartner identifies six leading IaaS providers: Alibaba Cloud, AWS, Google, IBM, Microsoft, and Oracle.  *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide*, Gartner (May 23, 2018), https://www.gartner.com/doc/reprints?id=1-50WJ5CK&ct=180525&st=sb.
[9] *FedRAMP Tips & Cues Compilation 2015-2017* (Jan. 2018) at 7, https://www.fedramp.gov/assets/resources/documents/FedRAMP_Tips_and_Cues.pdf.

exclusion from the competitive range based solely on an unacceptable Subfactor 1.1 rating still fails. The U.S. Code permits an agency to limit the field at the competitive range stage "to the greatest number [of offerors] that will permit an efficient competition among the offerors rated most highly in accordance with such criteria." 10 U.S.C. § 2305(b)(4)(B). ███████████████

███████████████████████████ DoD has provided no reasoned basis for excluding Oracle, particularly given that the U.S. Code prohibits the exclusion of an offeror based on a qualification requirement "if the potential offeror . . . can meet such standards before the date specified for award of the contract." 10 U.S.C. § 2319(c)(3). Oracle's proposal demonstrates that Oracle meets subfactor 1.1 well before proposal submission, yet DoD did not consider this.

Fifth, Oracle challenges the CO's latest Deap Ubhi no-impact determination. AWS (during JEDI with knowledge of Ubhi's JEDI leadership role) made a hidden job offer to Ubhi including a ████ signing bonus, a second ████ bonus payable after year one, ██ shares of Amazon stock (roughly ████ per share in the relevant period), and a ████ salary. (AR Tab 253 at 60719.) Neither Ubhi nor AWS disclosed the negotiation or job offer to DoD. Having belatedly recognized Ubhi's elaborate Tablehero tale as a ruse, DoD now admits violations of FAR subpart 3.1, potential violations of Title 18, and an Inspector General ("IG") referral. Still, the CO claims that the Ubhi-AWS misconduct had no impact. But, the CO's assessment never even considers the most important impact: "The [conflict of interest] statute is directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961); 48 C.F.R. § 3.101-1 ("avoid strictly even the appearance of a conflict").

DoD now asks this Court to adopt the CO's false test, "sanction an 'infected bargain' and deny the public the protection from corruption among public officials granted by Congress"; the Court should decline. *Quinn v. Gulf & W. Corp.*, 644 F.2d 89, 94 (2d Cir. 1981). Regardless, even adopting the CO's test, which seemingly seeks proof beyond a reasonable doubt that Ubhi altered the course of JEDI history, Ubhi impacted this procurement. 48 C.F.R. § 3.104-1 (even a single step may be substantial). For instance, belatedly produced Slack messages confirm that before Ubhi left (and as a result of Ubhi's efforts): "the single [vs.] multiple conversation [was] done. Everyone that matters [was] convinced." (AR Tab 242 at 60239 (Van Name).) The Slack messages confirm Ubhi's involvement with the gates: "So we need to come up with those 5-8 'differentiators' that help us meet mission better right . . . i.e. high availability, built-in redundancy and fail-over, true elasticity, AI/ML managed services available \'out of the box\'." (*Id.* at 60237.) And the record confirms that Ubhi accessed competitor information after accepting AWS' offer: "Yo I wanna be in those Azure meetings when they happen, please." (AR Tab 247 at 60373.)

Faced with this record, the CO underpins much of her no-impact finding with the proposition that, "Ubhi did not have the technical expertise to substantially influence the JEDI Cloud requirements" and also could not understand the technical information he accessed. (AR Tab 221 at 58719.) Both Van Name and the CO, however, testified repeatedly to Ubhi's technical expertise before GAO in this very matter: "Right, again, Deap is a technical expert. That's why he was hired on to the DDS team" (AR Tab 78 at 5445:6-8), and "the technical expert that was pegged to support this -- support aspects of this was Deap Ubhi." (*Id.* at 5571:18-20.)

Moreover, the CO bases her no-impact finding on a handful of the Google drive documents accessed by Ubhi and the Google drive history of "authors", "creation dates", and edits. DoD previously advised the Court that DoD could not determine who authored particular Google drive

documents or when DoD created the documents due to system limitations.  (Dkt 47-1 at 6.)  Still, the CO relied on information DoD formerly declared unreliable and consequently has reached false conclusions.  For instance, the CO concludes that Ubhi had no involvement with the acquisition strategy based on its March 22, 2018 Google drive creation date.  (AR Tab 221 at 58722.)  But an October 27, 2017 slack message records the DDS acquisition team (including Ubhi) discussing a Deputy Secretary of Defense ("DSD") request for "a (rough) copy of the acquisition strategy," which they provided and marked acquisition sensitive that same day.  (AR Tab 242 at 60306.)[10]

Sixth, although the record is less developed, the AWS-███ actions also present admitted FAR Part 3 and potential Title 18 violations.  AWS engaged in employment discussions with ███ beginning in late summer 2017 and continuing throughout JEDI.  (AR Tab 222 at 58746.) Like Ubhi, ███ participated on JEDI after accepting an employment offer from AWS.  (Id.)  For instance, three days after ███ accepted an offer to serve as a ████████████ ████████████ attended a JEDI meeting and accessed the source selection sensitive draft Acquisition Strategy. Equally problematic for AWS (given ███ role as a senior DoD official), the U.S. Code and DFARS prohibited AWS from compensating ███ absent "a written opinion from the appropriate DoD ethics counselor regarding the applicability of post-employment restrictions to the activities that the official is expected to undertake on behalf of the Contractor."  48 C.F.R. § 252.203-7000 (contemplating rescission, suspension or debarment).

Seventh, at relevant times, Anthony DeMartino, a high-level political appointee, served as the chief of staff for the DSD—the Pentagon official who initiated and led JEDI.[11]  In April 2017,

---

[10] DoD indicated on a Court call that the Google drive presently contains over 1900 documents. DoD asserts that it is cannot determine which documents existed during Ubhi's involvement and has not determined which documents Ubhi synced to his personal laptop, just that he did so.
[11] DoD admits that then DSD Shanahan (whose authority DeMartino implemented) had "personal and substantial" involvement in the procurement.  (AR Tab 64 at 4862.)

DoD SOCO directed DeMartino, who consulted for AWS immediately prior to joining DoD, <u>not to participate in any AWS matters</u>. DeMartino ignored the directive and participated in JEDI for eight months. DoD misclassifies the DSD's Chief of Staff as a mere "note taker" but the record evidences that DeMartino impacted JEDI from the policy level to the details. DoD, inexplicably, rests on its earlier less than one page, incomplete, error ridden analysis. (AR Tab 33 at 685.)

Finally, Oracle challenges the CO's finding that AWS has adequately mitigated the unfair competitive advantage arising from AWS' decision to hire (at least) two JEDI personnel. AWS did not set up timely or appropriate firewalls in either instance. This Court has rejected untimely firewalls, self-monitoring, and offeror affidavits as resolving such issues:

> Can it be that the drafters of the FAR dedicated a whole subpart's worth of guidance to how and when to identify such conflicts, as well as how and when to mitigate the conflicts so identified, yet subscribed to the notion that the failure to follow these procedures could be cured by having the awardee swear up and down it did nothing improper? <u>Of course not</u>.

*See NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 528 (2011).

## II.   QUESTIONS PRESENTED

1.      Whether DoD violated the statutory prohibition on single IDIQ awards by mischaracterizing the JEDI contract and its technology refresh provisions as seeking only "services for which prices are established in the contract for the specific tasks to be performed."

2.      Whether DoD violated applicable law by failing to "give preference to making multiple [IDIQ] awards" to the "maximum extent practicable."

3.      Whether DoD's imposition of the three challenged gate criteria, that exceed DoD's needs and authority, violates CICA and the qualification requirements.

4.      Whether DoD reasonably excluded Oracle from the competitive range based on the unlawful Subfactor 1.1 criterion.

5.      Whether the unlawful involvement of conflicted former government officials (Ubhi, ███ and DeMartino) violated the public trust and gave an unfair advantage to AWS.

## III.    STATEMENT OF FACTS

The JEDI cloud will service DoD, related agencies, and contractors performing DoD missions "at all classification levels, across the homefront to the tactical edge, including disconnect and austere environments, and closed loop networks." (AR Tab 27 at 608, 610.) [12]

### A.    From Early On, DoD Sought A Single Award.

On September 13, 2017, the DSD issued a memorandum establishing the Cloud Executive Steering Group ("CESG") and initiating JEDI. (AR Tab 91 at 5955.) The next day, the CESG held its first meeting, where the CESG discussed a single award approach and agreed to withhold the decision from the public to delay scrutiny. (*See* AR Tab 86 at 5928.) [13] The CESG's October 5, 2017 meeting minutes indicate further single award approach discussion. (AR Tab 88 at 5934; *see also* AR Tab 51 at 4325 ("the CESG acquisition strategy is focusing on a single-award.").) On October 17, 2017, the CESG held a meeting with significant focus on the single award issue; Ubhi presented the single award argument for DDS. (AR Tab 242 at 60100, 60229.) On November 6, 2017, DoD confirmed the chosen "Acquisition Strategy" of a "Single-award [IDIQ] contract...." (AR Tab 92 at 5957.)

On July 17, 2018, nearly ten months after committing to the single award approach, the CO issued a memorandum identifying three purported justifications. (AR Tab 24.) The CO's one-sided analysis reflects one purpose—to support DoD's earlier single award conclusion. (*Id.*) The CO did not consider any task order competition benefits. (*Id.*)

---

[12] The RFP defines "tactical edge" to include "[e]nvironments covering the full range of military operations...." (AR Tab 29 at 652.)
[13] DoD withheld much of the record from GAO, including the documents at AR Tabs 86-186.

On July 19, 2018, Under Secretary Lord signed a D&F declaring JEDI exempt from the prohibition against large, single-award IDIQ contract because the JEDI contract purportedly will provide only for FFP "task orders or delivery orders for services for which prices are established in the contract for the specific tasks to be performed." (AR Tab 16 at 318.)

## B.     DoD Structured The Challenged Gate Criteria To Restrict Competition.

Officially, DoD devised the RFP qualifying gates to avoid potential delays from receiving too many proposals or protests—both improper purposes:

> The JEDI program schedule could be negatively impacted if source selection extends beyond the planned timeline due to an unexpected number of proposals or lengthy protest delays.  To mitigate this risk, the solicitation will use a gated evaluation approach that includes "go/no go" gate criteria.  Offerors must meet the established minimum criteria in order to be considered a viable competitor.

(AR Tab 21 at 422; AR Tab 25 at 504; *see also* AR Tab 78 5473:2-11; AR Tab 35 at 805.)  Internal DoD Slack messages evidence more perniciously that DDS set up the gate criteria metrics and capabilities to "get to one" contractor.  (*See* AR Tab 47c at 3123.)

The gate criteria served their improper purpose.  When first announced, JEDI sparked intense interest: hundreds of companies attended the industry day, and more than sixty companies submitted detailed RFI responses identifying extensive, sometimes unique capabilities.  (AR Tab 70 at 4986-87, 5022.)  But following the issuance of the final RFP and its restrictive qualifying gates, only four companies submitted proposals.  (*See* AR Tabs 120-123.)  Three of the four offerors expressed concerns during the Q&A session regarding the gates' restrictive nature.  (*See id.*)  Two of the four offerors (Oracle and IBM) ultimately filed protests challenging the gates and a third (Microsoft) publicly criticized the gates.[14]  Google chose not to compete due to the gates:

---

[14] Billy Mitchell, *DOD defends its decision to move to commercial cloud with a single award*, FedScoop (Mar. 8, 2018), https://www.fedscoop.com/dod-pentagon-jedi-cloud-contract-single-award/.

11

"We determined that there were portions of the contract that were out of scope with our current government certifications."[15]

### C.     The Improper Competitive Range Decision

In the initial evaluation, DoD found ███████████████.  (AR Tab 224 at 58758-60.)  The Technical Evaluation Board ("TEB") rated Oracle unacceptable under the gate Subfactor 1.1, Elastic Usage and did not further evaluate Oracle's proposal.  (AR Tab 204 at 57845.)  The TEB misread Oracle's proposal regarding the network component of Subfactor 1.1, which demonstrated that when Oracle added the JEDI's estimated usage to Oracle's usage commercial cloud usage in January and February 2018, the JEDI estimated usage is ████████ of the total usage (███ for ingress, ███ for egress).  (*Compare* AR Tab 204 at 57847-48 *with* AR Tab 197a at 56786.)  The TEB did not consider the compute table in the narrative portion of Oracle's Subfactor 1.1 proposal and ignored that Oracle exceeded all elastic usage criteria before proposal submission.  (*Compare* AR Tab 204 at 57848 *with* AR Tab 197a at 56784.)

The TEB rated IBM unacceptable under Subfactor 1.2 and did not further evaluate IBM's proposal.  (AR Tab 202 at 57827.)  ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[15] Naomi Nix, *Google Drops Out of Pentagon's $10 Billion Cloud Competition*, Bloomberg (Oct. 8, 2018), https://www.bloomberg.com/news/articles/2018-10-08/google-drops-out-of-pentagon-s-10-billion-cloud-competition.

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ (AR Tab 220 at 58655-58.)

**D.    DoD Neither Screened Personnel Adequately Nor Resolved Conflicts.**

DoD deviated from its procurement policy and did not require Ubhi, ████ or DeMartino

(and many others) to complete conflict-of-interest forms and sign nondisclosure agreements prior

to JEDI involvement.[16]  Consequently, several DoD officials with clear financial interests in AWS

participated in JEDI in violation of applicable laws and regulations.

On July 23, 2018, three days before posting the RFP, the CO issued a memorandum noting

"there were four instances where individuals with potential financial conflicts of interest under 18

U.S.C. § 208 or impartiality restrictions under 5 C.F.R. § 2635.502 were provided with access to

procurement sensitive information." (AR Tab 33 at 683.)  Each "individual had either a financial

interest in or a covered relationship with Amazon, Inc./Amazon Web Services (AWS)...." (*Id.*)

The individuals included Ubhi, who rejoined AWS with a lucrative compensation package during

JEDI, and DeMartino, a former AWS consultant, who served as the DSD's Chief of Staff and

participated in JEDI contrary to ethics advice. (*Id.* at 683-87.)  Apparently unaware of the ████

conflict, the CO did not include him among the individuals reviewed.

The CO based her initial consideration of Ubhi's alleged misconduct on a false narrative

fabricated by Ubhi.  Specifically, the CO believed that Ubhi ended his covered employment

relationship with AWS in January 2016, more than a year before he began working on JEDI, and

---

[16]*Compare* DoD Source Selection Procedures at 11, 36 ("To confirm statutory and regulatory
compliance, ensure all persons receiving source selection information sign a Non-Disclosure
Agreement and a Conflict of Interest statement. Ensure Conflict of Interest Statements ... are
appropriately reviewed and actual or potential conflicts of interest are resolved prior to granting
access to any source selection information.") at https://www.dau.mil/guidebooks/Shared%20
Documents/Source%20Selection%20Guide.pdf *with* AR Tab 188 (showing most of the JEDI
NDAs were finally signed during the pendency of Oracle's protest).

██████████████████████████████████████████████

that Ubhi "promptly recused himself from any participation in JEDI" on October 31, 2017 after Amazon expressed an interest in purchasing Tablehero, a start-up owned by Ubhi. (*Id.* at 686.) But Ubhi's October 31, 2017 Tablehero recusal excuse was a lie apparently designed to hide that Ubhi and AWS had been negotiating employment throughout JEDI. In a belated submission from AWS to the CO in mid-February 2019, AWS admitted that neither AWS nor Amazon offered to purchase Tablehero at any time after 2016. (AR Tab 251 at 60702-03.)

Consequently, the CO re-opened the investigation with regard to Ubhi (Dkt. 60-1 at 2) and DoD asked this Court to stay Oracle's protest pending the re-investigation. The CO also broadened the investigation to include ███ another DoD official who participated personally and substantially in JEDI while engaged in executive-level employment discussions with AWS. (AR Tab 222 at 58744.) On April 9, 2019, the CO issued a Reassessment of Potential Procurement Integrity Act Violation and No-Impact Determination for Ubhi (AR Tab 221) and a No-Impact Determination for ███ (AR Tab 222.) DoD notified the Court and Court reinstated this matter.

### 1. Deap Ubhi

Information AWS shared with the CO during the reassessment confirms that AWS and Ubhi negotiated Ubhi's reemployment throughout JEDI, without disclosure to DoD or recusal by Ubhi. On August 23, 2017, Ubhi told his former AWS manager that Ubhi would consider AWS' offer to "craft [his] own role" to rejoin AWS. (AR Tab 221 at 58706.) Detailed discussions with AWS followed in September 2017 and, by October 4, 2017, Ubhi had committed to return to AWS. (AR Tab 259 at 60913.) Qualifications for his new position included "leading a technical program office" and required "broad understanding of the cloud computing landscape, including its various players." (*Id.* at 60840.) On October 25, 2017, Ubhi received a formal letter confirming his ███ base salary, signing bonuses of ███ and ███, and ██ shares of Amazon

14

stock. (AR Tab 253 at 60719-20.) Ubhi accepted the formal terms by email on October 27, 2017. (AR Tab 259 at 60973.) Although ethics laws prohibited Ubhi's participation in JEDI <u>from its inception</u>, Ubhi embarked on a campaign to drive the single award approach and gather competitively valuable nonpublic information from DoD and AWS competitors.

<blockquote>a. <strong>Ubhi's JEDI Influence and Information Access.</strong></blockquote>

Ubhi served as the JEDI "lead PM," one of four DDS personnel leading JEDI. (AR Tab 47a at 2793, 2813.) As Ubhi proclaimed to his JEDI team: "I'm reviewing and writing more documents than a college professor!" (AR Tab 242 at 60251.) Ubhi was vital to the single source decision. In a September 29, 2017 message to Ubhi, Woods said: "I get nervous when I hear these arguments about multiple clouds. I really need to better understand from you [Ubhi] why only one provider makes sense." (AR Tab 47c at 3114.) In new Slack messages inexplicably withheld from GAO and the prior record before this Court, DoD has now disclosed <u>further</u> evidence of Ubhi's success in driving the single award approach. For example, the new documents show Ubhi repeatedly lobbying Jane Rathburn, the lead support to Under Secretary Lord (who signed the challenged D&F). In one message, Ubhi reports "we just won this conversation" because "Jane R is now moved to our side and is supportive of a single provider." (AR Tab 242 at 60096-97.) Ubhi later advised the DDS team to "check your email, and see Jane coming to the light." (*Id.* at 60150.) Woods responded: "That is great about Jane... Your one pager should really drive it home!" (*Id.* at 60151.) In subsequent messages about Ubhi's one pager (*id.*), Ubhi noted it "puts multi vs. single to bed once and for all hopefully (at least from a technical standpoint)." (*Id.* at 60166.)

Ms. Rathbun was not Ubhi's only target. Ubhi also bragged that "Enrique [Uti from DIUX] and [Ubhi] talk at 1700 ET," "so he'll [Enrique] be on our side by 1800 ET" and "so we'll be very very well positioned now." (*Id.* at 60096-98.) Later that evening, Ubhi reported: "Another quick

win: Enrique is totally on our side now." (*Id.* at 60107.) Ubhi later indicated to Woods that he was not worried about the "single vs. multiple" awardee approach and "if there are people in the building [Pentagon] that [he] need[s] to go see and school, or ally, let's do that too." (*Id.* at 60176.)

Beyond converting individuals to the single-award position, DDS relied on Ubhi to counter the multi-cloud proponents. (*Id.* at 60100.) The CO confirmed with Woods that she relied on Ubhi to understand how to oppose the U.S. Marine Corps position that "multiple providers would be ideal ...," and designated Ubhi to address the DoD Cost Assessment Program Evaluation ("CAPE") "question of one versus multiple cloud providers." (*See* AR Tab 221 at 58739; *see also* AR Tab 47c at 3114 (Woods to Ubhi: "I get nervous when I hear these arguments about multiple clouds. I really need to better understand from you why only one provider makes sense."); AR Tab 242 at 60100 (Woods to Ubhi: "The CAPE thing is the one versus multiple cloud conversation. Bob Daigle of CAPE is pushing the issue, but this is the meeting where you will get to present your one pager.").) Following the October 2017 CESG meeting and Ubhi's presentation, Woods reported: "It went well. Single is assumed now," and told Ubhi that she was: "Really glad you were here this week." (*Id.* at 60229.) Later Van Name told Ubhi: "The single [vs.] multiple conversation is done. Everyone that now matters is convinced." (*Id.* at 60239.)

For several weeks after Ubhi verbally accepted AWS' offer, Ubhi sought competitively valuable information about AWS' competition and DoD's needs and requirements. Two days after committing to rejoin AWS, Ubhi traveled to SPAWAR for an internal meeting, during which SPAWAR's expert was "schooling [him] on the tactical edge." (AR Tab 47c at 3172.) Ubhi messaged his DDS team about the expert's "compelling takes on looking at hybrid options, i.e. Azure Stack." (*Id.* at 3174.) Ubhi also participated in numerous other internal JEDI needs meetings. (*See* AR Tab 47a at 2941 (Ubhi offering to "huddle" on technical requirements); *id.* at

2802 (Ubhi arranging a meeting with Air Force personnel); AR Tab 47b at 3065-75 (referencing

Ubhi Navy JEDI meeting); AR Tab 242 at 60140 (discussing call with Air Force); *id.* 60158

(discussing three "in-depth tech docs" from Air Force); *id.* at 60233-34 (discussing CIO slides).)

In mid-September 2017 (during his employment discussions with AWS), Ubhi helped set

up the Google drive to act as DoD's "repository for *everything*" JEDI related. (AR Tab 47a at

2910.) Ubhi and the DDS team subsequently convinced all DoD JEDI participants "to data dump

everything into the Google Folder." (AR Tab 47b at 2986; AR Tab 221 at 58699 (stating that DoD

employed Google Team Drives to maintain all JEDI information).) Ubhi managed untold amounts

of nonpublic and acquisition sensitive JEDI-related information based on his access to the JEDI

Google drive. (*See* AR Tab 78 at 5532:16-18, 5533:8-16.) At some point prior to rejoining AWS,

Ubhi synced the Google Team Drives to his laptop. (Dkt. 40-1 at 6.)[17]

Similarly, Ubhi plotted to ensure he had direct access to AWS' competitor information.

When Woods sought someone to lead industry outreach, Ubhi pleaded "make it me please." (AR

Tab 47b at 3049.) After committing to rejoin AWS, Ubhi positioned himself to attend meetings

with industry beginning on October 12, 2017. (*See* AR Tab 247 at 60373 ("Yo I wanna be in those

Azure meetings when they happen, please.").) On October 19, Ubhi conducted a confidential one-

on-one vendor meeting with Microsoft. (AR Tab 221 at 58713.) On October 26, Ubhi met with

Google, whom he had advised to "please keep in mind these are technical conversations, and we

expect folks to be able to answer technical questions. We're trying to understand the depth and

breadth of your technical capabilities within the context of cloud." (AR Tab 247 at 60488.) On

---

[17] Jordan Kasper's Declaration (Dkt. 47-1) indicates that Ubhi synced the Google team drives to his laptop to work offline. When Google drive syncs documents to work offline: "These are then treated as local files on the computer, so your important stuff is always up to date on every computer you own (and in the cloud)." https://www.howtogeek.com/228989/how-to-use-the-desktop-google-drive-app/. DoD still has no idea what Ubhi downloaded.

October 24, 2017, Ubhi had proprietary discussions with VMWare.  (AR Tab 221 at 58714.)

During this same period, Ubhi worked on the JEDI gate requirements.  (AR Tab 47c at 3123 (Woods and Ubhi discussing JEDI metrics); AR Tab 242 at 60237 (Ubhi discussing need for high availability, redundancy, elasticity, etc.); *id.* at 60306-09 (Ubhi working on documents for the DSD including the draft acquisition strategy).)

### b.    AWS Knew of Ubhi's JEDI Role as AWS Courted Ubhi.

AWS knew of Ubhi's central JEDI role as AWS courted Ubhi to rejoin AWS.  AWS also knew that Ubhi had not recused himself as legally required.  Still neither Ubhi nor AWS notified DoD of the employment negotiations.  (AR Tab 221 at 58707-08.)  Specifically, █████ (AWS) emailed Lynch, the DDS Director, on September 25, 2017 to set up a meeting following the release of the DSD Cloud Memorandum and Lynch responded, copying Ubhi: "adding Deap on our team to help get something scheduled." (AR Tab 247 at 60485; *id.* (█████ acknowledging response).) A few days later, on October 2, 2017, Ubhi emailed AWS advising that he is "running point on all [JEDI] industry touch points." (AR Tab 34 at 699; AR Tab 242 at 60161 ("Just got AWS to come to us next week").)  On October 18, 2017, Ubhi conducted a JEDI vendor meeting with █████ and her AWS JEDI team.  (AR Tab 221 at 58699.)  A few days later, Ubhi (at AWS' request) provided an official resume describing his DDS work as *"**Leading the effort to migrate the entire Department of Defense enterprise to the commercial cloud**...."*  (AR Tab 259 at 60845.)

### 2.    █████

AWS' proposal disclosed a previously unreviewed AWS conflict issue involving █████ the former █████ of the Navy for Command, Control, Communications, Computer Systems, and Intelligence; Information Operations; and Space.  (AR Tab 223 at 58753; AR Tab 194a at 24537, 24539.)  █████ responsibilities included providing acquisition guidance,

oversight and policy expertise regarding, among other subjects, information technology. (AR Tab 194a at 24549.) Despite that ███ never should have had JEDI involvement, ███ participated in at least two JEDI acquisition planning sessions, including a JEDI acquisition strategy session after accepting AWS' offer. (AR Tab 222 at 58746.)

According to AWS, in the summer of 2017, ███ consulted with Navy ethics counsel about engaging with defense contractors for future employment. (AR Tab 222 at 58746; AR Tab 259 at 60801.) From August 2017 to early 2018, ███ engaged with an AWS recruiter and ███ about his post-government plans. (AR Tab 222 at 58746; AR Tab 259 at 60802-03.) On January 11, 2018, ███ submitted a letter to the Navy advising of his employment discussions with AWS and requesting recusal from AWS matters. (AR Tab 259 at 60806.) A few days later, ███ interviewed with AWS for an executive-level position, received an offer on March 29, and accepted the offer on April 2. (AR Tab 222 at 57846.) ███ did not submit a formal application because AWS' Executive Recruiting team did not require one. (AR Tab 259 at 60787.) The CO did not ask AWS for any details about ███ offer, or post-government restrictions.

On April 5, 2018, ███ attended a source selection sensitive JEDI meeting. (AR Tab 222 at 58746.) Absent from the record is any evidence of ███ advising DoD that he had accepted the AWS offer. On June 1, 2018, ███ retired from the Navy and joined AWS on June 18, 2018 as ███ with responsibilities covering "business, technology, and strategic development for federal AWS customers." (AR Tab 194a at 24549, AR Tab 259 at 60801.) AWS did not instruct ███ to avoid JEDI related matters until more than a month later, on July 26, 2018, and AWS did not circulate a "formalized firewall" email until August 16, 2018. (AR Tab 194a at 24543.) Prior to that firewall, both ███ and ███ confirm that they discussed JEDI. (*Id.* at 24550-51, 24553.)

AWS' organizational conflict of interest ("OCI") Mitigation plan and attached declaration from ███ dated October 8, 2018, contain incorrect statements.   AWS claims that it has established firewalls that "prevent any exchange of information related to JEDI between … ███ and any AWS employees who are currently, have previously, or will in the future participate in the JEDI proposal." (AR Tab 194a at 24537.)  But, as noted, ███ who later declared she was "intimately involved with drafting AWS's JEDI proposal" (AR Tab 259 at 60811), admitted to having "a few informal conversations [with ███ in which JEDI came up." (AR Tab 194a at 24553.)  In fact, she averred that they "regularly interact to strategize business and technology solutions for federal customers." (*Id.*)

███ also misstated his involvement in JEDI and his access to nonpublic competitively useful information.  ███ declared that he participated in only one meeting related to JEDI and that he did not gain access to any "information that could conceivably provide a competitor an unfair competitive advantage...." (*Id.* at 24549-50; AR Tab 259 at 60803 ("while at the Navy, I did not receive any nonpublic information about the JEDI procurement").)  The CO knew ███ statements were wrong based on her own knowledge of ███ participation in the April 5, 2018 JEDI Cloud meeting (i.e., three day *after* ███ had accepted the AWS executive offer) during which the attendees received and discussed the draft JEDI acquisition strategy.  (AR Tab 223 at 58754; AR Tab 222 at 58746-47.)  But the CO neither questioned ███ about the affidavit inaccuracies nor performed any independent investigation of ███ emails and other documents to learn the full scope of his JEDI involvement.  Even a review of the Ubhi emails produced by DoD shows that ███ likely attended other JEDI meetings, including a Cloud Focus Session with Gartner, in November 2017.  (*See* AR Tab 47a at 2837; *id.* at 2846.)

### 3.    Anthony DeMartino

DeMartino served as a consultant for AWS through January 2017, when he became Deputy Chief of Staff for the Office of the Secretary of Defense. (AR Tab 75 at 5231-32.) In March 2017, DeMartino transitioned to serve as the DSD's Chief of Staff. (*Id.*)[18] Due to his financial ties with AWS, DeMartino received an ethics letter from DoD's SOCO in April 2017 warning DeMartino not to work on matters involving AWS. (AR Tab 51 at 4345.) DeMartino ignored SOCO's written direction, electing to participate in JEDI from its inception. (AR Tab 75 at 5233.) Eight months later—after DoD received press FOIA requests raising concerns about his JEDI involvement— DeMartino consulted with SOCO about the propriety of his actions. (*Id.*) SOCO instructed DeMartino to recuse himself immediately. (*Id.*)

As the DSD's Chief of Staff, DeMartino routinely and materially participated in JEDI. DeMartino obtained and edited JEDI briefings on behalf of the Secretary of Defense and DSD, directed JEDI activities, and participated in JEDI strategy meetings that discussed the Acquisition Strategy, Security Strategy, Business Case, and the propriety of a single versus multiple award approach. (AR Tab 51 at 4351-53, 4366-68, 4390; AR Tab 47a at 2926; AR Tab 78 at 5676:21-5677:18; *id.* at 5541:3-20; AR Tab 47e at 3310, 3315-16.) DeMartino directed efforts regarding the best way to garner external approval for the single source approach. (AR Tab 51 at 4366-67.) DeMartino also provided input regarding the JEDI industry day briefing and the JEDI press strategy. (*Id.* at 4402, 4404; AR Tab 47f at 3831, 3880; AR Tab 47e at 3319.)

In a perfunctory assessment, the CO concluded that "DeMartino's involvement did not negatively impact the integrity of the JEDI Cloud acquisition" based on the misunderstanding that

---

[18] DeMartino reportedly declared income from AWS through August 2017—the same month in which Secretary Mattis visited AWS to learn about AWS' cloud service capabilities.  Pete Sweeney, *Amazon Pentagon ties may receive greater scrutiny*, Reuters (Aug. 16, 2018), https://www.breakingviews.com/considered-view/amazon-pentagon-ties-may-receive-greater-scrutiny/.

his role was "ministerial," and that DeMartino purportedly complied with SOCO guidance. (AR Tab 33 at 685.) The record contradicts both assertions. The CO did not talk to DeMartino or review his emails or other documentation. (AR Tab 78 at 5686:11-14; AR Tab 75 at 5239 ("there are relatively few documents that I considered in my investigation").)

## IV.     JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to review this bid protest action pursuant to 28 U.S.C. § 1491(b). *See Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008). Oracle, a leading cloud services provider and RFP competitor, has standing to raise each of its timely challenges to the unlawful procurement structure and conflicts of interest which have thwarted competition and corrupted the procurement to Oracle's severe prejudice.

To obtain declaratory relief, Oracle must show that the challenged actions and RFP criteria violate procurement law <u>or</u> are arbitrary and capricious and competitively prejudice Oracle. *See* 28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001). To obtain permanent injunctive relief, Oracle must show that: (i) Oracle has succeeded on the merits; (ii) Oracle will suffer irreparable injury if injunctive relief does not issue; (iii) the harm to Oracle without an injunction outweighs the harm to the government with one; and (iv) the injunction serves the public interest. *See Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 359 (2017).

## V.     THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF ORACLE.

### A.     The Single Award D&F Violates 10 U.S.C. § 2304a(d)(3) And FAR 16.504(c)(1)(ii)(D) (Count I).

The D&F purporting to justify the $10 billion, single award JEDI contract violates the statutory prohibition on such awards by relying on an inapplicable exception. The JEDI contract will not establish prices for the specific tasks the awardee will perform across the ten year period.

Rather, the contract includes a special technology refresh provision of the very type that led to the prohibition.  The improper D&F competitively prejudices Oracle by depriving it of the opportunity to compete for multiple awards and subsequent task orders.  *See Weeks Marine v. United States*, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009); *WinStar*, 41 Fed. Cl. at 762-63 (finding prejudice).

### 1.    Congress Largely Prohibits Large, Single Award IDIQ Contracts.

For DoD IDIQ contracts estimated to exceed $112 million, statute and regulation prohibit a single award unless the senior procurement executive determines that one of four stated exceptions exists.  *See* 10 U.S.C. § 2304a(d)(3); 48 C.F.R. § 216.504(c)(1)(ii)(D).  As relevant here, the U.S. Code identifies the following narrow exception:

> (3) No task or delivery order contract in an amount estimated to exceed $100,000,000 (including all options) may be awarded to a single source unless the head of the agency determines in writing that … (B) the contract provides only for firm, fixed price task orders or delivery orders for- ... (ii) services for which prices are established in the contract for the specific tasks to be performed[.]

10 U.S.C. § 2304a(d)(3); 48 C.F.R. § 16.504(c)(1)(ii)(D)(1)(ii).[19]  The prohibition ensures that high dollar IDIQ contracts "provide for the competition of task … orders unless there is a compelling reason not to do so."  S. Rep. No. 110-77 at 368 (2007).  The applicable regulatory history describes the benefits of task order competition: "<u>Competition of orders leads to improved contractor performance, stimulation of technological solutions, and reduction of costs over time</u>." 73 Fed. Reg. 54008, 54009 (Sept. 17, 2008).

Congress logically excepted base contracts with established FFPs for the specific, identified tasks from the prohibition because in that <u>limited circumstance</u> the pre-award competition determines the pricing of future orders, permitting the agency (and Congress) to have

---

[19] In 2015, the FAR was updated pursuant to the statutory inflation adjustment requirement at 41 U.S.C. § 1908, raising the single award prohibition to $112 million.  *See* Inflation Adjustment of Acquisition-Related Thresholds, 80 Fed. Reg. 38293-01, 38997 (July 2, 2015).

23

confidence (at the time of award) that the specific services purchased resulted from competition. The JEDI contract does not meet the exception.

> **2.    Pursuant to the JEDI Technology Refresh Provision, the Cloud Services and Pricing Available on the Contract Will Constantly Adjust.**

The D&F claims that the JEDI contract fits with the FFP exception to the single award prohibition based on the errant assertion that the cloud catalogs proposed for the JEDI competition and incorporated into the contract will cover all services delivered across ten years.  (AR Tab 16 at 318.)  The D&F states: "The CLINS for cloud offerings … <u>will be priced by catalogs resulting from the full and open competition</u>, thus enabling competitive forces to drive <u>all aspects of the FFP pricing</u>.  All catalogs will be incorporated at contract award and <u>cover the full potential 10 years.</u>"  (*Id.* at 319.)  But the RFP and its technology refresh provisions neither identify the "specific tasks to be performed" nor call for prices on cloud services that do not yet exist.

DoD's research reveals that the "cloud market is an evolving and competitive landscape" where "new cloud providers are emerging monthly, and <u>the service offerings of the vendors are rapidly shifting</u>."  (AR Tab 137 at 9603.)  To account for this dynamic nature, "keep[] pace with industry innovation and stay[] at the forefront of available technology" (AR Tab 25 at 472), the RFP intentionally does <u>not</u> solicit fixed service catalogs or pricing.  Instead, DoD structured the JEDI contract to require the contractor to <u>update continually</u> the cloud services available on the contract.  Specifically, DoD crafted a special clause at RFP Section H2, which provides that the awardee will constantly add "new services" to the contract, with pricing to be determined later.  (AR Tab 35 at 740-41.)  DoD's decision to incorporate this technology refresh clause prevents DoD from falling within the statutory exception that requires fixed prices for established services at the time of contract award.  Indeed, Congress passed the single award IDIQ restrictions due to anticompetitive, single award IDIQ technology contracts with refresh provisions.  (AR Tab 77 at

24

5310 (recognizing that "[e]ven with [the technology refresh and price reduction]" clauses, the government had to negotiate in a sole-source environment and was often unable to realize the economies and efficiencies afforded by vigorous competition among vendors in the marketplace).)

In documents withheld from GAO, the record reveals that DoD issued an internal Justification and Approval ("J&A") for Clause H2. (AR Tab 112 at 6673-74.) The J&A explains that DoD designed this "New Services" clause to ensure that the offerings on the contract "keep pace with advancements in industry," by requiring the contractor to update the catalogs consistently so that "as new commercial cloud services are available, the Contractor will provide these new services and apply and incorporate those services into the contract catalog." (*Id.* at 6674.) When the Defense Procurement and Acquisition Policy office questioned the H clause, the JEDI team explained that "the Iaas/PaaS offerings are not static and will be updated overtime [sic] both in terms of available services and applicable pricing." (AR Tab 130 at 8721.) Industry advised DoD that the H2 clause would result in "daily or weekly" updates to the service offerings and pricing, even during the competition. (*See* AR Tab 32 at 660 (Q17); *id.* at 668 (Q86-87).)

DoD has not solicited FFPs for the future, undefined and unknown cloud services that the awardee will deploy on the contract. Clause H2 merely attempts to peg the DoD's prices to the awardee's future commercial market prices—an approach that the FAR does not countenance and that Congress blocked by the prohibition. 48 C.F.R. § 15.403-3(c) ("[t]he fact that a price is included in a catalog does not … make it fair and reasonable," much less competitive). Thus, the D&F's conclusion that 10 U.S.C. § 2304a(d) supports a single award IDIQ violates the statute.

**B.    The CO's Single Award Approach Contradicts Law And Reason (Count II).**

A separate statutory and regulatory provision, applicable to all IDIQ RFPs, requires contracting officers to "give preference to making multiple [IDIQ contract] awards" under a single

solicitation for the same or similar services to the "maximum extent practicable."  10 U.S.C § 2304a(d)(4), 48 C.F.R. § 16.504(c)(1)(i).  This requirement differs from the separate prohibition on single award IDIQ contracts over $112 million and, consequently, an agency must satisfy both requirements where a single award IDIQ exceeds $112 million.  75 Fed. Reg. 13416, 13420 (Mar. 19, 2010).  In the July 17, 2018 Memorandum, the CO did not meaningfully consider the benefits of competition, arbitrarily inflated the cost of competition, and violated Congressional policy.

The statutory and regulatory requirement favoring multiple award IDIQ contracts "<u>to the maximum extent practicable</u>" materially limits agency discretion.  *See, e.g.*, *Palantir USG, Inc. v. United States*, 904 F.3d 980, 992-93 (Fed. Cir. 2018) (affirming that Army actions undermined different "maximum extent practicable" commercial item preference); *SMS Data Products Grp., Inc. v. United States*, 853 F.2d 1547, 1553-54 (Fed Cir. 1988) (interpreting "shall," "to the maximum extent practicable" to mean "<u>in the most competitive manner feasible</u>.").[20]

The law requires the CO's single award justification to demonstrate that the CO rationally <u>balanced</u> Congress' strong multiple award preference to the maximum extent practicable by objectively assessing the benefits and risks of both the multiple award and single award approach.  *WinStar*, 41 Fed. Cl. at 762-64.  The CO's single-award justification does not meet this standard.

**1.      The CO Did Not Meaningfully Consider the Benefits of Competition.**

The CO cites three grounds for using a single award approach for JEDI: (i) based on the CO's knowledge of the market, more favorable terms and conditions, including pricing will result

---

[20] DoD's disdain for this maximum extent practical requirement has not escaped notice.  Recently, Congress tasked the GAO to report on DoD's use of single award IDIQ contracts for fiscal years ("FY") 2015 through 2017.  GAO's May 2018 study reveals that DoD "obligated about two-thirds of its IDIQ obligations on single award contracts."  *Defense Contracting: Use by the Department of Defense of Indefinite Delivery Contracts from Fiscal Years 2015 through 2017* at 7 (May 10, 2018), https://www.gao.gov/assets/700/691692.pdf.  In FY2017 alone, DoD awarded 9331 single source IDIQ contracts and 1423 multiple award IDIQ contracts.

from a single award competition; (ii) the expected cost of administering multiple contracts outweighs the benefits of multiple awards; and (iii) multiple awards do not serve the government's best interest.   (AR Tab 24 at 457-64.)   In making each finding, however, the CO never meaningfully considers the benefits of competition, a fatal, prejudicial flaw.

In *WinStar*, the Court confronted a similar circumstance in which the agency issued a single award IDIQ determination <u>based on the same three multiple-award exceptions</u> utilized here.  41 Fed. Cl. at 758.  The *WinStar* contracting officer, as here, principally focused on multiple award contracting difficulties, which the Court found contravened the requirement to prefer multiple awards to the maximum practicable extent given that each exception plainly requires consideration of the benefits of multiple awards.  *Id.* The Court should similarly rule in Oracle's favor here.

Multiple award IDIQ contracts for technology yield significant benefits.  As noted, Congress implemented the multiple award, maximum practicable preference to address just such contracts.  (AR Tab 77 at 5310.)  OMB has documented the competitive benefits achieved by numerous federal agencies through technology task order competition, noting that surveys revealed the costs after competition "averaged 16.7 percent less than the government's projected estimated costs." (*Id.* at 5310-11.)  DoD Guidelines also recognize task order competition benefits, including lower prices, innovation, better quality and performance, curbing fraud, and maintaining a strong defense industrial base—<u>none of which the CO considers</u>.  (*Id.* at 5361-62.)

Moreover, in September 2018, Congress (aware of DoD's intended single award approach) <u>mandated</u> that DoD maintain cloud service provider competition <u>under JEDI</u>:

> None of the funds appropriated or otherwise made available … may be obligated or expended by [DoD] to migrate data and applications <u>to the proposed Joint Enterprise Defense Infrastructure</u> … until a period of 90 days has elapsed following the date on which the Secretary of Defense submits to the congressional defense committees—
> .....

(2)  a detailed description of the <u>Department's strategy to implement enterprise-wide cloud computing, including the goals and acquisition strategies for all proposed enterprise-wide cloud computing service procurements; the strategy to sustain competition and innovation throughout the period of performance of each contract, including defining opportunities for multiple cloud service providers and insertion of new technologies</u>....

Pub. L. No. 115-245, § 8137 at 50-51.  More recently (and as quoted in the introduction), the House Appropriations Committee again expressed the benefits of a multiple-award JEDI acquisition strategy.[21]  Still DoD demands that the Court accept a CO justification which presumes JEDI task order competition has <u>no value</u>.  The law requires otherwise.

In finding more favorable terms (e.g., pricing) will exist for a single award, the CO entirely ignores the seven DoD-identified benefits of competition. (AR Tab 24 at 457.)[22]  "Obviously, it is impossible to conclude that a single award will provide more favorable terms and conditions, including pricing (16.504(c)(1)(ii)), without first considering the terms and conditions which would result from multiple awards." *WinStar*, 41 Fed. Cl. at 758.

The same error pervades the CO's second justification that "the expected cost of administration of multiple contracts outweighs the expected benefits of making multiple awards." (AR Tab 24 at 459.)  Even accepting the CO's wildly errant calculations, after quantifying a $515 million administrative cost, the CO makes <u>no effort</u> to quantify any competition benefits:  "Since the CO did not consider those benefits or explain why they would not ensue ... the analysis is one-sided and incomplete." *WinStar*, 41 Fed. Cl. at 762.  Indeed, applying OMB's 16.7% cost reduction

---

[21]  DoD Appropriations Bill, https://appropriations.house.gov/sites/democrats.appropriations.house.gov/files/FY2020%20Defense%20Report%20Draft.pdf.

[22]  The CO also ignores a serious cloud computing problem associated with a single cloud approach, commonly referred to as "lock-in."  Congress has specifically raised this concern regarding JEDI. Market research prepared for DoD also repeatedly emphasizes the "lock-in" and "exit strategy" risk associated with a single cloud approach.  (*See* AR Tab 178 at 23151, 23160, 23162 (Gartner report for CESG); AR Tab 166 at 22919 (Navy's cloud acquisition goals are to utilize "multi-cloud solutions" to "avoid vendor lock-in."); AR Tab 173 at 23003 (noting goal to foster DoD's ability to innovate freely and to avoid lock-in.).)

figure to JEDI would have yielded $1.67 billion in savings from competition, with added quality, more choices, and less fraud risk as additional, unconsidered benefits.

Likewise, the CO's final "best interests" justification ignores the benefits of competition and relies on purported costs to manage connections and train staff. But, as the *Winstar* Court aptly noted, "one cannot reasonably conclude that a single award is in the government's best interests based on the inherent costs of multiple awards unless the costs are weighed against the presumed benefits, underlying the preference." 41 Fed. Cl. at 762.

### 2.    The CO's Purported Justifications Fail Against the Record.

#### a.    The CO Errantly Found that a Single Award Approach Will Result in More Favorable Contract Terms and Conditions.

The CO based the more favorable terms justification on two faulty assumptions: (i) a multiple award approach would cause offerors to charge higher prices to offset classified and tactical edge offerings, and (ii) "fierce competition is expected under a single award scenario." (AR Tab 24 at 457-58.) Turning to the latter assumption first, the CO's focus on base contract competition is misplaced. Allowing base contract competition to overcome Congress' maximum practicable multiple awards preference renders the preference meaningless. *WinStar*, 41 Fed. Cl. at 760 (recognizing "this argument is not reasonably equivalent to multiple vendors competing head-to-head for each task order"). Moreover, DoD's qualifying gates have severely and improperly discouraged base competition.

The record also lacks support for the counter-intuitive <u>conjecture</u> that a single award contract and sole source task orders will yield lower pricing. *WinStar*, 41 Fed. Cl. at 761-62 (<u>rejecting similar unsupported claim</u>). And, the underpinnings of the CO's conjecture are flawed. The CO wrongly believed that DoD cannot require awardees to compete for particular task orders (AR Tab 24 at 457)—an error DoD conceded to GAO. (AR Tab 71 at 5067-68 (citing FAR

29

16.505(b)).)  The CO also assumed that a single award approach would guarantee the awardee the recovery of classified and tactical edge investments, without which offerors would bid higher prices.  But the RFP only guarantees $1 million of work—1/100 of one percent of the JEDI value. (AR Tab 35 at 730; AR Tab 70 at 4985.)  As the CO admitted:  "The guarantee for the JEDI Cloud requirement is a million dollars.... [Q: But there is no guarantee for tactical edge?]  A: No.  No separate guarantee for tactical edge...."  (AR Tab 78 at 5592:16-5593:5.)[23]

### b.   The CO's One-Sided Determination that the Expected Costs of Multiple Awards is Prohibitive Lacks Record Support.

To reach her second justification about the expected cost versus the benefits of multiple awards, the CO tallies only the costs of competition and never the benefits.  (AR Tab 24 at 459.) But that is not the only error; the cost assertions also lack record support.

The CO relies on severely flawed administrative costs calculations, with inputs that overstate multiple award competition costs and understate single award contract costs to conclude a multiple award approach will cost $505 million more and cause "770 years" of delay across a ten-year contract.  (*Id.* at 460.)  The CO reaches the baseless $505 million differential by claiming that DoD will spend 1688 hours awarding each multiple award task order but only 32 hours for a single award task order.  The CO testified that she derived these hours from "personal experience," but conceded that she has never purchased cloud services on an IDIQ contract.  (AR Tab 78 at 5707:10-17, 5717:1-5.)  A GSA-sponsored 2013 study reveals that agencies average 119 to 168 hours to award a task order depending on complexity, not 1688 hours, and the CO could not explain her 1318% hour escalation.  (*Compare* AR Tab 77 at 5337 *with* AR Tab 24 at 466.)

The CO's claim that task order competition will cause "770 years worth of time ... of

---

[23] If DoD needed a work guarantee to obtain best pricing of classified services and tactical edge offerings, DoD could have provided a guarantee in the contract.  DoD did not.

30

delaying warfighters" over the ten-year contract fares no better. (AR Tab 24 at 460.) The CO uses a series of unsubstantiated inputs—4,032 task orders * 70 days (the difference between 100 days the CO assumes for a multiple award order versus 30 days the CO assumes for a single award order) to arrive at 282,240 days. (*Id.*) The record does not corroborate either input, e.g., 4,032 task orders over the ten-year period or 70 net days difference. (*Id.* at 456.) Instead, the GSA-sponsored study exposes the CO's assertions as wildly overstated.

### c.     The CO's Best Interests Determination Ignores Record Evidence and Congressional Statements to the Contrary.

The CO's final suggestion that a multiple award approach will result in a prohibitive security risk or contravene DoD's best interests fails for several reasons. (AR Tab 24 at 461-64.)

First, as Congress has repeatedly noted, the CO's assertions contradict the government's lessons learned, government stated best practices, and industry best practices. *See, e.g.*, Pub. L. No. 115-245, § 8137 at 50-51 (directing DoD adopt a multiple award JEDI acquisition strategy). Indeed, late last year, OMB published its government-wide Cloud Smart strategy recognizing that multi-cloud environments are "effective and efficient", and Congress recently observed that DoD's JEDI approach "is deviating from established OMB [Cloud Smart] policy and industry best practices, and may be failing to implement a strategy that lowers costs and fully supports data innovation for the warfighter."[24] Moreover, several DoD entities and other federal agencies have awarded (or plan to award) contracts for multi-cloud offerings during JEDI. Most recently, the CIA announced its intent to "pursu[e] a multiple cloud strategy to increase access to cloud innovation <u>and reduce the disadvantages associated with using a single cloud service provider</u>."[25]

---

[24] DoD Appropriations Bill, <u>https://appropriations.house.gov/sites/democrats.appropriations.house.gov/files/FY2020%20Defense%20Report%20Draft.pdf</u>
[25] *See id.* (internal citation omitted). Jason Miller, *Is the CIA's new cloud procurement a signal to DoD to update JEDI?*, Federal News Network (Apr. 8, 2019), <u>https://federalnewsnetwork.com/</u>

Second, Van Name testified at GAO that the purported security risk arose <u>not from the multi-cloud approach</u> but instead from DoD's purported inability to manage the approach.  (AR Tab 78 at 5452:15-54:4.)  The record contradicts the suggestion that managing the security of multiple clouds will be too costly.  DoD's own market research shows that the Defense Information Systems Agency ("DISA") MilCloud 2.0 leverages a multi-cloud approach.  (*See* AR Tab 44 at 1009-11.)  DoD research also shows the Navy uses a multi-cloud approach.  (*See* AR Tab 166 at 22919; *see also* AR Tab 161 at 22853 (NSA multi-cloud).)  Moreover, the DoD CIO's Memorandum reports that "DoD will always have a multiple cloud environment" (AR Tab 115 at 6788), and the Acquisition Strategy states that DoD "will continue to use disparate clouds."  (AR Tab 25 at 505.)  Given that DoD runs more than <u>500 different clouds</u> today, the suggestion that DoD cannot handle two or three JEDI contractors hardly provides a basis for limiting competition.  And, if DoD cannot handle it, DoD can contract the work.  A contractor administers DISA's MilCloud.  (AR Tab 44 at 1009-11; AR Tab 25 at 471.)

Third, the record also belies the CO's suggestion that a single JEDI Cloud remains necessary to foster DoD's attempts to pool data.  In lessons learned from 2011-2017 related to the CIA Commercial Cloud Service procurement and implementation (another document withheld from GAO), the Intelligence Community ("IC") reported that after five years the CIA has still not been able to implement a "data lake" due to slow data migration to the cloud (IC analysts continue to use databases external to the cloud) and the fact that data maintained in different instances of the cloud, using different programs, is not pooled.  (AR Tab 161 at 22856-57.)

It is impossible to reconcile the CO's best interest assertions with Congress' repeated JEDI

---

reporters-notebook-jason-miller/2019/04/is-the-cias-new-cloud-procurement-a-signal-to-dod-to-update-jedi/.

multiple-provider direction, OMB's directive favoring multi-cloud, the actions of DoD's largest and most secretive entities (awarding multi-cloud contracts during JEDI),[26] and the DoD CIO's statements that DoD will always be multi-cloud.   Given that the CO's single IDIQ contract approach decision fails to consider the benefits of competition and rests on unfounded and improper assertions, the Court also should grant judgment for Oracle on Count II.   *See WinStar*, 41 Fed. Cl. at 762-63 (protester prejudiced by unlawful single approach).

### C.     DoD's Restrictive Subfactor 1.1 Violates CICA (Count III).

The Elastic Usage gate and its imposition violates applicable law to Oracle's severe prejudice.  DoD excluded Oracle from the competition based on the Subfactor 1.1 evaluation, even though Oracle met the outsized, network, compute, and storage metrics imposed by the qualifying gate well before proposal submission.[27]

The U.S. Code and FAR mandate that agencies specify their needs using market research, promote full and open competition, and only include restrictive provisions or conditions "to the extent necessary to satisfy the needs of the agency or as authorized by law."   10 U.S.C. § 2305(a)(1); 48 C.F.R. § 11.002(a); *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (2015) (finding provision unduly restrictive).  "Contracting without providing for full and open competition … is a violation of statute, unless permitted by one of the exceptions in [FAR] 6.302." 48 C.F.R. § 6.301.   An agency cannot restrict competition to only those companies that can demonstrate specific capabilities prior to the point in time needed by the agency.  *See, e.g., USA Jet Airlines, Inc., Active Aero Grp., Inc.*, B-404666, Apr. 1, 2011, 2011 CPD ¶ 91.

---

[26] DISA and the Navy do not have to use JEDI and it is telling that these entities do not agree that a single cloud is more secure or better.

[27] Presumably, DoD would re-assess its gate criteria in a multiple award scenario or if it finds that the conflicts potentially tainted the procurement.  If so, the Court would not need to reach the gate issues (Counts III-VI) if it rules in Oracle's favor on Counts I, II, VII, VIII, or IX.

DoD did not design the Elastic Usage gate to achieve full and open competition or to satisfy DoD's legitimate needs as required by 10 U.S.C. § 2305.   Among other outsized usage requirements, Subfactor 1.1 compels each offeror to show existing commercial cloud offering storage usage of <u>200 Petabytes</u> offline across two months (January – February 2018).  (AR Tab 35 at 791.)  For understanding, <u>two Petabytes</u> (1/100th of the standard set by DoD) equates to the volume of information housed in <u>all U.S. academic research libraries</u>.[28]  Most interested offerors did not even bother to bid because of the staggering Elastic Usage metrics.  Indeed, Oracle, one of the largest IaaS providers, could not clear the gate as of the anticompetitive time frame selected.

Subfactor 1.1 violates several separate aspects of CICA.   <u>First</u>, leaving aside DDS' internally stated intent "to get to one", DoD purportedly designed Subfactor 1.1 <u>to narrow the number of viable competitors to reduce delays "due to an unexpected number of proposals or lengthy protest delays.</u>" (AR Tab 21 at 422; AR Tab 25 at 504; AR Tab 78 at 5473:2-11.)  Congress specifically has rejected the concept of effective competition in passing CICA.  *SMS Data Products Grp.*, 853 F.2d at 1544 (quoting H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1422) ("<u>The Conference agreement on CICA rejected 'effective' competition as too low a standard for government procurements</u>..."); 10 U.S.C. § 2305(a)(1)(A)(i).  Instead, Congress created a J&A process for agencies facing schedule demands that prevent full and open competition. 10 U.S.C. § 2304(c)(2); 48 C.F.R. § 6.302-2.  DoD did not follow the required process.  <u>Second</u>, DoD knows that few cloud providers can met these massive criteria.  Where DoD seeks to limit the competitive field because of "unique supplies or services available from only one or a limited number of sources or from only one or a limited number of suppliers with unique capabilities," Congress again has provided a specific procedure.  10 U.S.C. § 2304(c)(1); 48 C.F.R. § 6.302-1.  DoD again

---

[28] <u>http://pcbunn.cithep.caltech.edu/presentations/giod_status_sep97/tsld013.htm</u>.

did not follow CICA's J&A procedures to limit the competitive field.  *Nat'l Gov't Servs., Inc. v. United States*, __ F.3d __, 2019 WL 1941163 (Fed. Cir. May 2, 2019) (reversing protest denial where award limitation provision without J&A violated CICA).

Third, the measurement date selected by DoD (nine months before even proposal submission) does not reflect a minimum need. 10 U.S.C. § 2305(a). As described by DoD, "Sub-factor 1.1. requires the Offeror to demonstrate that the JEDI Cloud portion of service usage will not constitute the majority (50% or more) of the Offeror's [Iaas] and [PaaS] usage, once the Department of Defense's (DOD's) usage is added post award." (AR Tab 42 at 944.) But DoD's description of Subfactor 1.1. is inaccurate.  This gate does not measure each offeror's network, compute, and storage capabilities after DoD usage is "added post award." Instead, Subfactor 1.1 measures whether the outsized RFP metrics for network, compute, and storage are less than 50% of each offeror's overall usage during the months of January-February 2018.  (AR Tab 35 at 791.) The measurement period DoD selected—nine months before proposal submission and more than seventeen months before the anticipated award—violates CICA as it long precedes DoD need. *USA Jet, supra*, 2011 CPD ¶ 91 (sustaining protest where agency sought capability before need).

Nothing in the record demonstrates a legitimate DoD need for network, compute, and storage of the size required by Subfactor 1.1 on contract day one, much less seventeen months earlier.[29] As Acting Defense Secretary Patrick Shanahan has explained:

> Across the department, there is a proliferation in terms of implementing clouds. Everyone was moving to the cloud," Shanahan said. "The JEDI competition is about creating a pathway so that we can move as a department on a **small scale. This isn't wholesale.** This sometimes gets advertised as this is winner take all. This is winner take all for a **very small subset** of the amount of cloud infrastructure we're going to have to **build out over time.**[30]

---

[29] DoD estimates an FY2019 JEDI contract spend of only $27,071,000.  (AR Tab 25 at 491.)
[30] "Oracle continues to cite AWS-Pentagon ties in revamped JEDI lawsuit," FedScoop (May 9, 2019), https://www.fedscoop.com/jedi-oracle-aws-pentagon-revamped-lawsuit/.

The record, including the Acquisition Strategy which projects a growing cost (by multiples each year) profile for the JEDI Cloud contract, confirms this statement. (AR Tab 25 at 491 (showing a gradually increasing JEDI fiscal year spend).) DoD nevertheless attempts to justify the Elastic Usage gate by stating the metrics ensure: 1) the Cloud is capable of providing the full scope of services even under surge capacity during major conflict or natural disaster event;[31] and 2) the Cloud experiences ongoing innovation and development and capability advancements throughout performance. (AR Tab 42 at 944-46; AR Tab 78 at 5475:1-14, 5483:19-5484:1.) But DoD's stated justification proves Oracle's point: any DoD need for such capabilities does not arise until <u>after contract award</u>, when DoD data is placed in the cloud. (AR Tab 78 at 5476:5-9.)[32]

Subfactor 1.1, however, does not measure which offerors can meet DoD's needs during performance. It measures historic usage at an arbitrary point at least seventeen months before DoD will even issue its first task order and well before even proposal submission. DoD has not and cannot articulate a legitimate need for limiting the JEDI competition to only the few cloud service providers that had this massive commercial network, computer, and storage usage in January and February 2018. (*Compare* AR Tab 25 at 504 *with* 10 U.S.C. § 2304(c).)

Finally, Congress realizes that qualification requirements discourage competition. Consequently, agencies that seek to impose qualifications requirements when soliciting proposals must follow still further procedures set forth in 10 U.S.C. § 2319. Section 2319 defines "<u>qualification requirement</u>" as "a requirement for testing or other quality assurance demonstration that must be completed by an offeror <u>before award of a contract</u>."[33] Most notably, section 2319

---

[31] "[S]urge capacity is the ability to meet sudden unexpected demands in usage," and these metrics seek to assess whether the offeror's Cloud can handle a certain number of users and data in a future, worst-case disaster scenario. (AR Tab 78 at 5475:15-5476:9.)

[32] Similarly, DoD's objective of innovation throughout contract performance by definition does not arise until after award. (AR Tab 78 at 5477:2-12.)

[33] The Elastic Usage gate is a "qualification requirement;" the Federal Circuit has explained that

requires that: "the head of the agency shall, before establishing a qualification requirement—(1) prepare a written justification stating the necessity for establishing the qualification requirement and specify why the qualification requirement must be demonstrated before contract award." 10 U.S.C. § 2319(a). The Federal Circuit has observed that these additional procedural safeguards exist "to ensure that qualification requirements are used only when and to the extent necessary to ensure product quality, reliability, and maintainability, rather than to inappropriately restrict competition." *W.G. Yates*, 192 F.3d at 992. DoD did not follow these requirements either.

In sum, the Elastic Usage gate violates CICA and 10 U.S.C. § 2319 in several, independent, prejudicial ways. DoD's unlawful imposition of the Elastic Usage gate has resulted in an irrational situation where DoD has now excluded Oracle from the competition (and the field of viable competitors) despite that Oracle exceeded even DoD's arbitrary, outsized Elastic Usage qualifying metrics at the time of proposal submission. (AR Tab 197a at 56784, 56786.) The Court, accordingly, must sustain this protest and strike this gate. *See e.g.*, *Nat'l Gov't Servs.*, 2019 WL 1941163, *11.

### D. DoD's Competitive Range Determination Lacks A Rational Basis And Is Unequal (Count IV).

DoD excluded Oracle from the competition based on the unlawful Subfactor 1.1 gate. A competitive range determination based on the unlawful criterion is itself unlawful and cannot stand. Moreover, as noted, even where an agency properly sets a qualification gate, the agency must allow the offeror to demonstrate that it can meet the gate before award. 10 U.S.C. § 2319(c)(3). Oracle's proposal establishes that it amply exceeded each of the Elastic Usage metrics (network, compute, and storage) by the time of proposal submission, rendering the

---

such requirements cover "activities which establish the experience and abilities of the bidder to assure the government that the bidder has the ability to carry out and complete the contract." *W.G. Yates & Sons Constr., Inc. v. Caldera*, 192 F.3d 987, 994 (Fed. Cir. 1999).

competitive range determination unlawful under section 2319(c)(3).

Specifically, Oracle's proposal confirms that even during the arbitrary January and February 2018 timeframe the RFP's JEDI Usage for network and compute is less than ██ of Oracle's overall usage. (AR Tab 197a at 56784, 56786 (showing when estimated JEDI network usage is added to Oracle's network usage, the JEDI usage is less than ██ of the total usage (██ for ingress, ██ for egress); *id.* at 56784 (compute table showing that estimated JEDI compute usage is ██ of total cloud compute usage and only ██ of the total capacity).) Although Oracle just missed the 50% metric for storage in the January and February period (███), Oracle's proposal establishes that moving the timeframe just a few months forward to June and July 2018— still even prior to proposal submission—Oracle amply meets the metric. (*Id.* at 56786 (showing RFP JEDI storage is only ██ of the cloud's storage usage ██ and ██ of the total capacity).)

The competitive range decision also fails because DoD irrationally and unfairly included only AWS and Microsoft ████████████████████████████ ██████ (AR Tab 226 at 58774-75; AR Tab 227 at 58777.) The U.S. Code permits DoD to set a competitive range, provided DoD only limits the range "to the greatest number that will permit an efficient competition among the offerors rated most highly in accordance with such criteria." 10 U.S.C. § 2305(b)(4)(B). When setting a competitive range, an agency must act in an even-handed manner toward the offerors. *L-3 Commc'ns EOTech Inc. v. United States*, 83 Fed. Cl. 643, 652 (2008) (granting judgment for protester where agency treated offerors differently). DoD violated both requirements. ████████████████████████████████ ██████████████████████████

DoD received only four potentially viable proposals under the JEDI RFP, ████████

████████████████████████████████████

[34] (AR Tab 224 at 58758-60.)

[35] (AR Tab 220 at 58667.)

---

[34] Seven offerors apparently submitted responses to the RFP, but DoD found three offerors "submitted incomplete proposals that were not in accordance" with the RFP and excluded these offerors at the competition's outset. (AR Tab 224 at 58758.)
[35] The SSAC also noted that

(AR Tab 220 at 58667.)

39

The selection official concurred, ████████████████████████████ ████████████████████████ (AR Tab 226 at 58775.)

DoD fails to justify why Oracle's proposal also could not be resolved ████████ ███████████████████ particularly given that DoD premised Oracle's unacceptable rating on a misreading of Oracle's proposal and an arbitrary timeframe for a metric that Oracle exceeded by proposal submission.[36]   The CO provides no justification for her flawed and unequal determination, which the underlying record contradicts.

The RFP contemplates that DoD could establish a competitive range of up to <u>four</u> offerors. (AR Tab 35 at 782, 805.)  Under this record, the greatest number of proposals for an efficient and fair competitive range is all four ███████ offerors, affording them all the opportunity to improve their proposals and address DoD's concerns with the initial proposals.  10 U.S.C. § 2305(b)(4)(B).

### E.    Subfactor 1.2 And 1.6 Also Exceed DoD's Authority Or Legitimate Needs And Unduly Restrict Competition (Counts V-VI).

DoD did not structure either Subfactor 1.2 or Subfactor 1.6 to achieve full and open competition or to satisfy a legitimate need as required by 10 U.S.C. § 2305 and FAR 11.002.  The Court, accordingly, should also grant judgment in Oracle's favor on Counts V and VI because DoD's imposition of Subfactors 1.2 and 1.6 also exceed DoD's authority or legitimate needs and unduly restrict competition for the JEDI contract to Oracle's competitive prejudice.

### 1.    Subfactor 1.2 Violates 10 U.S.C. § 2319 and Exceeds DoD's Needs.

Subfactor 1.2 seeks to leverage FedRAMP as a qualification requirement by mandating that each offeror have, at the time of proposal submission, no fewer than (i) three physically

---

[36] The RFP does not restrict the competitive range to the offerors that passed all gate criteria in Factor 1.  Instead, the RFP merely provides that the agency will establish a competitive range after completion of Phase One and Phase Two step 1.  (AR Tab 35 at 782, 805.)

existing data centers (ii) within the customs territory of the United States (iii) that are separated by at least 150 miles, (iv) capable of automated failover to the others, and (v) each "supporting at least one IaaS and one PaaS offering that are FedRAMP Moderate 'Authorized' by the Joint Authorization Board (JAB) or a Federal agency as demonstrated by official FedRAMP documentation." (AR Tab 35 at 792; AR Tab 32 at 661 (*see* government responses to Q26 and Q27); AR Tab 42 at 947; AR Tab 78 at 5488:22-5489:7.)   The offeror must satisfy all five conditions by proposal submission to pass the gate and compete. (AR Tab 78 at 5489:7-10.)   Like Subfactor 1.1, Subfactor 1.2 violates CICA for numerous reasons.

First, as with Subfactor 1.1, DoD admits creating the gate <u>to narrow the number of viable competitors to reduce delays "due to an unexpected number of proposals or lengthy protest delays</u>." Yet, DoD did not comply with CICA's J&A procedures to limit competition based on its claimed schedule demands.   10 U.S.C. § 2304(c)(1); 48 C.F.R. § 6.302-2.

Second, the FedRAMP approval process is government-run (with DoD involvement). DoD necessarily knew that only two offerors could meet this requirement—Microsoft and AWS.[37] Yet, DoD did not issue a J&A justifying the restrictive criteria because "only one or a limited number of sources" can meet the agency's needs.   10 U.S.C. § 2304(c)(1); 48 C.F.R. § 6.302-1.

Third, Subfactor 1.2 is a prohibited qualification requirement, appropriate only following compliance with 10 U.S.C. § 2319's procedures.   DoD's stated rationale for Subfactor 1.2's three data centers each supporting at least one IaaS and one PaaS offering that are "FedRAMP Moderate Authorized" is "to provide reliability and resiliency of services even in the unlikely circumstance that two datacenters are simultaneously affected." (AR Tab 42 at 947; AR Tab 78 at 5486:22-

---

[37] Indeed, DoD removed IBM from the competition and Google noted it could not compete based on required certifications.

41

5487:9.) DoD describes Subfactor 1.2 as a "mechanism to validate that the core architecture is extensible and likely to be able to meet the JEDI Cloud requirements across all service offerings." (AR Tab 43 at 955.)  Significantly, DoD will not require FedRAMP authorization as part of performance; this is merely a qualification test. (AR Tab 78 at 5495:5-14 ("[W]e are not requiring, as part of the JEDI cybersecurity plan, that the winner go through the FedRAMP process before DoD uses the final solution"); id. at 5496:3-6 ("Q: So if I understand correctly, your cybersecurity plan does not require FedRAMP authorization.  A: Correct.").)  DoD's response to RFP question 233 also establishes that offerors did not even have to propose the data centers and offerings used for the gate.  (AR Tab 40 at 853 (Q233).)  But DoD did not follow the statutory and regulatory requirements to impose Subfactor 1.2 as a qualification requirement.  10 U.S.C. § 2319(a).  The agency head did not issue a written justification stating the necessity for establishing the qualification requirement and the rationale for imposing it prior to proposal submission.  10 U.S.C. § 2319(b)(1).  Nor has DoD provided each potential offeror the opportunity to show that the offeror could satisfy the qualification requirement before the intended award date.  Compare id. § 2319(c)(3) with AR Tab 35 at 792.  Subfactor 1.2 is therefore invalid and unenforceable.  W.G. Yates, 192 F.3d at 992-93 ("any attempt by an agency to impose qualification requirements without following the procedures set out by Congress is a violation of § 2319, and such a qualification requirement must be struck down.").

Fourth, DoD cannot establish a legitimate need for "FedRAMP Moderate Authorized" cloud service offerings in three data centers at all, much less prior to proposal submission contrary to 10 U.S.C. § 2305(a).  In fact, FedRAMP prohibits requiring FedRAMP authorization as a precondition to bid,[38] because procuring agencies lack a legitimate need for authorized offerings

---

[38] GAO's decision does not mention the statutory process for imposing qualification requirements

until after contract award **_when the systems will hold federal data_**: "Federal Agencies cannot require CSPs to be FedRAMP authorized as part of their RFP but can state that a CSP needs to be FedRAMP authorized once federal data is placed in the system."[39] The myriad "Other Solicitation, Contract, and Requirements" documents that DoD presumably reviewed during JEDI planning demonstrate DoD and other agencies comply with FedRAMP's restriction, and that DoD had a multitude of less restrictive options available to ensure the offerors can meet the continuity and security requirements needed during contract performance. (AR Tab 180 at 23506, 23613, 23432.)

Subfactor 1.2 causes Oracle competitive prejudice. Oracle began investing heavily in its Next Generation Government Cloud in late 2017, has a DoD FedRAMP sponsor, and seeks to offer this latest technology to JEDI Cloud users.[40] (AR Tab 73 at 5179-80.) The Court should rule in Oracle's favor because under a revised RFP that is reasonably, narrowly tailored to DoD's actual requirements, Oracle, which will meet Subfactor 1.2 by award, would have a substantial likelihood of receiving the JEDI award. *Redland Genstar, Inc. v. United States,* 39 Fed. Cl. 220, 235 (1997) (declaring requirement void).

### 2. DoD Lacks Authority to Solicit an Online Marketplace (Subfactor 1.6).

Subfactor 1.6 requires demonstration, at the time of proposal submission, that the offeror has an online marketplace of third-party platform and software offerings that JEDI Cloud users can access to purchase and provision software. (AR Tab 35 at 793-94.) DoD seeks a contractor-

---

or FedRAMP's prohibition, electing instead to treat this matter as one of national security to which DoD purportedly has deference. (AR Tab 83.) But Section 2319 does not exempt procurements involving services or goods to the warfighter; it is a DoD procurement statute.

[39] *FedRAMP Tips & Cues Compilation 2015-2017* (Jan. 2018) at 7, https://www.fedramp.gov/assets/resources/documents/FedRAMP_Tips_and_Cues.pdf ; *see also id.* at 13 ("Agencies … should not limit the request to CSPs with ATOs.").

[40] Oracle is not the only offeror hampered by this unduly restrictive gate. DoD found IBM unacceptable under Subfactor 1.2, and excluded IBM from the competition, based on the fact that IBM does not have "█████████████████████████." (AR Tab 202 at 57829.)

43

run software marketplace so that DoD does not need to purchase its software through traditional competitive processes. (AR Tab 42 at 950-51.) DoD cannot establish a legitimate need for the online marketplace because DoD lacks authority to procure such a market. By outsourcing the selection of third-party software to the JEDI contractor, DoD has abdicated its responsibility to procure supplies and the many legal and regulatory requirements that govern such a procurement. *See* 48 C.F.R. § 7.503(a) ("[c]ontracts shall not be used for the performance of inherently governmental functions."). The RFP also lacks any provisions or controls to address the manifest OCIs that will arise from DoD delegating the control of DoD's software marketplace to a contractor.

Congress only recently authorized a pilot program for such a marketplace to be overseen by GSA, using multiple vendors. National Defense Authorization Act, Pub. L. No. 115-91, § 846, 131 Stat. 1483 (2017). The RFP's marketplace falls within Section 846's definition of an "e-commerce portal." *Compare id.* at § 846(k)(3) *with* AR Tab 78 at 5504:11-22. This Court recently declared another agency's attempt to set up a vendor-run marketplace unlawful. *Electra-Med Corp.*, 140 Fed. Cl. at 104 ("By outsourcing the selection of suppliers to the PVs [Prime Vendors] entirely, the government has avoided the multitude of legal and regulatory requirements appurtenant to a federal procurement...."). The Court should find that the solicited JEDI marketplace contravenes CICA.

DoD has not identified <u>any</u> authority permitting it to set up a vendor-run online software marketplace. (*See, e.g.*, AR Tab 42 at 950-51.) Instead, DoD contends that Oracle (which has a marketplace for its commercial customers) suffers no harm from DoD's CICA violation. The law provides otherwise. *Weeks Marine*, 575 F.3d at 1361-62. The Court should strike the RFP provisions concerning the third party software marketplace.

**F.     The CO Irrationally Determined That Conflicts of Interest Have Not Impacted JEDI And Performed An Incomplete Investigation.**

No dispute exists that (i) the CO based her initial review and no-impact determination on false information about the AWS-Ubhi relationship; (ii) more AWS-caused conflicts of interest exist than the CO originally identified; (iii) numerous violations of FAR Part 3 and potentially Title 18 exist as a result of undisclosed employment interactions between AWS and JEDI officials; and (iv) the IG is investigating whether Ubhi and ███ violated 18 U.S.C. § 208 and its implementing regulations.  (AR Tab 221 at 58709; AR Tab 222 at 58747.)  Nevertheless, without the results of the IG investigation, the CO concluded that the unlawful conduct of Ubhi, ███ DeMartino, and AWS did not impact JEDI and asks that this Court place its imprimatur on this tainted procurement.   Although the CO necessarily plays a role in this process, the CO's reassessment is as riddled with patent shortcomings as the first.  This Court also has an important role in protecting the integrity of the system.  *Express One Int'l, Inc. v. United States Postal Serv.*, 814 F. Supp. 93, 97 (D.D.C. 1992) (sustaining protest and noting inappropriate to give "special deference" to agency determination on government conflict-of-interest issues); *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 67 (1989) ("To find that the interest of the public, the rights of the competing bidders, and the integrity of the federal procurement process can be ignored simply because [agency] chooses … would be senseless and self-defeating.").

**1.     The CO Irrationally Determined That Ubhi's and AWS' Misconduct Did Not Impact JEDI (Count VII).**

Ubhi did not promptly recuse himself from JEDI based on an Amazon offer to buy Tablehero in late-October 2017 as Ubhi formerly represented to DoD and the CO previously found. Instead, AWS (during JEDI and with full knowledge of Ubhi's JEDI leadership role) made a hidden job offer to Ubhi, to include a ███ immediate signing bonus, a ███ second-year bonus,

███ shares of Amazon stock (roughly ████ per share in the relevant period), and a ████ salary.  (AR Tab 253 at 60719-20.)  AWS thus knowingly offered its former employee nearly ███ ████ in cash and stock while he actively led JEDI.

No legitimate dispute exists that Ubhi had a prohibited conflict and violated numerous statutes and regulations requiring the relief that Oracle seeks to protect the public's interest in a corruption-free procurement.  *See e.g.*, *Express One Int'l, Inc.*, 814 F. Supp. at 98 ("The temptation to assist the source of future employment ... is exactly the type of conflict of interest that statutes and ethical principles are designed to prevent.").  FAR 3.101-1 requires the government to conduct business "in a manner above reproach ... with complete impartiality and with preferential treatment for none," demands personnel adhere to an "impeccable standard of conduct," and prohibits even the appearance of conflicts of interest in government-contractor relationships.  48 C.F.R. § 3.101-1; *see also id.* § 1.102-2(c)(1) (highlighting criticality of "maintaining the public trust").

Several statutory and regulatory regimes underpin FAR 3.101-1's mandate.  *See* 48 C.F.R. Subpart 3.1 (incorporating 18 U.S.C. § 208 and 5 C.F.R. Part 2635).  For instance, the U.S. Code imposes criminal penalties where an official participates in a matter that may affect the financial interests of a prospective employer.  18 U.S.C. § 208; 5 C.F.R. § 2635.604 (requiring recusal). The PIA and its regulations also require an official contacted by a competitor during a procurement above the simplified acquisition threshold to notify his supervisor and the agency ethics official and either immediately reject the employment offer or recuse from the matter.  41 U.S.C. § 2103; *see also* 48 C.F.R. § 3.104-8(b).  The regulations define contact as "any of the actions included as 'seeking employment' in 5 CFR 2635.603(b)." *Id.* at § 3.104-3(c)(2).[41]  The PIA and its regulations

---

[41] Section 2635.603(b)(1) defines "seeking employment" broadly to include an unsolicited communication of possible employment or a response, other than a rejection to an unsolicited communication regarding possible employment. 5 C.F.R. § 2635.603(b). "The term is not limited to discussions of specific terms and conditions of employment ...." *Id.*

███████████████████████

also prohibit contractors from knowingly engaging in employment discussions with officials who have not recused themselves. 41 U.S.C. § 2103(c); 48 C.F.R. § 3.104-8(b).

These laws, which serve to "insure honesty in the Government's business dealings," <u>set an objective standard of conduct</u>, and "whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, regardless of whether there is positive corruption." *Miss. Valley*, 364 U.S. at 548-49, 562. By design, Congress has not limited the proscriptions to final decisionmakers. *Id.* at 554-55. Instead, if an agency employee "personally and significantly" participates, the prohibitions apply. *See, e.g.*, 5 C.F.R. § 2635; 48 C.F.R. § 3.104-1 (<u>restrictions cover actions "not determinative of outcome"</u>). And, when a violation occurs, the agency may not ignore the violation. *TRW*, 18 Cl. Ct. at 67. The conflicted individual's participation in government business establishes the harm:

> As *Mississippi Valley* makes clear, it is the potential for injuring the public interest created by a conflict of interest that requires invalidation of the tainted contract. <u>It therefore is immaterial whether the particular taint has or has not in fact caused the government any financial loss or damages. What the statute condemns is the inevitable taint of the contract itself that results when it is the product of a conflict of interest.</u>

*K & R Eng'g Co., Inc. v. United States*, 616 F.2d 469, 475 (Ct. Cl. 1980). Accordingly, when considering whether the public needs protection from corruption "<u>which might lie undetectable beneath the surface of a contract conceived in a tainted transaction</u>," *id.* at 474, three questions are relevant: Did the government employ the individual? Did the individual participate "personally and substantially" in the contract letting, performance, or administration? Did the individual have a prohibited conflict? *Id.* at 472. If the answer to all three is yes, the agency must act to preserve trust in the procurement system.

With respect to Ubhi, the answer to all three questions is plainly "yes," but DoD has proceeded as if no such misconduct occurred—an unlawful and irrational result. The CO

acknowledges that "Ubhi violated FAR 3.101-1" and "may have violated 18 U.S.C. § 208 and its implementing regulations" (AR Tab 221 at 58723), stating:

> Based on (1) Mr. Ubhi seeking employment with a potential offeror while being personally and substantially involved in the JEDI Cloud effort, and (2) Mr. Ubhi's actions to conceal seeking employment and accepting a position, including but not limited to not promptly recusing himself from JEDI Cloud, I find he did not conduct himself in a manner above reproach.

(*Id.* at 58709.)  In fact, the employment contacts between Ubhi and AWS violate the FAR, the OGE regulations, 18 U.S.C. § 208, and the PIA's employment negotiation restrictions.  AWS and Ubhi had ongoing employment discussions throughout his DoD tenure.  (AR Tab 221 at 58710-11.)  Then, in late September 2017, after DDS appointed Ubhi to the four person DDS team leading JEDI, AWS offered Ubhi a position to rejoin AWS, and on October 4, 2017 Ubhi committed to rejoin AWS.  (AR Tab 259 at 60794-95, 60911, 60913-14.)  Rather than disclose AWS' contacts and recuse himself promptly, Ubhi intensified his JEDI participation during which time he obtained nonpublic DoD cloud enterprise data, AWS competitor data, and helped shape the procurement in AWS' favor. (AR Tab 221 at 58716; Section III.D.1, *supra*.)  Weeks later, Ubhi fabricated a story to leave DoD without disclosing his improper conduct.  (AR Tab 221 at 58709; AR Tab 253 at 60719-22; AR Tab 45 at 2777-78; AR Tab 259 at 60819 (11/13 start date); *id.* at 60983-84 (covering start date plans); *id.* at 60993-94 (announcing Ubhi rejoining AWS team).)

The record also establishes that AWS improperly failed to disclose the Ubhi employment contacts to DoD and proceeded to hire Ubhi knowing Ubhi had not recused himself.  41 U.S.C. § 2103(c); 48 C.F.R.  §  3.104-8(b).   AWS knew it was actively recruiting and negotiating employment with Ubhi, a member of the JEDI acquisition team.  Ubhi's resume describes his DDS work as "leading the effort to migrate the entire [DoD] enterprise to the commercial cloud...." (AR Tab 259 at 60845; *see also* AR Tab 34 at 699 (Ubhi advising AWS in early October 2017 that he

was "running point on all [JEDI] industry touch points").)  AWS also knew that Ubhi did not recuse himself until long after the AWS made the triggering employment contact with Ubhi.  (AR Tab 259 at 60816 (Ubhi advising AWS recruiter that he was not speaking with DoD ethics counsel until October 30, 2017).)  In fact, on October 18, 2017—well after the informal re-employment agreement, Ubhi (as a JEDI official) met with the AWS JEDI team and others from DoD to discuss AWS' JEDI capabilities; neither Ubhi nor AWS disclosed the hidden relationship.  (*See e.g.*, AR Tab 34 at 696-97, 699, 714; AR Tab 259 at 60940.)

The CO avoids the PIA (and AWS' misconduct entirely) by declaring the PIA inapplicable because AWS had not yet submitted a proposal.  (AR Tab 221 at 58716.)  The CO's flawed interpretation of law deserves no deference.  Under such a reading, contractors could negotiate employment and compensation with procurement officials up until the proposal submission deadline with impunity, so long as the negotiations were complete by the time the company pressed "send" on its proposal.  Such an interpretation contravenes the PIA's definition of procurement, which focuses on when the acquisition started and not when offerors submit proposals.  41 U.S.C. § 2101 ("federal agency procurement means the acquisition (by using competitive procedures and awarding a contract) of goods or services (including construction) from non-Federal sources by a Federal agency using appropriated funds."); *see also* 41 U.S.C. § 111 (definition procurement to "include[] all stages of the process of acquiring property or services…").  Given that the JEDI acquisition began on September 13, 2017, and ███████ reached out to DDS shortly thereafter to express AWS' interest, the PIA covers the subsequent AWS-Ubhi employment contacts.  (AR Tab 33 at 686; AR Tab 34 at 697.)[42]

---

[42] AWS seeks to set up a "large business" safe harbor from the PIA, claiming that AWS cannot possibly track what its thousands of employees do.  (AR Tab 259 at 60785.)  But the PIA does <u>not</u> exempt large organizations.  AWS also seeks to distinguish its public sector team from its commercial sector team, claiming that its public sector team did not know the commercial sector

Even assuming the CO had discretion to ignore regulatory and statutory violations by Ubhi and AWS (which the CO did not), the primary reasons the CO gives for finding no-impact lack a rational basis. <u>First</u>, the CO asserts that Ubhi "did not have the technical expertise to substantially influence JEDI Cloud requirement" (AR Tab 221 at 58719), or the "level of technical understanding necessary to make the case for some of the most important foundational decisions." (*Id.* at 58720.) <u>But the CO and Van Name both testified repeatedly to Ubhi's technical expertise before GAO in this matter.</u> (AR Tab 78 at 5445:6-8 ("<u>Right, again, Deap is a technical expert</u>. That's why he was hired on to the DDS team."); *id.* at 5571:18-20 ("<u>[T]he technical expert that was pegged to support this -- support aspects of this was Deap Ubhi.</u>").) The record also confirms Ubhi's highly technical role: "I am hopeful that will be Google's opportunity to discuss issues around security, AI and big data ops. We've got some pointed technical questions for industry (I am a TPM [Technical Product Manager] and Jordan is a full-stack developer), so we expect our conversation tomorrow to be highly technical (as it should be!)." (AR Tab 247 at 60621.)

<u>Second</u>, the CO errantly found "<u>no evidence</u> that … Ubhi's participation … had any substantive impact on the procurement decisions or documents." (AR Tab 221 at 58723; *see also id.* at 58719.) Instead, the CO concluded that "Ubhi's attempts to influence the JEDI Cloud requirement were limited" and that "all the key decisions for the JEDI Cloud procurement such as the actual RFP terms and whether to award one or more multiple contracts, were made well after

---

team was negotiating employment with Ubhi and its commercial sector team did not know Ubhi failed to recuse himself promptly. (AR Tab 260 at 61016-18.) The distinction AWS advances fails as a matter of fact and law. The offering entity is "Amazon Web Services, Inc.," not the Worldwide Public Sector team. (AR Tab 194a at 24477.) And, agency principles impute an employee's knowledge to the corporate employer. *See, e.g., Long Island Savings Bank, FSB v. United States*, 503 F.3d. 1234, 1244-50 (Fed. Cir. 2007) (imputing knowledge to corporation and declaring contract void *ab initio*); *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378 (7th Cir. 2010) ("Corporations do not have brains, but they do have employees. One fundamental rule of agency law is that corporations 'know' what their employees know. . . .") (citing Restatement (Third) of Agency § 5.03 (2006)).

Mr. Ubhi recused himself." (*Id.* at 58719.)

The record, however, establishes Ubhi's success driving the single award strategy. In fact, DoD's commitment to that approach never shifted after the October 16, 2017 CESG meeting in which DDS tasked Ubhi to "tackle [the] question of one versus multiple cloud providers." (AR Tab 242 at 60100.) Following Ubhi's presentation, Woods reported, "Single is assumed now," and told Ubhi that she was: "Really glad you were here this week." (*Id.* at 60229.) A few days later, on October 22, 2017, Van Name told Ubhi: "The single [vs.] multiple conversation is done. Everyone that now matters is convinced." (*Id.* at 60239.) A couple weeks later, on November 6, 2017, DoD confirmed in public document the chosen "Acquisition Strategy" of a "Single-award [IDIQ] contract...." (AR Tab 92 at 5957.) Although external groups may have questioned the approach—in fact DoD anticipated public scrutiny—the approach never changed. (*See* AR Tab 86 at 5928 (CESG meeting minutes showing DoD sought to "[a]void specifying that there is a single vendor," because doing so "will create perception issues with vendors . . .").) The record also demonstrates Ubhi's extensive, successful lobbying of critical decisionmakers on this issue, including the representative of Under Secretary Lord. (*See* Section III.D.1.a.)

The record also contradicts other CO statements purportedly supporting the conclusion that Ubhi's involvement came too early to matter. For instance, based on her "recent review of the Google Drive history," the CO states that DoD did not create the acquisition strategy until January 25, 2018. But the Slack messages show the DDS acquisition team, including Ubhi, discussing the DSD's request for "a (rough) copy of the acquisition strategy," which DDS apparently provided and marked acquisition sensitive on October 27, 2017. (AR Tab 242 at 60306.)

The record also shows Ubhi's efforts in the requirements drafting process. For instance, Ubhi played a role in drafting and revising the JROC Memorandum ("JROCM"). (AR Tabs 244,

51

258.)  As described by the CO, the JROCM "was essential to begin the process of drafting the Statement of Objectives and the RFP." (AR Tab 221 at 58716.)  The Slack messages also confirm Ubhi's involvement with the gate criteria and other requirements.  (AR Tab 47c at 3123 (Woods to Ubhi: "So if multiple cloud providers can meet the metrics, then we don't get to one.  The metrics solve the problem."); AR Tab 242 at 60237 (Ubhi:  "So we need to come up with those 5-8 'differentiators' that help us meet mission better right … i.e. high availability, built-in redundancy and fail-over, true elasticity, AI\/ML managed services available \'out of the box\'.").)  Ubhi's Slack messages evidence sweeping (not limited) involvement in foundational documents: "I'm reviewing and writing more documents than a college professor!"  (AR Tab 242 at 60251; *see also id.* at 60309 ("dropping dimes in the document like steph curry").)

Third, the CO found "no evidence that … Ubhi's participation … introduced any bias in favor of AWS" on the procurement decisions or documents.  (AR Tab 221 at 58716.)  The CO apparently reached this conclusion by speaking with seven DDS personnel—including Ubhi's DDS supervisors (Lynch and Van Name) and DDS counsel tasked with vetting Ubhi (Woods).  (*Id.* at 58716-17.) Each of these individuals, some of whom failed to adequately screen Ubhi (e.g., Woods and the CO) and all of whom supported Ubhi's access and improper efforts (even if unwittingly), purportedly claimed that Ubhi did not impact the procurement.  (*Id.*)[43] The subjective opinions of these seven individuals cannot substitute for an objective investigation into Ubhi's conduct.  Instead, the AWS-Ubhi employment arrangement establishes Ubhi's bias as a legal matter.  And, the record is littered with Ubhi statements to favor AWS or harm a competitor.  For example, in one JEDI session, Ubhi suggested that DoD consider simply having AWS build the JEDI cloud: "know how fast AWS builds regions?", "I'm dead serious. Why wouldn't they [AWS]

_____

[43] The CO did not record or retain any notes of these interviews.

52

just build out an entire region footprint just for us?" (AR Tab 242 at 60169-70.)

Finally, the CO finds "no evidence that ... Ubhi obtained or disclosed any competitively useful nonpublic information." (AR Tab 221 at 58723.)  The CO reaches this flawed conclusion by declaring: (i) the vast government information worthless "because the acquisition was in its predecisional planning phase"; and (ii) the marked competitor information Ubhi received available on-line and not competitively useful.  (*Id.* at 58715-16.)  As related to Ubhi's plenary unrestricted access to procurement sensitive, JEDI information, the examples abound.  For example, two days after verbally committing to AWS, Ubhi traveled to SPAWAR for an internal meeting with a tactical edge expert, whom Ubhi described as "schooling [him] on the tactical edge." (AR Tab 47c at 3172.)  The CO nevertheless found no competitive harm despite finding that:

> I assess Mr. Ubhi's comments to mean that Ms. Morgan was very impressive in demonstrating her knowledge of the unique challenges of the warfighter at the tactical edge as it relates to cloud.  Moreover, it's clear that Ms. Morgan imparted an appreciable amount of knowledge that informed the DDS team ... and led others in DDS to express interest in increasing their knowledge of the tactical edge challenges and potential solutions to satisfy the tactical edge requirement.

(AR Tab 221 at 58741-42.)  Tactical edge is one of the RFP's technical evaluation factors.  (AR Tab 35 at 796.)  Meetings with the Air Force also resulted in "more in depth tech docs," documents which the CO did not review.  (AR Tab 242 at 60158.)

In fact, the record shows that Ubhi managed and had access to untold amounts of nonpublic and acquisition sensitive JEDI-related information based on his access to the acquisition's Google drive.  (*See* AR Tab 78 at 5532:16-18, 5533:8-16.)  Recognizing the competition sensitive information generated during Ubhi's tenure, Woods cautioned Ubhi and Kasper to be careful when talking to industry to avoid revealing such information:  "Need to be in receive only mode.  Be careful not to reveal info from our side that is not public knowledge." (AR Tab 242 at 60133.)  In another instance, as to documents Ubhi reviewed just moments earlier, Woods identified the

53

documents as "close hold" and "Acquisition sensitive", and directed: "No support contractors and only government folks that are read in so we protect integrity acquisition [sic]." (*Id.* at 60315.) At some point prior to rejoining AWS, Ubhi synced the Google Team Drives to his laptop. (Dkt. 40-1 at 6.) The CO did not consider what documents Ubhi downloaded or what happened to the documents. The CO ultimately only considered a handful of documents on the Google drive and left everything else Ubhi created, reviewed, revised, and downloaded unconsidered.

As related to the CO's determination that the contractor-proprietary information lacks competitive value, the record again evidences otherwise. (AR Tab 78 at 5436:11-5437:3; *id.* at 5463:12-5464:11.) Ubhi conducted "highly technical", one-on-one meetings with potential JEDI competitors during which he asked vendors wide-ranging, sensitive questions such as "what is your biggest weakness and how are you working to improve in that area?" (AR Tab 221 at 58724.) Ubhi also received access to substantial vendor written material. Notably, each vendor's material produced so far properly marked the information disclosed to DoD and Ubhi. (AR Tab 247 at 60397 (Microsoft), *id.* at 60626, 60628-21, 60634 (Google), *id.* at 60602-20 (VMware). Still, the CO did not consult with any contractor before declaring the proprietary information publicly available. *Cf. McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1185–86 (D.C. Cir. 2004) (contractor's proposal covered by Trade Secrets Act).

Instead, DDS cites to websites that purportedly reveal the same information that the vendors marked proprietary. (AR Tab 221 at 58729-34.) A comparison of the marked materials to the webpages, however, disproves the CO's conclusion. For instance, with respect to Microsoft, DDS obtained two white papers, the first marked as "Microsoft Proprietary - shared under NDA" (AR Tab 247 at 60402) and the second marked as "confidential, proprietary information of Microsoft and shall be protected in accordance [with] 18 U.S.C. Section 1905 (Trade Secrets Act)."

(*Id.* at 60427.)  The documents describe Microsoft's approach to 

(*Id.* at 60437.)  The websites DDS cites do not reveal ███████████████████████

Google also provided DoD far more detailed proprietary information than the public information DDS cites.  For instance, Google submitted a "technical key takeaway presentation." (*Id.* at 60622.)  On a slide marked "Proprietary and Confidential," Google provided a map detailing each of Google's "edge points of presence," and "Google global cache edge nodes."  (*Id.* at 60626.)  The websites DDS cites do not reveal comparable detail.  (AR Tab 262.)

Contrary to the CO's findings, the record demonstrates that Ubhi played a pivotal role driving substantive acquisition decisions (including single source and gate criteria) and that Ubhi deliberately positioned himself to obtain competitively valuable DoD cloud and AWS competitor information after having agreed to rejoin AWS.  The Ubhi-AWS misconduct corrupted JEDI.

## 2.    The CO Irrationally Determined That ████ and AWS' Misconduct Did Not Impact JEDI (Count VIII).

The CO acknowledges that ████ violated FAR 3.101-1 and likely 18 U.S.C. § 208 and its implementing regulations by participating in JEDI after accepting an AWS high-level executive position.  (AR Tab 222 at 58747.)  Yet, the CO declares the violations did not impact the procurement.  (*Id.*)  The CO's conclusion fails for several reasons.

First, the CO did not reasonably investigate "all information available."  48 C.F.R. § 3.104-7(b).  The CO did not interview ████ or review his Navy emails to understand the extent of his JEDI involvement and why he participated in the JEDI Cloud meeting after accepting AWS' offer.  The CO did not question why ████ affidavits were incomplete and untruthful.  The CO did not ask about ████ compensation or obtain any documents from AWS related to the hiring of ████

The CO did not explore the content of the many interactions between ▮▮▮ and ▮▮▮ Without making these basic inquiries, the CO could not rationally find no evidence (i) of ▮▮▮ providing input to JEDI acquisition decisions or documents, (ii) that he disclosed competitively useful information to AWS, and (iii) that he introduced any bias into the procurement.  (AR Tab 222 at 58747.)  ▮▮▮ own affidavits contradict the CO's no evidence findings, conceding that he provided "input on a high-level strategy document for the JEDI Cloud." (AR Tab 194a at 24549.) But, the CO neither asked ▮▮▮ to describe his input nor to identify the "strategy document."

Second, the CO failed to consider all applicable legal standards, including whether AWS' hiring of ▮▮▮ violated the regulations governing contractor compensation of covered DoD officials. 48 C.F.R. § 252.203-7000.  The proscription applies to DoD Senior Executive Service officials, like ▮▮▮ that leave office after January 28, 2008. *Id.*  Specifically, DoD's regulations required ▮▮▮ <u>prior</u> to accepting compensation from a DoD contractor like AWS, to request a written opinion from the appropriate DoD ethics counselor about post-employment restrictions. *Id.* at § 203.171-3.  The regulations also prohibited AWS from compensating ▮▮▮ within two years of his participation in an acquisition like JEDI, "without first determining that [▮▮▮ has sought and received … <u>a written opinion</u> from the appropriate DoD ethics counselor regarding the applicability of post-employment restrictions" to ▮▮▮ role for AWS. *Id.* at § 252.203-7000; *id.* at § 203.171-3(b).  Absent from the record is any indication ▮▮▮ communicated with the Navy's ethics office about post-government restrictions prior to accepting AWS' offer or that AWS required ▮▮▮ to submit a written opinion from the appropriate ethics office about his restrictions prior to compensating ▮▮▮ as a senior executive.  Instead, AWS' communications to the CO suggest that AWS sought no written submissions from ▮▮▮ (AR Tab 259 at 60787 (noting AWS' Executive Recruiting team does not require written candidate submissions).)

Additionally, the CO never considered whether ▮ violated the PIA. Based on the limited facts the CO gathered, it is clear that ▮ violated FAR 3.104-3(b), which prohibits a person, <u>other than as provided by law</u>, from "knowingly obtain[ing] ... source selection information before the award of a Federal agency procurement contract to which the information relates." Applicable regulations required ▮ to recuse himself from all matters involving AWS (including JEDI) while he sought employment with AWS, and certainly after he accepted a position with AWS. 18 U.S.C. § 208; 5 C.F.R. §§ 2635.604, 607. Yet, ▮ attended the CESG meeting to discuss the draft acquisition strategy three days after accepting AWS' offer and months after recusing himself from matters involving AWS.

Finally, the findings the CO made to claim ▮ conduct had no impact lack support, and the reliance on AWS' submissions is misplaced given the CO knows those submissions (both as to ▮ involvement and access to information) are inaccurate and incomplete. For instance, ▮ stipulated in his original affidavit that he "had no access to the DoD's acquisition plan, source selection procedures, or any other information that could provide a competitor an unfair competitive advantage." (AR Tab 223 at 58754.) But the CO found that ▮ reviewed and discussed the draft Acquisition Strategy—nonpublic source selection information. (AR Tab 222 at 58746.) Moreover, ▮ averred that she and ▮ regularly interact to strategize about technology solutions to federal customers, and both she and ▮ averred that they <u>discussed JEDI prior to AWS initiating an email firewall</u>. (AR Tab 194a at 24550-51, 24553.) The CO never explored their conversations and yet determined it "immaterial" that AWS did not issue its email firewall for over six weeks after ▮ arrived. (AR Tab 223 at 58754.) Nevertheless, the CO, without explanation, accepts and relies on ▮ statements that he has not disclosed any nonpublic, competitively useful information to AWS. Whether ▮ lied about access to source

selection information or did not recognize that he had accessed JEDI acquisition sensitive information is immaterial.  At best, ███ does not realize an obligation to protect the JEDI information he has.  At worst, ███ has made a false statement.  Either way, the CO cannot possibly leave it to ███ to protect against disclosure of the sensitive information.

This record makes clear that the CO did not review the relevant materials, ask the right questions, or articulate sufficient reasoning for finding ███ participation in JEDI confidential meetings after accepting an executive position in AWS' federal sector had no impact on JEDI.

> ### 3. The CO Irrationally Determined That DeMartino's Misconduct Did Not Impact JEDI (Count IX).

DeMartino's JEDI participation violated the U.S. Code, the applicable regulations, and specific DoD SOCO guidance.  No dispute exists that DeMartino, a former DSD Chief of Staff, served as a senior executive branch official, and was prohibited from participating on JEDI based on his prior consulting relationship with AWS.  The only dispute involves whether the CO's assessment correctly declared DeMartino's involvement "ministerial and perfunctory in nature" and thus not improper.  (AR Tab 33 at 685.)  The CO's July 2018 assessment lacked material facts, ignored contrary law, and broke from regulatory processes.

Absent appropriate authorization, a federal official may not participate in a matter involving "a person with whom he has a covered relationship" when "the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality...."  5 C.F.R. § 2635.502(a); 48 C.F.R. § 3.104-2.  Although this rule prohibits involvement with a covered relationship (including those of former consultants) for one year, Executive Order 13770 extends the restriction to two years for political appointees (like DeMartino).  82 Fed. Reg. 9333

(Jan. 28, 2017); 5 C.F.R. § 2635.502(b)(1)(iv).[44]   Given that DeMartino consulted for AWS

through January 2017 and transition into DoD in early 2017 (AR Tab 33 at 685), these rules

prohibited DeMartino's participation in matters involving AWS before January 2019 at the earliest.

Indeed, due to his financial ties with AWS, DoD's SOCO issued an ethics letter in April 2017,

warning DeMartino not to work on matters involving AWS without approval.  (AR Tab 51 at

4345.)   But DeMartino ignored SOCO's written direction and participated in JEDI from its

inception without seeking SOCO's consent.  (*See generally* AR Tab 51.)  More than eight months

elapsed before DeMartino finally requested such approval, apparently as a result of press inquiries

questioning DeMartino's role. (AR Tab 75 at 5233.)  In April 2018, SOCO instructed DeMartino

to recuse himself immediately but the damage was already done.  (*Id.*)

The CO's few-paragraph analysis has numerous, independent and prejudicial flaws.  (AR

Tab 33 at 685.)  First, the CO did not reasonably investigate DeMartino's conduct.  The CO did

not interview DeMartino, review his emails, or assess his work product.  (AR Tab 78 at 5686:11-

14; *id.* at 5695:2-9; AR Tab 75 at 5239.)  The CO testified to GAO that she did not remember

when or how she learned of DeMartino's conflict.  (AR Tab 78 at 5668:16-5669:5.)  The CO had

not even seen SOCO's prior ethics warning issued to DeMartino prior to concluding he complied

with the ethics rules.  (*Id.* at 5669:12-5670:13.)  Had she done so, the CO would have learned the

opposite was true: DeMartino participated in JEDI contrary to the SOCO's instruction.  (AR Tab

51 at 4345; AR Tab 75 at 5233.)  Instead, the CO never conferred with SOCO (AR Tab 78 at

5675:4-8) nor considered the materials that SOCO reviewed (if any) when SOCO later directed

DeMartino not to participate further in JEDI.  (*Id.* at 5674:1-5675:3).  The CO's "check-the-box"

---

[44] OGE, *Conflicts of Interest Considerations: Law Firm or Consulting Employment*, https://www.
oge.gov/web/OGE.nsf/0/53BE4061E9EFDEB4852582B400626DAA/$FILE/Law%20Firm%20
or%20Consulting%20Employment.pdf.

exercise renders the DeMartino conflict assessment irrational. *NetStar-1*, 101 Fed. Cl. at 521.

Second, even the few DeMartino records available confirm that the CO's characterization of DeMartino role's as "ministerial and perfunctory" is inaccurate.[45] These documents show that DeMartino participated personally and substantially in JEDI. DoD concedes that the DSD, on whose behalf DeMartino oversaw JEDI, participated "personally and substantially." (AR Tab 64 at 4862.) As the Chief of Staff for the organization managing DoD's cloud strategy, DeMartino shaped JEDI from a policy level all the way down to specific acquisition details. DeMartino received and commented on JEDI acquisition sensitive information. (*See* AR Tab 47e at 3310, 3315-16.) DeMartino obtained and edited JEDI briefings on behalf of the Secretary of Defense and DSD, directed JEDI activities, and conducted meetings about the Acquisition Strategy, Security Strategy, Business Case, the single award approach, among other matters. (*See* Section III.D.3.) DeMartino also directed efforts and strategy about the best way to garner external approval for the single source approach. (AR Tab 51 at 4366-67 ("I would nuance this with the language about single 2 year award and that there are going to [sic] OPPORTUNITIES for other companies to compete for other awards later in the lifecycle.").) DeMartino coordinated with DoD's CAPE office to obtain information to support projected savings from the single source approach, among other data. (*Id.*) DeMartino revised the JEDI industry day briefing and coordinated and shaped the JEDI press strategy. (*Id.* at 4402, 4404; AR Tab 47f at 3831; *id.* at 3880; AR Tab 47e at 3319.) DeMartino also met and substantively discussed JEDI with the DSD routinely. (*See* AR Tab 242 at 60139, 60282, 60285.) But since the CO never interviewed DeMartino, the scope of such communications is unknown.

Third, the CO did not assess DeMartino's participation against the relevant legal

---

[45] DoD has not produced and the CO never reviewed the purported notes taken by DeMartino.

benchmarks.   The FAR states that "[p]articipation may be substantial even though it is not

determinative of the outcome," and that "the single act of approving or participating in a critical

step may be substantial."  48 C.F.R. § 3.104-1.  OGE opinions also reinforce that DeMartino

participated "personally and substantially" in JEDI, and show that a wide variety of activities

qualify, including advocating for a program plan,[46] and reviewing recommendations and issuing

communications,[47] all activities DeMartino performed.

Despite that Oracle raised each of these issues prior to the CO's reassessment, the CO did

not remedy the legal and factual errors in her initial July 2018 assessment.  Indeed, the CO did not

consider DeMartino's conduct in her April 2019 reassessment, even though the new record

production includes even further evidence of his JEDI involvement.  (*See e.g.*, AR Tab 242 at

60139, 60282, 60285.)   Had the CO reasonably investigated DeMartino's conflicts and JEDI

involvement, the CO would have found that DeMartino violated FAR 3.101-1, ethics rules, and

SOCO's express direction—all to the detriment of the public's trust in the JEDI procurement.  The

CO's failure to reasonably investigate and resolve the conflict prejudices Oracle. *See Jacobs Tech.*

*Inc. v. United States*, 100 Fed. Cl. 198, 213 (2011).

### G.    The CO's Determination That AWS Does Not Have An Unmitigated OCI From Its Hiring Of Multiple JEDI Officials Lacks A Rational Basis.

AWS' pervasive hiring of JEDI officials during the procurement, without notice to DoD

and adequate firewalls, has created an unmitigable OCI for AWS.  Indeed, the record makes clear

that AWS failed to take the steps necessary to firewall Ubhi and █████ fully and adequately when

---

[46] OGE Opinion 96 x 21, Nov. 5, 1996, at https://www.oge.gov/Web/OGE.nsf/All+Advisories/0 DBDD3F25EB971885257E96005FBE98/$FILE/b491b2086be74d4791507906d501ef3c3.pdf?o pen.
[47] OGE Opinion 83 x 12, Aug. 3, 1983, at https://www.oge.gov/web/oge.nsf/Legal%20Advisorie s/486F71347E36660185257E96005FBBE0/$FILE/8a664c07fd4040008b68a00b4a4f30795.pdf? open.

they joined AWS.  The CO's suggestion that AWS has no actual or potential OCI and that AWS' belated internal processes are "effective to maintain the integrity of the procurement process" lack legal and factual merit.  (AR Tab 223 at 58752 (Ubhi), 58754 (███ *id.* at 58753.)

The "strict limitation on both actual and apparent conflicts [in government and contractor relationships set forth in FAR 3.101-1] reflects the reality that the potential harm flowing from [FAR 3.101-1 violations] is, by its nature, frequently not susceptible to demonstrable proof." *Dep't of Navy- Recon.*, B-286194.7, May 29, 2002, 2002 CPD ¶ 76.  Accordingly, the Court's inquiry focuses on whether AWS may have gained an unfair competitive advantage through its hiring of former government officials based on whether those individuals joined AWS with nonpublic, competitive useful information. *NetStar-1*, 101 Fed. Cl. at 529 (recognizing "[a] long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed") (internal citation omitted); *Int'l Res. Grp.*, B-409346.2 *et al.*, Dec. 11, 2014, 2014 CPD ¶ 369 (hiring of a government official with competitively useful information creates an OCI "without the need for an inquiry about whether" the competitor actually utilized information).

Even the CO concedes that ███ joined AWS with knowledge of the draft acquisition plan—competitively useful, nonpublic information.  (AR Tab 223 at 58754; AR Tab 222 at 58746-47.)  Ubhi also joined AWS with significant nonpublic data about the JEDI requirements, DoD user's needs (including Tactical edge), and AWS competitor "proprietary and confidential" information. (*See* Section V.F.1.) AWS has an actual OCI which the CO must resolve either by disclosing all information accessed by ███ and Ubhi to the competitors or excluding AWS.

AWS' reliance on untimely emails asking JEDI proposal personnel not to discuss or solicit JEDI information from ███ and Ubhi and statements by self-interested AWS personnel leading the proposal effort are not effective means to address AWS' unfair advantage.  As to ███ DDS

never obtained an NDA for ▮▮▮▮ (AR Tab 188.) AWS' proposal and the declarations submitted by ▮▮▮ and ▮▮▮▮ confirm that AWS did not instruct ▮▮▮▮ to avoid JEDI related matters until July 26, 2018, <u>six weeks after</u> ▮▮▮▮ <u>joined AWS</u>, and AWS did not circulate a "formalized firewall" email until August 16, 2018—<u>two months after</u> ▮▮▮▮ joined. (*See* AR Tab 194a at 24551, 24543.) Prior to that email, both ▮▮▮▮ and ▮▮▮▮ averred that they discussed JEDI, and ▮▮▮▮ notes she still interacts with ▮▮▮▮ "regularly." (*Id.* at 24550-51, 24553.)   The CO's determination that the timing of the email attempting to firewall ▮▮▮ from AWS' JEDI efforts was "immaterial" lacks a rational basis. *See NetStar-1*, 101 Fed. Cl. at 528 ("remedies adopted after-the-fact cannot be effective if they look only forward and fail adequately to address unequal access problems that have occurred in the past.").

Similarly, with Ubhi, the CO's reliance on the Ubhi and AWS statements that they did not misuse the non-public competitively useful information known to Ubhi lacks reason.  The Ubhi and AWS affidavits are rife with inconsistencies. For example, the AWS recruiter avers that within a week of Ubhi submitting the false Government Entity Questions Form claiming he had no restrictions, Ubhi verbally advised of a need to recuse himself from the DoD program he was working on and that he could not work with the AWS public sector team. (AR Tab 221 at 58711.) The recruiter never addressed Ubhi's directly conflicting post-government restrictions statements, and claims she never "asked for any detail, about the program that he was working on for DoD." (AR Tab 259 at 60815-16.) Nor did the recruiter act on Ubhi's verbally-disclosed restriction by formally preventing Ubhi from working with the public sector team. Rather, AWS waited to send an email to the JEDI proposal team instructing them not to engage Ubhi about JEDI until May 11, 2018—seven months after Ubhi joined AWS <u>and based on a press inquiry about Ubhi</u>. (*Id.* at 60785.) When the CO asked AWS about Ubhi's conflicting statements, AWS avoided the issue

63

claiming that it did not know why Ubhi falsified the Government Entity Question form.

Moreover, the belated email firewalls (two months for ████ and seven months for Ubhi) and post hoc declarations disclaiming any wrongdoing are inadequate as a matter of law. The eventually "formalized" AWS firewalls are little more than emails directing AWS employees not to seek or obtain ████ or Ubhi's input on the JEDI proposal. (AR Tab 194a at 24543.) Even if untimely firewalls sufficed, there is no suggestion that AWS implemented the physical and document control protocols necessary to prevent information and communication between conflicted individuals. This Court has rejected such paper promises as inadequate methods of firewalling. *NetStar-1*, 101 Fed. Cl. at 526 ("Such bare bone promises are a far cry from the detailed procedures, as well as physical and electronic barriers, that the decisional law have found adequate to mitigate 'unequal access to information' OCIs.").

Finally, it is axiomatic that AWS cannot mitigate its unequal access OCI by relying on a "self-implementing" mitigation plan: "[R]emedies adopted after-the-fact cannot be effective ... if they allocate to the putative contract awardee the task of policing and mitigating its own potential conflicts of interest." *Id.*; *McCarthy/Hunt, JV*, B-402229.2, Feb. 16, 2010, 2010 CPD ¶ 68. Here, DoD's purported mitigation has left it to bad actors—AWS, Ubhi, and ████ to self-execute. The Court should reject such an approach.

## VI.   ORACLE MEETS THE PERMANENT INJUNCTIVE RELIEF REQUIREMENTS

As demonstrated in Section V, the single award D&F violates the law, three of the RFP gate criteria limit competition improperly and exceed DoD's authority or needs and Oracle suffered exclusion as a result, and multiple JEDI officials violated FAR 3.101-1 and related ethics and procurement integrity laws (two with assistance from AWS) undermining the public trust in this significant procurement. Having demonstrated success on the merits and entitlement to

declaratory relief, Oracle's evidentiary burden for the three other injunctive elements is low. *See, e.g., CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 577 (2004). Oracle readily satisfies each. First, absent an injunction, Oracle will suffer the irreparable harm of being deprived the opportunity to compete fairly for the contract and of being shut out of a substantial portion of the DoD cloud market for the contract's 10-year duration. *See, e.g., Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016). Second, the public interest in procurement integrity substantially favors injunctive relief. *Id.* at 294-95 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law." (citation omitted)). Finally, the irreparable harm to Oracle and the public interest outweigh any harm DoD may claim as a result of correcting the errors and proceeding with a fair and lawful competition of the solicited $10 billion JEDI contract. *See, e.g., Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500, 515 (2005).

## VII.  CONCLUSION

Oracle respectfully requests that the Court grant judgment in Oracle's favor and (i) issue the declaratory and injunctive relief set forth in Oracle's Complaint and herein, and (ii) provide such other and further relief as the Court deems just and proper.

Dated:  May 24, 2019                     Respectfully Submitted,

*Of Counsel:*                            ARNOLD & PORTER KAYE SCHOLER LLP

Kara L. Daniels                          /s/ Craig A. Holman
Dana E. Koffman                          Craig A. Holman
Amanda J. Sherwood                       Arnold & Porter Kaye Scholer LLP
Nathaniel E. Castellano                  601 Massachusetts Ave., N.W.
Arnold & Porter Kaye Scholer LLP         Washington, D.C. 20001
601 Massachusetts Ave., N.W.             Phone:  (202) 942-5722
Washington, D.C. 20001                   Fax:  (202) 942-5999

                                         *Attorney of Record for Oracle America, Inc.*