██████████████████████████████████

No. 18-1880C
(Senior Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

ORACLE AMERICA, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

AMAZON WEB SERVICES, INC.,

Defendant-Intervenor.

**DEFENDANT'S CROSS-MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD AND RESPONSE
TO PLAINTIFF'S SUPPLEMENTAL MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

CHRISTINA M. AUSTIN
ANDREW BRAMNICK
Office of General Counsel
Washington Headquarters
  Service & Pentagon Force
  Protection Agency
Department of Defense

PATRICIA M. MCCARTHY
Assistant Director

WILLIAM P. RAYEL
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
PO Box 480, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-0302
Facsimile:  (202) 307-0972
E-mail:  William.Rayel@usdoj.gov

June 11, 2019

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE ISSUES .................................................................................3

STATEMENT OF THE CASE ..................................................................................3

    I.      Nature Of The Case ..................................................................................3

    II.     Statement Of Facts And Counter-Statement Of Facts .............................4

         A.      DoD Cloud Computing And The JEDI Initiative ........................4

         B.      Initial Acquisition Planning .........................................................4

         C.      RFI Responses, Adoption Of Warfighting Requirements, And Draft Solicitations...........................................................................5

         D.      Final Single-Award Justifications ...............................................7

         E.      The Contracting Officer's July 2018 No Impact Determinations................7

         F.      JEDI Solicitation .........................................................................8

         G.      Oracle's GAO Protest .................................................................10

         H.      Contracting Officer's Additional No Impact Determination Regarding Mr. Ubhi, No Impact Determination Regarding ▮▮▮▮▮▮ And Determination That AWS Has No Unmitigated OCIs..............................11

         I.      Oracle's Exclusion From The Competitive Range ....................14

ARGUMENT ........................................................................................................15

    I       Standards of Review ..................................................................15

         A.      Standard For Judgment On The Administrative Record...........................15

         B.      Standard For Procurement Challenges.......................................15

    II.     Oracle Must Demonstrate Prejudicial Errors With Regard To Sub-factors 1.1 And 1.2 In Order To Demonstrate Prejudice With Regard To Its Other Protest Grounds...........................................................................................16

    III.    Oracle Has Not Demonstrated That Sub-factors 1.1. or 1.2 Are Irrational Or Illegal ........................................................................................................20

      A.     Standard Of Review For Challenges To Solicitation Requirements
As Unduly Restrictive Of Competition......................................................20

      B.     Oracle Has Not Demonstrated That Sub-factor 1.1 Unduly Restricts
Competition Or Otherwise Violates The Competition In Contracting
Act (CICA), As DoD Reasonably Determined That It Is Necessary To
Meet The Agency's Minimum Needs........................................................21

      C.     Oracle Has Not Demonstrated That Sub-factor 1.2 Unduly Restricts
Competition Or Otherwise Violates CICA, As DoD Reasonably
Determined That It Is Necessary To Meet The Agency's Minimum
Needs.......................................................................................................25

      D.     Sub-factors 1.1 And 1.2 Are Not Illegal Qualification Requirements,
And, In Any Event, Oracle Has Waived These Objections By Failing
To Raise Them Prior To The Close Of Bidding .......................................28

            1.     Waiver........................................................................................28

            2.     Sub-factors 1.1 And 1.2 Are Not Qualification Requirements;
Rather, They Are Evaluation Criteria Tailored Specifically To
The Requirements Of The JEDI Procurement ..............................30

IV.    Oracle Has Not Demonstrated That Its Elimination From The JEDI
Competition, Based Upon An Unacceptable Rating Under Sub-factor 1.1
Was Irrational Or Illegal .................................................................................32

V.     Oracle Has Not Demonstrated That Sub-factor 1.6 Is Illegal...............................35

VI.    Oracle Has Not Demonstrated That The Decision To Award A Single JEDI
Contract Was Irrational Or Illegal ....................................................................39

      A.     The Contracting Officer's Determination That DoD Could Not
Utilize A Multiple-Award Approach For The JEDI Procurement
Was Rational ...........................................................................................40

            1.     In Accordance With 10 U.S.C. § 2304(d)(4), The FAR
Specifies Situations Where It Would Not Be In The
Government's Best Interest To Award Multiple Task Order
Contracts ....................................................................................40

            2.     The Contracting Officer Rationally Considered The Benefits
Of Multiple Awards .....................................................................42

3.     The Contracting Officer Rationally Determined That More Favorable Terms And Conditions, Including Pricing, Will Be Provided If A Single Award Is Made ...........................................43

4.     The Contracting Officer Rationally Determined That The Expected Cost Of Administering Multiple Contracts Outweighs The Expected Benefits Of Making Multiple Awards ...........................................................................45

5.     The Contracting Officer Rationally Determined That Multiple Awards Would Not Be In The Best Interests Of The Government...................................................................47

       a.     Security ...........................................................47

       b.     Operationalizing Data ......................................48

       c.     Technical Complexity........................................49

B.     The JEDI Contract Will Provide For Only Firm, Fixed Price Task Orders For Services At Prices Established In The Contract For The Specific Tasks ...............................................................................50

VII.     Oracle Has Not Demonstrated That The Contracting Officer's Conflict Determinations Were Irrational Or Illegal ............................................................52

A.     The Contracting Officer Has Broad Discretion In Making Determinations Regarding Potential Conflicts Of Interest .......................53

B.     The Contracting Officer Reasonably Determined That Mr. Ubhi's Involvement In The JEDI Procurement Has No Negative Impact On The Procurement And That AWS's Subsequent Employment Of Mr. Ubhi Is Not An Unmitigated OCI ...........................55

1.     The Contracting Officer Reasonably Determined That Mr. Ubhi's Conflict Does Not Impact The JEDI Solicitation .......56

2.     The Contracting Officer Reasonably Determined That AWS's Hiring Of Mr. Ubhi Did Not Provide AWS With Competitively Useful, Non-Public Information Relevant To JEDI ....................61

C.     The Contracting Officer Reasonably Determined That ▮▮▮▮▮ Involvement In The JEDI Procurement Has No Negative Impact On The Procurement And That AWS's Subsequent Employment Of ▮▮▮▮ Is Not An Unmitigated OCI ....................................................66

1.     The Contracting Officer Reasonably Determined That ████████ Conflicts Do Not Impact The JEDI Solicitation .......66

2.     The Contracting Officer Reasonably Determined That AWS's Hiring Of ████████ Did Not Provide AWS With Competitively Useful, Non-Public Information Relevant To JEDI ......................69

D.     The Contracting Officer Reasonably Determined That Mr. DeMartino's Involvement In The JEDI Procurement Has No Negative Impact On The Procurement ......................................................71

VIII.     Oracle Has Not Demonstrated An Entitlement To A Permanent Injunction........72

CONCLUSION..........................................................................................................................75

**Index to Appendix**

| Document | Page |
|---|---|
| Screenshots from Draft Problem Statement in Google Drive, dated October 3, 2017 ....................1 | |
| Declaration of Lieutenant General Bradford J. Shwedo, dated June 7, 2019 .................................3 | |
| ████████████████████████████████ ......................................................................8 | |
| ████████████████████████████████████ ..........................................................9 | |

# TABLE OF AUTHORITIES

## Cases

*2M Research Servs., LLC v. United States*,
   139 Fed. Cl. 471 (2018)..................................................................................... 34, 35

*Adam Sommerrock Holzbau, GmbH v. United States*,
   866 F.2d 427 (Fed. Cir. 1989) ................................................................................ 52

*American Diesel Eng'g Co.*,
   92-1 CPD ¶ 79, 1992 WL 15033 (Comp. Gen. 1992)............................................... 24

*Apogee, Eng'g, Inc.*,
   2018 CPD ¶ 150, 2018 WL 2085660 (Comp. Gen. 2018) ....................................... 25

*Aqua-Trol Corp.*,
   1992 WL 55051 (Comp. Gen. Mar. 5, 1992) ..................................................... 23, 27

*Armstrong Elevator Co.*,
   2018 CPD ¶ 120, 2018 WL 1542123 (Comp. Gen. 2018) ............................... passim

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009) ......................................................................... passim

*Aydin, Corp.—Reconsideration*,
   87-1 CPD ¶ 141, 1987 WL 101411 (Comp. Gen. 1987)........................................... 31

*Bannum, Inc. v. United States*,
   404 F.3d 1346 (Fed. Cir. 2005) .................................................................... 15, 16, 17

*Battelle Memorial Institute*,
   98-1 CPD ¶ 107, 1998 WL 165898 (Comp. Gen. 1998)........................................... 54

*Benchmade Knife Co. v. United States*,
   79 Fed. Cl. 731 (2007)............................................................................................. 16

*Beta Analytics Int'l, Inc. v. United States*,
   67 Fed. Cl. 384 (2005)............................................................................................. 16

*Blue & Gold Fleet, LP v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) .................................................................... 28, 29, 34

*California Indus. Facilities Res., Inc. v. United States*,
   80 Fed. Cl. 633 (2008)...................................................................................... 30, 31

*Centech Gp., Inc. v. United States*,
554 F.3d 1029 (Fed. Cir. 2009) ............................................................ 23, 24, 31

*CHE Consulting, Inc. v. United States*,
552 F.3d 1351 (Fed. Cir. 2008) ............................................................ 24

*Cleveland Assets, LLC v. United States*,
883 F.3d 1378 (Fed. Cir. 2018) ............................................................ 15

*CliniComp Int'l, Inc. v. United States*,
904 F.3d 1353 (Fed. Cir. 2018) ............................................................ 17

*Electra-Med. Corp. v. United States*,
140 Fed. Cl. 94 (2018) ............................................................ 36, 37, 38

*Erickson Aero Tanker*,
2015 CPD ¶ 226, 2015 WL 4572443 (Comp. Gen. 2015) ...................... 25

*G.S. Link and Assocs.*,
88-1 CPD ¶ 70, 1988 WL 226974 (Comp. Gen. 1988) .......................... 25

*Godley v. United States*,
5 F.3d 1473 (Fed. Cir. 1993) ............................................................ 55

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) ............................................................ 15, 16

*Interactive Info. Sols., Inc.*,
2018 CPD ¶ 115, 2018 WL 1536746 (Comp. Gen. 2018) .................... 61, 63

*Jacobs Tech. Inc. v. United States*,
100 Fed. Cl. 198 (2011) ............................................................ 54

*John C. Grimberg Co. v. United States*,
185 F.3d 1297 (Fed. Cir. 1999) ............................................................ 54

*JWK Int'l Corp. v. United States*,
52 Fed. Cl. 650 (2002), *aff'd*, 56 F. App'x 474 (Fed. Cir. 2013) ................ 53

*Liquidity Servs., Inc.*,
2014 CPD ¶ 221, 2014 WL 3748241 (Comp. Gen. 2014) .................... 61, 63

*Maersk Line, Ltd.*,
2012 CPD ¶ 200, 2012 WL 2833687 (Comp. Gen. 2012) ...................... 24

*Mercom, Inc. v. United States,*
  131 Fed. Cl. 32 (2017) ................................................................. 34

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ..................................................................... 72

*National Gov't Servs., Inc. v. United States,*
  923 F.3d 977 (Fed. Cir. 2019) ...................................................... 24

*Orion Tech., Inc. v. United States,*
  704 F.3d 1344 (Fed. Cir. 2013) .................................................... 17

*Per Aarsleff A/S v. United States,*
  829 F.3d 1303 (Fed. Cir. 2016) .................................................... 29

*Persistent Sys., LLC,*
  2018 CPD ¶ 32, 2018 WL 525833 (Comp. Gen. 2018) ...................... 21

*PGBA, LLC v. United States,*
  389 F.3d 1219 (Fed. Cir. 2004) .................................................... 72

*QBE, LLC v. United States,*
  120 Fed. Cl. 397 (2015) ............................................................... 34

*R & W Flammann GmbH v. United States,*
  339 F.3d 1320 (Fed. Cir. 2003) .................................................... 15

*Roche v. Merit Sys. Protection Bd.,*
  596 F.3d 1375 (Fed. Cir. 2010) .................................................... 58

*Savantage Fin. Servs., Inc. v. United States,*
  595 F.3d 1282 (Fed. Cir. 2010) ................................................ 16, 20

*SDS Int'l v. United States,*
  48 Fed. Cl. 759 (2001) ................................................................. 27

*Tech Sys., Inc. v. United States,*
  50 Fed. Cl. 216 (2001) ................................................................. 15

*Turner Constr., Co. v. United States,*
  645 F.3d 1377 (Fed. Cir. 2010) .................................................... 61

*TRW Envtl. Safety Sys., Inc. v. United States,*
  18 Cl. Ct. 33 (1989) ..................................................................... 60

*Tyler Constr. Gp. v. United States,*
  570 F.3d 1329 (Fed. Cir. 2009) ........................................................................ 39

*Ultra Elecs. Ocean Sys., Inc. v. United States,*
  139 Fed. Cl. 517 (2019) ................................................................................... 17

*W.G. Yates & Sons Constr. Co. v. Caldera,*
  192 F.3d 987 (Fed. Cir. 1999) ......................................................................... 31

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................................... 72, 73

## **Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................ 15

10 U.S.C. § 2302(3)(D) .................................................................................... 23

10 U.S.C. § 2303(a) .......................................................................................... 38

10 U.S.C. § 2304a(d) .................................................................................. passim

10 U.S.C. § 2305(b)(1) .................................................................................... 34

10 U.S.C. § 2319 .................................................................................... 28, 29, 30

28 U.S.C. § 1491(b) .................................................................................... 15, 73

41 U.S.C. § 107 ................................................................................................ 23

41 U.S.C. § 2102 .............................................................................................. 53

41 U.S.C. § 2103 .................................................................................... 53, 57, 58

41 U.S.C. § 2107(4) .......................................................................................... 58

Pub. L. No. 115-91, 131 Stat. 1283 (2017) ...................................................... 39

Pub. L. No. 115-245, 132 Stat. 2981 (2018) ............................................... 11, 41

## **Rules**

RCFC 52.1 ..................................................................................................... 1, 15

## **Regulations**

FAR § 1.102(d) ............................................................................................................ 39

FAR § 2.101 ................................................................................................................. 58

FAR § 3.101-1 ........................................................................................................ passim

FAR § 3.104-1 ............................................................................................................. 67

FAR § 3.104-3 ........................................................................................................ 53, 57

FAR § 3.104-7 .................................................................................................... 54, 55, 69

FAR § 7.503 .......................................................................................................... 36, 38

FAR § 9.103(a) ............................................................................................................ 31

FAR § 9.104-1 ....................................................................................................... 23, 31

FAR § 9.206-2 ............................................................................................................. 30

FAR § 9.503 ................................................................................................................. 75

FAR § 9.504 ......................................................................................................... passim

FAR § 9.505 ......................................................................................................... passim

FAR § 9.505-2 ............................................................................................................. 53

FAR § 9.505-4 ............................................................................................................. 53

FAR § 12.603 ................................................................................................................ 8

FAR § 16.504(c)(1)(ii) ........................................................................................... passim

FAR § 52.212-4(c) ....................................................................................................... 52

FAR § 52.243-1 ........................................................................................................... 52

48 C.F.R. § 252.203-171 ............................................................................................. 68

███████████████████████████████████████

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

ORACLE AMERICA, INC.,                    )
                                         )
        Plaintiff,                   )
                                         )
        v.                           )
                                         )
THE UNITED STATES,                       )
                                         )     No. 18-1880C
        Defendant,                   )     (Senior Judge Bruggink)
                                         )
        and                          )
                                         )
AMAZON WEB SERVICES, INC.,               )
                                         )
        Defendant-Intervenor.        )

## DEFENDANT'S CROSS-MOTION FOR JUDGMENT
## ON THE ADMINISTRATIVE RECORD AND RESPONSE
## TO PLAINTIFF'S SUPPLEMENTAL MOTION
## <u>FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>

Pursuant to Rule 52.1 of this Court's Rules (RCFC), defendant, the United States, respectfully requests that the Court grant the Government judgment on the administrative record.

The Department of Defense (DoD) eliminated plaintiff, Oracle America, Inc. (Oracle), from its Joint Enterprise Defense Infrastructure (JEDI) procurement after DoD determined that Oracle failed Sub-factor 1.1, the first of seven pass/fail Gate Criteria in the solicitation. DoD has determined that an offeror who does not meet one of the Gate Criteria does not meet DoD's minimum needs and, in accordance with the solicitation's terms, will not be evaluated further. Oracle does not dispute that it failed Sub-factor 1.1 and cannot meet the requirements of the second Gate Criteria, Sub-factor 1.2. Rather, Oracle challenges the legality and rationality of these provisions. Because Oracle has not demonstrated that both of these Gate Criteria are

unduly restrictive of competition or otherwise illegal, it cannot succeed in this protest.  Even if Oracle had demonstrated other errors in the procurement, it could not demonstrate prejudice.

In any event, Oracle has not demonstrated that any aspect of the JEDI procurement is irrational or illegal.  First, the challenged Gate Criteria are JEDI-specific evaluation criteria, not "qualification requirements," and DoD has reasonably determined that these requirements are necessary to ensure that the awardee can meet DoD's minimum needs regarding surge capacity, ongoing innovation and development, security, availability, and data operationalization.

Second, the determination to solicit a single JEDI contract, rather than multiple JEDI contracts, was rational and compliant with the law.  In accordance with the relevant statutes and regulations, the contracting officer reasonably determined that the benefits of a single awardee outweigh the benefits of multiple awardees and, thus, DoD was *prohibited* from awarding multiple JEDI contracts.  Also, the Under Secretary of Defense for Acquisition and Sustainment correctly determined that a statutory exception applies to the general prohibition against single-award indefinite-delivery, indefinite-quantity (IDIQ) contracts above $112 million.

Finally, the contracting officer reasonably investigated potential conflicts of interest involving former DoD employees and defendant-intervenor, Amazon Web Services, Inc. (AWS), and rationally determined that any conflicts do not impact the procurement and AWS does not have any unmitigated organizational conflict of interests (OCIs) due to its hiring of former Government employees.  Two of the former employees highlighted by Oracle (█████████ and Anthony DeMartino) had very limited roles in the JEDI procurement.  The other former DoD employee (Deap Ubhi) left DoD before it had even started drafting the solicitation, and he was hired by AWS into a role that is functionally, organizationally, and physically separate from AWS's JEDI proposal team.

2

Ultimately, in challenging various JEDI solicitation terms and procurement decisions, Oracle merely second guesses discretionary business and technical judgments by DoD or raises meritless legal challenges. And much of Oracle's second guessing is improperly based upon Internet news articles. Like the Government Accountability Office (GAO), the Court should deny Oracle's protest and grant the Government judgment on the administrative record.

## STATEMENT OF THE ISSUES

1.      Whether Oracle has demonstrated that Sub-factors 1.1 and 1.2 are unduly restrictive of competition or contain illegal qualification requirements.

2.      Whether Oracle has demonstrated that its exclusion from the competitive range based upon its failure to meet the criteria of Sub-factor 1.1 was illegal or irrational.

3.      Whether Oracle has demonstrated that DoD lacks authority to include Sub-factor 1.6 in the solicitation.

4.      Whether Oracle has demonstrated that it was illegal or irrational to solicit a single contract for DoD's JEDI procurement, rather than multiple contracts.

5.      Whether Oracle has demonstrated that the contracting officer's conflicts determinations were irrational or illegal.

6.      Whether Oracle has demonstrated an entitlement to a permanent injunction.

## STATEMENT OF THE CASE

### I.      Nature Of The Case

Oracle is protesting: 1) three evaluation criteria in the JEDI solicitation; 2) Oracle's elimination from the JEDI competition; 3) DoD's decision to issue the JEDI solicitation as a single-award, rather than multiple-award, contract; and 4) the contracting officer's evaluation of potential conflicts of interest with regard to three former DoD employees and AWS.

II.     **Statement Of Facts And Counter-Statement Of Facts**

A.      **DoD Cloud Computing And The JEDI Initiative**

To maintain its military advantage, DoD needs "an extensible and secure cloud environment that spans the homeland to the global tactical edge, as well as the ability to rapidly access computing and storage capacity to address warfighting challenges at the speed of relevance." AR 607.  A "cloud" is "a collection of hardware and software that allows easy scaling of information technology infrastructure through virtualization of physical hardware," *e.g.*, servers. *Id.* at 327.

DoD's current "lack of a coordinated enterprise-level approach to cloud infrastructure and platforms prevents warfighters and leaders from making critical data-driven decisions at 'mission speed', negatively affecting outcomes." *Id.* at 607.  To remedy this situation, on September 13, 2017, the Deputy Secretary of Defense, Patrick Shanahan, directed that DoD take steps to accelerate the adoption of "a modern enterprise cloud services solution that can support unclassified, secret, and top secret information," through a tailored acquisition process, which ultimately became known as the JEDI procurement. *Id.* at 5955-56.

In the JEDI procurement, DoD is seeking commercial infrastructure as a service (IaaS) and platform as a service (PaaS) offerings to support DoD business and mission operations. *Id.* at 607.[1]

B.      **Initial Acquisition Planning**

In the early stages of the JEDI procurement, the acquisition team conducted initial market research and held initial discussions regarding the potential acquisition strategies.  One of the

---

[1] Definitions of IaaS and PaaS can be found at AR 327, along with the definition of software as a service (SaaS), which DoD is not seeking.

early members of the acquisition team, until his recusal on October 31, 2017, was Defense

Digital Service (DDS) product manager Deap Ubhi.  *See, e.g.*, *id.* at 2777, 5431.  Mr. Ubhi was

assigned to be a product manager for the market research report and, thus, participated with other

DoD representatives in early meetings with cloud vendors and "cloud focus sessions" with

groups such as the military services and industry thought leaders.  *See, e.g.*, *id.* at 368, 390,

5429-31, 5463, 5531, 58699.  Mr. Ubhi contributed minor edits to DoD's October 30, 2017

request for information (RFI), *id.* at 58720, which sought information from industry related to

DoD's initiative to accelerate enterprise cloud adoption.  *See id.* at  5935-38.  Mr. Ubhi also

made minor edits to a draft "requirements document," which was substantially revised after his

recusal.  *See id.* at 321-24, 58722, 60346-47.  He also participated in the drafting a "problem

statement," which was considered to be an early outline of the JEDI Business Case Analysis.

*See id.* at 58720, 60089-91.  This early outline was effectively scrapped after Mr. Ubhi recused

himself, and his replacement started a new outline.  *See id.* at 397-422, 58720, 60089-91.

While he was participating in the JEDI procurement, Mr. Ubhi (and others) advocated for

a single-award IDIQ contract, rather than multiple-award contract, *see id.* at 5742, but the

decision to use a single-award strategy was not made until well after his recusal.  *See id.* at 318-

20, 455-67; *see also id.* at 4352, 5986-87, 58721.

C.     **RFI Responses, Adoption Of Warfighting Requirements, And Draft Solicitations**

The bulk of the procurement activity began in November 2017, after Mr. Ubhi's recusal.

For example, in November 2017, DoD received 64 responses to its RFI from a variety of entities,

and subsequently began drafting its market research report.  *See id.* at 368, 58721.

On December 22, 2017, the Joint Requirements Oversight Council (JROC), led by

General Paul Selva, Vice Chairman of the Joint Chiefs of Staff, established the Defense Cloud

Warfighting Requirements. *Id.* at 321-35.  The JROC recognized that "efforts for accelerating to the cloud are critical in creating a global, resilient, and secure information environment that enables warfighting and mission command, resulting in improved agility, greater lethality, and improved decision-making at all levels." *Id.* at 321.

DoD began drafting its business case analysis, in earnest, in approximately November 2017. *See id.* at 5406-07, 60777-79.  DoD began drafting its Acquisition Strategy document in January 2018. *Id.* at 5407, 58722.  And DoD did not begin drafting the solicitation, including the Gate Criteria, until January 2018. *See id.* at 5405, 5570-71, 58722.  Contrary to Oracle's allegations, *see* Pl. Memo. 4,[2] the "metrics" that Mr. Ubhi and others were discussing in October 2017 were not the Gate Criteria. *Compare* AR 791-94, *with*, App. 1-2.[3]

In March 2018, DoD held an industry day and issued a draft solicitation. *See id.* at 5995. The announcement of the draft solicitation noted that "[w]hile industry is reviewing this draft, the Department will continue to assess its overall requirement." *Id.* at 5995.  DoD issued a second draft solicitation in April 2018, along with answers to more than 1,000 questions in response to the first draft solicitation. *See id.* at 6144, 6362-442.  The second draft solicitation generated hundreds more questions, which were answered when the JEDI solicitation was released in July 2018. *Id.* at 6762, 6791-823.  Prior to the solicitation release, solicitation terms were reviewed in detail by DoD's Defense Procurement and Acquisition Policy (DPAP) group, the DoD Chief Information Officer (CIO), other components of DoD, and numerous members of the JEDI acquisition team. *See id.* at 6472-83, 6690-716, 8702-37, 58700, 58722.

---

[2] "Pl. Memo. __" refers to Oracle's memorandum in support of its supplemental motion for judgment on the administrative record, filed on May 24, 2019.

[3] "App. __" refers to the appendix attached to this brief.

6

D.       **Final Single-Award Justifications**

On July 17, 2018, the contracting officer signed a memorandum explaining the rationale

for using a single-award IDIQ contract for the JEDI procurement.  *Id.* at 455-67.  The contracting

officer determined that there were three reasons why a single-award contract was required,

pursuant to Federal Acquisition Regulation (FAR) § 16.504(c)(1)(ii)(B).  AR 457-64.

First, based on her knowledge of the market, the contracting officer determined that more

favorable terms and conditions, including pricing, would be provided if a single award is made.

*Id.* at 457-59.  Second, the contracting officer determined that the expected cost of administering

multiple contracts outweighs the expected benefits of making multiple awards.  *Id.* at 459-61.

Third, and most importantly, the contracting officer determined that multiple awards would not

be in the best interests of the Government because they would: a) create seams between clouds

that increase security risks; b) create impediments to operationalizing data for the benefit of the

warfighter; and c) exponentially increase the technical complexity required to realize the benefits

of cloud technology.  *See id.* at 461-64.  DDS deputy director, Tim Van Name, also signed the

memorandum, attesting to the technical findings in the best interests section.  *Id.* at 464.

On July 19, 2018, The Honorable Ellen Lord, Under Secretary of Defense for Acquisition

and Sustainment, issued a determination and findings, pursuant to 10 U.S.C. § 2403a(d)(3), to

award the JEDI contract to a single source, based upon her finding that the contract will provide

for only firm, fixed price task orders for services for which prices are established in the contract

for specific tasks performed.  *Id.* at 318-20.

E.       **The Contracting Officer's July 2018 No Impact Determinations**

On July 23, 2018, the contracting officer analyzed whether the actions of five current or

former DoD employees, with financial or other ties to AWS, had any negative impact on the

7

integrity of the JEDI procurement.  *Id.* at 683-87.  The contracting officer determined that none

of the five individuals, including Anthony DeMartino and Deap Ubhi, had negatively impacted

the integrity of the procurement.  *Id.*

While at DoD, Mr. DeMartino worked as Deputy Chief of Staff for the Secretary of

Defense and as Chief of Staff for the Deputy Secretary of Defense.  *Id.* at 5231-32.  He resigned

from DoD effective July 6, 2018.  *See id.* at 5232, 23973.  Before joining DoD in January 2017,

Mr. DeMartino had worked as a consultant for AWS.  *Id.* at 685.  With regard to the JEDI

procurement, the contracting officer found that Mr. DeMartino had effectively acted as a liaison

for the Secretary and Deputy Secretary, scheduling and attending meetings and recording

minutes, but had no input or involvement in drafting the solicitation or acquisition strategy

documents.  *See id.*  Accordingly, the contracting officer determined that Mr. DeMartino's

involvement in the JEDI procurement was "ministerial and perfunctory in nature" and his

involvement did not negatively impact the integrity of the JEDI procurement.  *Id.*

With regard to Mr. Ubhi, the contracting officer determined that no restrictions attached

to his participation in the JEDI procurement because his prior employment with AWS ended in

January 2016 and that Mr. Ubhi had promptly recused himself from the procurement, on October

31, 2017, once Amazon had expressed an interest in purchasing his company, Tablehero.  *See id.*

at 686-87.  The contracting officer also determined that Mr. Ubhi's participation was limited to

market research activities.  *Id.* at 687.  Accordingly, she determined that his involvement in the

procurement did not negatively impact the integrity of the JEDI procurement.  *See id.*

**F.**     **JEDI Solicitation**

On July 26, 2018, pursuant to FAR § 12.603, DoD issued a synopsis/solicitation for the

JEDI Cloud contract (JEDI solicitation).  AR 1.  Besides the single-award term, the other terms

challenged by Oracle are three particular evaluation criteria, Sub-factors 1.1, 1.2, and 1.6.  *See* Pl. Memo. 33-37, 40-44.  These are three of the seven Gate Criteria, or pass/fail criteria that offerors must meet in order to proceed to the rest of the evaluation.  *See* AR 805-07.

Sub-factor 1.1, Elastic Usage, requires that an offeror "clearly demonstrate[] that the addition of DoD unclassified usage will not represent a majority of all unclassified usage," in accordance with specific requirements in Section L of the solicitation.  *Id.* at 806.  Section L requires the offeror to demonstrate this by comparing the offeror's usage (excluding the provider's own use and free services) in the areas of network, compute, and storage, during the months of January and February 2018, to the DoD provided estimates of JEDI Cloud usage.  *See id.* at 791.  As Mr. Van Name explained in his pre-solicitation justification memorandum, this minimum requirement ensures that the JEDI Cloud: 1) is capable of providing the full scope of services even under surge capacity during a major conflict or natural disaster event; and 2) experiences ongoing innovation and development and capability advancements for the full potential 10-year period of performance.  *Id.* at 944.  Mr. Van Name also explained that the January-February 2018 timeframe was selected "to facilitate fair competition, as this prevents potential Offerors from taking measures to change their numbers once they became aware of this Sub-factor requirement at the release of the draft [solicitation] in March 2018."  *Id.* at 945.

Sub-factor 1.2, High Availability and Failover, requires that an offeror "clearly demonstrate[] that [its Cloud Commercial Offering] data centers are sufficiently dispersed and can continue supporting the same level of DoD usage in the case of catastrophic data center loss," in accordance with specific requirements in Section L.  *Id.* at 806.  As part of this requirement, the offeror must demonstrate that it has three existing unclassified data centers within the Customs Territory of the United States, that are all supporting at least one IaaS

offering and at least one PaaS offering that are "FedRAMP Moderate 'Authorized'" by the

FedRAMP Joint Authorization Board or a Federal agency. *Id.* at 792.  Mr. Van Name explained

that the FedRAMP Moderate authorization requirement is necessary to demonstrate that the

offeror can meet more stringent requirements of the JEDI Cyber Security Plan for unclassified

services within approximately 30 days after the contract commences, as required by the

statement of objectives. *See id.* at 610, 947.

Under Sub-factor 1.6, offerors must demonstrate "an easy to use marketplace for both

Offeror native and third-party services that meets all" of the specific requirements set forth in

Section L. *Id.* at 807.  Mr. Van Name explained that this minimum requirement is necessary to

"take advantage of the critical functionality provided by modern cloud computing providers to

easily 'spin up' new systems" by combining their IaaS and PaaS offerings with offerings

provided through the online marketplace. *See id.* at 950-51.

### G.   Oracle's GAO Protest

In August 2018, Oracle filed a GAO protest challenging the terms of the JEDI

solicitation. *See id.* at 4442.  At the GAO, Oracle protested the single-award determination,

evaluation Sub-factors 1.1, 1.2, and 1.6, and the contracting officer's July 2018 analysis of the

impact of Messrs. Ubhi and DeMartino on the procurement. *See* AR 5909-18.  In November

2018, the GAO denied Oracle's protest in full.  AR 5900-18.

The GAO determined that Under Secretary Lord correctly found that the JEDI contract

will provide for only firm, fixed price task orders for services for which prices are established in

the contract for specific tasks performed, so the solicitation does not violate 10 U.S.C.

§ 2304a(d)(3) or FAR § 16.504(c)(1)(ii)(D).  AR 5909-11.  The GAO also determined that each

of the contracting officer's justifications for a single-award contract were reasonable and that the

"contemporaneous agency record contains significant documentation supporting the agency's national security concerns" with a multiple-award solution.  *Id.* at 5912.  And the GAO rejected Oracle's argument that proceeding with a single-award procurement would violate a reporting requirement in a September 2018 Appropriations Act (Public Law 115-245).  *Id.* at 5912-13.

Moreover, the GAO rejected Oracle's challenges to the three Gate Criteria, stating that DoD had "clearly articulated a reasonable basis for the Sub-factor 1.2 gate criteria prior to award," finding "nothing unreasonable in the agency's explanation" for Sub-factor 1.6, and finding "no merit" to Oracle's challenge to Sub-factor 1.1.  *See id.* at 5913-16.

Additionally, the GAO rejected Oracle's challenge to the contracting officer's July 2018 no impact determination, stating that the "agency has presented multiple bases--including, but not limited to, the agency's concerns regarding national security--that reasonably support all of the challenged requirements."  *Id.* at 5917-18.

### H.   Contracting Officer's Additional No Impact Determination Regarding Mr. Ubhi, No Impact Determination Regarding ▓▓▓▓, And Determination That AWS Has No Unmitigated OCIs

In October 2018, seven offerors submitted proposals in response to the JEDI solicitation, AWS, Oracle, Microsoft Corporation (Microsoft), International Business Machines Corporation (IBM), and three others whose proposals were incomplete and could not be meaningfully evaluated.  *See id.* at 58758.  In its proposal, AWS identified two potential perceived OCIs due to its hiring of Mr. Ubhi on November 27, 2017 and its hiring of ▓▓▓▓ on June 18, 2018.  *See id.* at 24536-54.  AWS explained that Mr. Ubhi works for AWS's commercial organization, and neither he, nor his team, nor his supervisor, are involved in pursuing Government contracts, including JEDI.  *Id.* at 24537.  AWS also explained that Mr. Ubhi is located in San Francisco, whereas most AWS JEDI proposal activities occur in Virginia.  *Id.* at 24537-38.  AWS provided

11

declarations by Messrs. Ubhi and ████ explaining that they have had no role in AWS's JEDI proposal, nor have they provided any non-public information regarding JEDI to anyone at AWS. *See id.* at 24546-51. AWS also provided documentation of formal firewalls implemented between the AWS JEDI proposal team and Messrs. Ubhi and ████. *Id.* at 24541-45. In conducting her OCI investigation regarding AWS, the contracting officer sought further information from AWS to ensure that AWS had not received an unfair competitive advantage by hiring Government employees. *See id.* at 60687-97, 60711-35, 60751.

On February 12, 2019, while the contracting officer was investigating whether AWS had any unmitigated OCIs, AWS sent her an unsolicited letter that called into question some of her earlier conclusions regarding Mr. Ubhi's recusal from the JEDI procurement. *See* AR 60702-04. Specifically, AWS indicated that Mr. Ubhi did not engage in Tablehero discussions with AWS or its affiliates after December 2016, but Mr. Ubhi was engaged in employment discussions with AWS beginning in late September 2017, and he accepted an offer of employment with AWS on October 27, 2017. *Id.* at 60702-03. In light of this new information, the contracting officer re-opened her investigation regarding whether Mr. Ubhi had any conflicts while working on the JEDI procurement to reconsider her earlier no impact determination. *Id.* at 58704.

On April 9, 2019, the contracting officer determined that Mr. Ubhi violated FAR § 3.101-1 by failing to strictly avoid conflicts of interest and conduct himself in a manner above reproach, but his unethical behavior does not impact the procurement. *See id.* at 58696-723. The contracting officer recognized that Mr. Ubhi improperly participated personally and substantially in the JEDI procurement while engaged in employment discussions with AWS, a potential offeror, and he had concealed his unethical behavior by providing false information in connection with his recusal. *See id.* at 58709. Based upon a thorough investigation, however,

the contracting officer also determined Mr. Ubhi did not introduce bias in favor of AWS during the procurement, and, even if he did, Mr. Ubhi's bias has no impact on the procurement for "three independent reasons": 1) "Mr. Ubhi did not have the technical [*i.e.*, engineering] expertise to substantially influence JEDI Cloud requirement"; 2) "Mr. Ubhi's actual attempts to influence the JEDI Cloud requirement were limited"; and 3) "most importantly, all the key decisions for the JEDI Cloud procurement, such as the actual [solicitation] terms and whether to award one or multiple contracts, were made well after Mr. Ubhi recused himself, after being vetted by numerous DoD personnel to ensure that the JEDI Cloud RFP truly reflects DoD's requirement." *Id.* at 58716-23.  The contracting officer also determined that Mr. Ubhi did not provide AWS with any non-public JEDI-related information and, in any event, none of the non-public information Mr. Ubhi learned while working on JEDI was competitively useful.  *Id.* at 58709-16.

In a separate April 9, 2019 memorandum, the contracting officer determined that ██ ██████ violated FAR § 3.101-1 by participating in a JEDI meeting in April 2018, after he had accepted employment with AWS, but also determined that there is no impact on the procurement from ██████████ conflict.  *Id.* at 58744-48.  The contracting officer determined that ████████ did not impact any acquisition decisions or documents, and his involvement in the JEDI procurement was limited to two meetings: 1) an October 2017 meeting where the Navy provided information on its cloud experiences; and 2) an April 2018 meeting where a draft Acquisition Strategy document was discussed.  *Id.* at 58746-47.  ████████ did not provide any edits to the draft Acquisition Strategy, and the multiple-award approach for which he advocated at the April 2018 meeting was not adopted.  *Id.*  The contracting officer also determined that, although the non-public draft Acquisition Strategy may be competitively useful, ████████ did not share any non-public JEDI information with AWS.  *Id.* at 58747.

In another April 9, 2019 memorandum, the contracting officer determined that AWS does not have any unmitigated OCIs.  *Id.* at 58749-57.  With regard to Mr. Ubhi, the contracting officer determined that he is functionally, organizationally, and physically separated from the AWS JEDI proposal team, has not shared any non-public JEDI information with the AWS JEDI proposal team, and, in any event, none of the non-public information Mr. Ubhi learned while working on JEDI was competitively useful.  *Id.* at 58709-16, 58750-53.  The contracting officer made these determinations without putting much weight on Mr. Ubhi's statements, in light of his earlier misrepresentations.  *Id.* at 58750.  The contracting officer also determined that ████ had not provided any non-public JEDI information to AWS.  *Id.* at 58753-54.  Additionally, the contracting officer found AWS's firewalls to be effective in preventing Messrs. Ubhi and ████ from influencing AWS's JEDI proposal.  *See id.* at 58750-54.

## I.    Oracle's Exclusion From The Competitive Range

On April 10, 2019, in light of her conflicts determinations, and with the concurrence of the Source Selection Authority, the contracting officer formed a competitive range of AWS and Microsoft, the only two offerors to pass all seven of the Gate Criteria.  *Id.* at 58758-62, 58773-77.  In accordance with the solicitation, Oracle was eliminated from the competition because it was found Unacceptable under Sub-factor 1.1, and the rest of Oracle's proposal was not evaluated.  *Id.* at 805-06, 58759, 58762.  DoD found numerous deficiencies in Oracle's proposal with regard to Sub-factor 1.1, *id.* at 57845-50, 59235-42, and Oracle admits that it failed at least one aspect of Sub-factor 1.1.  *See* Pl. Memo. 38.[4]

---

[4]  IBM was determined to be acceptable under Sub-factor 1.1, but unacceptable under Sub-factor 1.2.  AR 57827-32.  Accordingly, IBM was also excluded from the competitive range. *Id.* at 58762.

# ARGUMENT

## I.      Standards of Review

### A.      Standard For Judgment On The Administrative Record

Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to determine whether they are supported by the administrative record.  Unlike a motion for summary judgment, the question of whether an issue of material fact is disputed has no bearing upon a record review case, such as a bid protest.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); *Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001).  The inquiry, instead, is whether, given all the disputed and undisputed facts, the plaintiff has met its burden of proof that the agency's decision was arbitrary, capricious, or contrary to law.  *Tech Sys.*, 50 Fed. Cl. at 222.

### B.      Standard For Procurement Challenges

 The proper standard of review in a bid protest is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  To prevail, a plaintiff must demonstrate: 1) that the procurement decision "lacked a rational basis"; or 2) "a clear and prejudicial violation of applicable statutes or regulations."  *Impresa*, 238 F.3d at 1332-33 (citation omitted).

In reviewing the agency's procurement decisions, the Court should recognize that the decisions are entitled to a "presumption of regularity," *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018), and that the Court should not substitute its judgment for that of the agency.  *E.g., R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003).  Contracting officers are "entitled to exercise discretion upon a broad range of issues

confronting them[.]" *Impresa*, 238 F.3d at 1332 (citation omitted). "For that reason, procurement decisions 'invoke[ ] 'highly deferential' rational basis review.'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted). Also, the Court is required to give the procuring agency considerable deference in matters requiring technical judgment. *See, e.g.*, *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 740 (2007); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005).

The Court is not permitted to consider information outside the administrative record, for purposes of the merits, unless it finds that such information is necessary for effective judicial review. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Accordingly, the Court should ignore the multitude of Internet news articles upon which Oracle frequently relies. *See* Pl. Memo. 1, 3-4, 11-12, 21, 31, 35.

Additionally, if the protestor can show any errors in the procurement, it must then show that it was "significantly prejudiced" by those errors. *Bannum*, 404 F.3d at 1357.

## II.  Oracle Must Demonstrate Prejudicial Errors With Regard To Sub-factors 1.1 And 1.2 In Order To Demonstrate Prejudice With Regard To Its Other Protest Grounds

As we demonstrate in Section IV, below, DoD rationally determined that Oracle was unacceptable under Sub-factor 1.1 of the solicitation and, accordingly, eliminated Oracle from the JEDI competition. Indeed, Oracle admits that it failed at least one aspect of Sub-factor 1.1. *See* Pl. Memo 38 ("Oracle just missed the 50% metric for storage in the January and February [2018] period"). Likewise, Oracle effectively admits that it does not meet the requirements of Sub-factor 1.2, *id.* at 41, which would also require its elimination from the competition. AR 805 ("Offerors who receive a rating of 'Unacceptable' under any of the Gate Criteria Sub-factors will not be further evaluated. . . . and will not be considered for award."). Accordingly, unless Oracle demonstrates that Sub-factors 1.1 and 1.2 were both irrational or illegal, Oracle cannot

16

demonstrate that it was prejudiced by any other alleged errors in the procurement, and the Court need not address Oracle's other allegations of error.

To establish prejudice, the protestor must demonstrate that "there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum*, 404 F.3d at 1358 (citations omitted).  In this pre-award protest, where proposals have been submitted and evaluated, but an award decision has not yet been made, Oracle must demonstrate that it "could have likely competed for the contract" in the absence of any errors found.  *See, e.g.*, *Ultra Elecs. Ocean Sys., Inc. v. United States*, 139 Fed. Cl. 517, 526 (2018) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348-49 (Fed. Cir. 2013)).[5]

Here, the only way Oracle could have competed for the JEDI contract is if Sub-factors 1.1 and 1.2 were removed or amended to eliminate the aspects that DoD found that Oracle did not meet or Oracle admits it did not meet.  As we demonstrate in Section III, below, Oracle's challenges to these evaluation criteria are without merit.  Accordingly, the Court need not reach the questions Oracle has raised regarding the legality of Sub-factor 1.6, the single-award determination, or the conflicts determinations, because Oracle was not prejudiced by these alleged errors.

---

[5]  In some pre-award protests, where there is not an "adequate factual predicate" to apply the substantial chance test, the plaintiff need only demonstrate "a non-trivial competitive injury which can be redressed by judicial relief[.]"  *Orion*, 704 F.3d at 1348-49 (citation omitted).  Here, however, where proposals have been submitted, a competitive range has been formed, and the plaintiff has been eliminated from the competition based upon a failure to meet a solicitation requirement, the "substantial chance" test remains applicable.  *See id.*  In any event, under the non-trivial competitive injury test, Oracle must demonstrate that it is qualified to compete for the contract it seeks, *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1360 (Fed. Cir. 2018), and Oracle cannot demonstrate that it is qualified to compete for the JEDI contract if it cannot demonstrate that both Sub-factors 1.1 and 1.2 are irrational or illegal.  Indeed, in *Ultra*, the Court stated that the protestor must demonstrate that it "could have likely competed" in order to meet the "non-trivial competitive injury" test.  139 Fed. Cl. at 526 (citation omitted).

17

In a footnote to its motion, Oracle appears to argue to the contrary, suggesting that the Court does not need to reach the Gate Criteria issues if it rules in Oracle's favor regarding the single-award determination or the no impact determinations, because "[p]resumably, DoD would re-assess its gate criteria in a multiple award scenario or if it finds that the conflicts potentially tainted the procurement."  Pl. Memo. 33 n.27.  Oracle is wrong for two reasons.  First, the potential for DoD to re-assess its gate criteria *in the future*, if the Court were to find *other* errors in the procurement, does not demonstrate that Oracle "could have likely competed for the [JEDI] contract" in the absence of those errors.  Rather, if Oracle fails to demonstrate that Sub-factors 1.1 and 1.2 are illegal or irrational, then it was properly eliminated from the competition, regardless of any potential changes in the future.

Second, Oracle provides no reason to believe that the Gate Criteria it challenges would be different in a multiple-award solicitation or if the solicitation terms were re-assessed again based upon a Court ruling in favor of Oracle with regard to Messrs. Ubhi, ██████, or DeMartino.  None of the Gate Criteria were justified based upon the need for a single JEDI contractor.  *See* AR 944-52, 955-56.  For example, one of the reasons why Sub-factor 1.1 was included in the solicitation was to help ensure that the JEDI Cloud experiences ongoing innovation and development and capability advancements, by ensuring that the offeror has a critical mass of non-JEDI customers to drive innovation.  *See id.* at 944-45.  And the challenged Sub-factor 1.2 FedRAMP Moderate requirement was included because offerors will be required to meet the more stringent security requirements of the JEDI Cyber Security Plan for unclassified services within approximately 30 days after the contract commences, and "being able to meet the more stringent requirements [of the JEDI Cyber Security Plan] are contingent on the underlying physical data center security requirements that are approved during the FedRAMP Moderate

review process." *Id.* at 947.  These justifications are not tied to a single award, and, because they represent DoD's actual requirements, neither of these terms would reasonably be expected to change in a multiple-award environment.

Oracle's attempt to equate the Gate Criteria with "metrics" mentioned in an October 2, 2017 Slack message that references the single-award discussion is misplaced.  Pl. Memo. 4 (quoting AR 3123).  As evidenced from the Slack messages, the "metrics" DDS were drafting in early October 2017 were contained in the draft "problem statement."  AR 3123.  And the "metrics" in the draft problem statement at that time had nothing to do with the later developed Sub-factors 1.1 and 1.2.  *See* App. 1-2.

Similarly, Oracle has identified no evidence that Messrs. Ubhi, DeMartino, or ███ are responsible for the Gate Criteria Oracle challenges.  The Gate Criteria were justified by Mr. Van Name on July 23, 2018, after Messrs. Ubhi, DeMartino, and ███ had all left DoD.  *Id.* at 944-52, 2782, 23973, 24550.  As demonstrated in Sections VII.C-D, below, Messrs. DeMartino and ███ played minor roles in the JEDI procurement, and Oracle cites no evidence indicating that they were involved in crafting the Gate Criteria.  *See* Pl. Memo. 18-22, 55-61.  With regard to Mr. Ubhi, Oracle argues that his "involvement with the gates" is demonstrated by an October 20, 2017 Slack message where Mr. Ubhi suggested that the draft "requirements document" for the JROC should include five to eight "differentiators" that help DoD meet its mission better, including "high availability, built-in redundancy and fail-over, true elasticity[.]"  *See* Pl. Memo 7; AR 60237.  This draft "requirements document," which was provided to the JROC eight days before Mr. Ubhi's October 31, 2017 recusal, does not include any Gate Criteria or the specific requirements that would become the Gate Criteria that Oracle challenges.  AR 60345-47. Rather, it includes DDS's draft of the broad overarching requirements for JEDI.  *Id.* at 60346-47.

Indeed, the Sub-factor 1.2 FedRAMP Moderate Authorized requirement that Oracle challenges was not even included in the first draft solicitation released in *March 2018*, months after Mr. Ubhi's recusal.  AR 6083-84.

Accordingly, if Oracle fails to establish that Sub-factors 1.1 and 1.2 are both irrational or illegal, then it cannot demonstrate that it could have likely competed for the JEDI contract, and, thus, it was not prejudiced by any of its other alleged errors.

## III.   Oracle Has Not Demonstrated That Sub-factors 1.1 or 1.2 Are Irrational Or Illegal

Oracle's allegations that Sub-factors 1.1 and 1.2 are unduly restrictive of competition are without merit.  Mr. Van Name's memoranda explain why these criteria are necessary to meet DoD's minimum needs.  In challenging these Sub-factors, Oracle is merely second guessing the agency's technical judgment.  And Oracle's argument that these Sub-factors are illegal "qualification requirements" is both meritless and untimely.

### A.   Standard Of Review For Challenges To Solicitation Requirements As Unduly Restrictive Of Competition

When a plaintiff challenges a solicitation term as unduly restrictive of competition, the Court exercises "highly deferential" rational basis review, and the plaintiff must demonstrate that the term is "so plainly unjustified as to lack a rational basis."  *Savantage*, 595 F.3d at 1285-87 (citation omitted).

Agencies have broad discretion to determine their minimum needs and the criteria used to evaluate whether offerors will meet those needs.  *See id.* at 1286 ("'competitors do not dictate an agency's minimum needs, the agency does.' . . .  And determining an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'") (citations omitted); *Armstrong Elevator Co.*, 2018 CPD ¶ 120, 2018 WL 1542123, at *2 (Comp. Gen. 2018) ("The determination of a contracting agency's needs, including the

20

selection of evaluation criteria, is primarily within the agency's discretion and we will not object

to the use of particular evaluation criteria so long as they reasonably relate to the agency's needs

in choosing a contractor that will best serve the government's interests.").

Moreover, where the agency's requirements relate to the national defense, it has the

discretion to define solicitation requirements to achieve "not just reasonable results, but the

highest possible reliability and effectiveness." *E.g.*, *Persistent Sys., LLC*, 2018 CPD ¶ 32, 2018

WL 525833, at *3 (Comp. Gen. 2018).

> **B.      Oracle Has Not Demonstrated That Sub-factor 1.1 Unduly Restricts Competition Or Otherwise Violates The Competition In Contracting Act (CICA), As DoD Reasonably Determined That It Is Necessary To Meet The Agency's Minimum Needs**

Under Sub-factor 1.1, Elastic Usage, offerors were required to provide their network,

compute, and storage usage data for January and February 2018 (excluding the provider's own

usage and free services) and demonstrate that their usage was greater than the estimated JEDI

unclassified usage provided in the solicitation, such that JEDI Cloud usage would be less than 50

percent if added to the offeror's usage.  *See* AR 791, 806, 57846, 57849.  In his July 2018

memorandum, Mr. Van Name explained that this minimum requirement ensures that the JEDI

Cloud: 1) is capable of providing the full scope of services even under surge capacity; and

2) experiences ongoing innovation and development and capability advancements.  *Id.* at 944.

In its supplemental complaint, Oracle "primarily objects" to the requirement that its

usage data be from January and February 2018.  Supp. Compl. 70; *see also* Pl. Memo. 35-36.  In

this regard, Oracle is merely second guessing DoD's determination of how to meet its minimum

needs.  Oracle erroneously alleges that this timing is irrational because DoD's needs for surge

capacity and innovation do not arise until after award.  Pl. Memo 35-36.  In his memorandum,

Mr. Van Name specifically explained that January and February 2018 were selected "to facilitate

fair competition, as this prevents potential Offerors from taking measures to change their numbers once they became aware of this Sub-factor requirement at the release of the draft [solicitation] in March 2018."  AR 945.  Before the GAO, Mr. Van Name further explained that, based on his "understanding the technology," he recognized that this usage data "would be particularly easy to game[.]"  *Id.* at 5422.  For example, offerors could essentially give away their cloud services for a nominal fee in order to boost their usage numbers.  *See id.* at 5422, 5483.  Oracle has not demonstrated anything irrational about Mr. Van Name's judgment.

The fact that Sub-factor 1.1 required offerors to demonstrate certain experience prior to proposal submission does not make the term unduly restrictive of solicitation.  For example, in *Armstrong*, the protestor challenged an evaluation criterion requiring offerors to demonstrate successful experience as a contractor responsible for the construction and design of three similarly complex elevator projects that were substantially completed within the last five years before proposal submission.  *See* 2018 WL 1542123, at *2.  The GAO determined that this solicitation term did not unduly restrict competition, as the agency "reasonably explained that the minimum requirements are related to its needs."  *Id.* at 3.  Likewise, in this case, Mr. Van Name reasonably explained why it was necessary for offerors to meet certain usage requirements during the January and February 2018 timeframe.

Oracle also challenges the daily offline unclassified data storage usage average for JEDI that is included in the solicitation (200 Petabytes), erroneously asserting that this requirement is "outsized."  Pl. Memo 34.  In his July 2018 memorandum, Mr. Van Name explained that this number was calculated based upon existing DoD unclassified allocated storage.  *See* AR 946.  Oracle's only basis for challenging Mr. Van Name's analysis is an extra-record 1997 slideshow from the Internet that purports to show that 200 Petabytes is a huge amount of data.  Pl. Memo.

34.  But this random, outdated slideshow could not be used to call into question DoD's present

needs, even if it were proper for the Court to consider it.  Moreover, AWS, Microsoft, and IBM

all easily met this supposedly "outsized" requirement.  ████████████████████████████

████████████████████████████████

        Oracle also erroneously alleges that Sub-factor 1.1 (and Sub-factor 1.2) were designed to

improperly "narrow the number of viable competitors to reduce delays[.]"  Pl. Memo. 34, 41

(emphasis omitted).  Mr. Van Name's memorandum makes clear that each of the Gate Criteria is

a "minimum requirement[]" for the JEDI solicitation.  AR 944-52.  Any offeror that cannot meet

the agency's minimum requirements is already *per se* not a "viable competitor."  DoD

reasonably and properly put the evaluation of the Gate Criteria first to ensure that it did not have

to waste time evaluating thousands of pages of proposals of offerors that were not "viable

competitors" because they could not meet DoD's minimum needs.  *See id.* at 422.  An agency is

not required to "understate its minimum needs merely to increase competition[.]"  *Aqua-Trol*

*Corp.*, 1992 WL 55051, at *3 (Comp. Gen. Mar. 5, 1992).

        Moreover, contrary to Oracle's argument, *see* Pl. Memo. 34-35, 41, that the number of

companies who can meet DoD's minimum requirements is limited does not mean that the JEDI

solicitation provides for less than full and open competition, such that DoD was required to

execute a justification and approval for other than full and open competition (J&A).  As used in

CICA, "full and open competition" means that "all responsible sources are permitted to submit

sealed bids or competitive proposals on the procurement."  41 U.S.C. § 107; 10 U.S.C.

§ 2302(3)(D).  An entity is not a "responsible source" for a particular procurement if it cannot

meet the agency's minimum capability and experience requirements.  *See* FAR § 9.104-1;

*Centech Gp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) ("Responsibility

refers to an offeror's apparent ability and capacity to perform all contract requirements"). An agency is not required to execute a J&A where it permits all offerors to submit proposals, but its capability and experience requirements have the *effect* of limiting competition. *See Maersk Line, Ltd.*, 2012 CPD ¶ 200, 2012 WL 2833687, at *6 n.14 (Comp. Gen. 2012).

The United States Court of Appeals for the Federal Circuit's recent decision in *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019) (*NGS*), is not to the contrary. In *NGS*, the Federal Circuit reaffirmed the "proposition that a solicitation requirement (such as a past experience requirement) is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement." *Id.* at 985; *see also, e.g.*, *CHE Consulting, Inc. v. United States*, 552 F.3d 1351 (Fed. Cir. 2008); *American Diesel Eng'g Co.*, 92-1 CPD ¶ 79, 1992 WL 15033, at *3 (Comp. Gen. 1992). The *NGS* Court, however, distinguished cases such as *CHE*, *American Diesel*, *Maersk*, and *Armstrong*, which all stand for this proposition, because the provision at issue in *NGS*, which limited an offeror's ability to win award if it was already performing a certain percentage of the relevant agency workload, was not a "capability or experience requirement" that was "tailored to meet [the agency's] needs for a particular procurement." *NGS*, 923 F.3d. at 986.

Unlike the provision at issue in *NGS*, the Gate Criteria that Oracle protests are capability and experience requirements that are tailored to meet DoD's particular needs for the JEDI procurement. Accordingly, because they are rational, they are not unduly restrictive of competition and do not violate CICA.

**C.      Oracle Has Not Demonstrated That Sub-factor 1.2 Unduly Restricts
Competition Or Otherwise Violates CICA, As DoD Reasonably Determined
That It Is Necessary To Meet The Agency's Minimum Needs**

The specific aspect of Sub-factor 1.2 that Oracle challenges is the requirement that
offerors must demonstrate, in their proposal, that they have at least three existing unclassified
commercial cloud offering data centers within the Customs Territory of the United States that are
all supporting at least one IaaS offering and at least one PaaS offering that are FedRAMP
Moderate Authorized.  *See* Pl. Memo. 40-43.  Oracle erroneously alleges that requiring offerings
to be FedRAMP Moderate Authorized is unduly restrictive of competition because DoD has no
need for this security verification until data are actually placed in the cloud.  *See id.* at 42-43.
Oracle is merely second guessing DoD's determination of how to meet its minimum needs.

Agencies are permitted to require offerors to meet certain requirements at the time of
proposal submission, if they have a reasonable basis for doing so.  *See, e.g.*, *Apogee Eng'g, Inc.*,
2018 CPD ¶ 150, 2018 WL 2085660 (Comp. Gen. 2018); *Erickson Aero Tanker*, 2015 CPD
¶ 226, 2015 WL 4572443 (Comp. Gen. 2015); *G.S. Link and Assocs.*, 88-1 CPD ¶ 70, 1988 WL
226974 (Comp. Gen. 1988).  For example, in *Apogee*, the GAO explained that "an agency's
requirement for an offeror to possess a required facility clearance at the time of proposal
submission is not unduly restrictive of competition where the agency demonstrates a reasonable
basis for the requirement."  2018 WL 2085660, at *2.  In *Apogee*, the GAO determined that the
agency articulated a reasonable basis for its requirement that a subcontractor have a facility
clearance at the time of proposal submission, *i.e.*, the requirement was "reasonably necessary to
'avoid any delay in transitioning current contract employees and start-up of the new contract,
once it has been awarded.'"  *Id.* at *2-3.

Here, like in *Apogee*, DoD reasonably determined that the FedRAMP Moderate requirement is necessary at the time of proposal submission. FedRAMP Moderate represents the DoD's minimum security requirements for processing or storing its *least sensitive* information in a cloud. *See* AR 947. In his pre-solicitation memorandum justifying Sub-factor 1.2, Mr. Van Name explained that offerors will be required to meet the *more stringent* security requirements of the JEDI Cyber Security Plan for unclassified services within approximately 30 days after the contract commences. *See id.*; *see also id.* at 5495-97 (describing the JEDI security requirements as "FedRAMP High Plus," with some exemptions). Mr. Van Name further explained that "being able to meet the[se] more stringent requirements are contingent on the underlying physical data center security requirements that are approved during the FedRAMP Moderate review process." *Id.* at 947. Accordingly, "FedRAMP Moderate is the minimum criteria necessary for DoD to have confidence that the Offeror's proposed data centers have met the underlying physical security requirements necessary to successfully perform the contract." *Id.* Mr. Van Name's explained that "[h]aving the FedRAMP Moderate authorization upon proposal submission significantly mitigates the risk of unsuccessful performance." *Id.* at 948.

In his September 2018 memorandum justifying the first two amendments to the solicitation, Mr. Van Name further explained that some DoD security experts wanted a higher standard than FedRAMP Moderate in the Gate Criteria, "in light of the significant time and effort necessary to meet the FedRAMP High Plus so soon after award[.]" *Id.* at 955. DoD determined, however, that FedRAMP Moderate at the time of proposal submission would be sufficient to satisfy its minimum needs. *See id.* Nevertheless, without the FedRAMP Moderate requirement at the "time of proposal, the Department would be taking on an unacceptable level of risk that an Offeror will be unable to achieve the more stringent security requirements of JEDI Cloud." *Id.*

Oracle's fails to demonstrate that Mr. Van Name's technical judgment is irrational.  For example, Oracle erroneously suggests that the FedRAMP Moderate requirement is irrational because the JEDI contract does not require authorization through the FedRAMP process.  *See* Pl. Memo. 6.  This does not change the fact that the awardee will be required to meet more stringent security standards than FedRAMP Moderate approximately 30 days after award.

Also, contrary to Oracle's suggestion, *see id.*, the fact that DoD did not require every IaaS and PaaS solution proposed by an offeror to be FedRAMP Moderate Authorized at the time of proposal submission does not render the criteria irrational.  Rather, having at least one IaaS offering and one PaaS offering at each data center that are FedRAMP Moderate Authorized ensures that the "underlying *physical data center* security requirements that are approved during the FedRAMP Moderate review process" have been met.  *See* AR 947 (emphasis added). Oracle's suggestion that the Gate Criteria would have needed to be *more restrictive* to be rational is without merit and merely disagrees with the agency's technical judgment.

Furthermore, the fact that a "FedRAMP Tips & Cues Compilation" on the FedRAMP website states that agencies cannot require FedRAMP authorization as part of a solicitation is irrelevant.  *See* Pl. Memo. 42-43.  This document is not a binding regulation, and the FedRAMP program does not set *DoD's* minimum needs for this procurement.  Moreover, the fact that different components of DoD or different agencies have taken different approaches to security, *see id.* at 43, does not suggest that DoD's approach in the JEDI procurement is irrational. Rather, each procurement stands alone.  *See SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001); *Aqua-Trol*, 1992 WL 55051, at *2 n.2.

Finally, the record demonstrates that DoD thoroughly considered the input of industry in ensuring that Sub-factor 1.2 is no more restrictive than necessary.  *See* AR 955-56.  The initial

solicitation required that the offerings be "FedRAMP Moderate 'Authorized' by the [FedRAMP] Joint Authorization Board[.]" *Id.* at 75.  In response to a suggestion from Oracle, DoD amended the solicitation to allow the FedRAMP Moderate Authorization to be done by either the Joint Authorization Board *or* a Federal agency.  *See id.* at 583, 955, 8879, 8883.  Although agency authorizations can be more permissive, DoD determined that agency authorizations "retain a sufficient security bar, particularly around physical security controls, to meet the Department's needs," and, thus, amended the solicitation in an effort to maximize competition.  *Id.* at 955-56.

Accordingly, Oracle has not demonstrated that Sub-factor 1.2 lacks a rational basis, and, thus, Oracle has not demonstrated that it is unduly restricts competition.[6]

**D.     Sub-factors 1.1 and 1.2 Are Not Illegal Qualification Requirements, And, In Any Event, Oracle Has Waived These Objections By Failing To Raise Them Prior To The Close Of Bidding**

Contrary to Oracle's argument, Pl. Memo. 36-37, 41-42, Sub-factors 1.1 and 1.2 are not a "qualification requirements," and, in any event, Oracle has waived its objections that these terms contain illegal qualification requirements by failing to raise them prior to the close of bidding.

**1.     Waiver**

As an initial matter, Oracle has waived its arguments that Sub-factors 1.1 and 1.2 contain illegal qualification requirements in violation of 10 U.S.C. § 2319.

The Federal Circuit has held that a plaintiff who "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold Fleet, LP v. United States,* 492 F.3d 1308,

---

[6] In Section III.B, above, we explained why Oracle's arguments that DoD created Sub-factor 1.2 to improperly narrow the number of viable competitors to reduce delays and failed to comply with CICA's J&A requirements, *see* Pl. Memo. 41, are meritless.

1313 (Fed. Cir. 2007); *accord Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016).

At the GAO, Oracle did not object to any solicitation term as an illegal "qualification requirement" until its post-hearing comments filed on October 18, 2018, *see* AR 4442-81, 4757-815, 4878-975, 5117-225, 5791, 5799, which was after the close of bidding (October 12, 2018), and more than two months after Oracle filed its initial protest (August 6, 2018). *Id.* at 4303, 4442. Oracle had the opportunity to raise this objection prior to the close of bidding, but the words "qualification requirement" and the relevant statute, 10 U.S.C. § 2319, do not appear in Oracle's initial GAO protest, first supplemental protest, revised and consolidated protest, or comments on the agency report and additional supplemental protest, all filed prior to the close of bidding. *See id.* at 4442-81, 4757-815, 4878-975, 5117-225. Moreover, even Oracle's belated "qualification requirement" argument in its post-hearing comments related only to the Sub-factor 1.2 FedRAMP requirement, not Sub-factor 1.1. *Id.* at 5799, 5827-33, 5835. Oracle did not suggest that Sub-factor 1.1 violated 10 U.S.C. § 2319 until its December 2018 complaint, *see* Compl. 10, and did not develop an actual argument until its supplemental complaint in April 2019, after it had been eliminated from the competition. Supp. Compl. 68.

Also, in alleging that Sub-factors 1.1 and 1.2 are illegal qualification requirements, Oracle is alleging patent defects. A defect is patent if it is "an obvious omission, inconsistency or discrepancy of significance." *Per Aarsleff*, 829 F.3d at 1312 (citation omitted). "By contrast, '[a] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'" *Id.* (citation omitted). Both the usage requirements in Sub-factor 1.1 and the FedRAMP Moderate requirements in Sub-

factor 1.2 are readily apparent on the face of the solicitation.  *E.g.*, AR 791-92.  And the

solicitation does not contain FAR clause 52.209-1, AR 750-56, which demonstrates that DoD

does not consider the solicitation to contain any qualification requirements and, thus, did not

follow the procedures in 10 U.S.C. § 2319(b)-(c) in implementing Sub-factors 1.1 and 1.2.  *See*

FAR § 9.206-2 ("The contracting officer shall insert the clause at 52.209–1, Qualification

Requirements, in solicitations and contracts when the acquisition is subject to a qualification

requirement.").

    Accordingly, Oracle needed to raise its objections that Sub-factors 1.1 and 1.2 are illegal

qualification requirements before the close of bidding.  By failing to do so, Oracle waived its

ability to raise these objections now.

> **2.      Sub-factors 1.1 And 1.2 Are Not Qualification Requirements; Rather, They Are Evaluation Criteria Tailored Specifically To The Requirements Of The JEDI Procurement**

    Even if Oracle had not waived its qualification requirement arguments, they are meritless

because Sub-factors 1.1 and 1.2 do not contain a qualification requirements.

    A qualification requirement is defined, by statute, as "a requirement for testing or other

quality assurance demonstration that must be completed by an offeror before award of a

contract."  10 U.S.C. § 2319(a).  This Court and the GAO have explained that 10 U.S.C. § 2319

"was not intended to apply to any individual specification of any one solicitation."  *California*

*Indus. Facilities Res., Inc. v. United States*, 80 Fed. Cl. 633, 642 (2008) (quoting *Aydin Corp.—*

*Reconsideration*, 87-1 CPD ¶ 141, 1987 WL 101411, *2 (Comp. Gen. 1987)).  Rather, "the

statute 'only applies where the agency establishes a systematized quality assurance

demonstration requirement on a continuing basis as an eligibility for award, such as a qualified

products list, qualified manufacturers list, or qualified bidders list.'" *Id.* (quoting *Aydin—Reconsideration*, 1987 WL 101411, *2).[7]

Sub-factors 1.1 and 1.2 are not "systemized quality assurance demonstration requirements" that offerors must meet on a continuing basis to be eligible for cloud computing awards. Rather, as demonstrated in Section III.B-C, above, Sub-factors 1.1 and 1.2 are JEDI-specific evaluation criteria designed to ensure that offerors will be able to meet the agency's JEDI-specific minimum needs.[8] If procurement specific evaluation criteria like Sub-factors 1.1 and 1.2 were considered to be qualification requirements, then any pass/fail evaluation criteria designed to ensure that the awardee can meet the agency's needs would be considered a qualification requirement, which would nullify, at a minimum, the regulations requiring that agencies perform a responsibility determination before award. *See* FAR §§ 9.103(a), 9.104-1; *Centech*, 554 F.3d at 1034 n.2 ("Responsibility refers to an offeror's apparent ability and capacity to perform all contract requirements").

Accordingly, Oracle has not demonstrated that Sub-factors 1.1 and 1.2 contain "qualification requirements" or are otherwise illegal or irrational.

---

[7]  The Federal Circuit's decision in *W.G. Yates & Sons Constr. Co. v. Caldera*, 192 F.3d 987 (Fed. Cir. 1999), is consistent with *California Industrial* and *Aydin*. *See California Indus.*, 80 Fed. Cl. at 642-43 (analyzing *W.G. Yates*). In *W.G. Yates*, the Federal Circuit held that there was a qualification requirement in a solicitation that provided that certain hanger doors could only be manufactured by: 1) certain "prequalified manufacturers" named in the solicitation; or 2) other manufacturers who submitted certain written evidence regarding their previous experience designing, manufacturing, and installing at least 10 similar door systems. 192 F.3d at 989, 993-94. The listing of "prequalified manufacturers" in the solicitation suggests a "systemized quality assurance demonstration requirement" existing outside the procurement at issue in *W.G. Yates*.

[8]  Indeed, as Oracle emphasizes with regard to Sub-factor 1.2, in accordance with FedRAMP policy, Government solicitations do not typically require FedRAMP authorization as a condition of award. *See* Pl. Memo 42-43.

**IV.     Oracle Has Not Demonstrated That Its Elimination From The JEDI Competition, Based Upon An Unacceptable Rating Under Sub-factor 1.1 Was Irrational Or Illegal**

DoD reasonably determined that Oracle failed the Sub-factor 1.1 Gate Criteria and, as required by the solicitation, eliminated Oracle from the competition.

As an initial matter, Oracle *admits* that it failed at least one aspect of Sub-factor 1.1. Oracle explains that "it just missed the 50% metric for storage in the January and February [2018] period[.]" Pl. Memo. 38.  This alone demonstrates that DoD properly determined Oracle to be Unacceptable under Sub-factor 1.1.  *See* AR 805.  Moreover, there were additional reasons why Oracle was found unacceptable.

For example, Oracle was required to provide its average daily storage data for January and February 2018 "for *each* of online, nearline, and offline[.]" *Id.* at 791 (emphasis added). The solicitation provided JEDI unclassified data storage usage averages for each of these three categories, and the offeror was required to demonstrate that this JEDI unclassified usage would have been less than 50 percent of the offeror's usage in January and February 2018, when added to the offeror's usage during that time frame.  *See id.* at 791, 806.  Unlike AWS, Microsoft, and IBM, Oracle did not provide its data for online, nearline, and offline storage, but instead provided an aggregate of its storage in use.  AR 25278, 49298, 53907, 56785-86, 57849. Accordingly, Oracle's claim that it demonstrated that it met the solicitation's storage requirements in June and July 2018, Pl. Memo. 38, is not only irrelevant, but also incorrect.

Also, contrary to its argument, *id.*, Oracle did not demonstrate that it met the solicitation's network usage requirements.  Although Oracle asserted in a table in its summary report that its "% JEDI Usage to Oracle Usage" was under ▮ percent for ingress and ▮ percent for egress, it did not provide the required supporting data.  *See* AR 56786, 57846-48.  The

solicitation required offerors to provide their "*[v]olume* of commercial client traffic, in *bytes*, for public internet ingress and egress . . . *aggregate* of January 2018 and February 2018." *Id.* at 791 (emphasis added).  Oracle did not provide this information, but instead provided a column of information labeled "P99," with an ingress value of ▇ and an egress value of ▇.  *Id.* at 56786. In response to a clarification request, Oracle indicated that "P99" is a *rate* expressed in "Gbps" (Gigabytes per second), not a *volume* expressed in bytes (*e.g.*, Gigabytes, Petabytes, *etc.*).  *See id.* at 57813.  Oracle further explained that the "P99" column "reports that sustain network traffic utilization is at *or below* reported value 99% of the reporting period," based upon samples collected at five minute intervals.  *Id.* (emphasis added).  Accordingly, Oracle's aggregate volume of usage for the period of January and February 2018 cannot even be derived from Oracle's P99 column because P99 does not represent an average usage rate for the entire time period.  *See id.* at 59236-37. [9]

Furthermore, in its proposal narrative, Oracle stated that "DoD requirements for JEDI constitute less than ▇ percent of *installed network capacity* for ingress and ▇ percent for egress[.]"  *Id.* at 56783 (emphasis added).  Since these were the same percentages used in the table in Oracle's summary report for "% JEDI Usage to Oracle Usage," and Oracle's table also contained columns for "bandwidth," DoD reasonably concluded that Oracle conflated "usage" and "capacity" in its table.  *See* AR 57847, 59235-36.  It is the offeror's burden to submit an adequately written proposal that demonstrates compliance with the requirements of the

---

[9] Oracle's "P99" number is like someone saying that he drove a car "at or below" 60 miles per hour for 99 percent of a two-hour period, based upon looking at the speedometer once every five minutes.  From this information, it is impossible to tell how far he drove during the two-hour period because he may have been driving *below* 60 miles per hour at each of the speed checks and we do not know what speed the car was driving the vast majority of the period when its speed was not being checked.

solicitation, *e.g.*, *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017), which Oracle failed to do.

In any event, as demonstrated above, in its motion, Oracle does not argue that it met the requirements of Sub-factor 1.1, as written.  Pl. Memo 38.  Rather, Oracle argues that it should be included in the competitive range because "██████████████████████████

████████." *Id.*  Oracle erroneously attempts to ████████████████████████

████████████████████████████████████████████████████

████████████████. *See id.* at 38-40.  The solicitation was clear that an offeror was required to be eliminated from the competition if it failed one of the Gate Criteria:

> Under Phase One, the Government will evaluate the Offeror's
> Volume II, Factor 1, Gate Evaluation Criteria submission, against
> the "Acceptable / Unacceptable" criteria identified below in Table
> M-2.  Offerors who receive a rating of "Unacceptable" under any
> of the Gate Criteria Sub-factors *will not be further evaluated*. Thus,
> as an example, if an Offeror is rated as Unacceptable for Gate
> Criteria Sub-factor 1.2, *the remainder of the proposal will not be
> evaluated and will not be considered for award*.

AR 805 (italics added).  Oracle's argument that the solicitation "does not restrict the competitive range to the offerors that passed all gate criteria" is nonsense.  Pl. Memo 40 n.36.  If an offeror's proposal "will not be further evaluated" and "will not be considered for award," then it cannot logically be part of the "competitive range."

Accordingly, Oracle's argument that the competitive range should include all four responsive offerors because ████████████████████ is meritless.  Although DoD has broad discretion in forming the competitive range, *e.g., QBE, LLC v. United States*, 120 Fed. Cl. 397 (2015), it may not deviate from the terms of the solicitation.  *See* 10 U.S.C. § 2305(b)(1); *Blue & Gold*, 492 F.3d at 1313; *2M Research Servs., LLC v. United States*, 139 Fed. Cl. 471, 477

(2018).  Including Oracle in the competitive range would have been inconsistent with the

solicitation's evaluation criteria.

Moreover, Oracle admits that it did not and cannot meet all the criteria in Sub-factors 1.1

and 1.2, *see* Pl. Memo. 38, 41, which DoD has reasonably determined to be minimum

requirements.  See Sections III.B-C, above.  In contrast, AWS and Microsoft passed all of the

Gate Criteria, and DoD reasonably determined that AWS and Microsoft's proposals ███████

███████████████████████.  *See* AR 58759-62.  For example, Oracle notes that, ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

Accordingly, Oracle has not demonstrated that it was improperly excluded from the

competitive range.

## V.       Oracle Has Not Demonstrated That Sub-factor 1.6 Is Illegal

In challenging Sub-factor 1.6, Oracle does not allege that any of the specific evaluation

criteria in the Sub-factor are unduly restrictive.  *See* Pl. Memo. 43-44.  Rather, Oracle

erroneously argues that DoD's underlying requirement for an "online marketplace" is illegal

because it "outsourc[es] the selection of third-party software to the JEDI contractor," in violation

35

of CICA and the prohibition against using contracts to perform inherently Governmental functions.  *See id.* at 44 (citing FAR § 7.503(a); *Electra-Med. Corp. v. United States*, 140 Fed. Cl. 94, 104 (2018)).  The online marketplace requirement in the JEDI solicitation is nothing like the program at issue in *Electra-Med*, nor is it an inherently Governmental function.

The JEDI solicitation requires offerors to provide "an easy to use online marketplace (via web-accessible user interface) to deploy [commercial cloud offering] and third-party platform and software service offerings onto the [commercial cloud offering] infrastructure."  AR 793. The purpose of the online marketplace is to "take advantage of the critical functionality provided by modern cloud computing providers to easily 'spin up' new systems" by combining the JEDI contractor's IaaS and PaaS offerings with offerings provided through the online marketplace. *See id.* at 950-51.  In other words, the offerings in the online marketplace can integrate with the offerors' IaaS and PaaS solutions to allow JEDI users to create the specific cloud functionality the users need.  *See id.* at 5424-25.

With regard to third-party offerings, which is the aspect of the online marketplace to which Oracle objects, *see* Pl. Memo. 43-44, offerors are only required to make available two types of offerings: 1) "price-free" offerings; and 2) offerings where DoD "already possesses a license using the bring your own license (BYOL) approach."  *Id.* at 616.  The solicitation does not require offerors to include third-party offerings in their online marketplace that cost extra (apart from a license DoD already owns), nor does it preclude this.  *See id.*  If an offeror were to include such third-party offerings in its online marketplace, it would need to include fixed prices for the offerings in the contract.  *See id.* at 801.

For third-party offerings in the online marketplace, the Government would have one of two types of relationships with the third party.  For the bring your own license offerings, "the

Government's privity of contract for the offering license agreement is with the third party," *id.* at 749, so the Government would be procuring the offering through a contract/license separate from the JEDI contract.  For other third-party offerings, "the Government's privity of contract for use of third party offerings remains with the [JEDI] Contractor."  *Id.* at 748.  In other words, the JEDI contractor would be providing the offering to the Government via a subcontract with the third party.

The procurement of the online marketplace is readily distinguishable from the population of the Master List that the Court determined violated CICA in *Electra-Med*.  In *Electra-Med*, the Department of Veterans Affairs (VA) created a program whereby VA hospitals could order medical supplies from a "Master List," which was intended to include 80,000 supplies.  *See* 140 Fed. Cl. at 96, 98.  At first, the VA attempted to populate the Master List with supplies acquired via competitive or sole source awards with the suppliers, with separate contracts for distribution of the supplies.  *See id.* at 97-98.  But the VA eventually decided to modify the distribution contracts to provide for the distributors to also select and procure the supplies for the Master List via subcontracts (subject to VA approval).  *See id.* at 98, 102.  The Court determined that this arrangement violated CICA because, by "outsourcing the selection of suppliers to the [distributors] entirely, the government has avoided the multitude of legal and regulatory requirements appurtenant to a federal procurement."  *Id.* at 104.

There are multiple reasons why including third-party offerings in the JEDI online marketplace is materially different from the distributors populating the Master List in *Electra-Med*.  First, as demonstrated above, the JEDI contractor is only required to include third-party offerings that are free or subject to a separate contract/license.  The JEDI bring your own license offerings are akin to the VA's initial approach of filling the Master List via separate awards

pursuant to competition or sole source justifications, which the *Electra-Med* Court did not find to violate CICA.  And the inclusion of free third-party offerings in the online marketplace cannot violate CICA, because CICA (as applied to DoD) only applies to procurement of property and services "for which payment is to be made from appropriated funds[.]"  10 U.S.C. § 2303(a).

Second, although an offeror may include third-party offerings that carry a cost, the purpose of these offerings would be to allow JEDI users to integrate them with the offeror's IaaS and PaaS offerings to create the specific cloud functionality the user needs.  *See* AR 616, 950-51, 5424-25.  As the statement of objectives explains, "[s]oftware or platform offerings that cannot be deployed on JEDI Cloud infrastructure are outside the scope of [the JEDI] contract."  *Id.* at 616.  Accordingly, the third-party offerings in the JEDI online marketplace are akin to a situation where, in a procurement of rifles, an offeror includes options for the Government to purchase a subcontractor's specialty scopes and grips from the offeror.  These sorts of enhancements should not ordinarily violate CICA, if they are within the scope of the solicitation.

Oracle's new argument that the inclusion of third-party offering in the JEDI online marketplace violates the prohibition in FAR § 7.503(a) against using a contractor to perform an inherently Governmental activity is also meritless.  As an initial matter, this argument is waived because it was not raised prior to the close of bidding.  *See* Section III.D.1, above; AR 4442-81, 4757-815, 4878-975, 5117-225.  Moreover, offering the Government, as part of a contract, third-party products or services to improve the functionality of the contractor's offerings is not an inherently Governmental activity.  *See* FAR § 7.503(c)-(d).  Oracle has not demonstrated that the JEDI online marketplace requirement violates FAR § 7.503(a).

Finally, Oracle's argument that DoD has no specific authority to procure an online marketplace is irrelevant.  *See* Pl. Memo. 44.  The FAR encourages procurement officials to find

innovative ways to meet their agency's needs, consistent with the law.  *See* FAR § 1.102(d); *Tyler Constr. Gp. v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009).  Accordingly, the Federal Circuit has explained that the relevant question is not whether a challenged procurement practice is specifically *authorized* by law; rather, the relevant question is whether the practice is *prohibited* by law.  *See Tyler Constr.*, 570 F.3d at 1333.[10]

Because Oracle has not demonstrated that the JEDI solicitation's online marketplace requirement violates any statute or regulation, its protest of Sub-factor 1.6 should be denied.

## VI.    Oracle Has Not Demonstrated That The Decision To Award A Single JEDI Contract Was Irrational Or Illegal

Oracle's challenges to DoD's determination to award a single IDIQ contract, rather than multiple IDIQ contracts, are meritless.  Oracle merely disagrees with DoD's technical and business judgment that a single JEDI contract will better serve DoD's interest and misinterprets the relevant statutes and regulations.

Pursuant to 10 U.S.C. § 2304a(d)(4)(B), the FAR provides six situations in which an agency "must not use the multiple award approach" for IDIQ contracts.  FAR § 16.504(c)(1)(ii)(B).  The contracting officer considered potential benefits of multiple awards, but rationally determined that three of the six circumstances listed in FAR § 16.504(c)(1)(ii)(B) apply to the JEDI procurement, meaning that DoD was prohibited from utilizing a multiple-

---

[10]  For the same reason, Oracle's reliance upon Section 846 of the National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, 131 Stat. 1283, 1483-87 (2017) (FY 2018 NDAA), is misplaced.  Pl. Memo. 44.  This provision provides *authority* for the General Services Administration to establish a program to procure commercial products through e-commerce portals.  Pub. L. 115-91, 131 Stat. at 1483.  It does not prohibit DoD from creating an online marketplace.  *See id.* at 1483-87.  In any event, the JEDI online marketplace will not be a general commercial e-commerce portal like those authorized by the FY 2018 NDAA.  Rather, as demonstrated above, it should be limited to offerings that JEDI users may integrate with the contractor's IaaS and PaaS offerings to create the specific cloud functionality the user needs.

award approach.  Like the GAO, the Court should reject Oracle's attempts to second guess the agency's technical and business judgment.

Oracle's allegation that 10 U.S.C. § 2304a(d)(3) prohibits the use of a single-award approach is also meritless.  This statutory provision permits large single-award IDIQ contracts where the agency has determined that "the contract provides for only firm, fixed price task orders" for "services for which prices are established in the contract for the specific tasks to be performed[.]"  10 U.S.C. § 2304a(d)(3)(B).  As demonstrated below, Under Secretary Lord correctly determined that the JEDI contract meets this definition.

A.     **The Contracting Officer's Determination That DoD Could Not Utilize A Multiple-Award Approach For The JEDI Procurement Was Rational**

In her July 2018 memorandum, the contracting officer provided three rational reasons for utilizing a single-award approach for the JEDI procurement: 1) more favorable terms and conditions, including pricing, with a single award, AR 457-59; 2) the expected cost of administering multiple contracts outweighs the expected benefits of multiple awards, *id.* at 459-61, 465-67; and 3) multiple awards would not be in the best interests of the Government because they would: a) increase security risks; b) frustrate DoD's attempts to consolidate and pool data for the benefit of national security; and c) increase the technical complexity required to realize the benefits of cloud technology.  *Id.* at 461-64.  Accordingly, DoD is prohibited from issuing a multiple-award IDIQ contract, and Oracle's arguments to the contrary are meritless.

1.     **In Accordance With 10 U.S.C. § 2304(d)(4), The FAR Specifies Situations Where It Would Not Be In The Government's Best Interest To Award Multiple Task Order Contracts**

In its motion, Oracle emphasizes that DoD is generally required to use a multiple-award approach for IDIQ contracts "to the maximum extent practicable."  *See* Pl. Memo. 3, 9, 25-27 (emphasis omitted).  This requirement does not, however, exist in a statutory and regulatory

vacuum, and Oracle glosses over the regulations that define when it is *not* practicable to use a multiple-award approach.

The same statute that requires regulations establishing a "preference" for multiple awards "to the maximum extent practicable" also requires regulations that "establish criteria for determining when award of multiple task or delivery order contracts would not be in the best interest of the Federal Government." 10 U.S.C. § 2304a(d)(4).  Accordingly, the FAR lists six situations where the "contracting officer *must not* use the multiple award approach[.]"  FAR § 16.504(c)(1)(ii)(B) (emphasis added).  Three of these situations are relevant here: 1) "[b]ased on the contracting officer's knowledge of the market, more favorable terms and conditions, including pricing, will be provided if a single award is made"; 2) "[t]he expected cost of administration of multiple contracts outweighs the expected benefits of making multiple awards"; and 3) "[m]ultiple awards would not be in the best interests of the Government." *Id.*

Determining whether these three situations apply requires the contracting officer to exercise her business judgment and discretion.  So long as the contracting officer rationally determined that one of these situations exists, it cannot be considered "practicable" to use a multiple-award approach for the JEDI procurement.

Also, contrary to Oracle's argument, Congress did not "*mandate*[] that DoD maintain cloud service provider competition *under JEDI*" in a September 2018 appropriations act. Pl. Memo. 27 (emphasis in original).  As an initial matter, Congress only "mandated" a *report* to the congressional defense committees, prior to the obligation or expenditure of DoD funds to migrate data and applications to the JEDI Cloud.  Pub. L. 115-245, § 8137, 132 Stat. 2981, 3030-31 (2018).  Moreover, Congress did not require that the report specify that DoD will allow for multiple providers "under JEDI."  Rather, Congress required that the report include "the strategy

41

to sustain competition and innovation *throughout the period of performance* of each contract, including defining opportunities for multiple cloud service providers and insertion of new technologies[.]" *Id.* at 3031 (emphasis added).  In other words, the "competition" and other cloud providers could come from outside the JEDI contract, as the JEDI contract itself will not require anyone to use the JEDI Cloud services.  Congress could have required DoD to utilize a multiple-award approach for the JEDI procurement, but has chosen not to do so.

> ### 2.  The Contracting Officer Rationally Considered The Benefits Of Multiple Awards

Simply reading Oracle's motion, without reviewing the administrative record, would leave the reader with the erroneous impression that the contracting officer never considered the benefits of task order competition.  *See* Pl. Memo. 26-29.  In reality, the contracting officer meaningfully considered these benefits and simply decided that they did not outweigh the detriments of a multiple-award strategy for the JEDI procurement.  *See* AR 459, 464.

In her memorandum, the contracting officer recognized that multiple-award IDIQ contracts are often more advantageous to the Government because they can provide more favorable pricing at the task order level through competition.  *Id.* at 464.  She also recognized that a benefit of multiple-award contracts is that different vendors would offer different technical solutions to all of DoD.  *See id.* at 459.  Accordingly, contrary to Oracle's argument, Pl. Memo. 27, the contracting officer considered that multiple-award contracts can result in benefits such as lower prices, innovation, and better quality and performance.  Also contrary to Oracle's argument, *id.* at 28, nothing in the relevant statute or regulation required DoD to *quantify* the potential benefits of task order competition.[11]

---

[11]  Even if DoD were required to quantify the benefits of task order competition, it would not be required to rely upon the 16.7 percent figure from the White House Office of Management and Budget (OMB) report cited in Oracle's motion.  Pl. Memo. 27-29.  This figure was derived

42

Additionally, although Oracle claims that the contracting officer "ignores" the issue of vendor "lock-in," Pl. Memo. 28 n.22, the record demonstrates that DoD was well-aware of the potential for vendor lock-in, and took specific steps to mitigate this risk, as explained in the Acquisition Strategy. *See* AR 499-500.

### 3. The Contracting Officer Rationally Determined That More Favorable Terms And Conditions, Including Pricing, Will Be Provided If A Single Award Is Made

The Court should reject Oracle's attempt to second guess the contracting officer's rational determination that a single JEDI contract will result in more favorable terms and conditions than multiple JEDI contracts.

The JEDI contract will require a substantial upfront investment to meet DoD's classified and tactical edge requirements, which DoD is not directly funding. *See id.* at 458. The contracting officer reasonably determined that, in a multiple-award scenario, where offerors are not guaranteed to receive all of the classified and tactical edge work ordered under the JEDI contract, higher prices for these offerings are expected. *See id.* at 458-59. If there is a single JEDI contractor, that contractor can expect to offset its infrastructure investment through *more* classified and tactical edge task orders. *See id.* at 459. Contrary to Oracle's argument, this does not equate to an "assum[ption] that a single award approach would guarantee the awardee the recovery of its classified and tactical edge investments[.]" Pl. Memo. 30.

from a survey of 49 information technology task orders issued in the 1990s or earlier by the United States Department of Justice (DOJ) under multiple-award contracts, which found that actual costs of the task orders averaged 16.7 percent less than the Government's projected costs. *See* AR 5305, 5310-11. Although "DOJ attribute[d] these savings to the fact that awardees were competing with one another for each task order," the OMB report did not explain the basis of DOJ's conclusion. *Id.* at 5311.

43

Moreover, the contracting officer noted that, in light of "industry's high degree of involvement and responsiveness to the draft solicitation process, fierce competition is expected under a single award scenario."  AR 457.  While this was not the *sole* basis for her decision, it demonstrates that offerors' prices, including the classified and tactical edge offerings, should be subject to forces of competition sufficient to protect the DoD's interests in this situation.

Oracle also questions the contracting officer's conclusion that DoD cannot force awardees to compete for particular task orders.  Pl. Memo. 29.  As an initial matter, this argument is a red herring, as the contracting officer's expectation of more favorable terms with a single award was based upon the expectation of higher prices in a multiple-award environment, *even if* multiple contractors submitted proposals for classified and tactical edge task orders. *See* AR 458-59 ("Even if one or more awardee proposes for the classified task order work . . . higher prices are anticipated . . . with multiple awards, each vendor will not necessarily receive all orders for tactical edge offerings, thus higher prices are anticipated").  Whether DoD can force awardees to compete is irrelevant to the rationality of this conclusion.  In any event, as a practical matter, the contracting officer's statement was correct.  While DoD can include a clause in an IDIQ contract requiring awardees to submit proposals for each task order, Oracle does not explain how DoD could force contractors to submit *meaningfully competitive* proposals in a multiple-award environment for task orders they do not wish to perform.

Accordingly, Oracle has failed to demonstrate any irrationality in the contracting officer's business judgment that a single-award approach would result in more favorable pricing terms than a multiple-award approach.

    **4.**    **The Contracting Officer Rationally Determined That The Expected Cost Of Administering Multiple Contracts Outweighs The Expected Benefits Of Making Multiple Awards**

Oracle's attempts to second guess the contracting officer's conclusions regarding the expected costs of administering multiple contracts fare no better. Oracle has not demonstrated anything irrational in the contracting officer's conclusion that it will cost approximately $500 million more to administer multiple JEDI contracts instead of a single JEDI contract.

For example, Oracle questions the contracting officer's conclusion that it will take 1,688 hours of combined work by a contracting officer, a contracting officer specialist, and a source selection team, to procure a 12-month task order in a multiple-award setting, alleging that a 2013 study conducted by ASI Government (ASI) "reveals that agencies average 119 to 168 hours to award a task order depending on complexity[.]" Pl. Memo 30 (emphasis omitted). But this ASI estimate is irrelevant, as it was based upon ASI's "Resource Projection Model," which ASI asserts "produces a *theoretically optimal* estimate of direct labor hours required" for certain task order procurements. AR 5337 (emphasis added).

In contrast, the JEDI contracting officer was attempting to estimate how many hours it would *actually* take to award task orders if there were multiple JEDI contractors, based upon her 10 years of experience in contracting with DoD and the Department of Homeland Security. *See id.* at 5567-68, 5590-91, 5713, 5717, 5720-21. If the contracting officer attempted to ascertain "theoretically optimal" labor hours, she may have grossly underestimated the costs of multiple awards. Indeed, the contracting officer explained that studies such as ASI's often do not take into consideration important factors such as the disparity of skills in contracting specialists. *See id.* at 5721. She also explained tasks that the procurement officials would need to perform to award competitive task orders. *See id.* at 459, 466-67.

Oracle's disagreement with the contracting officer's estimate that it would take, on average, 70 days longer for a JEDI task order competition than task order award to a single JEDI contractor, Pl. Memo. 31, should be rejected for the same reasons.  This estimate was also based upon the experience of DoD acquisition officials, *see* AR 460, and Oracle has provided no basis to question it.

Oracle's attempt to second guess the contracting officer's estimate of 4,032 task orders also fails.  In its motion, Oracle asserts that the "record does not corroborate" this number, but fails to cite anything in the record calling it into question.  Pl. Memo 31.  The record is clear that the JEDI contract will have a 10-year ordering period with a $10 billion maximum, and *all* DoD contracting offices and ordering activities will be authorized to place task orders under the contract.  AR 730, 734-35.  Under these circumstances, Oracle has not demonstrated anything irrational about the contracting officer's task order estimate.

Because Oracle fails demonstrate any irrationality in the contracting officer's estimates of the number of JEDI task orders or the length of time to award them, Oracle also fails to call into question the contracting officer's rational conclusion that multiple awards would result in substantial delays ("770 years of worth of time *collectively*") in the warfighters receiving access to "foundational cloud computing and storage resources."  *Id.* at 460 (emphasis added).[12]

The contracting officer performed a detailed analysis of the costs of awarding multiple JEDI contracts, compared that against the potential benefits of awarding multiple contracts, and

---

[12]  In its motion, Oracle has prudently abandoned its earlier suggestion that the contracting officer "seems to presume DoD will work one task order at a time, and not start any task order performance until DoD awards all 4,032 task orders."  Pl. Supp. 63.  The contracting officer never suggested that the implementation of any particular cloud service would be delayed by 770 years.  Oracle's argument ignored the word "collectively" in the contracting officer's conclusion.  *See id.* at 62-63 (replacing "collectively" with ellipses).

determined that the costs outweighed the benefits.  Oracle has identified nothing irrational in this analysis and its challenge to this determination should be rejected.

<div style="text-align:center">

**5.      The Contracting Officer Rationally Determined That Multiple
Awards Would Not Be In The Best Interests Of The Government**

</div>

The Court should also reject Oracle's mere disagreement with DoD's technical judgment in determining that multiple awards are not in the Government's best interest.  The contracting officer rationally determined that multiple awards would not be in the best interests of the Government because they would: a) create seams between clouds that increase security risks; b) frustrate DoD's attempts to consolidate and pool data so data analytics capabilities can maximize benefits to the warfighting mission; and c) exponentially increase the technical complexity required to realize the benefits of cloud technology.  AR 461-64.

<div style="text-align:center">

**a.      Security**

</div>

With regard to security, the contracting officer explained that, within a single-cloud environment, traffic is tightly controlled and most commercial cloud offerings provide substantial automated security features.  *See id.* at 462.  In contrast, managing security and data accessibility between clouds creates seams that increase security risk.  *Id.*  Specifically, each connection transiting out of and into a single cloud environment must be carefully configured and managed appropriately, and it requires complex integration to overcome the challenge of accessing data in multiple cloud environments.  *Id.*  This complex manual configuration would increase the risk of human error, putting DoD's important information at risk.  *See id.*

Oracle argues that these concerns are unfounded because certain DoD components utilize a multi-cloud approach.  *See* Pl. Memo. 32.  But Oracle fails to acknowledge the enterprise-wide nature of the JEDI Cloud.  The fact that some components of DoD were comfortable that they could effectively manage security in their more limited multi-cloud environment does not make

<div style="text-align:center">

47

</div>

it irrational for DoD to be concerned about the risk of human error in managing connections on a larger scale.

Also, contrary to Oracle's suggestion, *see id.*, the fact that DoD will continue to have a multi-cloud environment after the JEDI Cloud is implemented does not mandate that the JEDI Cloud itself be a multi-cloud environment.  Rather, DoD rationally determined that a multi-cloud environment within its enterprise-wide pathfinder cloud would increase security risks and technical complexity to an unacceptable degree.  *See* AR 462, 5452-55.  Furthermore, although OMB has determined that multi-cloud environments "*can be* effective and efficient,"[13] that does not call into question DoD's conclusions that multiple awards for the DoD-wide JEDI Cloud would increase security risks and impose barriers on the efficient implementation and use of this particular cloud contract.

### b.    <u>Operationalizing Data</u>

With regard to operationalizing data, the contracting officer explained that the current lack of standardized and interoperable information technology infrastructure creates barriers to accessing and analyzing data when and where it is needed.  *See id.* at 463.  The contracting officer also explained that multiple awards would frustrate DoD's ability to apply analytics to its data because a multi-cloud environment requires aggregation of data sets and complex ongoing coordination across the data sets, which is "complicated to implement and challenging to troubleshoot."  *Id.*  The increased technical complexity could increase the risk of failure, preventing warfighters from accessing and analyzing critical data when and where it is needed, which could frustrate efforts to use DoD's data in support of the national defense.  *See id.*

---

[13]   https://cloud.cio.gov/strategy/ (emphasis added).

Oracle's response to all this is simply that, after five years, the Central Intelligence

Agency (CIA) was not able to implement a "data lake" of pooled data as part of its Commercial

Cloud Services (C2S) contract. *See* Pl. Memo. 32 (citing AR 22856-57). But this in no way

calls the contracting officer's rationale into question. According to the memorandum Oracle

cites, the reason that the "data lake" was not yet created was that the intelligence community

continued to store data in separate non-C2S clouds and non-cloud environments, and C2S was

slow to construct the data junction necessary to access this data. *See id.* at 22856. Indeed, the

chief information officers and analysts in the intelligence community expressed displeasure that

more datasets had not been incorporated into the C2S Cloud. *See id.* Accordingly, the C2S

lessons learned memorandum supports the contracting officer's view that incorporating data into

a single cloud is beneficial to the national defense and introducing additional technical

complexity with multiple-JEDI clouds is not in the Government's best interest.

### c.      Technical Complexity

With regard to technical complexity, the contracting officer and Mr. Van Name explained

that "multiple awards exponentially increases the technical complexity required to realize the

benefits of cloud technology." *Id.* at 463. Specifically, systems in different clouds, even when

designed to work together, require complex integration and ongoing management. *Id.* They

explained that making applications work across multiple clouds is difficult, making successful

implementation less likely. *Id.* They further explained how this difficulty is exacerbated at the

tactical edge. *See id.*

Oracle does not even attempt challenge these findings. *See* Pl. Memo. 31-33. Indeed, a

Gartner analyst report found that Gartner Peer Connect members recommended against moving

directly from on-premises to multi-vendor cloud deployments, before learning about one cloud

provider well.  *See* AR 23183.[14]  As one member explained, "multiple cloud strategies seem

great on paper.  However, there's about a thousand nuances between [Microsoft] Azure and

AWS, and trying to build services in both simultaneously is challenging, especially if you have

limited resources and talent."  *Id.*; *see also id.* at 5452-55 (Mr. Van Name testimony).

While Oracle emphasizes that DoD has a substantial number of cloud efforts today, *see*

Pl. Memo 32, these systems are disparate and do not adequately support the warfighter's ability

to rapidly access, manipulate, and analyze data.  *See id.* at 328, 607.  Oracle's arguments in no

way call into question DoD's analysis that multiple awards would increase the technical

complexity of implementing the JEDI Cloud and increase the risk of the project failing.

Accordingly, Oracle has failed to demonstrate any irrationality in the contracting officer's

determination that she was prohibited from awarding multiple JEDI contracts.

## B.   The JEDI Contract Will Provide For Only Firm, Fixed Price Task Orders For Services At Prices Established In The Contract For The Specific Tasks

Oracle's argument that the JEDI solicitation violates 10 U.S.C. § 2304a(d)(3) is also

meritless.  Under Secretary Lord correctly determined that the JEDI contract will provide for

only firm, fixed price task orders for services for which prices are established in the contract for

the specific tasks to be performed.

Section 2304a(d)(3) permits a large single-award IDIQ contract if the agency determines

in writing that "the contract provides only for firm, fixed price task orders or delivery orders

for . . . services for which prices are established in the contract for the specific tasks to be

performed[.]"  10 U.S.C. § 2304a(d)(3)(B).  Oracle does not dispute that Under Secretary Lord

---

[14]  This is advice is consistent with the CIA's recent decision to move to a multi-cloud environment with its upcoming C2S follow-on contract *after* using a single-award IDIQ cloud contract for the last six years.  *See* AR 23741, 23808.

made this exact determination on behalf of DoD.  *See* Pl. Memo 11.  Rather, Oracle erroneously

argues that Under Secretary Lord's determination was incorrect.  *See id.* at 22-25.

    First, it is indisputable that the JEDI contract will "provide[] only for firm, fixed price

task orders," as required by the exception at 10 U.S.C. § 2304a(d)(3)(B).  The JEDI solicitation

plainly states that "[a]ll TOs [task orders] will be firm-fixed price."  AR 730.  This should end

the inquiry regarding the first requirement of 10 U.S.C. § 2304(d)(3)(B), and Oracle does not

appear to argue otherwise in its supplemental motion.  *See* Pl. Memo. 24-25.

    Instead, Oracle erroneously alleges the exception at 10 U.S.C. § 2304a(d)(3)(B) does not

apply to the JEDI contract because clause H2 requires the JEDI contractor to update its catalogs

with new cloud services when they are made publicly available to the commercial marketplace.

*See id.*  Whenever a new cloud service is added to the contractor's JEDI catalogs, the service will

have an associated firm, fixed price.  *See* AR 719-29 (every contract line item number in the

IDIQ contract is labeled "FFP"), 740-41 (clause H2 requiring that prices for the new services be

incorporated into the JEDI catalogs).  Accordingly, the JEDI firm, fixed price task orders will

always be for "services with prices are established in the contract for the specific tasks to be

performed," as required by the exception at 10 U.S.C. § 2304(d)(3)(B).[15]

    The primary flaw in Oracle's argument is its erroneous assertion that this exception

"requires fixed prices for established services *at the time of contract award*."  Pl. Memo. 24

(emphasis added).  Oracle improperly seeks to re-write the statute to add a requirement that does

---

[15] Contrary to Oracle's suggestion, Pl. Memo. 24, Under Secretary Lord was aware of and acknowledged clause H2 when she signed her determination and findings invoking 10 U.S.C. § 2304a(d)(3)(B).  *See* AR 319-20.  In her determination and findings, Under Secretary Lord explained that Section H of the solicitation contains a clause that "contemplates adding new or improved cloud services to the contract," and "once the new service is added to the catalog, the unit price is fixed and cannot be changed without contracting officer approval." *Id.*

not exist.  *See Adam Sommerrock Holzbau, GmbH v. United States*, 866 F.2d 427, 429 (Fed. Cir. 1989) ("Courts have no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress.") (citation omitted).  Oracle would prefer that the relevant statutory provision state that the prices upon which the firm, fixed price task orders are based must be "established in the contract *at the time of contract award* for the specific tasks to be performed," but the italicized language is not in the statute.  10 U.S.C. § 2304a(d)(3)(B).

Moreover, under Oracle's re-writing of the statute, DoD would be precluded from modifying the prices or performance work statement in an IDIQ contract worth more than $112 million where DoD invoked the exception at 10 U.S.C. § 2304a(d)(3)(B) to issue a single-award contract.  If the prices for specific tasks must be established "at the time of contract award," as Oracle asserts, Pl. Memo 24, then any modification of these prices or tasks would be impermissible.  The GAO correctly rejected this absurd construction of the statute, *see* AR 5910-11, which is contrary to regulations allowing in-scope contract modifications.  *See, e.g.*, FAR Part 43; FAR §§ 52.212-4(c), 52.243-1.

Accordingly, because the JEDI contract will "provide[] only for firm, fixed price task orders or delivery orders for . . . services for which prices are established in the contract for the specific tasks to be performed," 10 U.S.C. § 2304a(d)(3) does not preclude the award of a single JEDI contract.

## VII.    Oracle Has Not Demonstrated That The Contracting Officer's Conflicts Determinations Were Irrational Or Illegal

As demonstrated below, the contracting officer conducted reasonable investigations, appropriate to the circumstances, regarding the whether the conflicts of Messrs. Ubhi, █████, and DeMartino impact the JEDI procurement, and she rationally determined that they do not.

AR 685, 58696-723, 58744-48.  Likewise, the contracting officer rationally determined that AWS's hiring of former JEDI officials, including Messrs. Ubhi and ███, did not create an OCI and, in any event, AWS reasonably mitigated any such OCI.  *Id.* at 58749-57.  Oracle has not demonstrated that the contracting officer's discretionary conflicts determinations were irrational.

### A.       The Contracting Officer Has Broad Discretion In Making Determinations Regarding Potential Conflicts Of Interest

Statutes and regulations applicable to Federal procurements include several provisions designed to ensure that contractors do not obtain an unfair competitive advantage.  For example, the Procurement Integrity Act (PIA) prohibits unlawfully disclosing or receiving contractor proposal information or source selection information before award and requires certain actions by a procurement official when contacted about employment by an offeror in that procurement. *See* 41 U.S.C. §§ 2102-2103; FAR § 3.104-3.  Also, FAR Subpart 9.5 contains regulations requiring the contracting officer to identify and evaluate potential OCIs and avoid, neutralize, or mitigate significant OCIs before contract award.  FAR § 9.504(a).  OCIs include situations where an offeror has an unfair competitive advantage due to having created the Government specification (biased ground rules) or obtained proprietary information of its competitors or relevant source selection information without proper authorization or through its performance of another contract (unequal access to information).  *See* FAR §§ 9.505(b), 9.505-2, 9.505-4.

Additionally, FAR § 3.101-1 sets forth aspirational goals such as "Government business shall be conducted in a manner above reproach" and the "general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships," but does not describe particular conflicts of interest.  Accordingly, this Court and the GAO have looked to the OCI rules in FAR Subpart 9.5 for guidance when reviewing personal conflict of interest allegations under FAR § 3.101-1.  *See, e.g.*, *JWK Int'l Corp. v.*

*United States*, 52 Fed. Cl. 650, 655 n.10 (2002), *aff'd*, 56 F. App'x 474 (Fed. Cir. 2013); *Battelle Memorial Institute*, 98-1 CPD ¶ 107, 1998 WL 165898, at *4 (Comp. Gen. 1998).

Contracting officers have broad discretion in fulfilling their obligations to protect the integrity of the procurement system and avoid the appearance of impropriety pursuant to FAR § 3.101-1, FAR Subpart 9.5, and the PIA. *Axiom*, 564 F.3d at 1382 ("the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact specific inquiries that require the exercise of considerable discretion."); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 217 (2011) ("A contracting officer has broad discretion to fulfill [her] obligations" under FAR § 3.101-1); FAR § 3.104-7 ("A contracting officer who receives or obtains information of a violation or possible violation of [the PIA] must determine if the reported violation or possible violation has any impact on the pending award or selection of the contractor."). Indeed, the FAR recognizes that the "exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it." FAR § 9.505.

Accordingly, in investigating potential conflicts of interest and PIA violations, contracting officers have wide discretion to determine how much information they need to make their determinations. *Cf. John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("the contracting officer is the arbiter of what, and how much, information he needs [to make a responsibility determination]. . . Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.") (citation omitted). And the FAR provides that, in "fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers should *avoid creating unnecessary delays,*

*burdensome information requirements, and excessive documentation*." FAR § 9.504(d)

(emphasis added).[16]

The above authorities demonstrate the fallacy of Oracle's argument that a procurement is tainted anytime a Government official who participated personally and substantially in the procurement had a prohibited conflict.  Pl. Memo. 47.  The FAR gives the contracting officer discretion to determine whether a conflict or PIA violation impacts the procurement going forward.  FAR §§ 3.104-7(a), 9.504, 9.505.  Moreover, as the Federal Circuit has explained, "[i]llegal acts by a Government contracting agent *do not alone taint a contract* . . .  Rather, the record must show some *causal link* between the illegality and the contract provisions."  *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (emphasis added).

Here, the contracting officer reasonably determined, after investigations appropriate to the circumstances of each individual, that there was no causal link between the JEDI solicitation provisions and Messrs. Ubhi, ██████, and DeMartino's limited work on the procurement, nor did they create an unfair competitive advantage for AWS.  Although Oracle disagrees with the contracting officer's conclusions, it has failed to demonstrate that they were irrational.

**B.    The Contracting Officer Reasonably Determined That Mr. Ubhi's Involvement In The JEDI Procurement Has No Negative Impact On The Procurement And That AWS's Subsequent Employment Of Mr. Ubhi Is Not An Unmitigated OCI**

There is no dispute that Mr. Ubhi violated FAR § 3.101-1, and possibly other laws, when he sought and accepted employment with AWS while participating personally and substantially

---

[16]   Contrary to Oracle's argument, the contracting officer is not required to consider "all information available" in assessing the impact of potential conflicts or PIA violations.  Pl. Memo 55 (quoting FAR § 3.104-7(b)) (emphasis omitted).  The obligation to consider "all available information" applies to the *head of contracting activity only if* the contracting officer or her designated reviewer first determines that the possible PIA violation impacts the procurement. FAR § 3.104-7(a)-(b).

in the JEDI procurement until October 31, 2017.  Accordingly, the issue for the Court is whether

the contracting officer rationally determined that Mr. Ubhi's improper behavior has no impact on

the procurement going forward and that AWS's hiring of Mr. Ubhi did not create an unmitigated

OCI.  The two key questions are: 1) whether the contracting officer rationally determined that

Mr. Ubhi did not impact the solicitation terms to provide AWS with an unfair competitive

advantage; and 2) whether the contracting officer rationally determined that AWS's hiring of Mr.

Ubhi did not provide AWS with an unfair competitive advantage by providing AWS with non-

public competitively useful information.  As demonstrated below, the answer to both questions is

yes.

### 1.    The Contracting Officer Reasonably Determined That Mr. Ubhi's Conflict Does Not Impact The JEDI Solicitation

The contracting officer reasonably determined that, notwithstanding his conflict, Mr.

Ubhi did not attempt to bias the JEDI procurement in favor of AWS and, even if he did, his

actions more than eight months before the solicitation was issued do not impact the procurement

going forward.  AR 58716-23.

The contracting officer determined that Mr. Ubhi did not act to bias the JEDI

procurement in favor of AWS based upon a review of e-mails and Slack messages, as well as

interviews with people Mr. Ubhi worked with on the JEDI procurement.  *See* AR 58716-19.

Oracle asserts that "the record is littered with Ubhi statements to favor AWS or harm a

competitor," Pl. Memo 52, but the contracting officer addressed many of the statements that

Oracle has previously asserted show bias, and determined that, in context, they did not.  *See* AR

58717-19, 58737-42.

The one alleged example of bias in Oracle's supplemental motion is a prime example of

Oracle's overreaching by taking Slack messages out of context.  Oracle claims that Mr. Ubhi

"suggested that DoD consider simply having AWS build the JEDI cloud" with statements such as "know how fast AWS builds regions?" and "I'm dead serious. Why wouldn't they [AWS] just build out an entire region footprint just for us?" Pl. Memo 52-53 (quoting AR 60169-70). But Oracle ignores Mr. Ubhi's earlier message in the same thread, where he stated, "why wouldn't we ask AWS *or Azure [Microsoft] or whoever* to just build an entire global infrastructure footprint, mapped to DoD strategic needs?" AR 60169 (emphasis added). This message demonstrates that Mr. Ubhi was not suggesting that DoD award AWS a sole source contract for the JEDI Cloud. Rather, he was suggesting that "whoever" wins the JEDI contract build a global infrastructure footprint specifically for DoD.[17] This thread is similar to other Slack messages where the contracting officer found that Mr. Ubhi discussed AWS or Microsoft on equal terms. *See id.* at 3174, 3181, 58741-42. Oracle has failed to demonstrate anything irrational in the contracting officer's conclusion that Mr. Ubhi did not act with bias for AWS in the JEDI procurement.

Similarly, although Oracle highlights Mr. Ubhi's compensation from AWS in its motion, Pl. Memo. 1, 6, 45-46, Oracle ignores the contracting officer's reasonable conclusions that AWS's employment offer to Ubhi was relatively standard for the industry and had nothing to do with JEDI. *See* AR 58709-11.

Also, Oracle's argument that Mr. Ubhi and AWS violated 41 U.S.C. § 2103 and FAR § 3.104-3(c) is meritless. *See* Pl. Memo. 48-49. The contracting officer correctly determined that AWS did not violate these laws because it did not submit a JEDI proposal until nearly a year

---

[17] Also, contrary to Oracle's assertion, Pl. Memo. 52-53, the word "they" in the statement "[w]hy wouldn't they just build out an entire region footprint just for us" did not refer to AWS. Rather, it is clear from Mr. Ubhi's next Slack message in the thread that "they" referred to "whatever" company won the JEDI contract. *Id.* at 60170 ("Staffed with Amazon or [Microsoft] or whatever employees").

after it hired Mr. Ubhi.  AR 58716.  This specific section of the PIA applies when an agency official participating personally and substantially in certain procurements "contacts or is contacted by a person that is a *bidder or offeror* in that Federal agency procurement regarding possible non-Federal employment[.]"  41 U.S.C. § 2103(a) (emphasis added); *see also* FAR § 3.104-3(c)(1).  In the procurement context, a "bidder or offeror" is generally understood to be someone who submits a response to a solicitation that, if accepted, would bind that person to perform the resultant contract.  *See* FAR § 2.101 (definitions of "Offer" and "Offeror").  Moreover, another provision of the PIA applies to meetings with "an offeror or potential offeror[.]"  41 U.S.C. § 2107(4).  If Oracle were correct that an entity is an "offeror" before it submits an actual offer, then the words "potential offeror" in 41 U.S.C. § 2107(4) would be superfluous, contravening a canon of statutory construction.  *See Roche v. Merit Sys. Protection Bd.*, 596 F.3d 1375, 1380 (Fed. Cir. 2010).

In any event, the contracting officer rationally determined that, even if Mr. Ubhi had been biased in favor of AWS, there still is no impact on the acquisition.  The contracting officer reached this conclusion for "three independent reasons," the "most important[]" being that "all the key decisions for the JEDI Cloud procurement, such as the actual [solicitation] terms and whether to award one or multiple contracts, were made well after Mr. Ubhi recused himself, after being vetted by numerous DoD personnel to ensure that the JEDI Cloud [solicitation] truly reflects DoD's requirement."  AR 58719.  This conclusion is rational and well-supported by the record.

Mr. Ubhi recused himself from the JEDI procurement on October 31, 2017.  *Id.* at 2777.  At that time, the RFI has just been issued and DoD had not yet received any responses.  *Id.* at 5438, 58721.  Also, DoD had not yet begun drafting the solicitation (including the Gate Criteria),

the Gate Criteria justification, the Market Research Report, or the Acquisition Strategy.  *Id.* at

5405, 5407, 58721-22.[18]  The "problem statement" that Mr. Ubhi worked on was effectively

scrapped after he recused himself.  *Compare id.* at 397-422, *with*, 60089-91; s*ee also id.* at 5442-

43, 5615-16, 58722.  And the "requirements document" (or draft JROC memorandum) to which

he contributed minor edits was substantially revised after he recused himself.  *See id.* at 321-24,

58722, 60346-47.

    While he was working on the JEDI procurement, Mr. Ubhi did advocate for a single-

award strategy, but the final single-award decision was made in July 2018, more than eight

months after he recused himself.  *See id.* at 88, 318-20, 455-67.  And Mr. Ubhi was not the only

advocate for a single-award strategy.  *See id.* at 5742, 5934.  He did not "drive" the single-award

decision, as alleged by Oracle.  Pl. Memo. 15.  Rather, he considered the single versus multiple

award discussion "[l]argely . . . a total red herring[.]"  *Id.* at 3181.

    Oracle erroneously argues that the single-award decision was effectively made in October

2017, based upon a Slack message from Mr. Van Name stating that "[t]he single [vs.] multiple

conversation is done[,] [e]veryone that now matters is convinced," and a document dated

November 6, 2017 suggesting a single-award acquisition strategy.  Pl. Memo. 51 (quoting AR

60239).  Once again, Oracle has failed to provide context for its snippets from the record.  In

February 2018, DoD publicly explained that the November 6, 2017 document was actually a

"draft document[] used to spark discussion and debate" within DoD, and "the [Cloud Executive

Steering Group] is still in the analysis and fact finding phase of this process to determine how

---

    [18]  Contrary to Oracle's argument, Pl. Memo. 51, there was no draft of the Acquisition
Strategy in October 2017.  Although the Deputy Secretary requested "a (rough) copy of the
acquisition strategy" on October 27, 2017, AR 60306, DDS did not provide a draft Acquisition
Strategy, because it did not exist.  *Id.* at 5407, 58722.  Rather, DDS provided the draft RFI and a
two-page high-level summary of DDS's plans for the acquisition.  *Id.* at 4312, 4320-25.

many contracts will best meet DoD's needs." *Id.* at 5986-87.  Accordingly, contrary to what this leaked document may imply, the single-award decision was not made by November 6, 2017.  In fact, there was still robust debate within DoD regarding a single versus multiple award strategy after Mr. Ubhi recused himself, as evidenced by a November 10, 2018 internal DoD e-mail stating that the Deputy Secretary was "[o]pen to the first cloud contract being single source OR multiple source" and tasked the JEDI team to "layout all options and recommendations[.]"  *Id.* at 4352 (emphasis in original).  In light of the *Deputy Secretary's* openness to a multiple-award contract, after Mr. Ubhi left the JEDI team, Mr. Van Name was obviously mistaken in his assessment that "[e]veryone that now matters is convinced[.]"  Indeed, the single versus multiple award debate was still ongoing within DoD in April 2018.  *See id.* at 58721, 58746.

The contracting officer also reasonably determined that any influence Mr. Ubhi may have had on the terms of the solicitation was negated by the substantial review process that the JEDI solicitation underwent well after Mr. Ubhi recused himself, including a peer review by DPAP, a "full top-down, bottom up independent review" by the DoD CIO, review by other DoD components, and review by numerous hard-working members of the JEDI team.  *Id.* at 58699-700, 58722; *see also id.* at 6472-83, 6690-716, 8702-37.

This case is unlike *TRW Environmental Safety Systems, Inc. v. United States*, where the Court determined that the *Chairman of the Source Evaluation Board* in the procurement at issue had a prohibited conflict.  18 Cl. Ct. 33, 44, 64 (1989); *see also id.* at 68 (the conflicted official "held perhaps the most (or certainly one of the most) influential positions" in the procurement) (emphasis omitted).  In this case, Mr. Ubhi recused from the JEDI procurement and left DDS *before process of drafting the solicitation started.*  AR 5405, 58722.  Under these circumstances,

the contracting officer acted well within her discretion in determining that Mr. Ubhi's conflict and improper behavior has no impact on the solicitation.[19]

### 2. The Contracting Officer Reasonably Determined That AWS's Hiring Of Mr. Ubhi Did Not Provide AWS With Competitively Useful, Non-Public Information Relevant To JEDI

The contracting officer also reasonably determined that AWS's hiring of Mr. Ubhi did not provide it with any competitively useful, non-public information, relevant to JEDI, and, thus, AWS did not violate the PIA or have an unmitigated OCI due to its hiring of Mr. Ubhi. *Id.* at 58709-16, 58749-53.

Contracting officers have considerable discretion in determining whether a significant OCI exists and whether it has been reasonably mitigated. FAR § 9.505; *Turner Constr., Co. v. United States*, 645 F.3d 1377, 1384 (Fed. Cir. 2010); *Axiom*, 564 F.3d at 1382. In determining whether an offeror's hiring of a former Government employee creates a conflict of interest, it is appropriate to consider "whether the former government employee had access to competitively useful inside information, as well as whether the former government employee's activities with the firm were likely to have resulted in a disclosure of such information." *Interactive Info. Sols., Inc.*, 2018 CPD ¶ 115, 2018 WL 1536746, at *5 (Comp. Gen. 2018); *accord, e.g.*, *Liquidity Servs., Inc.*, 2014 CPD ¶ 221, 2014 WL 3748241, at *9 (Comp. Gen. 2014). Here, the contracting officer reasonably determined that Mr. Ubhi was effectively firewalled from the

---

[19] The other two reasons the contracting officer found that Mr. Ubhi did not impact the procurement were that he "did not have the technical [*i.e.*, engineering] expertise to substantially influence JEDI Cloud requirement," and his "actual attempts to influence the JEDI Cloud requirement were limited." *Id.* The contracting officer reached these reasonable conclusions through a detailed review of Slack messages and Google Drive documents Mr. Ubhi worked on (*i.e.*, the RFI, vendor meeting notes, requirement document, and problem statement), as well as interviews with individuals he worked with on the JEDI procurement. *See id.* at 58719-21. Nevertheless, the Court need not address these bases, in light of the independent rational basis for her no impact determination discussed at length above.

JEDI proposal team and, in any event, he was not provided access to competitively useful information while working on JEDI for DDS.  AR 58709-16, 58749-53.

Mr. Ubhi works for AWS's Commercial Sales Group, while AWS's separate World Wide Public Sector (AWS Public Sector) is preparing AWS's JEDI proposal.  *See id.* at 24537, 58751-52, 60783.  Mr. Ubhi has been organizationally, functionally, and geographically separated from the JEDI proposal team since he was re-hired by AWS.  AWS explained that its Commercial Sales Group is a separate organization from AWS Public Sector, with a separate chain of command.  *Id.* at 60783, 60798.  AWS also explained that Mr. Ubhi is located in San Francisco, whereas the JEDI proposal team is primarily based in Northern Virginia.  *Id.* at 60784, 60798.  And Mr. Ubhi's job duties do not require him to work with anyone from AWS Public Sector, let alone the JEDI proposal team.  *Id.* at 60783, 60798-99.  Mr. Ubhi's supervisor at AWS, ███████████, stated that, when Mr. Ubhi re-joined AWS in late November 2017, he informed ███████████ that he could not work with AWS Public Sector due to a potential conflict of interest.  *Id.* at 60797.  Because Mr. Ubhi's job duties do not require him to work with anyone from AWS Public Sector, this caused ███████████ no concern, and he did not inquire further at the time.  *See id.*

Mr. Ubhi was *formally* firewalled from the JEDI proposal team starting in May 2018 after AWS Public Sector's attorneys learned that AWS's commercial start-up team had hired Mr. Ubhi.  *Id.* at 24538-43, 60785.  Two AWS employees primarily responsible for AWS's JEDI proposal, ███████████ and ███████████, both declared that everyone on the JEDI proposal team: 1) acknowledged their receipt of the May 2018 e-mail formally implementing the firewall; and 2) confirmed that they had not received any information from Mr. Ubhi and would not request or accept any information from him in the future.  *Id.* at 60807-13.  ███████████ and

██████ also explained that all AWS documents relating to the JEDI proposal were stored in an access controlled location to which Mr. Ubhi had no access.  *Id.* at 60808, 60812.

Based upon the information provided by AWS, the contracting officer reasonably determined that AWS received no non-public JEDI information from Mr Ubhi, nor did Mr. Ubhi's employment with AWS create an OCI.  *Id.* at 58711-12, 58749-53.  While AWS did not have a *formal* firewall in place from the beginning of Mr. Ubhi's tenure, that was not necessary in light of his functional, organizational, and geographical separation from AWS Public Sector.  *See id.* at 58752.

Oracle's second guessing of the contracting officer's determinations must fail.  As an initial matter, Oracle erroneously suggests that the Court should ignore Mr. Ubhi's organizational, functional, and geographical separation from AWS Public Sector, and focus solely on whether Mr. Ubhi possessed competitively useful information.  Pl. Memo 62.  As demonstrated above, the contracting officer has broad discretion in evaluating potential OCIs, and may consider "whether the former government employee's activities with the firm were likely to have resulted in a disclosure of such information."  *E.g.*, *Interactive*, 2018 WL 1536746, at *5; *see also Liquidity*, 2014 WL 3748241, at *8 ("[the protestor] has not identified any aspect of [the awardee's] proposal that reflects the use or reliance on proprietary [protestor] information or agency source selection sensitive information.").

Also, Oracle's suggestion that AWS has not "implemented the physical and document control protocols necessary to prevent information and communication between" Mr. Ubhi and the JEDI proposal team, Pl. Memo. 64, is contradicted by the record.  *See* AR 60808, 60812 (██ ██████ and ████████ each declaring that "[a]ll documents relating to the JEDI proposal were stored in an access controlled location to which Mr. Ubhi was never granted access.").

Additionally, although Mr. Ubhi's false statement on his application to AWS that he had no restrictions based on his Government employment (among other false statements) calls into question Mr. Ubhi's credibility, see id. at 58750, it does not call into question the credibility of the other AWS employees whose declarations the contracting officer relied upon to ensure that any statements by Mr. Ubhi were corroborated.  Overall, the contracting officer had ample basis for determining that AWS did not receive any JEDI-related non-public information from Mr. Ubhi.

In any event, the contracting officer reasonably determined that Mr. Ubhi did not have access to any competitively useful information as a result of his early involvement in the JEDI procurement.  *Id.* at 58713-16.  DoD conducted a detailed investigation to determine whether Mr. Ubhi obtained any non-public competitively useful information from AWS's competitors while conducting market research.  *See id.* at 58713-16, 58725-35, 60369-647, 61151-2091.  DoD reasonably concluded that the information to which Mr. Ubhi had access was either publicly available or not competitively useful.  *See id.* at 58713-16, 58725-35.

In questioning DoD's conclusions, Oracle alleges that Microsoft provided documents that discuss the limitations of Azure ExpressRoute, including its peering limitations.  Pl. Memo 55 (citing AR 60437).  But the focus of this section of Microsoft's submission was the limitations of the *Defense Information Systems Agency's cloud access point*, not technical limitations of Microsoft's products and services.  AR 60436-37.  In any event, Azure ExpressRoute peering limitations are available on the Internet.[20]  Oracle also notes that Google provided DoD a slide with Google's "edge points of presence" and "global cache edge nodes."  Pl. Memo. 55 (quoting

---

[20]   https://docs.microsoft.com/en-us/azure/expressroute/expressroute-faqs

AR 60626).  But this information is also available on the Internet.[21]  Oracle has not demonstrated

any irrationality in the contracting officer's conclusion that Mr. Ubhi did not have access to

competitively useful information of AWS's competitors.

Likewise, the contracting officer reasonably concluded that information learned in

internal Government meetings related to JEDI did not provide Mr. Ubhi with competitively

useful information.  AR 58715-16.  The contracting officer recognized that this information

might provide "insight into the DoD users' individual needs, problems, and lessons learned from

working on the cloud prior to the JEDI Cloud requirements development," but reasonably found

that this information does not represent DoD's enterprise-wide needs, which are reflected in the

public JROC memorandum and solicitation.  *See id.*  Accordingly, while Oracle correctly notes

that a SPAWAR representative "school[ed] [Mr. Ubhi] on the tactical edge," Pl. Memo. 53

(quoting AR 3172), this was for the purpose of developing DoD's specific tactical edge

requirements, which are publicly available in the solicitation.  *E.g.*, AR 616-17, 796-97.

Oracle also erroneously argues that the contracting officer's investigation was inadequate

because she "only considered a handful of documents on the Google drive[.]"  Pl. Memo. 54.  In

fact, the contracting officer considered the documents she determined to be most relevant,

including vendor meeting notes, vendor presentations, Slack messages, and other documents that

might have contained competitively useful information.  *See* AR 58707, 58713-16, 58724-43.

The FAR affords the contracting officer wide discretion in determining what information to

---

[21]  https://peering.google.com/#/infrastructure;
https://cloud.google.com/about/locations/?hl=ru#network-tab.  Unlike Oracle, which cites extra-record material for the purported truth of the matter contained within it, we cite this website and the website in footnote 20 merely to establish that the information in them is publicly available.  Although the contracting officer did not cite these particular websites in her no impact determination, the Court should supplement the administrative record with them to the extent that it deems them necessary for effective judicial review.  *See Axiom*, 564 F.3d at 1381.

review, while cautioning against "creating unnecessary delays, burdensome information requirements, and excessive documentation." FAR § 9.504(d). A review of every document on the JEDI Google Drives as of October 31, 2017 would have been contrary to FAR § 9.504(d).

Accordingly, the contracting officer reasonably determined that AWS did not have an unmitigated OCI with regard to Mr. Ubhi and did not violate the PIA by obtaining non-public JEDI procurement information.

    **C.**    **The Contracting Officer Reasonably Determined That ███████ Involvement In The JEDI Procurement Has No Negative Impact On The Procurement And That AWS's Subsequent Employment Of ███████ Is Not An Unmitigated OCI**

As with Mr. Ubhi, the two key questions with regard to ███████ are: 1) whether the contracting officer rationally determined that ███████ did not impact the solicitation terms to provide AWS with an unfair competitive advantage; and 2) whether the contracting officer rationally determined that AWS's hiring of ███████ did not provide AWS with an unfair competitive advantage by providing AWS with non-public competitively useful information. As demonstrated below, the answer to both of these questions is yes.

    **1.**    **The Contracting Officer Reasonably Determined That ███████ Conflicts Do Not Impact The JEDI Solicitation**

Based upon information provided by ███████ her personal knowledge, and interviews with others, the contracting officer reasonably determined that ███████ did not provide any input impacting the JEDI acquisition decisions or documents. *See* AR 58744-48.

███████ attended two meetings related to JEDI. *See id.* at 58746. The first meeting occurred on October 5, 2017, when he provided information on the Navy's experience with cloud services, including providing input into a "high-level cloud strategy document for JEDI," *i.e.*, a brief slideshow describing the Navy's cloud strategy. *See id.* at 22916-24, 24549, 58746.

66

At that time, ███████ had not yet interviewed for a position with AWS, but, rather, was communicating with various contractors, including AWS, about post-retirement opportunities, as he had been cleared by Navy ethics counsel to do. *Id.* at 60801-02. This October 2017 meeting occurred well before any of the foundational JEDI acquisition documents had been started. *See* Section VII.B.1, above; AR 58721-22. The contracting officer reasonably determined that ███████ participation in this meeting did not constitute personal and substantial participation in the JEDI procurement, as he was merely participating in "a broad discussion of existing technologies and approaches toward satisfying the broad DoD need for cloud computing solutions." AR 58746; *see also* FAR § 3.104-1 (participating in "[a]gency-level boards, panels, or other advisory committees that . . . evaluate and make recommendations regarding alternative technologies or approaches for satisfying broad agency-level missions or objectives" is not generally considered personal and substantial participation).

The second meeting occurred on April 5, 2018, the purpose of which was to discuss a draft JEDI Acquisition Strategy document with individuals invited by Under Secretary Lord. AR 58746; *see also id.* at 60648-86. The contracting officer, who was present at the meeting, concluded that ███████ did not show any bias toward any particular vendor. *Id.* at 58746. ███████ argued unsuccessfully for a multiple-award approach, but did not provide any suggested edits to the draft Acquisition Strategy. *Id.* The contracting officer concluded that ███████ should not have participated in this meeting, as he had just accepted a job offer from AWS. *Id.* at 58747. Nevertheless, in light of her personal knowledge of the meeting, she reasonably determined that ███████ conflict has no impact on the JEDI acquisition decisions and documents. *See id.*

Oracle's assertions to the contrary are meritless.  First, Oracle argues that the investigation regarding ███████ was inadequate, but the information Oracle seeks was unnecessary.  Pl. Memo. 55.  For example, in light of ███████ limited participation in the JEDI procurement, reviewing all of ███████ Navy e-mails from the time the JEDI procurement commenced to his departure would have contravened the FAR's caution against creating "unnecessary delays, burdensome information requirements, and excessive documentation."  FAR § 9.504(d).  Moreover, in light of the fact that ██████ was not personally and substantially involved in the JEDI procurement until after he was offered a position by AWS, an inquiry into his AWS compensation was unnecessary.  Also, because the contracting officer was aware of ██████ participation in the April 2018 meeting and determined that it does not impact the procurement, the reasons for the omission of the April 2018 meeting from his declaration in AWS's proposal are also irrelevant.  Additionally, as demonstrated in Section VII.C.2., below, the contracting officer was satisfied that ██████ did not provide any non-public JEDI information to ██████ or anyone else at AWS, so she did not need to inquire further into the specifics of ██████ conversations with ██████ regarding JEDI.

Second, the contracting officer was not required to investigate whether AWS's hiring of ██████ violated the 48 C.F.R. § 252.203-171 requirements for ██████ to seek an ethics opinion and AWS not to knowingly compensate him before he seeks this opinion, because it is irrelevant to the questions of the impact of ██████ conflict on the JEDI procurement and whether AWS obtained an unfair competitive advantage by hiring ██████  Whether AWS or ██████ violated this requirement has no bearing on the extent of ██████ participation in

the JEDI procurement, the information he obtained a result of that participation, or whether he shared that information with AWS.  Oracle's argument is a red herring.

Third, Oracle erroneously asserts that the contracting officer improperly failed to consider whether ███████ violated the PIA's proscription against knowingly obtaining source selection information before award, other than as provided by law.  Pl. Memo. 57.  The contracting officer acknowledged that ███████ received source selection information when he attended the April 2018 meeting and reasonably determined that this possible PIA violation does not impact the procurement going forward.  AR 58746-48.  FAR § 3.104-7(a) requires the contracting officer to analyze the *impact* of a possible PIA violation, not make a determination of whether a violation actually occurred.

Accordingly, the contracting officer reasonably determined that ███████ limited involvement in the JEDI procurement did not impact the JEDI solicitation.



**2.      The Contracting Officer Reasonably Determined That AWS's Hiring Of ███████ Did Not Provide AWS With Competitively Useful, Non-Public Information Relevant To JEDI**

The contracting officer also reasonably determined that AWS's employment of ███████ ███████ did not provide AWS with any non-public competitively useful information and, thus, AWS did not have an unmitigated OCI.  The contracting officer reasonably determined that, given ███████ limited involvement in the JEDI procurement, the universe of competitively useful information he had was limited to a draft Acquisition Strategy that has since been revised. *See* AR 58747, 58754.  The contracting officer also reasonably determined that ███████ did not provide this information to anyone at AWS.  *See id.*

███████ ███████, and ███████ have all declared that ███████ did not have any input into AWS's proposal.  *Id.* at 60803, 60809-10, 60813-14.  And ███████ declared that

he has never accessed or attempted to access any files related to AWS's proposal, *id.* at 60803, which are stored in an access controlled location. *Id.* at 60808. Additionally, on July 31, 2018, shortly after the solicitation was issued, AWS implemented a firewall formally directing █████ ███ and the JEDI proposal team not to interact regarding AWS's JEDI proposal. *Id.* at 24544-45. ████████ and ████████ declared that every member of the JEDI proposal team confirmed receipt of the e-mail implementing the firewall and confirmed that they had not received any information from ████████ and would not request or accept any in the future. *Id.* at 60809, 60813. ████████ and ████████ both acknowledged that, after ████████ joined AWS, but before the firewall was implemented, they had a few informal conversations in which JEDI came up, and ████████ provided general input on DoD acquisition practices and Navy clouds usage, but averred that ████████ did not provide any non-public information regarding JEDI. *Id.* at 24551, 24553-54.

The contracting officer reasonably accepted these representations from multiple sources. *Id.* at 58747, 58754. She had no reason to believe that ████████ had provided competitively useful non-public information related to JEDI to ████████ or any other AWS employee. *Id.* at 24551, 60803. The contracting officer reasonably determined that AWS's hiring of ████████ did not provide AWS with an unfair competitive advantage, based upon a reasonable investigation under the circumstances.[22]

---

[22] Also, contrary to Oracle's allegations, AWS's mitigation plan with regard to Mr. Ubhi and ████████ is not "self-implementing," and AWS has not been tasked with complete responsibility for "policing and mitigating its own potential conflicts of interest." Pl. Memo 64 (citations omitted). AWS reported the potential OCIs and its mitigation measures in its proposal, as required by the solicitation. *Id.* at 789, 24536-54. The contracting officer performed a review of AWS's potential OCIs, and has recognized her duty to "conduct further reviews [of potential conflicts] in order to maintain the integrity of the acquisition." *Id.* at 58757. Accordingly, if evidence arises indicating that AWS personnel are not complying with the firewalls that have been implemented or AWS has improperly received non-public competitively useful information regarding JEDI, then the contracting officer has indicated that she will further assess AWS's

**D.    The Contracting Officer Reasonably Determined That Mr. DeMartino's Involvement In The JEDI Procurement Has No Negative Impact On The Procurement**

Contrary to Oracle's arguments, the contracting officer reasonably determined that Mr. DeMartino's role in the JEDI procurement was "ministerial and perfunctory in nature and he provided no input into the JEDI Cloud acquisition documents[.]" *Id.* at 685.  The administrative record supports this assessment.

Mr. DeMartino did not participate in drafting the solicitation or the various acquisition strategy documents. *Id.* Rather, consistent with his roles in the Office of the Secretary of Defense, Mr. DeMartino essentially acted as a liaison between the Secretary/Deputy Secretary and the JEDI team, scheduling meetings and routing documents through the Secretary and Deputy Secretary.

For example, Mr. DeMartino prepared notes from a November 2018 meeting between DoD personnel involved in the procurement and the Deputy Secretary to keep everyone aware of the Deputy Secretary's taskers from the meeting. *Id.* at 4390-91.  Likewise, Mr. DeMartino met with DDS personnel to receive or provide information to or from the Deputy Secretary. *See, e.g.*, *id.* at 2926.  Similarly, in April 2018, Mr. DeMartino provided edits to a two-page briefing for the Secretary of Defense that was prepared by the DDS Director. *Id.* at 4366-68. Contrary to Oracle's allegations, Mr. DeMartino did not "direct efforts and strategy about the best way to garner external approval for the single source approach" in this document. Pl. Memo. 60.  Rather, he asked the DDS Director to include "some specifics the [Secretary of

---

compliance with its mitigation plan and whether AWS should be permitted to continue in the competition. *See id.*

Defense] is going to need" regarding the single-award approach (for which DDS was advocating in the briefing).  AR 4366, 4368.

The contracting officer was personally aware of Mr. DeMartino's involvement with the procurement and to what degree, and she discussed the matter with others on the JEDI team.  *See id.* at 5239, 5663-64.  She reasonably characterized Mr. DeMartino's involvement in the JEDI procurement as "ministerial and perfunctory[.]"  *Id.* at 685.  There is no reason to believe that Mr. DeMartino was acting in bad faith to steer the JEDI contract to AWS or that he had the ability to do so with his limited involvement in the procurement.  Conducting a detailed review of all Mr. DeMartino's e-mails and documents related to the JEDI procurement under these circumstances would have created "unnecessary delays, burdensome information requirements, and excessive documentation."  FAR § 9.504(d).

The contracting officer rationally determined, based upon a reasonable investigation, that Mr. DeMartino's limited role in the procurement as a liaison between the JEDI team and the Secretary/Deputy Secretary did not negatively impact the integrity of the procurement.

## VIII.   Oracle Has Not Demonstrated An Entitlement To A Permanent Injunction

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Even if Oracle were to succeed on the merits in this case, as it must to obtain permanent injunctive relief, the Court must also consider three additional criteria before ordering a permanent injunction: 1) irreparable harm; 2) balance of hardships; and 3) public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

In determining whether to issue an injunction, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted).  The Court should

defer to agency officials' "predictive judgments" regarding the potential harm of an injunction.

*See id.* at 27.  Indeed, this Court's jurisdictional statute requires it to "give due regard to the

interests of national defense and national security[.]"  28 U.S.C. § 1491(b)(3).

     Here, the potential harm to our national defense is substantial and outweighs any

potential harm to Oracle.  As explained in the solicitation, DoD currently lacks a "coordinated

enterprise-level approach to cloud infrastructure and platforms," which "prevents warfighters

and leaders from making critical data-driven decisions at 'mission speed', negatively affecting

outcomes."  *Id.* at 607.  The JEDI Cloud contract will move DoD toward "an extensible and

secure cloud environment that spans the homeland to the global tactical edge, as well as the

ability to rapidly access computing and storage capacity to address warfighting challenges at the

speed of relevance."  *Id.*

     In a declaration, Lieutenant General Bradford J. Shwedo provides some specific

examples of how implementation of the JEDI Cloud is critical to our national defense.  *See* App.

3-7.  For example, due to the lack of a globally available general purpose cloud today, a

significant amount of information that is collected from surveillance equipment, such as

surveillance aircraft, is never analyzed.  *Id.* at 4.  The JEDI Cloud will facilitate DoD's ability to

store and analyze information that may be the difference between success and failure in a

mission.  *See id.* at 4-5.  General Shwedo also explained that the JEDI Cloud should improve

force readiness with regard to both training and equipment maintenance.  *Id.* at 6-7.

Accordingly, delaying implementation of the JEDI Cloud will negatively impact our military's

lethality and strategic readiness.

Oracle asserts that it will be irreparably harmed in the absence of an injunction because it will be deprived of the opportunity to compete for the JEDI contract.  Pl. Memo. 65.  But Oracle's odds of being awarded the JEDI contract are slim, even if the Gate Criteria it challenges were removed.  Contrary to the suggestion in its supplemental brief, Oracle is not in the same class as Microsoft and AWS when it comes to providing commercial IaaS and PaaS cloud services on a broad scale.  Oracle misleadingly asserts that a recent Gartner report has identified Oracle as one of "six leading IaaS providers," Pl. Memo. 5 n.8, when, in fact, this extra-record report (improperly cited by Oracle in support of its merits arguments, *see Axiom*, 564 F.3d at 1381) identified only AWS, Microsoft, and Google as "Leaders," while identifying Oracle as a "Niche Player."[23]  Indeed, ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████  Even if Oracle were reinstated into the competition, its chances of being awarded the JEDI contract would be slim, minimizing the harm of its exclusion.  Accordingly, Oracle would probably be better off with an award of bid preparation costs instead of an injunction.

In any event, even if an injunction were appropriate, Oracle's request in its proposed order (p. 3) that DoD be "permanently enjoined from permitting [AWS's] further participation

---

[23] https://www.gartner.com/doc/reprints?id=1-50WJ5CK&ct=180525&st=sb; *see also* https://wikibon.com/oracle-confronts-growing-challenge-aws-cloud/ (analyst explaining reasons why "fundamentally Oracle's back is against the wall in the IaaS and PaaS segments of the public cloud," including "Oracle is not even within shouting distance of the top three IaaS and PaaS public cloud providers by market share.").

under the Solicitation" is overbroad.  Even if the Court were to determine that the contracting

officer committed a prejudicial error in her OCI analysis with regard to AWS, any injunctive

relief should be limited to enjoining DoD from awarding the JEDI contract to AWS unless and

until the contracting officer issues a new determination that AWS has no unmitigated OCIs or

DoD waives all OCIs pursuant to FAR § 9.503.  The contracting officer has significant discretion

in determining whether an OCI exists and how to mitigate it, and this Court should not interfere

with DoD's lawful discretion.  *See Axiom*, 564 F.3d at 1382, 1384.

## CONCLUSION

For these reasons, the Court should grant the Government judgment on the administrative

record and deny Oracle's supplemental motion for judgment on the administrative record.

<div style="margin-left: 40%;">

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

</div>

Of Counsel:

CHRISTINA M. AUSTIN
ANDREW BRAMNICK
Office of General Counsel
Washington Headquarters Service &
      Pentagon Force Protection Agency
Department of Defense

<div style="margin-left: 40%;">

s/ William P. Rayel
WILLIAM P. RAYEL
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0302
Facsimile: (202) 307-0972
E-mail: William.Rayel@usdoj.gov

</div>

June 11, 2019                        Attorneys for Defendant