> **REDACTED VERSION**
> **6/28/2019**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| ORACLE AMERICA, INC.,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | |
| ) | |
| THE UNITED STATES,  ) | Case No. 18-1880C |
| ) | Senior Judge Eric G. Bruggink |
| Defendant,  ) | |
| ) | ███████████████ |
| and  ) | |
| ) | |
| AMAZON WEB SERVICES, INC.,  ) | |
| ) | |
| Defendant-Intervenor.  ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF SUPPLEMENTAL MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO
DEFENDANT'S AND DEFENDANT-INTERVENOR'S CROSS-MOTIONS FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

*Of Counsel:*

Kara L. Daniels
Dana E. Koffman
Amanda J. Sherwood
Nathaniel E. Castellano
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Craig A. Holman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5722
Fax: (202) 942-5999
Email: craig.holman@arnoldporter.com

*Attorney of Record for Oracle America, Inc.*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................ 5

III. THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF ORACLE ..................... 5

    A.   Oracle Has Standing To Challenge The RFP's Single Award Approach, The Three Gates, And The Conflicts Of Interest Tainting This Procurement. .............. 5

    B.   The RFP Violates 10 U.S.C. § 2304a(d)(3) As The D&F Invokes An Inapplicable Exception To The Prohibition Against Single Awards (Count I). ..... 10

    C.   The CO's Single Award Approach Also Violates The Separate Multiple Award To The Maximum Extent Practicable Requirements (Count II) ........................... 14

    D.   DoD's Restrictive Subfactor 1.1 Violates CICA (Count III). ............................... 17

    E.   DoD's Competitive Range Determination Lacks A Rational Basis (Count IV). ... 22

    F.   Subfactors 1.2 And 1.6 Also Exceed DoD's Authority Or Legitimate Needs And Unduly Restrict Competition (Counts V-VI) ........................................................ 22

        1.   Subfactor 1.2 Also Violates Title 10 and Exceeds DoD's Needs. ............. 23

        2.   DoD Lacks Authority to Solicit an Online Marketplace (Subfactor 1.6). ................................................................................................................ 25

    G.   The Ubhi, ███ and DeMartino Conflicts Violated The Law And Tainted JEDI (Counts VII-IX). ........................................................................................ 26

        1.   The CO Made No Findings And Has No Discretion With Respect To Violations Of 18 U.S.C. § 208 Or 5 C.F.R. § 2635.604. ........................... 27

        2.   The CO's Determinations Were Irrational In Any Event. ........................... 29

            a.   The CO Irrationally Found That Ubhi Did Not Impact JEDI. ........ 30

            b.   The CO's ███ Determination Was Irrational ............................. 33

            c.   The CO's DeMartino Determination Was Irrational .................... 34

    H.   Neither Defendant Has Credibly Refuted AWS' Unmitigated, Exclusionary OCIs Arising From The Hiring Of JEDI Officials (Count X). .............................. 36

IV.  ORACLE MEETS THE PERMANENT INJUNCTIVE RELIEF REQUIREMENTS ... 39

V.   CONCLUSION ................................................................................................. 40

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Alfa Laval Separation, Inc. v. United States,*
   175 F.3d 1365 (Fed. Cir. 1999).................................................................8

*Am. Safety Council Inc. v. United States,*
   122 Fed. Cl. 426 (2015) .......................................................................20

*Apogee Engineering, LLC,*
   B-415976, May 1, 2018, 2018 CPD ¶ 150.............................................24

*Applied Bus. Mgmt. Solutions, Inc. v. United States,*
   117 Fed. Cl. 589 (2014) .......................................................................15

*Armstrong Elevator Co.,*
   B-415809, Mar. 28, 2018, 2018 CPD ¶ 120 ....................................18, 19

*Arxium, Inc. v. United States,*
   136 Fed. Cl. 188 (2018) .......................................................................22

*CACI, Inc.-Federal v. United States,*
   719 F.2d 1567 (Fed. Cir. 1983)............................................................28

*California Industrial Facilities Resources, Inc. v. United States,*
   80 Fed. Cl. 633 (2008) .........................................................................21

*CGI Fed., Inc. v. U.S.,*
   779 F.3d 1346 (Fed. Cir. 2015)..............................................................6

*Chenega Mgmt., LLC v. United States,*
   96 Fed. Cl. 556 (2010) ......................................................................9, 29

*Cleveland Telecom. Corp.,*
   B-257249, Sept. 19, 1994, 94-2 CPD ¶ 105 .........................................37

*Clinicorp Int'l, Inc. v. United States,*
   904 F.3d 1353 (2018)..............................................................................7

*Container Products Corp.,*
   B-280603.2, Nov. 4, 1998, 98-2 CPD ¶ 106.........................................19

*Creative Mgmt. Tech., Inc.,*
   B-266299, Feb. 9, 1996, 96-1 CPD ¶ 61...............................................37

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008)................................................................................5

*Electra-Med Corp. v. United States,*
    140 Fed. Cl. 94 (2018) ...............................................................................10, 26

*Eng'g Support Personnel, Inc.,*
    B-410448, Dec. 24, 2014, 2015 CPD ¶ 89 .....................................................29

*Express One Int'l, Inc. v. U.S. Postal Service,*
    814 F. Supp. 93 (D.D.C. 1992) .............................................................3, 27, 29

*Galen Med. Assocs., Inc. v. United States,*
    369 F.3d 1324 (Fed. Cir. 2004) ....................................................................29

*Godley v. United States,*
    5 F.3d 1473 (Fed. Cir. 1993) ....................................................................28, 29

*Harris IT Services Corp.,*
    B-411699, B-411796, Oct. 2, 2015, 2015 CPD ¶ 293 .....................................9

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
    238 F.3d 1324 (Fed. Cir. 2001) ......................................................................6

*Info. Tech. & Applications Corp. v. United States,*
    316 F.3d 1312 (Fed. Cir. 2003) ......................................................................5

*Int'l Resources Group,*
    B-404346.2 et al., Dec. 11, 2014, 2014 CPD ¶ 369 ......................................37

*Interactive Info. Sols., Inc.,*
    B-415126.2 et al., Mar. 22, 2018, 2018 CPD ¶ 115 ......................................38

*Jacobs Tech. Inc. v. United States,*
    100 Fed. Cl. 198 (2011) ................................................................................36

*JWK Intern. Corp. v. United States,*
    52 Fed. Cl. 650 (2002) ..................................................................................29

*K&R Eng'g Co., Inc. v. United States,*
    616 F.2d 469 (1980) ......................................................................................28

*LBM, Inc.,*
    B-286271, Dec. 1, 2000, 2000 CPD ¶ 194 .....................................................19

*Lockheed Martin,*
    B-295402, Feb. 8, 2005, 2005 CPD ¶ 24 .......................................................29

*Maersk Line, Ltd.,*
    B-406586, June 29, 2012, 2012 CPD ¶ 200 ..............................................18, 19

*Med. Dev. Int'l, Inc. v. United States,*
  89 Fed. Cl. 691 (2009) ..................................................................................................10

*MTB Group, Inc. v. United States,*
  65 Fed. Cl. 516 (2005) ..................................................................................................29

*NetStar-1 Gov't Consulting, Inc. v. United States,*
  101 Fed. Cl. 511 (2011) ...........................................................................................37, 38

*Newell Cos. v. Kenney Mfg. Co.,*
  864 F.2d 757 (Fed. Cir. 1988)......................................................................................28

*Northrop Grumman Sys. Corp.,*
  B-412278.7 *et al.,* Oct. 4, 2017, 2017 CPD ¶ 312 ......................................................27

*OMV Med. Inc. v. United States,*
  219 F.3d 1337 (Fed. Cir. 2000)....................................................................................17

*Oracle Am. Inc.,*
  B-416657 *et al.,* Nov. 14, 2018, 2018 CPD ¶ 391 ..................................................19, 20

*Orion Technology, Inc. v. United States,*
  704 F.3d 1344 (Fed. Cir. 2013)......................................................................................7

*Palantir Techns. Inc. v. United States,*
  128 Fed. Cl. 21 (2016) .............................................................................................22, 24

*Palantir U.S.G., Inc. v. United States,*
  129 Fed. Cl. 218 (2016), *aff'd,* 904 F.3d 980 (Fed. Cir. 2018) ...............................6, 22

*QinetiQ N. Am.,*
  B-405163 *et al.,* Jan. 25, 2012, 2012 CPD ¶ 53...........................................................29

*RAMCOR Servs. Grp., Inc. v. United States,*
  185 F.3d 1286 (Fed. Cir. 1999).....................................................................................12

*Reeves v. Shineski,*
  682 F.3d 988 (Fed. Cir. 2012).........................................................................................6

*Rothe Dev. Corp. v. Dep't of Defense,*
  413 F.3d 1327 (Fed. Cir. 2005).......................................................................................6

*SMS Data Products Grp. v. United States.,*
  853 F.2d 1547, 1554 (Fed. Cir. 1988)..........................................................................17

*Sys. Application & Techs., Inc., v. United States,*
  100 Fed. Cl. 687 (2011), *aff'd,* 691 F.3d 1374 (Fed. Cir. 2012) ................................40

*Threat Mgmt. Grp.,*
  B-407766.5, Mar. 28, 2013, 2013 CPD ¶ 84 ........................................................................38

*Transfair Intern., Inc. v. United States,*
  54 Fed. Cl. 78 (2002) .......................................................................................................28

*TRW Envtl. Safety Sys., Inc. v. United States,*
  18 Cl. Ct. 33 (1989) .........................................................................................................27

*Tyler Construction Group v. United States,*
  570 F.3d 1329 (Fed. Cir. 2009)........................................................................................25

*Ultra Electronics Oceans Sys. Inc. v. United States,*
  139 Fed. Cl. 517 (2018) .................................................................................................6, 7

*United States v. Mississippi Valley Generating Co.,*
  364 U.S. 520 (1960) .........................................................................................................28

*USA Jet Airlines,*
  B-404666, Apr. 1, 2011, 2011 CPD ¶ 91 .........................................................................19

*W.G. Yates & Sons Constr., Inc. v. Caldera,*
  192 F.3d (Fed. Cir. 1999)............................................................................................20, 21

*Weeks Marine, Inc. v. United States,*
  575 F.3d 1352 (Fed. Cir. 2009).................................................................................5, 6, 7

*WinStar Comm'ncs, Inc. v. United States,*
  41 Fed. Cl. 748 (1998) ............................................................................................. *passim*

**STATUTES**

5 U.S.C. § 706(2)(A).................................................................................................................39

10 U.S.C. § 2304 .............................................................................................................. *passim*

10 U.S.C. § 2305(a) ..........................................................................................................17, 19

10 U.S.C. § 2319...............................................................................................................23, 24

41 U.S.C. § 2101(5) ..................................................................................................................27

Pub. L. No. 115-245, 2017 Cong. HR 6157, § 8137 (Sept. 27, 2018)......................................40

**OTHER AUTHORITIES**

5 C.F.R. § 2635.502 ...................................................................................................................35

5 C.F.R. § 2635.604 ...................................................................................................................34

iv

48 C.F.R. § 3.101-1 ............................................................................................27

 48 C.F.R. § 3.104-2 ...........................................................................................35

48 C.F.R. § 6.301-1 ............................................................................................23

48 C.F.R. § 6.302-1 ............................................................................................18

48 C.F.R. § 6.302-2 ........................................................................................18, 23

48 C.F.R. § 6.303-1(a)(3) ...................................................................................18

48 C.F.R. § 15.403-3(c) ................................................................................11, 17

48 C.F.R. § 16.504 ..........................................................................................2, 10

48 C.F.R. § 206.304 ............................................................................................18

48 C.F.R. § 252.203-171 .....................................................................................34

73 Fed. Reg. 54008, 54009 (Sept. 17, 2008) ......................................................12

82 Fed. Reg. 9333 (Jan. 28, 2017) ......................................................................35

S. Rep. No. 103-258 (May 11, 2014) ..................................................................12

S. Rep. No. 110-77 (2007) ..............................................................................12, 13

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AWS | Amazon Web Services, Inc. |
| CESG | Cloud Executive Steering Group |
| CICA | Competition In Contracting Act |
| CO | Contracting Officer |
| D&F | Determination & Finding |
| DDS | Defense Digital Service |
| DFARS | Defense Federal Acquisition Regulation Supplement |
| DoD | Department of Defense |
| DPAP | Defense Procurement and Acquisition Policy |
| DSD | Deputy Secretary of Defense |
| FAR | Federal Acquisition Regulation |
| FASA | Federal Streamlining Act of 1994 |
| FFP | Firm Fixed Price |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| GSA | General Services Administration |
| IaaS | Infrastructure as a Service |
| IDIQ | Indefinite Delivery, Indefinite Quantity |
| IG | Inspector General |
| J&A | Justification & Approval |
| JEDI | Joint Enterprise Defense Infrastructure Cloud Procurement |
| OCI | Organizational Conflict of Interest |
| OMB | Office of Management and Budget |

| Oracle | Oracle America, Inc. |
| PaaS | Platform as a Service |
| PIA | Procurement Integrity Act |
| RFP | Request for Proposals No. HQ0034-18-R-0077 |
| SOCO | Standard of Conduct Office |
| SOO | Statement of Objectives |
| TEP | Total Evaluated Price |

## I.   INTRODUCTION

Desperate to avoid the Court's scrutiny, Defendants claim procedural defects at odds with Federal Circuit precedent, assert waiver arguments rejected by this Court, and advance national security claims ill-suited for the circumstance.  Our nation's warfighters and taxpayers have a vested interest in obtaining the best services through lawful, competitive means, as Congress has directed.  Instead, DoD (with AWS' help) has delivered a conflict-ridden mess in which hundreds of contractors expressed interest in JEDI, over sixty responded to requests for information, yet only the two largest global cloud providers can clear the qualification gates for this multi-billion dollar, single award IDIQ contract.  DoD has conducted this significant procurement with disregard for the most basic mandates of the competitive procurement system—a circumstance that has led to two separate Congresses directly questioning JEDI and the institution of multiple, ongoing investigations.  Still, DoD demands the Court's imprimatur on this troubled procurement. The Court should not accede unless and until DoD complies with the law.

First, DoD has violated 10 U.S.C. § 2304a(d)(3) by soliciting this 10-year, $10 billion IDIQ contract, with near constant technology refresh requirements, as a single award.  This DoD targeted statute applies to all DoD procurements regardless of claimed importance.  The parties' opening briefs establish this straightforward statutory construction matter.  Oracle asserts that the exception invoked by DoD means what it says.  The contract must provide "only for firm, fixed price task orders or delivery orders for … services for which prices are established in the contract for the specific tasks to be performed."  10 U.S.C. § 2304a(d)(3).[1]  Defendants claim the JEDI contract, and its bespoke, constant technology (price and service) refresh provisions, satisfy this requirement.  But if technology refresh provisions (that led to the earlier preference for multiple

---

[1] The emphasis of quoted material in this brief is added unless otherwise noted.

████████████████████████████████████████████

award contracts) can be read into the statute—the exception has swallowed the rule.[2]

Second, the CO violated separate statutory and regulatory directives (applicable to all IDIQ competitions) to favor a multiple award IDIQ acquisition strategy to the "maximum extent practicable." *See* 10 U.S.C. § 2304a(d)(4); 48 C.F.R. § 16.504(c)(1)(i). Despite that this Court has a decision on-point involving the very three single award justifications that the CO asserts here, neither Defendant even engages with that decision. *WinStar Comm'ncs, Inc. v. United States*, 41 Fed. Cl. 748, 758 (1998) (overturning single award approach). Instead, Defendants demand deference for the CO's explication on the purported negatives of competition. Notwithstanding that the CO's sentiments lack record support, the Court need not even scrutinize the CO's dissembling analysis, as the CO's findings suffer a much more basic problem—the CO reached each finding without weighing the benefits of competition, rendering the decision contrary to FAR 16.504(c)(1) under *WinStar*. 41 Fed. Cl. at 758-59.

Third, with respect to gates 1.1 and 1.2, the Slack message laid bare DoD's plan: "Let me put the metrics [we select] in this context. The agreed upon measures drive what acquisition strategy will be approved. So if multiple cloud providers can meet the metrics, then we don't get to one. The metrics solve the problem." (AR Tab 47c at 3123.) Consequently, DoD expends significant effort claiming the referenced metrics are not the gates, as if that would somehow make the plan to "get to one" more palatable. The goal under discussion among the individuals leading JEDI is as much the problem as the method. (AR Tab 47a at 2793, 2813.)[3] The DDS team should

---

[2] Both Defendants implore the Court to defer to the GAO decision, ignoring that DoD inexplicably failed to produce numerous material documents at GAO, including internal documents acknowledging constantly evolving prices and services. (AR Tab 130 at 8721.) The Court does not defer to GAO on statutory interpretation matters in any event. As regards the GAO decision more generally, the repeated citations of DoD and particularly AWS to the decision are misplaced given the withheld documents and the severe Ubhi misrepresentations that infect the decision.

[3] Throughout its brief, AWS attacks Oracle often without citation. For instance, AWS' introduction claims: "Oracle continues to grossly exaggerate [Ubhi's] role, incorrectly referring to him as the

have been planning to maximize competition; instead, they were planning to restrict it. Regardless, even the very few Google drive documents DoD agreed to produce establish that the metrics are the gates.[4] Moreover, the "proof is in the pudding" as they say, the plan worked—only the two largest global cloud companies cleared these gates. Yet, DoD did not comply with any of the statutory requirements for restricting competition.

Fourth, Defendants' positions regarding the Ubhi, ███ and DeMartino conflicts suffer from severe legal and factual flaws. For instance, neither Defendant cites Title 18 or 5 C.F.R. Part 2635 (central parts of Oracle's arguments), instead focusing entirely on the PIA and demanding deference to the CO. In this regard, Defendants would have done well to heed the introductory PIA admonition in FAR 3.104-2, noting the "other statutes and regulations that deal with the same or related prohibited conduct," including expressly 18 U.S.C. § 208 and 5 C.F.R. part 2635. The presence of a PIA investigation does not obviate these other laws. *Express One Int'l, Inc. v. U.S. Postal Service*, 814 F. Supp. 93 (D.D.C. 1992) (sustaining protest and noting with respect to Title 18 issues: "Whether or Mr. Cole's conduct comports with the PIA is not controlling...."). Here, the CO did not make any conclusions regarding the Ubhi and ███ violations of Title 18 to which the Court could defer (even were such deference proper). Equally problematic, the CO's PIA investigation is undercut by unsupported and inaccurate findings and failures to consider relevant information. Consequently, DoD sensibly seeks to separate itself from the errant investigation declaring that the Court "need not address" two of the bases for the CO's no-impact determination.

---

JEDI 'lead PM' and 'one of four DDS personnel leading JEDI.'" (Dkt. 86 at 3.) But DoD's record refers to Ubhi as "lead PM" and as part of the "team within DDS leading the cloud acquisition for DoD." (AR Tab 47a at 2793, 2813; *see also* AR Tab 259 at 60845.) Although the page limitation renders it impossible for Oracle to respond to each AWS barb, they are equally without merit.
[4] DoD refused to produce many of the documents handled and prepared by Ubhi because the CO did not review them, even after asking this Court for a lengthy remand to investigate Ubhi. Indeed, DoD has provided nineteen Google drive documents out of hundreds. (AR Tab 242 at 60251 (Ubhi "I'm reviewing and writing more documents than a college professor!").)

(Dkt. 84 at 61, n.19.)  The CO's errors, however, cannot be swept aside.

Finally, even the CO acknowledges that JEDI has had multiple ethics investigations <u>all tied to one contractor—AWS</u>, two of which resulted in the CO finding violations of FAR 3.101-1 and making referrals to the IG.  (AR Tab 223 at 58749.)  But still Defendants maintain there is nothing to redress, with AWS self-declaring its conduct "above reproach throughout the entire procurement."  (Dkt. 86 at 4.)  Professor Schooner summarized the message the AWS and DoD actions have sent to the procurement community:  "government office and public funds are spoils to be exploited by the well-connected and powerful, public service ethics laws and regulations are for chumps, rules are made to be broken."[5]

For its part, AWS apparently has not yet learned the "first rule of holes" and consequently continues digging.  For instance, in attempting to explain away its failure to notify DoD of its employment offer to Ubhi and the absence of any firewall for seven months after Ubhi's arrival, AWS advances numerous claims including that: "<u>AWS' JEDI team was wholly unaware of Mr. Ubhi's employment</u>" (AR Tab 260 at 61018); "during 2017 and 2018 alone AWS hired over 18,700 new employees" (*id.*); and, most recently, only "<u>lesser employees</u>" knew of Ubhi's hiring (Dkt. 86 at 70, n.41).  AWS then without legal support contends that the Court cannot impute knowledge of Ubhi's hiring to the massive AWS organization.  But AWS' latest excuse also fails against the record, which shows that ███████████████ apparently both knew of Ubhi's hiring and ██████████████ .  (*Compare* AR Tab 259 at 60970 (indicating AWS brought Ubhi in November 13, 2017 to meet with ██████), AR Tab 259 at 60819 ("Is there any way we can make the start date 11/13?  I ask because there is a critical meeting that day with ██████ on a

---

[5]  https://federalnewsnetwork.com/defense-main/2019/06/oracles-latest-jedi-filings-cite-aws-ex-dod-officials-conflict-of-interest/.

big project Deap will lead....") *with* AR Tab 194a 24479 (▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮).)[6]  AWS knew precisely who it had hired.  (AR Tab 259 at 60845 (Ubhi resume

describing his DDS work as "Leading the effort to migrate the entire Department of Defense

enterprise to the commercial cloud....").)  No large organization safe harbor exists.  AWS, a JEDI

offeror, should not have offered Ubhi a highly lucrative job while he participated on JEDI.

## II.     FACTUAL BACKGROUND

Oracle hereby incorporates the facts set forth in its Supplemental MJAR and refutes any

contradicting Cross-MJAR allegations in the legal arguments below.

## III.    THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF ORACLE

### A.     Oracle Has Standing To Challenge The RFP's Single Award Approach, The Three Gates, And The Conflicts Of Interest Tainting This Procurement.

Defendants contend that unless the Court finds gates 1.1 and 1.2 improper (which they are)

then Oracle lacks standing to challenge the RFP's single award approach, gate 1.6, and the DoD

personnel and AWS conflicts.  (Dkt. 84 at 16-20, Dkt. 86 at 33-35.)[7]  Not so.  Oracle is an actual

bidder with a direct economic interest in DoD procuring the JEDI contract lawfully.  Oracle has

suffered a non-trivial competitive injury that the Court can redress and, alternatively, has a

substantial chance for award in a fair competition.

To establish standing, a protester must be an actual or prospective bidder that has a direct

economic procurement interest.  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed.

Cir. 2009).  In a pre-award challenge to an RFP's terms (like Oracle's), the Court assesses the direct

---

[6] *See also* AR 259 at 60793 ("I was sorry to see him leave AWS, as were many of his colleagues and other AWS executives, including ▮▮▮▮▮▮▮▮▮▮▮.").
[7] AWS styles its argument in standing.  DoD styles its argument in prejudice (a narrower element of standing).  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  Neither engages in the count-by-count analysis required by the law, instead errantly inviting the Court to dispense with standing in gross.  "Standing is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quotation omitted).

economic interest by asking whether the plaintiff has shown "a non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1363. An offeror need not even submit a proposal to have standing in connection with a pre-award protest, so long as the protester could compete in a properly conducted, fair bidding process. *CGI Fed., Inc. v. United States*, 779 F.3d 1346, 1352 (Fed. Cir. 2015) (finding standing to challenge solicitation despite not bidding); *Palantir U.S.G., Inc. v. United States*, 129 Fed. Cl. 218, 283-89 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).[8] Standing exists where a successful protest could require DoD to rebid, revise its solicitation, or consider increased competition. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001). The Court determines standing "as of the commencement of the suit," i.e., December 6, 2018 here, prior to any evaluation and competitive range determination. *Rothe Dev. Corp. v. Dep't of Defense*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (rejecting standing evidence subsequent to action's commencement). Defendants' arguments challenging Oracle's standing fail for several reasons.

First, Defendants errantly rely on events that happened after Oracle filed suit in this Court to challenge Oracle's standing. Just as a plaintiff cannot manufacture standing after commencement of an action, so too a defendant's actions cannot undermine a plaintiff's standing. *Reeves v. Shineski*, 682 F.3d 988, 994 (Fed. Cir. 2012); *Rothe*, 413 F.3d at 1334-35.

Second, Defendants apply the wrong test. (Dkt. 84 at 17.) The cases Defendants rely on for the substantial chance test are inapposite because none involved RFP challenges. For example, in *Ultra Electronics Oceans Sys. Inc. v. United States*, the Court applied the substantial chance test (and found standing) because the offeror brought its protest after exclusion from the competitive

---

[8] Having had its arguments to the Federal Circuit that "prospective bidders" do not have standing in pre-award bid protests squarely rebuked, DOJ now invites a scheme in which "actual offerors" have lesser rights than prospective bidders. The reasoning of *Weeks*, *CGI*, and *Palantir* is clear notwithstanding the DoD and AWS contortions designed to evade review.

range based on a purported failure to meet a performance requirement.  139 Fed. Cl. 517, 526 (2018).  Similarly, in *Orion Technology, Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013), the agency had excluded the protester from the procurement <u>prior to the initial protest</u>.  The Federal Circuit thus distinguished *Weeks Marine* because: "<u>Orion [i]s not challenging the terms of the solicitation, as was the case in *Weeks Marine*</u>; it is challenging the Army's application of those solicitation criteria to Orion."  704 F.3d at 1349.  Even so, the *Orion* Court found the protester had standing notwithstanding the protester's alleged failure to submit required information.  *Id.* at 1349-50.  Further, *Clinicorp Int'l, Inc. v. United States*, involved a sole source award challenge where the protester did not object to the contract structure or requirements, only the sole source justification, which the Court recognized implicates a different interested party standard.  904 F.3d 1353, 1358-60 (2018).

Here, Oracle timely filed a *pre-award* bid protest challenging the procurement structure, conflicts impacting the procurement, and particular criteria.  The addition of a supplemental count after DoD asked this Court to stay the matter for further conflict review, and during the same period excluded Oracle from the competition, does not somehow change the nature of the protest.  No dispute exists that Oracle is an actual bidder.  Nor can there be any legitimate dispute that Oracle, a large commercial cloud services provider, has the capability to perform the JEDI contract.  (AR Tab 197a at 56880-988 (outlining Oracle's specific Cloud capability in response to RFP); *id.* at 56988-91 (showing how Oracle meets performance metrics).)  Indeed, Oracle will satisfy even the unduly restrictive gates by award, despite that these challenged criteria are <u>not</u> JEDI contract performance requirements.  (*Id.* at 56783-86, 56791-92.)[9]

---

[9] ████████████████████████████████████████████████████████████████████████████████████████

Third, even under the substantial chance test, DoD and AWS ignore that of the four offerors which made it through DoD's initial screening (IBM, Microsoft, AWS, and Oracle), ██████ ████████████████ (AR Tab 224 at 58758-60.)   The Federal Circuit has rejected substantial chance standing and prejudice arguments where ████████████████████ ██████████. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999) (reversing ruling that ████████████████ supported no standing).

Fourth, each of the Oracle Counts clears the standing bar factually regardless of how the Court addresses gates 1.1 and 1.2 or what standing test the Court applies.   As related to Counts I and II, addressing DoD's violation of Congressional multiple award maxims, no basis exists for the suggestion that DoD would apply criteria that winnowed the universe of cloud providers to Microsoft and AWS if DoD sought meaningful task order level competition as the law directed. Indeed, this Court in *WinStar* noted that an unlawful single award solicitation approach impacted the protester's direct economic interests because "an offeror stands a better chance of receiving an award if multiple awards are made."   41 Fed. Cl. 748, 756 (1998).

To borrow from DoD's competition structuring guidance:  "When the number of offerors is very limited due to the unique nature of the requirement, evaluation criteria should not be so narrowly focused as to drive competitors away. . . [and directing DoD to] Structure ... (IDIQ) Contracts to Remove Obstacles to Competitive Bidding."[10]   In any resolicitation, DoD must consider its best methods to comply with Congress' competition directives, including revising the criteria that discourage participation of able competitors like Google, IBM, and Oracle.

_____

████████████████████████████████████████████████████████

[10] DoD Guidelines for Creating and Maintaining a Competitive Environment for Supplies and Services in the Department of Defense at 3, 17 (Dec. 2014), at https://www.acq.osd.mil/dpap/cpic/cp/competition.html.

████████████████████████████████████████████████████████

GAO's decision in *Harris IT Services Corp.*, B-411699, B-411796, Oct. 2, 2015, 2015 CPD ¶ 293, shows that Defendants have their standing analysis <u>precisely backwards</u> as related to Oracle Counts I and II. In *Harris*, the protester raised a variety of arguments related to the FBI's improper issuance of prohibited single award IDIQs, failure to maintain task order competition, and use of unduly restrictive specifications. In sustaining Harris' prohibited single-award IDIQ and competition allegations, GAO explained that because it found the RFP unlawful and recommended the FBI consider alternative ways to meet its requirements, GAO need not consider whether the criteria were restrictive. *Id.* So too here. If the Court determines that DoD violated the prohibition against large single source awards or irrationally overrode Congress' multiple awards to the "maximum extent practicable" direction, the Court need not consider the other counts as DoD will have to consider various lawful alternatives to meeting its needs.

    <u>For similar reasons, Oracle has standing to challenge the illegal involvement of conflicted individuals (Counts VII-X)</u>. Not only have the individuals violated laws that exist to protect the offerors and public, but Oracle has alleged and the record shows these individuals were involved in the challenged RFP provisions, including (most notably) the unlawful single award approach <u>and</u> the anticompetitive gates. (Dkt. 80-1 at 51-53; *infra* at Section III.G.2.a.) Proper treatment of the conflicts would result in solicitation cancellation or revised criteria, among other outcomes. *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 571-72 (2010) (protester eliminated from competition had standing to assert bias, illegal gratuities, etc.).

    As related to Oracle's challenges to gates 1.1 and 1.2 and its subsequent exclusion from the competitive range (Counts III-V), Oracle plainly has standing. *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 701-02 (2009). Finally, with regard to Count VI's challenge to DoD's unlawful software marketplace (gate 1.6), Oracle has standing as both an actual bidder for JEDI

and as a market leading software provider which will have to sell its software through the JEDI awardee or not at all. *Compare* Dkt. 1 at ¶ 326 ("Oracle, an actual bidder <u>and</u> provider of software to DoD, has an 'economic stake' in DoD carrying out the RFP in accordance with applicable law.") *with Electra-Med Corp. v. United States,* 140 Fed. Cl. 94, 104 (2018) (allowing supplier to challenge contractor run marketplace).

**B.      The RFP Violates 10 U.S.C. § 2304a(d)(3) As The D&F Invokes An Inapplicable Exception To The Prohibition Against Single Awards (Count I).**

The Court should grant judgment in Oracle's favor because DoD invokes an inapplicable statutory exception to the single-award IDIQ contract prohibition, rendering the RFP unlawful.

The statute prohibits the award of a task and delivery order contract over $112 million to a single source unless the head of the agency determines in writing that "the contract provides only for firm, fixed price task orders or delivery orders for- ... (ii) services for which prices are established in the contract for the specific tasks to be performed[.]" 10 U.S.C. § 2304a(d)(3)(B); 48 C.F.R. § 16.504(c)(1)(ii)(D)(1)(ii). The D&F, in turn, states that the cloud offering CLINs "will be priced by catalogs resulting from the full and open competition, <u>thus enabling competitive forces to drive all aspects of the FFP pricing. All catalogs will be incorporated at contract award and cover the full potential 10 years,</u>" and states that each catalog offering is a "service." (AR Tab 16 at 319.) But Oracle's MJAR established that the exception does not apply because the JEDI contract contemplates that the awardee will constantly add new cloud services onto the contract with applicable pricing determined at a later date.

In documents withheld from GAO, DoD explained that the broad CLIN categories of IaaS/PaaS offerings procured under the JEDI contract "are not static and <u>will be updated overtime</u> <u>[sic] both in terms of available services and applicable pricing</u>." (AR Tab 130 at 8721 (Q1115).) The contracting mechanism DoD adopted to address the dynamic IaaS/PaaS services solicited is a

10

bespoke H clause, designed to "keep pace with advancements in industry." The clause requires the contractor to update the catalogs constantly so that "as new commercial cloud services are available, the Contractor will provide these new services and apply and incorporate those services into the contract catalog." (AR Tab 112 at 6673-74.) Although DoD did not opine on the expected volume of new services covered by the clause (AR Tab 112), industry advised DoD prior to proposal submission that the H.2 clause would result in "<u>daily or weekly</u>" updates to the IaaS/PaaS offerings, even during the JEDI competition. (*See* AR Tab 32 at 660 (Q17); *id.* at 668 (Q86-87).)[11] The JEDI competitors cannot price these expected, non-existent future services during the competition. Instead, the H.2 clause seeks to peg the not-yet-created services to future not-yet-issued catalog prices—an approach that the FAR does not countenance and that Congress blocked by the prohibition. 48 C.F.R. § 15.403-3(c) ("[t]he fact that a price is included in a catalog does not … make it fair and reasonable," much less competitive).

Equally problematic, the JEDI contract does <u>not</u> identify "the specific tasks to be performed," as evidenced by the RFP's pricing scenarios. (AR Tab 35 at 782, 786-87, 807-12.) The tasks the JEDI Cloud users will order are <u>not</u> specified in the base contract; rather, the user agencies will identify the specific tasks through the ordering process. (*Id.* at *passim*.)

Defendants argue that the H.2 clause is legally insignificant because although the services will be new, and not part of the base contract competition, each will have a firm fixed price. (Dkt. 84 at 51; Dkt. 86 at 46.) Defendants appear to believe that so long as the services and prices are added to the contract at some future point, the rule is satisfied. Each thus argues that the plain language of § 2304(d)(3)(b) does not require the services and prices to be established and competed

---

[11] Similarly, public sources, including Gartner, indicate that major cloud providers release 40 to 50 new cloud services each month. Chris Pemberton, *Hidden Cloud Opportunities for Technology Service Providers*, Gartner (June 20, 2018), <u>https://www.gartner.com/smarterwithgartner/7-hidden-cloud-growth-opportunities-for-technology-service-providers/</u>.

11

as part of the base contract competition—i.e., in the contract at the time of award. (Dkt. 84 at 51-52; Dkt. 86 at 46-47.) Defendants' arguments ignore the tense of the verb "<u>established</u>" and the purpose of the rule. Defendants seek to recast through litigation this narrow exception to Congress' broad high value single award prohibition. *RAMCOR Servs. Grp., Inc. v. United States,* 185 F.3d 1286, 1288–89 (Fed. Cir. 1999) (providing all parts of a statute must be given effect).

The limited legislative history for the statutory provision confirms that it serves to ensure future, significant IDIQ contracts "provide for the competition of task and delivery orders unless there is a compelling reason not to do so." S. Rep. No. 110-77 at 368 (2007). The regulatory history for the FAR's implementing provisions recognize the statute "place[s] greater emphasis on awarding multiple award contracts," noting that "[c]ompetition of orders leads to improved contractor performance, stimulation of technological solutions, and reduction of costs over time...." 73 Fed. Reg. 54008, 54009 (Sept. 17, 2008).

There can be no serious doubt that Congress enacted the prohibition in 2008 to strengthen the preference for multiple awards of IDIQ contracts first codified through FASA. Pub. L. 103-355 § 2304a(d)(3), 108 Stat. 2349, 3250, Oct. 13, 1994. FASA's legislative history reflects Congress' concern for the "indiscriminate use of task order contracts for broad categories of ill-defined services"; which "unnecessarily diminishes competition and results in the waste of taxpayer dollars." S. Rep. No. 103-258 at 15 (May 11, 2014).[12] The 2007 Report of the Acquisition Advisory Panel, which influenced the FY 2008 NDAA provision prohibiting the use of large single-award IDIQ contracts except in four limited circumstances, echoed these sentiments. S. Rep. No. 110-77, at 368 ("The committee notes that the enhanced task and delivery

---

[12] *See also* Report of the Acquisition Advisory Panel to the Office of Federal Procurement Policy and the United States Congress January 2007 ("2007 Report") at 67 (noting concerns regarding the abuse of sole source IDIQ contracts), https://www.acquisition.gov/sites/default/files/page_file_uploads/ACQUISITION-ADVISORY-PANEL-2007-Report_final.pdf.

12

order competition requirements in the provision would implement the recommendations of the Acquisition Advisory Panel. . . ."). The 2007 Report noted the government's continued anticompetitive practices with task order contracts, including those for services.[13] The 2007 Report also noted evidence of broad scopes of work in base contracts undermining competition and observed that unit prices were not a particularly useful indicator of the price to the government when acquiring complex IT services.[14]

     With all of this information in hand, and an unwavering concern over single award task order contracts for ill-defined services, Congress enacted the prohibition. 10 U.S.C. § 2304a(d)(3)(B). The plain language of the exception DoD invokes contradicts AWS' contention that Congress' concern with the lack of task competition was limited to single award cost-reimbursable IDIQ services contracts like LOGCAP III. (Dkt. 86 at 49.) If LOGCAP III type contracts were the sole concern, Congress could have ended the exception's language at the "contract provides only for firm, fixed price tasks orders." But Congress did not. The exception's language about "services for which prices are established in the contract for the specific tasks to be performed" evidences Congress' concern to require task order competition whenever the solicited needs are ill-defined and unpredictable, as here, where the procuring agency uses a SOO to describe its needs, and hypothetical scenarios of future orders to evaluate the offerors' proposed capabilities. (AR Tab 27; AR Tab 35 at 782 ("Any … scenarios included in Section L are based on the Government's projected needs and are used for evaluation purposes only").) Similarly, AWS' suggestion that the specific needs of JEDI users are more stable and fixed than the military contingency contract services procured under LOGCAP is belied not only by the JEDI RFP

---

[13] *Id.* at 90.
[14] *Id.* at 91-92, 94.

structure but also by the custom-crafted H.2 clause.

In this respect, it bears noting that JEDI is a classic IDIQ technology contract of the very type that led Congress to enact the earliest FASA provisions favoring task order competition:

> Before FASA, many agencies relied on long-term ID/IQ and umbrella contracts with technology refreshment and price reduction clauses to take advantage of falling prices and new technology. Even with these clauses, the government had to negotiate in a sole-source environment and was often unable to realize the economies and efficiencies afforded by vigorous competition among vendors....

(AR Tab 77 at 5310 (OMB describing backdrop for multiple award preference).)

Finally, Defendants' suggestion that declaring the exception inapplicable here would infringe DoD's ability to modify a large single award IDIQ contract during performance is false. If constantly adding "new services" to the JEDI contract to maintain commercial parity were a simple modification covered by the changes clause, DoD would not have had to draft and justify a bespoke "New Services" clause. Moreover, changes clauses cover unplanned changes. DoD's technology refresh clause is not an unplanned change, it is a mandated constant updating provision to the dynamic nature of the IT services solicited. Enforcing the single award prohibition here does not prevent DoD from using the changes clause in future contracts; it prevents DoD from treating a large IDIQ contract with a broad scope of work and persistent technology refresh provisions as if it contains fixed prices for "specific tasks to be performed."

## C. The CO's Single Award Approach Also Violates The Separate Multiple Award To The Maximum Extent Practicable Requirements (Count II).

DoD also has violated Congress' separate mandate that the CO pursue multiple awards to the maximum extent practicable. (Dkt. 80-1 at 25-31.) Defendants devote much of their defense to demanding deference to the CO's "business judgment and discretion", and claiming that the

single award serves the best interest of the military.[15]

Defendants mischaracterize Count II's challenge as mere disagreement with the CO's discretion. Oracle, however, does not seek to impose its own technical judgment for that of DoD. Rather, Oracle objects to the CO's decisionmaking because the CO failed to weigh an important aspect of the problem—the benefits of task order competition—and the findings underlying her decision lack record support. *Applied Bus. Mgmt. Solutions, Inc. v. United States*, 117 Fed. Cl. 589, 603-04 (2014) (describing APA standard of review of rational decision making) (citations omitted). Although neither Defendant addresses the decision, the Court in *WinStar*, faced with a single award IDIQ determination based on the same three multiple award exceptions, held that the decision violated FAR 16.504(c)(1)(ii) because the contracting officer failed to give meaningful consideration to multiple award contracting benefits in connection with each finding. 41 Fed. Cl. at 758-59. The same defect exists here.

The CO's first rationale is that "more favorable terms and conditions, including pricing, will be provided if a single award is made." (AR Tab 24 at 457.) But, the CO did not consider the task order competition benefits that DoD's own Guidelines specify, including lower prices, innovation, better quality and performance, curbing fraud, and maintaining a strong defense industrial base. (AR Tab 77 at 5361-62.) Instead, contrary to DoD's claims, the CO rejected the very idea that task order competition leads to better pricing and ignored all other competition benefits. (*Compare* Dkt. 84 at 42 *with* AR Tab 24 at 457-59, 464.)[16]

---

[15] Although 10 U.S.C. § 2304a(d)(3) provides a public interest exception to the statutory prohibition against large single award IDIQ contracts, Under Secretary Lord's D&F did not adopt any of the CO's rationales. (*Compare* AR Tab 24 *with* AR Tab 16.) Thus, even assuming the CO's determination was rational (which it was not), DoD's single award approach still violates § 2304a(d)(3)(B), warranting relief in Oracle's favor.

[16] Unable to defend the CO's more favorable terms finding based on the CO's rationale, AWS improperly recasts the CO's "background" description of why JEDI covers both classified and

15

The same error pervades the CO's second rationale that "the expected cost of administration of multiple contracts outweighs the expected benefits of making multiple awards." (AR Tab 24 at 459.) The CO makes no effort to quantify any competition benefit, electing to weigh only the purported negatives. (*Id.* at 459-61); *see also WinStar*, 41 Fed. Cl. at 762. ("Since the CO did not consider those benefits or explain why they would not ensue ... the analysis is one-sided and incomplete."). Equally problematic, the inputs the CO uses to calculate the varying costs lack record support. The Google drive shows wild swings in the calculation (*compare* Screen Shot, Ex. C (multiple award order cost of $63,716.56 and single at $16,122.23) *with* AR Tab 24 at 460 (inflating multiple award order cost to $127,851.84 and slashing the single to $2,595.71)), and the record does not evidence from where the CO derived the inputs.

Despite rejecting the GSA-sponsored 2013 study reporting agencies average 119 to 168 hours to award a task order as "theoretically optimal," DoD offers no support for the CO's staggering 1688 hours per order. (*Compare* AR Tab 77 at 5337 *with* AR Tab 24 at 466.) Instead, DoD relies on the CO's "personal experience," despite that the CO admitted she has never purchased cloud services through task order competition. (AR Tab 78 at 5707:10-17, 5717:1-5.) The CO's task order estimate fails for similar reasons. Nowhere does the CO explain how she derived the number or provide record support.[17] Rather, the Acquisition Plan funding profile casts serious doubt on the task order estimates. (AR Tab 23 at 443.)[18]

---

unclassified services into a cloud integration concern unrelated to the CO's more favorable terms rationale. (*Compare* Dkt. 86 at 40-41 *with* AR Tab 24 at 457-58.)

[17] DoD's suggestion that the Court accept the CO's unsupported inputs because the record contains no information on the expected number of task orders turns the APA review standard on its head.

[18] Again, unable to defend the CO's determination based on the rationale and record provided, AWS improperly offers its own take—that the H.3 clause requiring offerors to match commercial prices gives DoD "all or nearly all of the savings of a multiple award contract structure, ... with the added efficiency of having to administer only a single award vehicle." (Dkt. 86 at 42.) AWS' argument fails. First, this is the same flawed logic that lead to FASA's maximum practicable prescription in the first place. (AR Tab 77 at 5310.) Second, neither AWS nor the Court may supply a reason for the agency's actions that the agency has not given. *OMV Med. Inc. v. United*

Lastly, the CO's findings that a multiple award approach contravenes DoD's best interests also fails against *WinStar* and the record.  Rather than consider the benefits of competition, the CO relies on purported added costs to manage connections between clouds and to train staff.  (AR Tab 24 at 461-63.)  But "one cannot reasonably conclude that a single award is in the government's best interests based on the inherent costs of multiple awards unless the costs are weighed against the presumed benefits underlying the preference."  *WinStar*, 41 Fed. Cl. at 762.[19]

### D.    DoD's Restrictive Subfactor 1.1 Violates CICA (Count III).

The Elastic Usage gate and its imposition violates applicable law to Oracle's severe prejudice.  DoD excluded Oracle from the competition based on the gate 1.1 evaluation, even though Oracle met the outsized, network, compute, and storage metrics well before proposal submission.  Oracle challenges this gate for four independent reasons.  (Dkt. 80-1 at 33-37.) Neither Cross-MJAR responds to every Oracle argument, and the rebuttals presented are flawed.

First, Oracle has demonstrated by citation to the Slack messages and Acquisition Strategy that DoD crafted the gates to limit competition and avoid delays from multiple proposals and protests.  (AR Tab 25 at 504.)  Congress rejected the concept of effective competition in passing CICA.  *SMS Data Products Grp. v. United States.*, 853 F.2d 1547, 1554 (Fed. Cir. 1988); 10 U.S.C. § 2305(a)(1)(A)(i).  Instead, Congress created a J&A process for agencies facing schedule demands that prevent full and open competition. 10 U.S.C. § 2304(c)(2); 48 C.F.R. § 6.302-2. Here, no J&A exists to support DoD's restriction of competition.  AWS does not engage with the

---

*States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000).  Third, the catalog pricing is not the same thing as head-to-head competition of offerors' proposed technical solutions in response to task orders (like the pricing scenarios) issued by the JEDI users.  Finally, the FAR provides that simply because "a price is included in a catalog does not, in and of itself, make it fair and reasonable," unlike prices based on head-to-head competition.  *Compare* 48 C.F.R. § 15.403-3(c) *with id.* § 15.403-1(b).

[19] Oracle's MJAR also demonstrates that the record disproves the best interest claims.  (Dkt. 80-1 at 31-33.)

Acquisition Strategy or *SMS*. DoD references the expressed goal, but suggests the Court focus instead on the Gate Memorandum. (Dkt 84. at 23.) But, as shown below, the Gate Memorandum is no substitute for the J&A.

Second, DoD knew based on its market research that only a few cloud providers had the existing infrastructure and scale in January and February 2018 to pass the gate. (AR Tab 20 at 369; AR Tab 47c at 3123.) Where DoD seeks to limit the competitive field to "a limited number of responsible sources", Congress again has provided a specific J&A procedure—which DoD ignored. 10 U.S.C. § 2304(c)(1); 48 C.F.R. § 6.302-1.

Although AWS attempts to recast the Gate Memorandum into the J&A that CICA required (Dkt. 86 at 26-28), the Memorandum does not comply with the content requirements specified by 10 U.S.C. § 2304(c)(1), FAR 6.303-2 or DFARS 206.303-2, nor was it approved by Under Secretary Lord or an authorized delegate. (*Compare* AR Tab 42 *with* FAR 6.303-1(a)(3); DFARS 206.304.)[20] For its part, DoD retorts that it may set the requirements bar as high as it likes without a J&A and regardless of whether only the two largest global IaaS providers contractors can meet its gates. (Dkt. 84 at 23.) DoD's argument reduces § 2304(c)(1) to a solicitation crafting hurdle. If the restrictions and J&A requirements of § 2304(c)(1) do not apply where an agency sets gates such that only the two largest global cloud providers can meet them, the provision has been read out of existence.[21]

---

[20] AWS' reliance on other RFP reviews by the DPAP or the CIO is similarly misplaced (Dkt. 86 at 29 & n.13), because CICA does not contemplate any substitute for the J&A process.

[21] DoD relies on *Maersk Line, Ltd.*, B-406586, June 29, 2012, 2012 CPD ¶ 200 and *Armstrong Elevator Co.*, B-415809, Mar. 28, 2018, 2018 CPD ¶ 120, to assert broadly that an agency need not execute a J&A where it permits all offerors to submit proposals and the capability and experience requirements have the unintended effect of limiting competition. (Dkt. 84 at 20, 24.) Here, however, DoD specifically designed the gating criteria to limit the number of proposals received. (AR Tab 25 at 504.) The cases are inapposite in any event. *Maersk* concerned a challenge to an RFP requirement that GAO agreed the agency's regulations mandated. *Armstrong* conversely involved a challenge to the past experience factor. Neither decision involved an agency seeking to limit the field of responsible offerors to reduce the number of proposals received.

Third, the Elastic Usage measurement date selected by DoD (nine months before even proposal submission) does not reflect a minimum need. 10 U.S.C. § 2305(a). Neither the SOO nor the JEDI contract require the contractor to maintain commercial cloud usage greater than 50% of any JEDI cloud unclassified usage in the areas of network, compute, or storage during performance. (AR Tab 35 at passim; AR Tab 27 at passim.) To the contrary, after questions by the DPAP, DoD removed any utilization level from the contract requirements: "The requirement to maintain a certain level of utilization will be removed from the final RFP, but regular reporting to the CCPO about utilization levels will remain." (AR Tab 113 at 6712-13.) Even the Gate Memorandum confirms that the Elastic Usage gating measurement period long proceeds any purported DoD's need. (AR Tab 42 at 944; Dkt. 80-1 at 36.) DoD concedes that the referenced concerns for surge capacity and innovation will not arise until after contract award, when DoD data is placed in the cloud. (AR Tab 78 at 5476:5-9; AR Tab 42 at 944.) But the gate does not measure each offeror's network, compute, and storage capabilities after DoD usage is "added post award." The measurement period DoD selected—nine months before proposal submission and more than seventeen months before the anticipated award—violates CICA. _LBM, Inc._, B-286271, Dec. 1, 2000, 2000 CPD ¶ 194 (requiring adjustment of ISO 9000 requirement to date of award).[22]

DoD nevertheless seeks to justify the premature time period claiming that it "facilitate[s] fair competition as this prevents potential Offerors from taking measures to change their numbers

---

[22] _See also USA Jet Airlines,_ B-404666, Apr. 1, 2011, 2011 CPD ¶ 91 (same); _Container Products Corp._, B-280603.2, Nov. 4, 1998, 98-2 CPD ¶ 106 (same). AWS errantly suggests that GAO addressed and rejected Oracle's arguments about gate 1.1. (Dkt. 86 at 31.) GAO, however, never specifically discussed Oracle's gate 1.1 challenges. _Oracle Am. Inc._, B-416657 _et al._, Nov. 14, 2018, 2018 CPD ¶ 391 (lumping elastic usage into a general denial). GAO's discussion of gate 1.2 observes the _Jet Airlines_ "general rule" and then proclaims that in more extreme cases "an agency may properly require an offeror to submit evidence of its ability to meet contract requirements at the time of proposal submission...." _Id._ Had GAO even applied the more extreme rule to gate 1.1, Oracle would have prevailed.

once they become aware of this Sub-factor requirement at the release of the draft [RFP] in March 2018." (AR Tab 42 at 945.) Beyond demanding deference for this entirely unsupported assertion, DoD advances no defense.[23]  DoD had ample means to protect against gaming (not a need) which did <u>not</u> require the effective exclusion of capable competitors.  For instance, DoD could have applied the criteria at the time of contract award or proposal submission and also required the offerors to submit January 2018 data as well and justify any changes.[24]

Fourth, Oracle has demonstrated that this Elastic Usage gate (like gate 1.2) constitutes a prohibited qualification requirement, which required additional procedural safeguards set forth in 10 U.S.C. § 2319 to prevent unnecessary anticompetitive harm.  (Dkt. 80-1 at 38-39.)  Because DoD did not follow the process for imposing a qualification requirement, DoD and AWS are left to contend baldly that gate 1.1 is a "specification" and not a "qualification requirement" subject to § 2319.  (Dkt. 84 at 30-31; Dkt. 86 at 30.)  The Federal Circuit explained the distinction in *W.G. Yates & Sons Constr., Inc. v. Caldera*:

> Specifications are the requirements of the particular project for which the bids are sought, such as design requirements, functional requirements, or performance requirements. See 10 U.S.C. § 2305(a)(1)(C). . . . <u>Qualification requirements, on the other hand, are activities which establish the experience and abilities of the bidder to assure the government that the bidder has the ability to carry out and complete the contract.</u>

192 F.3d at 987, 994 (Fed. Cir. 1999).  Here, the gate's 50% metric is not a design requirement,

---

[23] Curiously, DoD presumes evil of contractors generally should they get even the slightest opportunity, but has no concern that Ubhi and ▮▮▮▮ joined AWS with reams of inside information. Indeed, Ubhi knew from his metrics exchanges that DoD intended to measure elastic usage yet DoD does not seem to think this information had value to AWS. (*Compare* AR Tab 242 at 60237 *with* AR Tab 221 at 58712-16.)

[24] DoD also offers no explanation of how an offeror, like Oracle, that satisfies the 50% metric well before even proposal submission, is not a viable competitor for DoD's JEDI performance needs. And, contrary to AWS' misreading of Judge Damich's decision, the fact that three competitors met the unlawful gating metric is not a defense. (Dkt. 86 at 32 n.15.)  "Indeed, the very inclusion in [CICA] of the qualification on the extent of the restrictions in solicitations indicates that the goal of CICA is not just *any* level of competition but the best level possible under the circumstances." *Am. Safety Council Inc. v. United States*, 122 Fed. Cl. 426, 436 (2015).

functional requirement, or performance requirement of the JEDI contract.  Neither the SOO nor

the JEDI contract require the contractor to maintain commercial cloud usage greater than 50% of

any JEDI cloud unclassified usage in the areas of network, compute, or storage during

performance.  (AR Tab 35 at passim; AR Tab 27 at passim; AR Tab 113 at 6712-13).)[25]  DoD's

own rebuttal repeatedly describes gate 1.1 as "requir[ing] offerors to demonstrate certain

experience <u>prior to proposal submission</u>."  (Dkt. 84 at 22; *id.* at 23 (referring to gate 1.1 as a

"<u>minimum capability and experience</u>" requirement); *id.* at 24 (same).[26]  *W.G. Yates* is dispositive.[27]

Unable to counter the qualification argument substantively, DoD and AWS seek to avoid

it by claiming waiver.  But Oracle has challenged this gate for <u>numerous</u> reasons since the earliest

days of, and throughout, the GAO protest (well before proposal submission).  (AR Tab 63 at 4804-

08 (August 23, 2018 supplemental protest); AR Tab 67 at 4945 (Sept. 6, 2018 consolidated

protest); AR Tab 73 at 5175 (Oct. 1, 2018 comments).)  Oracle also has challenged the gate for

numerous reasons since the inception of this action.  (Dkt. 1 at 73-79 (initial complaint); Dkt. 68

at 66-72.)  That the Court will not find matching citations and identical pleadings across the months

in which DoD has slowly produced documents, witnesses have testified, DoD has evaluated

offerors, and DoD explanations have evolved is neither surprising <u>nor a basis for Defendants'</u>

<u>waiver claims</u>.  *Palantir Techns. Inc. v. United States*, 128 Fed. Cl. 21, 41-44 (2016) (rejecting

same waiver argument, distinguishing *Blue & Gold* and its progeny because these cases involved

---

[25] The SOO performance measures do not specify any particular commercial cloud usage metric at all.  (AR Tab 27 at 620-24.) The SOO discusses network "capacity," not utilization. (AR Tab 27 at 614 (§ 3.14.2).)  The SOO also requires "automated redundancy of storage, networking and computing systems in the case of catastrophic data center loss." (*Id.* (§ 3.15).)

[26] Defendants' reliance on *California Industrial Facilities Resources, Inc. v. United States*, 80 Fed. Cl. 633 (2008) is misplaced.  There, the challenged solicitation provisions sought independent tests showing that equivalent shelters could <u>meet the performance requirements</u>.  *Id.* at 636.  For that reason, the Court found the challenged provisions were specifications.  *Id.* at 642.

[27] DoD contends that to hold Subfactor 1.1 as a qualification requirement would render all pass/fail evaluation criteria qualification requirements. (Dkt. 84 at 31.)  Not so.  Standard evaluation criteria relate to actual performance requirements, not pre-award gates designed to limit competition.

situations "where the offerors did not file *any* formal protests during the bidding period, and instead opted to file [protests] after award of the contracts"). As in *Palantir*, Defendants acknowledge that Oracle timely challenged gate 1.1 at GAO and this Court. (Dkt. 84 at 28-29; Dkt. 86 at 29-30.)

In sum, the Elastic Usage gate violates law in several, <u>independent</u>, prejudicial ways. The Court, accordingly, should grant judgment in Oracle's favor on Counts III and IV, strike this gate, and find the competitive range determination based thereon irrational.

### E.   DoD's Competitive Range Determination Lacks A Rational Basis (Count IV).

Oracle has demonstrated that DoD's competitive range determination cannot stand because DoD excluded Oracle based on an unlawful gate. *Arxium, Inc. v. United States,* 136 Fed. Cl. 188 (2018) (sustaining competitive range protest based on arbitrary application of criteria). Moreover, even if DoD had properly set Elastic Usage as a qualification gate, the competitive range determination would fail under 10 U.S.C. § 2319(c)(3), which requires the Agency to permit the offeror to demonstrate that it can meet the qualification requirement before award. (Dkt. 80-1 at 37-38.) This should end the Court's inquiry. Nevertheless, the competitive range decision also fails because DoD has no sound reason for keeping only two of the four ███████ offerors in the competitive range. (Dkt. 80-1 at 38-40.)

### F.   Subfactors 1.2 And 1.6 Also Exceed DoD's Authority Or Legitimate Needs And Unduly Restrict Competition (Counts V-VI).

Oracle's MJAR demonstrated how DoD violated multiple laws by failing to structure either gate 1.2 or 1.6 to achieve full and open competition or to satisfy a legitimate minimum need. (Dkt. 80-1 at 40-43.) AWS elected not to respond. DoD's attempts to shield itself from these legal deficiencies are unpersuasive and contradicted by precedent and the underlying record.

1.    **Subfactor 1.2 Also Violates Title 10 and Exceeds DoD's Needs.**

First, as with gate 1.1, Oracle does not object to the substantive requirement that DoD seeks

to impose but to the timing.  The record shows that DoD imposed Subfactor 1.2 as a prequalifying

gate <u>to limit the number of proposals received rather than to meet a legitimate pre-proposal need.</u>

(AR Tab 25 at 504.)  Based on its market research, DoD necessarily knew that only two cloud

service providers had the existing infrastructure with FedRAMP authorized offerings to meet the

gate.[28]  (AR Tab 20 at 369; *id.* at 374 (showing commercial cloud offerings available to

government are "currently extremely limited" due to lengthy FedRAMP authorization process);

*id.* at 382.)  Yet, DoD did not comply with CICA's J&A procedures.  10 U.S.C. § 2304(c)(1); 48

C.F.R. §§ 6.301-1; 6.302-2.  Although DoD seeks cover of national security, when national

security or emergency concerns require limited competition, Congress still mandates DoD follow

the proper J&A procedures.  10 U.S.C. §§ 2304(c)(2), (f)(1).

Second, DoD's imposition of Subfactor 1.2 at the time of proposal submission also fails

because it is a prohibited qualification requirement.  10 U.S.C. § 2319.  DoD again seeks to dodge

the merits.  But, as noted in section III.D, DoD's reliance on *Blue & Gold* is misplaced and its

claims of waiver are flawed.  Oracle diligently pursued its gate 1.2 protest in a timely manner (AR

Tab 63 at 4793-4802), and specifically raised this qualification argument its post-hearing

comments (AR Tab 80 at 5799, 5828), and in its December 2018 Complaint (Dkt. 1 at 66-73).

*Palantir Techs. Inc.*, 128 Fed. Cl. at 42-44.

---

[28] Despite marketing research about the obstacles of FedRAMP authorization, DoD waited to specify FedRAMP authorization in the gate until the final RFP issued on July 26, 2018. (*Compare* AR Tab 105 at 6241 (requiring "FedRAMP Moderate compliant") *with* AR Tab 35 at 792; AR Tab 78 at 5490:11-17.) DoD thus gave cloud service providers less than two months to seek and obtain government authorization, a process that takes six months' time or more. FedRAMP Accelerated A Case Study for Change Within Government, https://www.fedramp.gov/assets/resources/documents/FedRAMP_Accelerated_A_Case_Study_For_Change_Within_Government.pdf (indicating authorization timeline of six months).

DoD's characterization of gate 1.2 as a "specification," rather than a qualification requirement triggering § 2319, likewise fails. Significantly, no dispute exists that DoD does not require FedRAMP authorization as part of the JEDI contract performance; this is a qualification test. (AR Tab 78 at 5495:5-14; *id.* at 5496:3-6.) DoD even describes gate 1.2 as a "mechanism to validate" the offeror's core architecture. (AR Tab 43 at 955.) But DoD neither followed the proper procedures nor provided Oracle the opportunity to show it could satisfy the qualification requirement before the intended award date. *Compare* 10 U.S.C. §§ 2319(b)(1), 2319(c)(3) *with* AR Tab 35 at 792. As noted, the Gate Memorandum cannot substitute for the J&A process required by CICA and § 2319. And, the Memorandum confirms that neither the requirement for three existing data centers nor the requirement for each to have FedRAMP authorized IaaS/PaaS offerings relates to a legitimate DoD pre-award need. According to the Memorandum, "[t]hree datacenters are necessary to provide reliability and resiliency of services even in the unlikely circumstance that two datacenters are simultaneously affected." (AR Tab 42 at 947.) But DoD has conceded that its need for failover capabilities does not arise until after award. (AR Tab 78 at 5487:10-15; AR Tab 32 at 675 (answer to Q157).) DoD's Cross-MJAR does not argue otherwise.

Lastly, neither the record nor DoD provide a valid rationale for requiring FedRAMP authorized IaaS and PaaS offerings in all three data centers prior to award despite FedRAMP's express prohibition against such requirements. (Dkt. 80-1 at 40-43.) As noted, the contract does not require FedRAMP authorization (AR Tab 78 at 5496:7-5498:15; *see also* AR Tab 5 at 159),[29] and DoD does not require offerors to propose the same data centers and offerings used for the gate

---

[29] The fact that the JEDI contract does not require FedRAMP authorization but the qualifying gate does makes DoD's reliance on *Apogee Engineering, LLC*, B-415976, May 1, 2018, 2018 CPD ¶ 150, unavailing. (Dkt. 84 at 25.) In *Apogee*, GAO denied the challenge to RFP terms requiring the subcontractor possess a secret facility clearance at the time of proposal submission where the facility clearance was necessary to timely meet the contract's requirements.

for the contract: "[T]he RFP does not restrict an Offeror from proposing its latest technologies, even if not FedRAMP authorized at the time of proposal." (AR Tab 40 at 853 (Q233).)

### 2.   DoD Lacks Authority to Solicit an Online Marketplace (Subfactor 1.6).

DoD devotes multiple pages of its brief to an attempt to rebut, or at least muddy the waters, regarding Oracle's gate 1.6 protest. Oracle's straightforward challenge is that gate 1.6 purports to procure something which DoD has no authority to procure. In short, gate 1.6 requires offerors to demonstrate they can provide a contractor-run online marketplace of third-party platform and software offerings that JEDI users can access to purchase and provision software. (*See* AR Tab 35 at 793-94.) By including this requirement, DoD seeks to avoid purchasing software through traditional means (AR Tab 42 at 950-51); yet, DoD lacks the authority to delegate its responsibility to procure supplies and the many legal and regulatory requirements going along with such responsibility. Gate 1.6 accordingly violates CICA.

DoD's response does not identify any authority to procure this marketplace. Indeed, DoD does not seem to have an answer to this obvious question. Instead, DoD argues that the "FAR encourages procurement officials" to be "innovative," a term that does not appear in the cited FAR provision, which calls on officials to use "sound business judgment." (Dkt. 84 at 38-39.) DoD then mis-cites a Federal Circuit case, *Tyler Construction Group v. United States*, which held that because it was not clear whether the FAR supported the use of IDIQs for construction services, it was necessary to look to whether any law prohibits the use. 570 F.3d 1329, 1333 (Fed. Cir. 2009). Here, CICA and the FAR prohibit what DoD is attempting to do—delegating the software marketplace for JEDI Cloud users to the contractor, rendering *Tyler* inapposite.

Further, gate 1.6 does not limit the online marketplace to free software offerings, as DoD would have this Court believe. (Dkt. 84 at 36-37.) Rather, at the time of proposal submission,

offerors are "only required to make available [offerings] that are price-free" or for which DoD already has a license. (AR Tab 27 at 616.) But, DoD intends that this marketplace will include third-party priced software post award. (Dkt. 84 at 36.) DoD lacks the authority to procure this marketplace, which impermissibly grants the <u>cloud offeror</u> the power to decide what software will be sold in the JEDI cloud—<u>not DoD</u>. This is the scenario this Court found illegal in *Electra-Med*, holding that "outsourcing the selection of suppliers ... avoided the multitude of legal and regulatory requirements appurtenant to a federal procurement." 140 Fed. Cl. 94, 104 (2018). The law presumes offerors and software providers (Oracle is both) suffer prejudice from such a CICA violation; the Court should strike this RFP provision.

### G.   The Ubhi, ███, and DeMartino Conflicts Violated The Law And Tainted JEDI (Counts VII-IX).

This case does not present mere allegations of wrongdoing. The violations of law have been admitted. The CO has found that two officials, who participated personally and substantially in JEDI while successfully securing employment with AWS, violated FAR 3.101-1 and referred both to the IG due to potential Title 18 violations. (AR Tab 221 at 58723 (Ubhi); AR Tab 222 at 58747 ███.) The record also reveals deceit by both officials regarding their misconduct— Ubhi in his recusal letter and ███ in his affidavit. (AR Tab 251 at 60702-03; *compare* AR Tab 194a at 24549-50 *and* AR Tab 259 at 60803 *with* AR Tab 223 at 58754 *and* AR Tab 222 at 58746-47.) The third official (DeMartino), a former AWS consultant, participated in JEDI for more than eight months despite express SOCO direction to avoid AWS matters. (AR Tab 51 at 4345.) The issue for the Court is whether such misconduct is tolerable in this $10 billion procurement. The law answers with an emphatic "no."

AWS and DoD wrongly claim the Court should ignore the misconduct and find no prejudice unless the corrupt officials were the final decisions makers. (Dkt. 86 at 51-54

(inexplicably claiming "there is nothing to redress"); Dkt. 84 at 58-60.) The law, however, does not limit the ethical restrictions placed on officials only to the contracting officer, head of agency, or their delegate. 18 U.S.C. § 208; 41 U.S.C. § 2101(5). The standard for ethical conduct in government business is to avoid even the appearance of an impropriety by all government employees participating in a procurement. 48 C.F.R. § 3.101-1.

     1.    **The CO Made No Findings And Has No Discretion With Respect To Violations Of 18 U.S.C. § 208 Or 5 C.F.R. § 2635.604.**

Defendants' demands for deference to the CO's determination that the misconduct had no impact ring hollow. Defendants effectively declare that FAR 3.104-7 contemplates the CO conducting an investigation and the Court accepting the outcome. Defendants' positions invite legal error. Nowhere does the U.S. Code or the Code of Federal Regulations authorize a CO to waive the prohibitions in 18 U.S.C. § 208, 5 C.F.R. § 2635.60, or FAR 3.101-1 or declare (to the foreclosure of Court legal review) that no violation has occurred.[30] And, the CO only addressed FAR 3.101-1, electing to refer the violations of Title 18 and 5 C.F.R. to the IG. (AR Tab 221 at 58709.) Thus, on such issues there is no finding on which to defer. Regardless, legal issues, especially those involving government corruption, do not fall within an agency's discretion. *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 67 (1989) (allowing agency to ignore integrity of procurement process "would be senseless and self-defeating"); *Express One*, 814 F. Supp. at 97 (sustaining protest and refusing "special deference").

Here, no meaningful doubt exists that Ubhi and ██████ violated 18 U.S.C. § 208, which prohibits any executive employee from participating in a particular matter that he knows will impact the financial interests of an organization with whom he is negotiating or has any

---

[30] Contrary to AWS' suggestion (Dkt. 86 at 56), GAO recognizes that agencies <u>cannot</u> waive the conflicts prohibited by FAR 3.101-1. *Northrop Grumman Sys. Corp.*, B-412278.7 *et al.*, Oct. 4, 2017, 2017 CPD ¶ 312.

arrangement regarding employment.   The CO correctly recognized that Ubhi participated personally and substantially in JEDI while he secured lucrative employment with AWS, a confirmed "interested party in the JEDI Cloud acquisition." (AR Tab 221 at 58709, 58716.) DoD also concedes that ███ wrongly participated in the JEDI acquisition <u>after</u> he too secured a senior executive position with AWS. (Dkt. 84 at 68.)

Precedent from the U.S. Supreme Court and the Federal Circuit confirm: (1) the Court will assess a violation of § 208 in the first instance, <u>regardless of any prior criminal conviction or agency determination</u>, *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 551-59 (1960); and (2) the law deems a contract tainted by a § 208 violation invalid in order to protect the public interest against corrupt procurements, *id.* at 563. *See also K&R Eng'g Co., Inc. v. United States*, 616 F.2d 469 (1980).   Although subsequent decisions have limited the precedential reach to violations of § 208,[31] this emphasizes the statute's significance as the "cornerstone of the executive branch ethics program."[32]

Defendants' reliance on *Godley v. United States*, 5 F.3d 1473, 1475 (Fed. Cir. 1993) is unavailing; *Godley* did not alter the holdings of *Mississippi Valley* and *K&R*.[33]   Rather, *Godley* distinguished *Mississippi Valley* and *K&R* on the basis that, in those cases (but not in *Godley*), the involved government official <u>had conflicting incentives</u>. 5 F.3d at 1475 & n.1. *Godley* thus recognizes unremarkably that an official does not infect a contract unless the official has a

---

[31] *See e.g., CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (reversing injunction of contract award <u>after finding no violation of § 208</u>); *Transfair Intern., Inc. v. United States*, 54 Fed. Cl. 78, 86 & n.11 (2002) (compiling cases).

[32] *Report to the President and to Congressional Committees on the Conflict of Interest Laws Relating to Executive Branch Employment* 28 (2006), at https://oge.gov/Web/oge.nsf/Resources/Report+to+the+President+and+to+Congressional+Committees+on+the+Conflict+of+Interest+Laws+Relating+to+Executive+Branch+Employment.

[33] *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc.   Where there is direct conflict the precedential decision is the first.") (citation omitted).

prohibited incentive. The other cases AWS cites confirm AWS has missed that salient point.[34]

The *Godley* decision does not provide Defendants' safe harbor because Ubhi and █████ had significant, prohibited financial interests when they participated in JEDI. Specifically, Ubhi negotiated a ████████ package including ████ shares of Amazon stock (AR Tab 253 at 60719-20), as he worked on JEDI.[35]  ████ senior executive position almost certainly earned him significant stock as well, but the CO never inquired as to his compensation package and signing bonus. The record nonetheless confirms that ████ participated personally and substantially on JEDI after accepting an AWS job offer.[36]  Given that Ubhi and ████ violated § 208 by participating personally and substantially at the same time that they and their future employer (AWS) stood to gain so much from capturing the JEDI award, their prohibited participation compels a protest sustain.[37]  The CO's conclusions about whether they actually steered JEDI to AWS are irrelevant. *See Express One Int'l,* 814 F. Supp. at 102.

### 2.    The CO's Determinations Were Irrational In Any Event.

Even assuming the CO had discretion to ignore regulatory and statutory violations by Ubhi, ████ and DeMartino (which the CO did not), the CO's review was incomplete and her

---

[34] None of the cases involve conduct proscribed by 18 U.S.C. § 208. *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1336 (Fed. Cir. 2004) (no conflict of interest); *Chenega,* 96 Fed. Cl. at 583 (same); *JWK Intern. Corp. v. United States,* 52 Fed. Cl. 650, 655-58 (2002) (same); *MTB Group, Inc. v. United States,* 65 Fed. Cl. 516 (2005) (no PIA violation); *Eng'g Support Personnel, Inc.,* B-410448, Dec. 24, 2014, 2015 CPD ¶ 89 (same); *QinetiQ N. Am.,* B-405163 *et al.,* Jan. 25, 2012, 2012 CPD ¶ 53 (same).
[35] Both Defendants claim Ubhi's compensation package as "relatively standard for the industry" citing only the CO's unsupported characterization. (Dkt. 84 at 57; Dkt. 86 at 4, 69; AR Tab 221 at 58711.) The record evidences that Ubhi received ███████████████████████████ (*Compare* AR Tab 255 at 60787 *with* AR Tab 253 at 60719-20.)
[36] DoD defends the CO's decision not to investigate ████ stating: "In light of the fact that Mr. ████ was not personally and substantially involved in the JEDI procurement <u>until after he was offered a position by AWS,</u> an inquiry into his AWS compensation was unnecessary." (Dkt. 84 at 68.) It is not clear why DoD believes confirmation of employment, solidifying the conflict, renders compensation details irrelevant. DoD's position is at odds with DFARS 252.203-7000.
[37] To be certain both Ubhi and AWS plainly violated the PIA as well. (Dkt. 80-1 at 49.)

conclusions unsupported, warranting relief in Oracle's favor.

### a.     The CO Irrationally Found That Ubhi Did Not Impact JEDI.

The CO's remand analysis identifies four bases for concluding Ubhi did not impact JEDI. Oracle's MJAR demonstrated in detail how the record contradicted each basis.  (Dkt. 80-1 at 50-55.)  Unwilling or unable to defend most of the CO's findings, including claims about Ubhi's purported lack of technical expertise which directly contradict the CO's prior GAO testimony, DoD declares by footnote that the Court "need not address" those CO findings. (Dkt. 84. at 61 n.19.)  Instead, DoD defends only the notion that any influence Ubhi had on JEDI could not matter given its timing.  (Dkt. 84 at 58-60.)

A cornerstone of DoD's defense is the CO's assertion that "no specific draft language for the RFP and supporting documents were discussed or written until January 2018."  (AR Tab 221 at 58722.)  Even the DoD's Cross-MJAR Appendix, however, proves this false.  DoD attached screenshots from an early version of the Problem Statement as evidence of the "'metrics' that Mr. Ubhi and others were discussing in October 2017."  (Dkt. 84 at 6.)  These excerpts reveal that Ubhi and the DDS acquisition team devised and edited material in October 2017 that DoD ultimately included in the SOO.  (*Compare* ECF No. 84-1 at App. 1 *with* AR Tab 27 at 620.)  For example, the October 2017 Problem Statement imposed a two minute "storage provisioning time," and the SOO likewise provides two minutes as the "time to spin up object storage." (*Compare* Dkt. 84-1 at App. 1 with AR Tab 27 at 260.)  Similarly the Problem Statement allowed two minutes for the "Virtual Machine Provisioning Plan", and the SOO allows two minutes to "provision new VM." (*Compare* Dkt. 84-1 at App. 1 *with* AR Tab 27 at 260.)

The screen shots also make clear that Ubhi participated in crafting the gates to get to one contractor.  With respect to the gates, in early October 2017, DDS discussed the importance of the

performance metrics to the single-award approach: "So if multiple cloud providers can meet the metrics, then we don't get to one. The metrics solve the problem." (AR Tab 47c at 3123.) Although DoD claims that the referenced metrics "in the draft problem statement" were not "gates" (Dkt. 84 at 19), Ubhi contemporaneously referred to the Problem Statement as the "gating factor." (AR Tab 47b at 3053 ("So the problem stmt is gating factor").) Moreover, the screen shots show that these metrics include, among other measures, network availability and resource availability (computing, storage, database)—the exact subjects covered by Gate Criterion 1.1.[38]

The few Google drive documents actually provided also demonstrate the inadequacy of the CO's investigation. First, these documents lack vital information, rendering any of the CO's conclusions about Ubhi's involvement and influence unreliable. As DoD itself admits, the Google drive data does not "show who actually created the document;" instead, it shows who uploaded the document. (Dkt. 40-1 (Kasper Decl. ¶ 11).) The edit field relied on by the CO for when and by whom a document was created is useless given the upload glitch. For example, the BCA Draft included in the Google drive (dated February 13, 2018) has an upload date of February 16, 2018, yet, the document also reflects comments dated February 8, 2018. (Screen Shot, Ex. D at 1.) Similarly, while another BCA draft edit shows an upload of January 23rd, its name convention shows a January 9, 2018 date. (*See id.* at 2.)

Second, given DoD's concession that the few documents it provided to Oracle are all the

---

[38] In addition, the Google drive version history reveals that DoD renamed the performance measurement section of the Problem Statement as the "success criteria" in the Business Case Assessment. (*Compare* Screen Shot, Ex. B *with* AR Tab 21 at 415.) The "success criteria" include the challenged qualifying gates. (*Compare* AR Tab 21 at 415 *with* AR Tab 35 at 791.) Thus, the performance measures DDS ultimately agreed-upon to "get to one" contractor include the challenged gate criteria, the same "differentiators" Ubhi discussed with the team in October 2017. (AR Tab 242 at 60237 ("So we need to come up with those 5-8 \'differentiators\' that help us meet mission better right … i.e. high availability, built-in redundancy and fail-over, true elasticity, AI/ML managed services available \'out of the box\', etc.").)

documents that the CO reviewed as part of her conflicts inquiry (*see* Dkt. 76), it is an established fact that the CO did not review all relevant documents. The few documents provided do not include many documents that Ubhi references in record communications (e.g., the SPAWAR brief he developed, apparently to "crush single vs. multiple"). (AR Tab 242 at 60093, 60151.)

Third, the Google drive documents provide further proof of Ubhi's significant involvement in substantive JEDI decisions. Beyond the prototype SOO performance metrics that Ubhi contributed to in October 2017, a comparison of the Google drive document titled "Pros & Cons - Multi vs. Single" to the CO's ultimate Single Award Memorandum makes clear that the pricing, security, operationalizing data, and ease of use reasons Ubhi advocated for the single award are the same purported justifications that DoD defends before this Court. (*See* Ex. A at 1 (comparing Google Drive "Pros & Cons - Multi vs. Single" to AR Tab 24).) Although the Google drive "Pros & Cons" document purports to have been uploaded on November 17, 2017, for the reasons discussed above, this date is both misleading and meaningless. (*See* Ex. A at 2-4.) The Slack messages, produced with the supplemental investigation but not discussed in the CO's remand assessment make clear that Ubhi helped fashion the rationale and contributed to the Pros & Cons document. (AR Tab 242 at 60188-89 (Kasper and Ubhi exchange about single v. multiple rationale, asking Ubhi to "add things, or just comment" and Ubhi affirmative reply); *id.* at 60151 (Woods to Ubhi "Your one pager should really drive it [the single award strategy] home"); *id.* at 60166 (Ubhi saying: "this puts multi vs. single to bed once and for all hopefully (at least from a technical standpoint)"; *see id.* at 60207 (Kasper and Ubhi exchange about edits to document).)

Neither DoD nor AWS meaningfully respond to the evidence discussed in Oracle's MJAR of Ubhi's systematic and successful efforts to recruit individual CESG members and CESG as a whole to "our side" of the single award debate (Dkt. 80-1 at 15-16), including Woods stating,

"Single is assumed now ... really glad you [Ubhi] were in town this week" (AR Tab 242 at 60229), and Van Name announcing: "Everyone that matters is now convinced." (*Id.* at 60239.) DoD dismisses the Slack messages showing Ubhi's influence and claims "Van Name was obviously mistaken" based on the CO's contention that "the internal DoD debate on this issue was robust from Fall 2017 through Spring 2018." (AR Tab 221 at 58721.) The only support DoD can point to, however, is an email by <u>DeMartino</u> stating that the DSD was still open to a single or multiple award approach. (Dkt. 84 at 60 (citing AR Tab 51 at 4352).) Absent from the post-Ubhi record are any CESG meeting records indicating ongoing single versus multiple cloud debates, Slack discussions of single versus multiple awards, position papers or anything else. Instead, the record demonstrates the entirety of the debate occurred during Ubhi's tenure, and <u>now, with access to certain Google drive documents it is clear that the CO single award justifications that DoD defends before this Court had their genesis during Ubhi's tenure.</u> (*See* Ex. A.)

In sum, contrary to the CO's findings, the record demonstrates that Ubhi played a pivotal role driving substantive acquisition decisions and that Ubhi deliberately positioned himself to obtain competitively valuable DoD cloud and competitor information after having agreed to rejoin AWS. AWS' rebuttal that "Ubhi was simply doing his job" when he received in-depth insight into the cloud computing needs and best practices of the various DoD components and contractors while securing employment with AWS, casts in sharp relief AWS' irresponsible attitude toward the standards of conduct for government officials and contractors. (Dkt. 86 at 64.) Moreover, neither Defendant addresses what Ubhi did with the Google drive copy Ubhi synced to his laptop.

**b.    The CO's ▇▇▇ Determination Was Irrational.**

The CO concludes that ▇▇▇ misconduct had no JEDI impact based on the assumption that his participation was limited to two meetings—one that ▇▇▇ self-disclosed, and another of

which the CO happened to attend.  (*See* Dkt. 80-1 at 20.)[39]  DoD and AWS both state as a matter of fact that ███ attended only two JEDI meetings.  (Dkt. 84 at 13; Dkt. 86 at 19, 65.)  But neither has any idea how many JEDI-related meetings ███ actually attended or what other involvement ███ had.  The CO never confronted ███ about his failure to disclose his prohibited attendance at the second meeting, and she never sought additional information about ███ involvement in JEDI despite knowing his affidavits were inaccurate.  As the Oracle MJAR demonstrated (and DoD and AWS ignore), a review of the Ubhi-emails shows that ███ likely attended other JEDI meetings in November 2017.  (*See* Dkt. 80-1 at 20 (citing AR Tab 47a at 2837, 2846).)  The CO did not review ███ JEDI records.  The CO also did not ask about ███ compensation or obtain any documents from AWS related to ███ hiring.  Although DoD deems each of these inquires irrelevant (Dkt. 84 at 68-69), the law provides otherwise.  18 U.S.C. § 208; 5 C.F.R. § 2635.604; 48 C.F.R. § 252.203-171.  The CO's incomplete investigation of ███ lacks reason.

### c.   The CO's DeMartino Determination Was Irrational.

The DeMartino record is likewise limited because the CO did not interview DeMartino, or review his emails or documents.  (AR Tab 78 at 5686:11-14, 5695:2-9; AR Tab 75 at 5239.) Neither did the CO correct her perfunctory July 2018 assessment during the remand investigation; the CO did not reconsider the DeMartino conflict at all, even though the supplemental record reveals even more DeMartino involvement.  (*See, e.g.,* AR Tab 242 at 60139, 60282, 60285.)

Notwithstanding the fact that the CO failed to ask the relevant questions and collect the necessary evidence, the limited record confirms that DeMartino not only violated ethics law through his JEDI participation, but that he did so in defiance of SOCO ethics advice, facts neither

---

[39] AWS offers no support for the suggestion that ███ merely forgot the meeting discussing the source selection sensitive draft acquisition strategy.  (Dkt. 86 at 19 n.9.)  Notably, the CO never interviewed ███ preferring instead to rely on affidavits that the CO herself knew to be inaccurate.  (*See e.g.,* AR Tab 223 at 58754 ("Contrary to ███ October 2018 affidavit ....").)

mentioned in the CO's determination nor the Cross-Motions.  Applicable law provides that absent

authorization, a federal official is forbidden from participating in a matter involving "a person with

whom he has a covered relationship" when "the circumstances would cause a reasonable person

with knowledge of the relevant facts to question his impartiality...."  5 C.F.R. § 2635.502(a); 48

C.F.R. § 3.104-2.  Executive Order 13770 extends this restriction to two years for political

appointees, like DeMartino.  82 Fed. Reg. 9333 (Jan. 28, 2017); 5 C.F.R. § 2635.502(b)(1)(iv).

DeMartino consulted for AWS through January 2017; these rules accordingly barred DeMartino

from participating in matters involving AWS before January 2019 at the earliest.  DoD recognized

the applicability of these restrictions: SOCO issued an ethics letter in April 2017 providing that

DeMartino could not work on matters involving AWS absent DoD approval.  (AR Tab 51 at 4345.)

DeMartino ignored the guidance and participated in JEDI without authorization for eight months.

When DeMartino finally revealed his improper JEDI participation, SOCO instructed him to recuse

himself immediately.  (AR Tab 75 at 5233.)  Under these incontrovertible facts, the CO's

conclusion that DeMartino followed all ethics guidance is demonstrably incorrect.  The CO erred

because she never reviewed SOCO's prior ethics warning to DeMartino.  (AR Tab 75 at 5669:12-

5670:13.)  Neither did she speak with SOCO.  (AR Tab 78 at 5675:4-8.)

DoD's Cross-MJAR addresses none of this.  Instead, DoD continues to ignore DeMartino's

misconduct and the many examples of personal and substantive contributions by DeMartino

evident in the existing record by mischaracterizing this high level delegate of the DSD as a note

taker and errantly declaring his involvement "ministerial and perfunctory in nature."  (Dkt. 84 at

71.)[40]  DoD's brief ignores that DoD itself has admitted that the DSD participated "personally and

---

[40]  Both DoD and AWS rely on the CO's personal knowledge or testimony.  (Dkt. 84 at 72; Dkt.
86 at 67.)  But her testimony that DeMartino had no involvement in the Acquisition Strategy,
Business Case Analysis, single award determination or other pre-decisional documents is belied
by records showing DeMartino discussed these issues and had responsibility for inputs.  (*Compare*

substantially" in JEDI.  (AR Tab 64 at 4862.)  DeMartino, as the DSD's Chief of Staff, was privy

to and substantively contributed to JEDI acquisition sensitive information.  (AR Tab 47e at 3310,

3315-16.)  Even DoD's own citations demonstrate DeMartino was no mere note taker.  (Dkt. 84 at

71-72, citing AR Tab 47a at 2926 (Slack message for meeting to discuss edits to JEDI acquisition

documents), AR Tab 51 at 4366 (while DoD admits DeMartino "provided edits," DoD does not

call attention to the substance—specifically, one edit suggested changing "nuancing" language

about single award).)   And DoD conveniently omits the record citations demonstrating

DeMartino's work on the JEDI industry day briefing and press strategy (AR Tab 51 at 4402, 4404;

AR Tab 47f at 3831, 3880; AR Tab 47e at 3319), and his participation in various other substantive

JEDI meetings (AR Tab 242 at 60139, 60282, 60285).

Lastly, DoD persists in applying the wrong legal standard.  DoD declares that there is "no

reason to believe that Mr. DeMartino was acting in bad faith to steer the JEDI contract to AWS."

(Dkt. 84 at 72.)  The law does not require demonstration of bad faith—it prohibits conflicted

participation, and presumes prejudice.  Absent a reasonable investigation, the Court cannot uphold

the CO's determination.  *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 213 (2011).

### H.   Neither Defendant Has Credibly Refuted AWS' Unmitigated, Exclusionary OCIs Arising From The Hiring Of JEDI Officials (Count X).

Having wreaked havoc on JEDI with its unchecked, targeted hiring of DoD IT officials,[41]

AWS (with support from DoD) now asks the Court to permit AWS the bounty of its hiring efforts.

Fortunately for the other competitors and the public, the law is not so forgiving.  "A long line of

---

AR Tab 75 at 5232 *with* AR Tab 51 at 4351-52 (noting DeMartino tasks with review of inputs related to Acquisition Strategy, Business case, single versus multiple award).)

[41] AWS attacks Oracle counsel for including Supplemental Complaint allegations regarding still other government officials that AWS solicited, stating their inclusion "was a transparent attempt to drag individuals through the mud in the hopes of gaining additional traction in the press."  (Dkt. 86 at 71-72, n.42.)  But, as AWS knows, by the Supplemental Complaint deadline, DoD had not provided the record.  (*Compare* Dkt. 68 *with* Dkt. 70.)  Moreover, the names are redacted.

cases holds that when a potential significant OCI is identified, <u>prejudice stemming from that OCI is presumed</u>." *NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 529 (2011). Similarly, where the OCI arises from a hiring of a former government employee with competitively useful non-public information, <u>prejudice is presumed "without the need for an inquiry as to whether that information was actually used by the awardee</u>." *Int'l Resources Group*, B-404346.2 *et al.*, Dec. 11, 2014, 2014 CPD ¶ 369 at 9-10. Unable to prevail under existing law, Defendants devise a new standard: Oracle must show, without the benefit of discovery or access to the majority of materials handled by Ubhi and ▉▉▉▉ that AWS obtained and misused such information.

<u>With respect to the AWS OCI arising from the Ubhi hiring</u>, DoD claims that AWS effectively firewalled Ubhi (even though AWS did not issue its email firewall <u>until seven months after Ubhi arrived</u>) and that Ubhi did not have access to competitively useful information. (Dkt. 84 at 62-67.) Both points are legally and factually false. Numerous cases directly reject untimely implemented firewall as defenses and even the incomplete record demonstrates that Ubhi accessed substantial competitively useful information about JEDI performance measurements, tactical edge needs, competitors, and more. (Dkt. 80-1 at 53-55.) *NetStar-1* makes clear that (1) because Ubhi had access to competitively valuable JEDI information when he joined AWS, the hard facts needed to establish an unequal access to information OCI are satisfied, and (2) AWS' belated, inadequate attempt to firewall Ubhi via email does not suffice to mitigate AWS' OCI. (*Compare* Dkt. 86 at 73-74 *with* 101 Fed. Cl. at 519-20, 526.) AWS dismisses *NetStar-1* because Oracle cannot prove that Ubhi contributed to the AWS JEDI proposal. (Dkt. 86 at 71-72.) But *NetStar-1* specifically rejected AWS' offered defense. 101 Fed. Cl. at 529.[42]

---

[42] Review of the GAO decisions cited by AWS reveals consistent irrelevance. In most, the allegedly conflicted official never even left government employment. *See Threat Mgmt. Grp.*, B-407766.5, Mar. 28, 2013, 2013 CPD ¶ 84; *Creative Mgmt. Tech., Inc.*, B-266299, Feb. 9, 1996, 96-1 CPD ¶ 61; *Cleveland Telecom. Corp.*, B-257249, Sept. 19, 1994, 94-2 CPD ¶ 105. Another

DoD relies on the CO determination that Ubhi was effectively firewalled once at AWS, reasoning that a timely formal firewall was unnecessary because Ubhi worked in a separate business unit within AWS, in a different office, and did not have direct access to the JEDI proposal. (Dkt. 84 at 62-63.) It is ironic, given that this protest involves the acquisition of cloud services that allow data to travel instantly across the world, that DoD fails to appreciate how easy it would be for Ubhi to transfer his knowledge of the Tactical Edge or SOO requirements to others within AWS, whether through the AWS cloud, some instant message, or even a phone call.

With respect to the AWS OCI arising from its hiring of ███ it is undisputed that ███ (1) had access to non-public, source selection sensitive JEDI information when he joined AWS, (2) never signed an NDA covering those materials, and (3) talked to ███ (who leads the AWS JEDI proposal effort) about JEDI before AWS firewalled him.  (Dkt. 80-1 at 62-63.)  The CO's determination that AWS did not receive competitively valuable information by hiring ███ entirely ignored the admitted, pre-firewall discussions between ███ and ███.  (AR Tab 223 at 58753-54.)  The CO never asked ███ or ███ what ███ communicated during those discussions, and ███ qualified her declaration that ███ did not share non-public information during those conversations with the misunderstanding that ███ did not have any competition sensitive information.  (AR Tab 259 at 60813.)  As the CO found, however, ███ did access sensitive JEDI information.  (AR Tab 222 at 58747.)

With respect to the CO's determination that AWS did not violate the PIA by failing to timely notify DoD of the AWS-Ubhi employment contacts (a legal determination that FAR 3.104-7 compels), the CO relied on a deeply flawed legal interpretation that the PIA only applies to

---

failed to show the former government official ever had access to competitively useful information. *Interactive Info. Sols., Inc.*, B-415126.2 *et al.*, Mar. 22, 2018, 2018 CPD ¶ 115.

employment negotiations occurring *after* a contractor submits its proposal. (AR Tab 221 at 58716.) Defendants ask this Court to bless the CO's legal interpretation and declare AWS immune from the PIA notice requirements because AWS happened to violate the law after commencement of JEDI but before AWS submitted its proposal. The CO's termination of her PIA investigation into AWS on the sole basis that AWS recruited Ubhi before submitting its proposal is contrary to law and must be set aside. 5 U.S.C. § 706(2)(A).[43]

## IV. ORACLE MEETS THE PERMANENT INJUNCTIVE RELIEF REQUIREMENTS

Having demonstrated success on the merits, Oracle is entitled to permanent injunctive relief; anything less will irreparably harm Oracle and the public interest far beyond any inconvenience DoD can claim for having to comply with the law. AWS argues Oracle cannot demonstrate irreparable harm without satisfying the unlawful RFP (Dkt 86 at 75), but it is the unlawful RFP that irreparably harms Oracle and demands injunctive relief. DoD asserts that even "if Oracle were reinstated into the competition, its chances of being awarded the JEDI contract would be slim, minimizing the harm of its exclusion," suggesting "Oracle would probably be better off with an award of bid preparation costs instead of an injunction." (Dkt. 84 at 74-75.) Yet, DoD cannot prejudge a competition under a revised RFP, particularly one permitting multiple awards.

Predictably, DoD and AWS invoke national security interests. The Court does not automatically defer to claims of national security, but instead analyzes the claim critically just as any other claim in relation to the injunctive factors. *See Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 722 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012). This is not an urgent sole source award for ammunition in a combat zone, for which national security concerns might

---

[43] Although AWS attempts to demonstrate that it did not "know" Ubhi was violating the PIA, that is a factual matter for the CO to investigate and determine in the first instance.

legitimately militate against injunctive relief. This is a major, DoD-wide <u>commercial item</u> acquisition, which DoD understood from the outset would take more than a year to complete. (*See e.g.*, AR Tab 92 at 5957.) DoD already has lectured Congress on the significance of JEDI, with much the same content that DoD provides in its declaration. (AR Tab 129 at 8616 (Mattis testimony).) In response, Congress has not hesitated to withhold appropriations from JEDI based on its procurement concerns. *See* Pub. L. No. 115-245, 2017 Cong. HR 6157, § 8137 (Sept. 27, 2018). This Court need not bless DoD's unlawful actions based on purported national security interests that Congress already has judged insufficient to place expediency over legality.

## V.    CONCLUSION

Oracle respectfully requests that the Court grant judgment in Oracle's favor and (i) issue the declaratory and injunctive relief set forth in Oracle's Supplemental Complaint and MJAR, and (ii) provide such other and further relief as the Court deems just and proper.

Dated:   June 21, 2019                          Respectfully Submitted,

*Of Counsel:*                                          ARNOLD & PORTER KAYE SCHOLER LLP

Kara L. Daniels                              /s/ Craig A. Holman
Dana E. Koffman                           Craig A. Holman
Amanda J. Sherwood                     Arnold & Porter Kaye Scholer LLP
Nathaniel E. Castellano                 601 Massachusetts Ave., N.W.
Arnold & Porter Kaye Scholer LLP   Washington, D.C. 20001
601 Massachusetts Ave., N.W.       Phone:  (202) 942-5722
Washington, D.C. 20001               Fax:  (202) 942-5999

                                                        *Attorney of Record for Oracle America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June 2019, I caused a true and correct copy of the

foregoing Reply and Opposition to be served by electronic delivery on:

William P. Rayel
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0302
Facsimile: (202) 307-0972
E-mail:   William.Rayel@usdoj.gov

*Counsel for Defendant*

Daniel R. Forman
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2504
Facsimile:  (202) 628-5116
E-mail:  dforman@crowell.com

*Counsel for Defendant-Intervenor*

/s/  Craig A. Holman